1   JOHN KEVIN CROWLEY (SBN: 88189)
    **ATTORNEY AT LAW**
2   125 S. Market Street, Suite 1200
    San Jose, California 95113-2288
3   Telephone: (408) 288-8100
    Facsimile:   (408) 288-9409
4   e-mail: jkclaw@pacbell.net

5   Attorney for Plaintiffs
    **JESSICA DOMINGUEZ INDIVIDUALLY**
6   **AND JESSICA DOMINGUEZ AS GUARDIAN**
    **AD LITEM FOR JAD (1), JAD (2)**
7   **AND JAD (3)**

8

9                  **UNITED STATES DISTRICT COURT**

10                **NORTHERN DISTRICT OF CALIFORNIA**

11                        **SAN JOSE DIVISION**

12   JESSICA DOMINGUEZ INDIVIDUALLY        Case No.: 5:18-cv-04826 BLM
13   AND JESSICA DOMINGUEZ AS
     GUARDIAN AD LITEM FOR JAD (1), JAD    **DECLARATION OF JOHN KEVIN**
14   (2) AND JAD (3),                      **CROWLEY IN SUPPORT OF**
                                           **PLAINTIFFS' SUMMARY JUDGMENT**
15                Plaintiffs,              **MOTION**

16         vs.
                                           DATE:    April 21, 2022
17   CITY OF SAN JOSE, SAN JOSE POLICE     TIME:    9:00 a.m.
18   DEPARTMENT, MICHAEL PINA, AND DOE     DEPT.:   3, Fifth Floor
     POLICE OFFICERS 2 through 5,          JUDGE:   Hon. Beth Labson Freeman
19
                  Defendants.              Trial Date: August 22, 2022
20

21         I, John Kevin Crowley, declare:

22         1.      I am an attorney at law licensed to practice before all courts in the State of

23   California and I am an attorney for Plaintiffs in the above captioned matter.

24         2.      The deposition of Michael Pina took place on or about March 3, 2021.   I

25   conducted the deposition. A true and correct copy of the transcript of that deposition, is

26   attached hereto and incorporated herein as **EXHIBIT 1**.

27

28

1        3.      The deposition of Kristoffer Ferguson took place on or about March 4, 2021.

2  I conducted the deposition. A true and correct copy of the transcript of that deposition is

3  attached hereto and incorporated herein as **EXHIBIT 2**.

4        4.      On or about May 18, 2021, I received the Federal Rules of Civil Procedure

5
6  26 (a) (2) (B) report of Scott A. Defoe, police practices expert. A true and correct copy of

7  the report is attached hereto and incorporated herein as **EXHIBIT 3**.

8        5.      On or about September 27, 2021, I received the Federal Rules of Civil

9  Procedure 26 (a) (2) (B) report of David E. Balash, Plaintiffs' ballistics expert. A true and

10  correct copy of the report is attached hereto and incorporated herein as **EXHIBIT 4**.

11        6.      The deposition of David E. Balash, Plaintiffs' ballistics expert, taken on or

12  about November 22, 2021, was conducted by counsel for Defendants. A true and correct

13
14  copy of the transcript of that deposition is attached hereto and incorporated herein as

15  **EXHIBIT 5**.

16        7.      On or about May 19, 2021, Rocky Edwards, Defendants' ballistics expert,

17  submitted his Federal Rules of Civil Procedure 26 (a) (2) (B) report. A true and correct

18  copy of the report is attached hereto and incorporated herein as **EXHIBIT 6**.

19        8.      The deposition of Rocky Edwards, Defendants' ballistics expert, took place

20
21  on or about November 1, 2021. I conducted the deposition. A true and correct copy of the

22  transcript of that deposition is attached hereto and incorporated herein as **EXHIBIT 7**.

23        9.      Attached hereto and incorporated herein as **EXHIBIT 8** is a true and correct

24  copy of the County of Santa Clara County Crime Laboratory, physical evidence

25  examination report of March 26, 2018, of bullet fragments Item 20 and Item 29 further

26  identified as Exhibit A of the deposition of Rocky Edwards.

27

28

10.     Attached hereto and incorporated herein as **EXHIBIT 9** is a true and correct copy of the County of Santa Clara District Attorney, Jeffrey F. Rosen's report of March 8, 2019, of the fatal shooting of Jacob Dominguez on September 15, 2017.

11.     Attached hereto and incorporated herein as **EXHIBIT 10** is a true and correct copy of the City of San Jose Police Department Internal Affairs video interview with Officer Pina the night of the shooting produced by Defendants in discovery. (To be lodged with the court upon approval in re protective order)

12.     The deposition of Alvaro Lopez took place on or about March 4, 2021.   I conducted the deposition. A true and correct copy of the transcript of that deposition is attached hereto and incorporated herein as **EXHIBIT 11**.

I declare under penalty of perjury under the laws of the state of California that the foregoing is true and correct.

Dated:   March 14, 2022

_____
John Kevin Crowley

# EXHIBIT 1

Atkinson Baker, a Veritext Company
www.depo.com

1              UNITED STATES DISTRICT COURT

2            NORTHERN DISTRICT OF CALIFORNIA

3

4    JESSICA DOMINGUEZ INDIVIDUALLY    )
     AND JESSICA DOMINGUEZ AS          )   **CERTIFIED COPY**
5    GUARDIAN AD LITEM FOR JAD (1),    )
     JAD (2) AND JAD (3),              )
6                                      )
                   Plaintiffs,         )
7                                      )   Case No.:
            vs.                        )   5:18-CV-04826
8                                      )
     CITY OF SAN JOSE, SAN JOSE POLICE )
9    DEPARTMENT, MICHAEL PINA, AND     )
     DOE POLICE OFFICERS 2 through 5,  )
10                                     )
                   Defendants.         )
11   _____)

12

13

14

15

16

17                  DEPOSITION OF

18            SERGEANT MICHAEL PINA

19              SAN JOSE, CALIFORNIA

20                MARCH 3, 2021

21

22   ATKINSON-BAKER, a Veritext Company
     (800) 288-3376
23   www.depo.com

24   REPORTED BY:   THERESA KIELTY, CSR NO. 5037

25   FILE NO.:      AE08206

Atkinson Baker, a Veritext Company
www.depo.com

1              UNITED STATES DISTRICT COURT

2            NORTHERN DISTRICT OF CALIFORNIA

3

4  JESSICA DOMINGUEZ INDIVIDUALLY    )
   AND JESSICA DOMINGUEZ AS          )
5  GUARDIAN AD LITEM FOR JAD (1),    )
   JAD (2) AND JAD (3),              )
6                                    )
                     Plaintiffs,     )
7                                    )      Case No.:
          vs.                        )      5:18-CV-04826
8                                    )
   CITY OF SAN JOSE, SAN JOSE POLICE )
9  DEPARTMENT, MICHAEL PINA, AND     )
   DOE POLICE OFFICERS 2 through 5,  )
10                                   )
                     Defendants.     )
11 _____)

12

13

14

15

16          Deposition of SERGEANT MICHAEL PINA, taken on

17 behalf of Plaintiffs, at 200 East Santa Clara Street, San

18 Jose, California, 95113, commencing at 11:10 a.m., Wednesday,

19 March 3, 2021, before Theresa Kielty, CSR No. 5037.

20

21

22

23

24

25

```
 1                  A P P E A R A N C E S:

 2    FOR PLAINTIFFS:

 3    LAW OFFICES OF JOHN KEVIN CROWLEY
      BY:   JOHN KEVIN CROWLEY, Esq.
 4    125 S. Market Street
      Suite 1200
 5    San Jose, California   95113
      (408) 288-8100
 6    jkclaw@pacbell.net

 7    FOR DEFENDANTS:

 8    OFFICE OF THE CITY ATTORNEY
      BY:   MAREN CLOUSE, Esq.
 9    200 E. Santa Clara Street
      16th Floor
10    San Jose, California   95113
      (408) 535-1948
11    maren.clouse@sanjoseca.gov

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Atkinson Baker, a Veritext Company
www.depo.com

1        A.   No, sir.

2        Q.   Have you ever been sued before for excessive police

3   force?

4        A.   Yes.

5        Q.   Prior to this case?

6        A.   Prior to this case?  No.

7        Q.   Okay.  You're familiar with the San Jose Police

8   Department's manuals and procedures for use of force and

9   deadly force?

10       A.   Yes, sir.

11       Q.   You were taught that in the POST trainings?

12       A.   Yes.

13       Q.   And what is your understanding, before an officer

14   can use deadly force, what must be present?

15       MS. CLOUSE:  Objection, vague.  You can answer if you

16   understand the question.

17       THE WITNESS:  Could you elaborate on your question?

18   BY MR. CROWLEY:

19       Q.   So before you are entitled to use deadly force,

20   what do you have to articulate, what facts have to be

21   present, in your mind?

22       A.   A present danger to yourself or another person's

23   life, if someone poses an ongoing threat and is actively

24   evading, in your mind, you believe that person is an

25   immediate threat to another person.

Atkinson Baker, a Veritext Company
www.depo.com

1      Q.    Does the concept, in your mind, include any kind of
2   de-escalation or alternative uses of force less than deadly
3   force?
4      MS. CLOUSE:  Objection, vague.  You can answer if you
5   understand the question.
6      THE WITNESS:  I will answer what I -- could you say it
7   one more time?  Could you ask that one more time?  You're
8   asking me to --
9      MR. CROWLEY:  Madam Court Reporter, can you help us out
10   and repeat the question?
11         (Record read.)
12      THE WITNESS:  Maybe you could break it down.  What I got
13   was you're asking if I considered other less lethal options
14   prior to the use of force?  Is that what you asked?
15   BY MR. CROWLEY:
16      Q.    Let me ask it.  Before the use of deadly force, do
17   you -- are you required to go through a de-escalation
18   procedure and/or a force that's less than deadly?
19      MS. CLOUSE:  Objection, compound.  You can go ahead and
20   answer.
21      THE WITNESS:  There's not a requirement that we use a
22   lesser level of force prior to deadly force given the
23   circumstances at the time.  So it's all based on the totality
24   of the circumstances presented.
25   BY MR. CROWLEY:

Atkinson Baker, a Veritext Company
www.depo.com

1    A.   It's hard to -- I mean I'm feeling like I was able

2    to see down to like the elbow area.

3    Q.   So from the driver's position, could you see the

4    right side elbow of the suspect?

5    A.   I don't remember.  Honestly, I can't say for sure.

6    Q.   How about the chest area, could you see the chest

7    area?

8    A.   Yes.

9    Q.   Okay.  Could you see further beyond into the car

10   itself, like the console or the passenger seat or things like

11   that?

12   A.   I don't recall me looking at that.  I remember

13   looking at him.

14   Q.   Okay.  But it's safe to say you had the best view

15   of the driver, better than -- better full view of the driver

16   than Lopez or Ferguson had?

17   A.   I wouldn't say I had the best view.  I don't know

18   what their view was.

19   Q.   All right.  So what's -- in response to your first

20   command, you got a look that you said was like a defiant

21   look?

22   A.   That's a fair way to explain it, yes.

23   Q.   And then you issued another -- did you issue

24   another verbal command?

25   A.   Yes.

Atkinson Baker, a Veritext Company
www.depo.com

1    Q.    Before you issued the verbal command, do you recall

2  any of the other officers issuing verbal commands?

3    A.    I was hearing Ferguson, I believe I was hearing

4  Lopez, too.  I don't know what they said, though.

5    Q.    Okay.  What's the next command that you recall

6  issuing to the suspect?

7    A.    Well, I remember him giving me that look I just

8  explained, the defiant look, so I said something to the

9  effect of "I'll fucking shoot you.  Get your fucking hands

10  up."  More authoritative commands to try to overwhelm his

11  fight or flight and get him to put his hands up.

12    Q.    Did you have a taser weapon on your person at this

13  time?

14    A.    I don't remember what my setup was.

15    Q.    Did you have, of course I'm learning this, a flash

16  bang grenade or canister?

17    A.    Yeah, I should have.  I should have had one.

18    Q.    Okay.  So you issued a second command in response

19  to his look of defiance saying "I'll fucking shoot you," or

20  something to that effect.  Do you remember the words you

21  used?

22    MS. CLOUSE:  Objection, misstates the testimony.

23    MR. CROWLEY:  What?

24    MS. CLOUSE:  Misstates the testimony.

25    MR. CROWLEY:  That's why I want to get it straight.

```
 1   BY MR. CROWLEY:
 2       Q.   So do you want to go back to what the court
 3   reporter --
 4       A.   Sure.
 5       MR. CROWLEY:  So Madam Court Reporter, can you refresh
 6   our recollection of what the witness said?
 7            (Record read.)
 8   BY MR. CROWLEY:
 9       Q.   So your second command -- the second command is
10   "I'll fucking shoot you.  Get your fucking hands up," right?
11       A.   Yes.
12       Q.   And did you get any evidence indicating that he
13   heard what you said?
14       A.   Yeah, he heard me.
15       Q.   How do you know?
16       A.   At some point, he put his hands up.
17       Q.   Okay.  So he complied with the command?
18       A.   Eventually, yes.
19       Q.   And when you say "eventually" --
20       A.   Well, sorry.
21       Q.   So we'll just go step by step.  I mean I know he
22   put his hands down, or whatever, but at this point, your
23   second command, he complied, he put his hands up?
24       A.   Yes.
25       Q.   Both hands?
```

1    A.   Yes.

2    Q.   And you could see it from your perspective?

3    A.   Yes.

4    Q.   How high did he put his hands?

5    A.   Probably like head height.  A little over the

6    shoulders.

7    Q.   So it looks like your thumbs are equal to your

8    ears.

9    A.   Yeah, your hands over your shoulder.  At least

10   that's how I perceived how high it was.

11   MS. CLOUSE:  I'd just like to note for the record that

12   the motion that Sergeant Pina just made from my perspective,

13   he had his thumbs just about shoulder height.

14   BY MR. CROWLEY:

15   Q.   So it's about shoulder height, like this?

16   A.   Give or take a couple inches.

17   Q.   So how was the seat?  Was the sheet straight up or

18   was the seat leaned back, if you know, or do you remember?

19   A.   I don't know how his seat was because I don't know

20   if he was leaning back in the seat.  I don't know.  He could

21   have just been sitting up, but he was kind of slightly leaned

22   but it wasn't like all the way back.

23   Q.   It wasn't like way back?

24   A.   Well, when I was giving him commands, he wasn't

25   that far back.

Atkinson Baker, a Veritext Company
www.depo.com

```
 1          THE REPORTER:  I need to change my paper.
 2          MR. CROWLEY:  Okay.
 3             (Recess.)
 4    BY MR. CROWLEY:
 5          Q.   I think we left at the degree of the suspect, how
 6    he was sitting up or lying down.  Have we covered that fully?
 7    Is your best estimate somewhere between vertical and --
 8          A.   Closer to vertical but not like 90.
 9          Q.   Okay.  So the -- I'll just number these, the verbal
10    commands, rather than repeating it.  So the response to the
11    second verbal command you administered, did you get a
12    response from that?
13          MS. CLOUSE:  Objection, asked and answered.  Go ahead.
14          THE WITNESS:  He put his hands up.
15    BY MR. CROWLEY:
16          Q.   Okay.  Did he say anything to you at that point?
17          A.   I think I gave him more commands and then he said
18    something back to me.
19          Q.   What other commands did you give him?
20          A.   Something to the effect of "Don't move or you're
21    going to get shot," or "Move and you're going to get shot."
22    I was giving him the command to verify that if he brought his
23    hands down, I would shoot.
24          Q.   So we can call this the third command?
25          A.   Yes.
```

Atkinson Baker, a Veritext Company
www.depo.com

```
 1        A.   I think I have.
 2        Q.   I have with a hot load.  Forget it.  So that's
 3   something that you're not going to, like, you know, put it in
 4   your back pocket, but a snub nose .38, you could hide it
 5   various places pretty good, right?  It's pretty hideable, if
 6   you will?
 7        MS. CLOUSE:  Objection, compound, but you can answer.
 8   BY MR. CROWLEY:
 9        Q.   But your information was it was a revolver?
10        A.   Yes.
11        Q.   So if he violated your command, you were going to
12   shoot him?
13        A.   I verbally told him that.
14        Q.   And that's what you were going to do?
15        A.   Yeah, if he moved, he would be shot.
16        Q.   So what facts can you articulate as to where the
17   suspect had a gun?  He had the silver revolver.  Where was
18   it, if you know?
19        MS. CLOUSE:  Objection, vague and lacks foundation.  You
20   can go ahead and answer as best you can.
21        THE WITNESS:  I don't know where it was.  It could have
22   been on his person or in the vehicle.
23   BY MR. CROWLEY:
24        Q.   It also could have been behind the sun visor.  He
25   could have had it up there, and keeping his hands up, not
```

Atkinson Baker, a Veritext Company
www.depo.com

1    BY MR. CROWLEY:

2        Q.   Did he ever say "I got a gun, I'm going to use it"?

3    Did he verbally indicate to you any type of imminent threat,

4    that he was going to use lethal force on anybody?

5        MS. CLOUSE:  Objection, compound.  You can answer as

6    best you can.

7        THE WITNESS:  No.

8    BY MR. CROWLEY:

9        Q.   Did he give any physical sign that he was going to

10   use it, like pretending he has a gun and he's going to get

11   the gun and shoot himself or shoot anybody else, any physical

12   sign that he used that would lead you to believe he was going

13   to get a gun and use it?

14       MS. CLOUSE:  Objection, compound and vague.

15       THE WITNESS:  Are you asking if he, like, simulated a

16   finger pistol?

17   BY MR. CROWLEY:

18       Q.   Something like that.  I don't know.

19       A.   No.

20       Q.   Nothing, no physical signs?

21       A.   Other than his movement.

22       Q.   Other than putting his hands down?

23       A.   Yeah.

24       Q.   Did he ever give you a -- you know, flip you off,

25   give you the bird, bad gesture, anything like that?

Atkinson Baker, a Veritext Company
www.depo.com

1    like Officer Ferguson at one point said "Let me see your

2    hands, mother fucker," but I don't know where in the

3    sequence, where he said that, so when I was giving -- he

4    could have been saying that as he was just coming out.  I'm

5    not certain when that was said.

6         Q.   So do you have a recollection as to how much time

7    the suspect complied with your request, how many seconds did

8    he comply with your request?

9         A.   It was a few seconds.

10        Q.   Is that three, five, six, best estimate?

11        A.   Between there.

12        Q.   So when he held his hands up, you could see there

13   was nothing in his hands?

14        A.   Yes.

15        Q.   No weapon?

16        A.   No weapon.

17        Q.   His hands were bare, they weren't gloved?

18        A.   I don't remember him having gloves on.

19        Q.   Okay.  That's something you'd probably remember,

20   right?

21        A.   Probably.

22        Q.   Did he have long sleeves or short sleeves?

23        A.   I believe it was a sweatshirt.

24        Q.   Sweatshirt.  Okay.  Do you have any reason to

25   believe he could have had a gun in -- you know, strapped to

Atkinson Baker, a Veritext Company
www.depo.com

1       A.   I don't know if his car was on or off.  I don't
2  know.
3       Q.   And what kind of a gear shift did it have, if you
4  know?  Was it on the floor console, kind of automatic, or --
5       A.   I don't know.
6       Q.   Or was it on the -- you know, what do they call it?
7  The steering wheel stem, you know?  One of those --
8       A.   Yeah, I know what you mean.  I never saw the inside
9  of the car after.  I don't know.
10      Q.   The vehicle wasn't moving at this point; is that
11 right?
12      A.   It was stationary.
13      Q.   So in response to your third commands to him, what
14 did the suspect do, if anything, do or say?
15      A.   He said one of two things.  Either he said "Fuck
16 you, shoot me, bitch," or "Fuck you, bitch, shoot me," one of
17 those two things.
18      Q.   And how did you interpret that reply from the
19 suspect?
20      A.   Defiance.
21      Q.   Defiance?  Was it a form of taunting?
22      MS. CLOUSE:  Objection, lacks foundation.
23      THE WITNESS:  I didn't find it as a form of taunting, I
24 looked at it more as him not necessarily following commands
25 to an extent.

Atkinson Baker, a Veritext Company
www.depo.com

1   BY MR. CROWLEY:

2       Q.   And when he said that, where were his hands?

3       A.   They were -- I believe they were still up.

4       Q.   And were you able to see his face when he gave you

5   that reply?  Did he look at you with his hands up and --

6       A.   Yeah, he was staring at me pretty much the whole

7   time.

8       Q.   And what kind of expression on his face did he

9   demonstrate when he said what he said to you in response to

10  your statement?

11      A.   What kind of expression?

12      Q.   Yes.

13      A.   Hostile kind of aggressive type statement.

14      Q.   Did he have his head straight up or was it leaned

15  over or can you describe for us?

16      A.   He was looking at me.

17      Q.   Okay.  And at this point, do you remember any of

18  the other officers saying anything?

19      A.   I don't know what they were saying.

20      Q.   And after he responded to you this third time, did

21  you again make a statement to him?

22      A.   I said something similar to "Don't give me a

23  reason," or "If you give me a reason," in regards to shooting

24  him if he doesn't keep his hands up.

25      Q.   Why did you say that to him?

1      A.   Because his hands were up and he was saying -- he

2 said "Fuck you, bitch.   Shoot me."   Essentially "Don't give

3 me reason to."

4      Q.   And did you have any belief or indication that he

5 didn't hear what you said to him when you said something

6 along the lines of "Don't give me a reason"?

7      A.   I don't know.   I believe he heard me.

8      Q.   Okay.   Did he respond to your of fourth statement?

9      A.   His response was dropping his hands out of sight.

10      Q.   Okay.   Now, did you hear anyone else in your unit

11 yell for a flash bang?

12      A.   I think I remember hearing it, yeah.

13      Q.   Who was it that said it?

14      A.   I don't know who said it.

15      Q.   So at that point, if you didn't say it and Lopez

16 didn't say it, would the only person be Ferguson who would

17 have said it?

18      MS. CLOUSE:   Objection, lacks foundation.   You can

19 answer if you can.

20      THE WITNESS:   By process of elimination, it could have

21 been Ferguson, or if you're saying Lopez didn't say it, then

22 whoever was arriving next, but I want to say it was Ferguson

23 because I remember hearing it.

24 BY MR. CROWLEY:

25      Q.   Okay.   So basically, I'm trying to eliminate if

Atkinson Baker, a Veritext Company
www.depo.com

```
 1  senses.  But I don't know if that was his reason.
 2      Q.   So when you saw the suspect put his hands down,
 3  describe for us what you saw.
 4      A.   So he quickly dropped his hands out of sight, low
 5  enough for me to no longer see them in the direction towards
 6  his seat or towards the floor of where he was sitting.
 7      Q.   Okay.  So from where you could see, you could see
 8  his hands, both hands, being dropped.  How far were they
 9  dropped before they went out of your vision, your view?
10      A.   Well, they were up.  They were above his shoulders.
11      Q.   Okay.  So when he dropped them down, when he
12  dropped them down to his shoulders, you could still see them?
13      A.   Yes.
14      Q.   When he dropped them down further, could you still
15  see them?
16      A.   That's not how he dropped them.
17      Q.   Describe for us.
18      A.   He quickly dropped them and leaned down out of
19  sight, so his body started going forward as well.
20      Q.   So in one movement, he dropped his hands and his
21  upper body to the right?
22      A.   Towards like front right area, yes.
23      Q.   And did you have any reason to believe that he was
24  going for anything else other than a deadly weapon?
25      A.   No.  I had -- the only thing in my mind is he was
```

1      A.   I was trying to track where he was going and as he

2   was coming back up, so his only target area was shoulders up.

3      Q.   So you pulled the trigger when he started coming

4   back up?

5      A.   I remember finding my sight while he was leaning

6   forward, and as he was coming back looking at me, looking

7   kind of back movement is when I started firing.  I can't say

8   for sure exactly what he was doing as he was coming up

9   because I remember he's now -- I'm now looking at him solely

10  through the aim point of my rifle.

11     Q.   When did you release the safety?

12     A.   Just right before I shot.

13     Q.   And when you pulled the trigger, was he back up in

14  an erect position or partially erect?  Can you describe that

15  for us?

16     A.   After I shot him?

17     Q.   No, before.

18     A.   Before I pulled the trigger, he was -- he had

19  already been leaning low and then coming -- like I could just

20  turn my chair, so if you're me over there, he's now coming up

21  in this direction.

22     Q.   Okay.  So at that point, could you see where --

23  what his hands were doing?

24     A.   No.

25     Q.   Could you see if both hands had grasped anything,

Atkinson Baker, a Veritext Company
www.depo.com

1    or only one hand, or could you see anything at all?

2        A.   I could not see his hands at all.

3        Q.   And at that moment, was Officer Ferguson, did he

4    have his carbine focused on the suspect, too, as far as you

5    know?

6        A.   I know based on his body-worn camera.  I didn't

7    know at the time.

8        Q.   I'm talking at the time.

9        A.   Yeah.  I didn't know what he was doing at the time.

10       Q.   Before you pulled the trigger, was there a flash

11   bang grenade discharged?

12       A.   No, I think it was after.

13       Q.   And you shot at his head?

14       A.   I shot at the only target to stop the threat.

15       Q.   And that was his head?

16       A.   I was only aiming for a target to stop the threat,

17   I wasn't focusing on shooting at his head.  I was focusing on

18   taking a shot to stop the threat.

19       Q.   But where were you -- your focus is on taking a

20   shot to stop the threat.  What part of his anatomy were you

21   focused on?

22       A.   The portion I could see, so the shoulders and up.

23       Q.   So right when you pulled the trigger, who was in

24   imminent peril of great bodily harm or death, and they were

25   in peril of grave harm or death of what?

Atkinson Baker, a Veritext Company
www.depo.com

1   didn't see it.

2        Q.   Potentially three carbines?

3        MS. CLOUSE:  Objection, misstates the testimony.

4        THE WITNESS:  The only one that I saw was mine.

5   BY MR. CROWLEY:

6        Q.   And Officer Ferguson, did you see him in a position

7   where his carbine was directed towards the suspect?

8        A.   At a point in time, it was.  It appeared, based on

9   our commands for him to put his hands back up, that Officer

10  Ferguson had his rifle down at that time.

11       Q.   And just to kind of get an idea of Officer

12  Ferguson's placement, was his car door open and he was

13  between the A pillar and the top of the car door?

14       A.   Yes, sir.

15       Q.   Do you have a recollection of the time that elapsed

16  from the time that you exited your vehicle until you pulled

17  the trigger?

18       A.   Twenty, 25 seconds.

19       Q.   And how many times on your weapon did you pull the

20  trigger?  Do you have to pull the trigger each time the

21  cartridge discharged?

22       A.   Yes.  It's a semi-automatic so I pulled it two

23  times about a half second apart.

24       Q.   And at the time you pulled the trigger, your

25  testimony is his hands were down, they weren't up, there was

Atkinson Baker, a Veritext Company
www.depo.com

```
 1   no one hand up, one hand down, anything like that?
 2        MS. CLOUSE:  Objection, asked and answered.  Go ahead
 3   and respond.
 4        THE WITNESS:  When I made the decision to shoot, I
 5   recall him coming back up.  I don't know where his hands
 6   were.
 7   BY MR. CROWLEY:
 8        Q.   So the discharge of your weapon was not accidental?
 9        A.   No.
10        Q.   Anything else you heard from the suspect that would
11   lead you to believe that he was -- anything verbal that you
12   heard from the suspect that would lead you to believe that he
13   was going to use lethal force?
14        A.   Not that I remember.
15        Q.   Did he threaten the use of any kind of force
16   whatsoever?
17        A.   The motion, the threat.  He didn't verbally say
18   anything.
19        Q.   And when you say that, that's when he put his hands
20   down and bent over?
21        A.   He did the opposite of what I was telling him to
22   do.
23        Q.   Pardon me?
24        A.   When he did the opposite of what I was telling him
25   to do.
```

Atkinson Baker, a Veritext Company
www.depo.com

```
 1        Q.   So did you review what it had recorded?

 2        A.   Yes.

 3        Q.   What did it show?

 4        MS. CLOUSE:  Objection, vague and it calls for a

 5   narrative.

 6   BY MR. CROWLEY:

 7        Q.   Well, what do you remember it showing?

 8        MS. CLOUSE:  You can answer as best you can.

 9        THE WITNESS:  I can see me pulling in front of his car

10   in the crosswalk, you could see the street light, you can see

11   me jumping out of the car and it gets caught on the shirt,

12   now the shirt's hanging there and I have my rifle up, and the

13   only thing I'm focused on now is leaning.

14   BY MR. CROWLEY:

15        Q.   Right.

16        A.   And it's apparently off that whole time until I

17   look down and see it's green and then I turned it on, and I

18   turned it on knowing it would go back 30 seconds hoping it

19   would capture what I saw.

20        Q.   Did it?

21        A.   Not really because of the shirt.

22        Q.   Would you agree that use of deadly force is, of

23   course, only to be used only as a last resort?

24        A.   Yes.

25        Q.   And in your mind, at the time when Mr. Dominguez
```

1    put his hands down and leaned over, the use of deadly force

2    was the last resort?

3          A.    Under the circumstances, I felt it was the

4    only option for me at the time.

5          Q.    I've been supplied with your POST history by your

6    attorney.

7          A.    Okay.

8          Q.    And my only question is is there a POST training on

9    the use of deadly force, when that's available, the

10   authority, anything about that?

11         A.    I think it's -- it's encompassed in a couple

12   different professional trainings that we have.  I don't know

13   what titles you have listed there.  I may be able to assist

14   if I look at it.  I know there's like the simulator, the

15   force ops simulator training that has laws on 835(a), any

16   kind of de-escalation training, I've also had Crisis

17   Intervention training prior to that.  So we receive ongoing

18   training on different topics involving the use of force and

19   deadly force.

20         Q.    Okay.  I think I'm almost done.

21               What would your response be if someone said that

22   you over-reacted --

23         MS. CLOUSE:  Objection, calls for --

24   BY MR. CROWLEY:

25         Q.    -- when you pulled the trigger?

# EXHIBIT 2

Atkinson-Baker, a Veritext Company
www.depo.com

1          UNITED STATES DISTRICT COURT

2         NORTHERN DISTRICT OF CALIFORNIA

3

4   JESSICA DOMINGUEZ INDIVIDUALLY      )
    AND JESSICA DOMINGUEZ AS            )
5   GUARDIAN AD LITEM FOR JAD (1),      )
    JAD (2) AND JAD (3),                )
6                                       )
                   Plaintiffs,          )
7                                       )      Case No.:
          vs.                           )      5:18-CV-04826
8                                       )
    CITY OF SAN JOSE, SAN JOSE POLICE   )
9   DEPARTMENT, MICHAEL PINA, AND       )
    DOE POLICE OFFICERS 2 through 5,    )
10                                      )
                   Defendants.          )
11  _____)

**CERTIFIED COPY**

12

13

14

15

16

17              DEPOSITION OF

18         OFFICER KRISTOFFER FERGUSON

19            SAN JOSE, CALIFORNIA

20              MARCH 4, 2021

21

22  ATKINSON-BAKER, a Veritext Company
    (800) 288-3376
23  www.depo.com

24  REPORTED BY:   THERESA KIELTY, CSR NO. 5037

25  FILE NO.:      AE088F2

Atkinson-Baker, a Veritext Company
www.depo.com

1                        UNITED STATES DISTRICT COURT

2                       NORTHERN DISTRICT OF CALIFORNIA

3

4   JESSICA DOMINGUEZ INDIVIDUALLY      )
    AND JESSICA DOMINGUEZ AS            )
5   GUARDIAN AD LITEM FOR JAD (1),      )
    JAD (2) AND JAD (3),                )
6                                       )
                    Plaintiffs,         )
7                                       )      Case No.:
            vs.                         )      5:18-CV-04826
8                                       )
    CITY OF SAN JOSE, SAN JOSE POLICE   )
9   DEPARTMENT, MICHAEL PINA, AND       )
    DOE POLICE OFFICERS 2 through 5,    )
10                                      )
                    Defendants.         )
11  _____)

12

13

14

15

16                  Deposition of OFFICER KRISTOFFER FERGUSON,

17  taken on behalf of Plaintiffs, at 200 East Santa Clara

18  Street, San Jose, California, 95113, commencing at 11:30

19  a.m., Thursday, March 4, 2021, before Theresa Kielty, CSR No.

20  5037.

21

22

23

24

25

```
 1              A P P E A R A N C E S:

 2    FOR PLAINTIFFS:

 3    LAW OFFICES OF JOHN KEVIN CROWLEY
      BY:   JOHN KEVIN CROWLEY, Esq.
 4    125 S. Market Street
      Suite 1200
 5    San Jose, California    95113
      (408) 288-8100
 6    jkclaw@pacbell.net

 7    FOR DEFENDANTS:

 8    OFFICE OF THE CITY ATTORNEY
      BY:   MAREN CLOUSE, Esq.
 9    200 E. Santa Clara Street
      16th Floor
10    San Jose, California    95113
      (408) 535-1948
11    maren.clouse@sanjoseca.gov

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Atkinson-Baker, a Veritext Company
www.depo.com

```
1    deadly force?
2         A.   Myself?
3         Q.   Yes.
4         A.   No.
5         Q.   Do you feel that you have been trained and are
6    knowledgeable in the use of deadly force and when an officer
7    is entitled to use deadly force?
8         A.   Yes.
9         Q.   Do you feel you've been taught sufficiently in your
10   training and education the use of de-escalation procedures
11   when confronted with incidents that may call out for use of
12   force?
13        A.   Yes.
14        Q.   And do you feel that you're trained and educated
15   enough to use alternatives to deadly force other than using
16   deadly force?
17        A.   Yes.
18        Q.   And I want to apologize, sometimes my questions get
19   a little squirrely, but you're doing great.  I'll be thinking
20   of the question and break it up and you'll think I'm done,
21   but you haven't done that, and sometimes you may not
22   understand my question, so I can't guarantee they are all
23   great questions.
24        A.   Okay.
25        Q.   So if you don't get it, just tell me and I'll try
```

1      Q.    Did you hear -- did he give any gestures, you know,

2  like flip you off or any other kind of gestures with his

3  hands or anything like that?

4      A.    No.  It appeared that he -- whether or not he was

5  engaged with Officer Pina, to me, it looked like he was

6  saying something but I could not tell what it was.  Maybe it

7  was because I was yelling at the same time.

8      Q.    At any point, did you take your weapon off safety?

9      A.    No.

10     Q.    And at this point, when you were at your position

11 of -- when you were standing at your position looking at the

12 suspect between the, you know, the car door and the A pillar

13 of the vehicle, was your gun pointed at the suspect?

14     A.    Yes.

15     Q.    And you had it sighted?  Well, I assume that's what

16 you do, I don't know.  Was it -- did you have to look through

17 a sight to locate the suspect?

18     A.    No.

19     Q.    You don't use your sights?

20     A.    We do, but only when we shoot.

21     Q.    But you had it pointed on the suspect?

22     A.    Yes.

23     Q.    Did you see the suspect comply with the commands?

24     A.    Yes.

25     Q.    How much time elapsed before you saw the first

Atkinson-Baker, a Veritext Company
www.depo.com

1    compliance, if you can give me an estimate?

2         MS. CLOUSE:  Objection, vague.

3         THE WITNESS:  Less than 10 seconds.

4    BY MR. CROWLEY:

5         Q.   Okay.  And how did he comply?

6         A.   He raised his hands or put his hands up to maybe

7    shoulder level, kind of limp wrists, not like completely

8    compliant hands up on the floor or the steering wheel where

9    they can be seen.  It was kind of like just not wanting to go

10   on the program but kind of getting them up there just enough

11   so we could see them in the window.  He had them up and they

12   were, you know, kind of right here but not all the way up.

13        Q.   Okay.  It was a half -- no, I won't say that.

14   Half-hearted compliance.  It wasn't a full compliance where

15   he's showing his hands and holding them up high, right?

16        A.   Exactly.

17        Q.   You said a limp wrist, so his hands were kind of

18   down, and were his hands above his shoulders or --

19        MS. CLOUSE:  Objection, vague.

20   BY MR. CROWLEY:

21        Q.   -- like this?  Where was his wrist?

22        A.   I'd say above shoulder.

23        Q.   The bent wrist was above shoulder?

24        A.   Yeah.  Maybe ear level.

25        Q.   And could you see from your perspective if there

Atkinson-Baker, a Veritext Company
www.depo.com

1    was anything in his hands?

2         A.   I could not see anything in his hands.

3         Q.   Okay.  If he had something in his hands, would you

4    be able to see it?

5         A.   I would have been able to see it.

6         Q.   Okay.

7         A.   In his left hand.

8         Q.   And he didn't have gloves on his hands?  Were his

9    hands gloved?

10        A.   No, not that I recall.

11        Q.   So they were bare?

12        A.   Yes.

13        Q.   And did he have short sleeves or long sleeves, if

14   you could tell?

15        A.   I don't recall.

16        Q.   Okay.  So he gets his hands up, bent wrist.  How

17   did you take that compliance at the time you saw him comply

18   in the way he did?

19        A.   That he didn't want to.  Looked like he was

20   defeated, like he was -- he didn't want to give up, like he

21   didn't want to 100 percent commit to our commands.

22        Q.   Did you take it as some form of taunting a police

23   officer in any way?

24        A.   Not necessarily.

25        Q.   And did you, during this engagement, did you ever

Atkinson-Baker, a Veritext Company
www.depo.com

1      A.   Yes.

2      Q.   Because your life, the life of Mr. Pina, the life

3   of Mr. Lopez and even the life of the occupant is in the

4   balance, correct?

5      A.   Yes.

6      Q.   I would say it's going to take you less than two

7   seconds to do it but I could be wrong.  Okay.  So at -- how

8   long did he keep his hands with the wrists bent over, hands

9   down, sort of up visible in compliance with your command?

10   How many seconds, for instance, did he comply?

11      A.   I would say less than 10 seconds.

12      Q.   Okay.  And during this time period, did anything

13   occur to escalate the situation?

14      MS. CLOUSE:  Objection, vague.

15   BY MR. CROWLEY:

16      Q.   In your mind.

17      A.   While he had his hands up?

18      Q.   Yes.

19      A.   Or after?

20      Q.   Well, while he had his hands up, during that 10

21   seconds, approximately 10 seconds.

22      A.   He lowered his hands.  Is that -- there's that.

23      Q.   So at that point, that escalated the situation, in

24   your mind?

25      A.   Yes.

```
 1        Q.   So you didn't know if the suspect was, you know,
 2   like playing possum, faking it and waiting to get the officer
 3   close so he could shoot him?  You didn't know that, did you?
 4        MS. CLOUSE:  Objection, asked and answered.
 5        MR. CROWLEY:  No, it hasn't.
 6        THE WITNESS:  No, that's why we sent the K9 in.
 7   BY MR. CROWLEY:
 8        Q.   So after the shot was fired, you withdrew?
 9        A.   Correct.
10        Q.   So why didn't you withdraw before the shot was
11   fired?
12        MS. CLOUSE:  Objection, asked and answered.
13   BY MR. CROWLEY:
14        Q.   As a de-escalation procedure.
15        A.   That's not a de-escalation procedure for us.
16        Q.   Okay.  But as I hear your testimony, after the shot
17   was fired, the threat still existed and then you withdrew as
18   a de-escalation procedure.
19        A.   No.
20        Q.   No?
21        A.   We withdrew to get cover now, assess the situation,
22   see how Mr. Dominguez was.  We had sent a dog up there.
23   After shots are fired, everything slows down and you step
24   back and see what you got.
25        Q.   And part of your training and education is that you
```

1    don't do that procedure of backing up and withdrawing before

2    the shots are fired?

3        MS. CLOUSE:  Objection, misstates the testimony.

4    BY MR. CROWLEY:

5        Q.  Well, if I'm misstating it, please correct me.  I

6    don't want to misstate your testimony.

7        A.  Could you rephrase the question or ask it again?

8        MR. CROWLEY:  Madam Court Reporter, I hate to do that,

9    I'm almost done, but if you can get to that question.

10       THE WITNESS:  You could ask the same one, I just --

11       MR. CROWLEY:  I can't even remember what it was.

12           (Record read.)

13       THE WITNESS:  No.  At that moment, we are using a

14   technique that we used to apprehend him in the vehicle.  If

15   we were to run away, he would run out the door and be gone,

16   so we have to be in somewhat close proximity.

17   BY MR. CROWLEY:

18       Q.  So before the flash bang, did you attempt any type

19   of coaxing method to try to get him out of the car?

20       A.  As far as -- we don't -- so initially, we don't

21   call people out, it's when other units get there.  All we are

22   is containment.  Usually then when somebody else comes up,

23   they coordinate the arrest and get him out of the vehicle.

24   Initially, we're containment, we are giving them commands,

25   keeping them in the vehicle.  It's not something that happens

Atkinson-Baker, a Veritext Company
www.depo.com

1    quickly.  You don't want him out right away.  Everything

2    slows down once you have the vehicle contained.

3         Q.   Why don't you want them out right away?

4         A.   Well, you would have sufficient units to make it

5    happen safely as far as the arrest, especially when there's

6    multiple people in a vehicle.

7         Q.   Well, would you agree that lethal force is the

8    highest level of force a police officer can use?

9         A.   Yes.

10        Q.   And that it must be immediate defense of life, a

11   situation of defense of life, either self-defense or defense

12   of others?

13        A.   Yes.

14        Q.   Would you agree it's the last resort, deadly force?

15        A.   Yes.

16        Q.   That the circumstances must be dire?

17        A.   Yes.

18        Q.   That the use of deadly force can cause great bodily

19   injury or death?

20        A.   Yes.

21        Q.   That the discharge of the carbine within the

22   distance between Officer Pina and the suspect was highly

23   likely to cause death?

24        A.   Yes.

25        Q.   That officers who are trusted with the use of

Atkinson-Baker, a Veritext Company
www.depo.com

1    deadly force must show a reverence for human life?

2        A.    Yes.

3        Q.    That's what you've been trained for, right?

4        A.    Yes.

5        Q.    And you're also trained that if there were any

6    other reasonable measures available, the officer must utilize

7    them before the use of deadly force; is that correct?

8        A.    Yes.

9        Q.    And in your view, in this particular case, all

10   other reasonable measures were exhausted?

11       A.    Correct.

12       Q.    In this case, do you recall if there was a warning

13   that deadly force was going to be used?

14       A.    I don't know.

15       Q.    And would you agree that an officer that discharges

16   his weapon is responsible for every shot?

17       A.    Yes.

18       Q.    Would you agree that the subjective fear of the

19   officer is not sufficient to justify the use of deadly force?

20       A.    Can you ask that question again?

21       Q.    The officer has to articulate reasonable objective

22   facts to justify the use of deadly force in that there's

23   imminent danger to experience great bodily harm or death.

24   That's objective, right?

25       A.    Yes.

1      A.    Then it would be justified.

2      Q.    Would you agree if an officer overreacts, that that

3   could be deemed excessive force?

4      A.    If an officer does?

5      Q.    Yes.

6      A.    Yes.

7      Q.    Would you agree that the use of deadly force is the

8   most serious decision a police officer can ever make?

9      A.    Yes.

10      Q.    And would you agree that the reverence for life is

11   the foundation in which deadly force rests?

12      A.    Yes.

13      Q.    Would you agree that the officer's authority and

14   the right to use deadly force is bestowed on them by the

15   people?

16      A.    Yes.

17      Q.    And that the citizens of the community trust that

18   the police officers will use deadly force reasonably?

19      A.    Yes.

20      Q.    And that if the force used is unreasonable, that

21   would be deemed a breach of that trust of the citizenship;

22   fair to say?

23      A.    Yes.

24      MR. CROWLEY:  Okay.  I'm done.

25      MS. CLOUSE:  We can go off the record.  Before we close

```
 1    quickly.  You don't want him out right away.  Everything
 2    slows down once you have the vehicle contained.
 3         Q.   Why don't you want them out right away?
 4         A.   Well, you would have sufficient units to make it
 5    happen safely as far as the arrest, especially when there's
 6    multiple people in a vehicle.
 7         Q.   Well, would you agree that lethal force is the
 8    highest level of force a police officer can use?
 9         A.   Yes.
10         Q.   And that it must be immediate defense of life, a
11    situation of defense of life, either self-defense or defense
12    of others?
13         A.   Yes.
14         Q.   Would you agree it's the last resort, deadly force?
15         A.   Yes.
16         Q.   That the circumstances must be dire?
17         A.   Yes.
18         Q.   That the use of deadly force can cause great bodily
19    injury or death?
20         A.   Yes.
21         Q.   That the discharge of the carbine within the
22    distance between Officer Pina and the suspect was highly
23    likely to cause death?
24         A.   Yes.
25         Q.   That officers who are trusted with the use of
```

1    deadly force must show a reverence for human life?

2       A.   Yes.

3       Q.   That's what you've been trained for, right?

4       A.   Yes.

5       Q.   And you're also trained that if there were any

6    other reasonable measures available, the officer must utilize

7    them before the use of deadly force; is that correct?

8       A.   Yes.

9       Q.   And in your view, in this particular case, all

10   other reasonable measures were exhausted?

11      A.   Correct.

12      Q.   In this case, do you recall if there was a warning

13   that deadly force was going to be used?

14      A.   I don't know.

15      Q.   And would you agree that an officer that discharges

16   his weapon is responsible for every shot?

17      A.   Yes.

18      Q.   Would you agree that the subjective fear of the

19   officer is not sufficient to justify the use of deadly force?

20      A.   Can you ask that question again?

21      Q.   The officer has to articulate reasonable objective

22   facts to justify the use of deadly force in that there's

23   imminent danger to experience great bodily harm or death.

24   That's objective, right?

25      A.   Yes.

Atkinson-Baker, a Veritext Company
www.depo.com

1      A.    I couldn't give you a specific time.  Maybe a
2    couple minutes after.
3      Q.    So it was after.  Now, you don't agree that the
4    shot to the head was intended to kill the suspect?
5      MS. CLOUSE:  Objection, assumes facts.
6      THE WITNESS:  I didn't know where he had been shot.
7    BY MR. CROWLEY:
8      Q.    Well, generally, in your training and experience,
9    shooting somebody in the head is intended to kill the person,
10   right?
11     A.    We don't shoot to kill anyone, we shoot to stop the
12   threat.
13     Q.    Okay.  Well, you also can shoot to disarm the
14   person or disable them?
15     A.    What we train is to stop the threat.
16     Q.    And shooting in the head stops the threat?
17     A.    Yes.
18     Q.    Permanently?
19     MS. CLOUSE:  Objection, vague, calls for speculation.
20     THE WITNESS:  Like I said, I was not aware of where he
21   had been shot until after the shooting.
22   BY MR. CROWLEY:
23     Q.    So I just want to know about your training.  So
24   you're trained that shooting someone in the head is an
25   effective way to stop the threat?

**EXHIBIT 3**

## On-Scene Consulting

May 21, 2021

Mr. John Kevin Crowley, Esq.
Law Offices of John Kevin Crowley
125 S. Market Street, Suite 1200
San Jose, California 95113

### Federal Rules of Civil Procedure 26 (a) (2) (B) Report

**JESSICA DOMINGUEZ, INDIVIDUALLY AND JESSICA DOMINGUEZ AS
GUARDIAN AD LITEM FOR JAD (1), JAD (2), AND JAD (3), Plaintiffs,
vs.
CITY OF SAN JOSE, SAN JOSE POLICE DEPARTMENT, MICHAEL PINA,
AND DOE POLICE OFFICERS 2 through 5, Defendants.
Case No. 5:18-CV-04826.**

Dear Mr. Crowley,

Thank you for retaining me to analyze and render opinions regarding the September 15, 2017, shooting death of Mr. Jacob Arturo Dominguez at Penitencia Creek Road at White Road, San Jose, California 95127, by San Jose Police Department Police Officer Michael Pina.  Pursuant to the requirements of Rule 26, I have studied reports, Santa Jose Police Department documents, Body Worn Camera videos, Transcriptions of Depositions, and other material (as listed under Materials Reviewed) provided to me thus far regarding this case.  Please be advised that if additional documents related to this matter are provided, it may be necessary to write a supplemental report to refine or express additional opinions.

Scott A. DeFoe
Principal
On-Scene Consulting, LLC

## On-Scene Consulting

**Materials Reviewed:**

1.  Proposed Stipulated Protective Order, <u>Case No. 5:18-cv-04826-BLF</u>.

2.  Defendants' Interrogatories to Plaintiff Jessica Dominguez, Individually and as Guardian Ad Litem for Jacob Dominguez, Jordan Dominguez and Jaliyah Dominguez, <u>Case No. 5:18-cv-04826-BLF</u>.

3.  Defendants' Request for Production of Documents to Plaintiff Jessica Dominguez, Individually, <u>Case No. 5:18-cv-04826-BLF</u>.

4.  Defendants' Request for Production of Documents to Plaintiff Jessica Dominguez, as Guardian Ad Litem for Jacob Dominguez, Jordan Dominguez, and Jaliyah Dominguez, <u>Case No. 5:18-cv-04826-BLF</u>.

5.  Report on the Fatal Shooting of Jacob Dominguez on 9/15/17, The County of Santa Clara, Jeffrey F. Rosen, District Attorney.

6.  Amended Complaint, <u>Case No. 5:18-cv-04826-BLF</u>.

7.  Commission on Peace Officer Standards and Training, Pina, Michael Efren, Post ID No. B96-P92, (<u>SJ 1605-1608</u>).

8.  San Jose Police Department, GO# SJ 2017-172550757, 211 PC Armed Robbery, (<u>SJ 1795-1943</u>).

9.  County of Santa Clara, Office of the Medical Examiner, Report of Autopsy, Dominguez, Jacob, Arturo, <u>Case No. 17-03014</u>.

10.  Defendant City of San Jose's First Supplemental Response to Plaintiff's Request for Production of Documents, Set Two (<u>2</u>), <u>Case No. 5:18-cv-04826-BLF</u>.

11.  Defendant City of San Jose's Response to Plaintiff's Request for Production of Documents, Set Two (<u>2</u>), <u>Case No. 5:18-cv-04826-BLF</u>.

12.  Plaintiff's Request for Production of Documents, Set One, <u>Case No. 5:18-cv-04826-BLF</u>.

## On-Scene Consulting ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

13.  Plaintiff's Request for Production of Documents, Set Two, <u>Case No. 5:18-cv-04826-BLF</u>.

14.  Defendant City of San Jose's Response to Plaintiff's Request for Production of Documents, Set One, <u>Case No. 5:18-cv-04826-BLF</u>.

15.  Defendant City of San Jose's Amended Response to Plaintiff's Request for Production of Documents, Set One (<u>1</u>), <u>Case No. 5:18-cv-04826-BLF</u>.

16.  Defendant City of San Jose's Response to Plaintiff's Request for Specially Drafted Interrogatories, Set One (<u>1</u>), <u>Case No. 5:18-cv-04826-BLF</u>.

17.  City of San Jose's Supplemental Response to Plaintiff's Request for Specially Drafted Interrogatories, Set One (<u>1</u>), <u>Case No. 5:18-cv-04826-BLF</u>.

18.  Plaintiff Request for Specially Drafted Interrogatories, Set One (<u>1</u>), <u>Case No. 5:18-cv-04826-BLF.</u>

19.  San Jose Police Department, Covert Response Unit, Operational Plan, Case No. 17-255-0757, (<u>SJ 1944-1953</u>).

20.  San Jose Police Department, Covert Response Unit, Operational Plan No. 2, Case No. 17-255-0757, (<u>SJ 1954-1959</u>).

21.  Dispatch Audio Recording, No. 1551628, (<u>15:11:33</u>).

22.  911 Dispatch Audio Recording, No. 1551623, (<u>5:07</u>).

23.  911 Dispatch Audio Recording, No. 1551624, (<u>3:18</u>).

24.  911 Dispatch Audio Recording, No. 1551625, (<u>0:36</u>).

25.  CAD Event Chronology, <u>P172580283</u>, Code-5.

26.  Dispatch Audio Recording, No. 1551627, (<u>0:35</u>).

27.  Photographs, (<u>SJ 0189-763</u>).

## On-Scene Consulting

28. San Jose Police Department, Policies, Rules, Procedures.

29. Axon Body 2, X81032660, (17:00), (SJ 1640).

30. Axon Body 2, X81050171, (14:23), (SJ 1641).

31. Axon Body 2, X81077398, (12:29), (SJ 1642).

32. Axon Body 2, X81033659, (13:33), (SJ 1643).

33. Axon Body 2, X81078201, (13:33), (SJ 1644).

34. Axon Body 2, X81078225, (11:49), (SJ 1645).

35. Axon Body 2, X81079156, (5:58), (SJ 1646).

36. Axon Body 2, X81076983, (42:42), (SJ 1647).

37. Deposition Transcript of Officer Alvaro Lopez taken on 3/1/2021.

38. Deposition Transcript of Officer Kristoffer Ferguson taken on 3/4/2021.

39. Axon Body 2, X81077576, (12:42), (SJ 1610).

40. Axon Body 2, X81031694, (13:34), (SJ 1611).

41. Axon Body 2, X81093633, (2:23), (SJ 1612).

42. Axon Body 2, X81051024, (5:42), (SJ 1613).

43. Axon Body 2, X81049085, (6:15), (SJ 1614).

44. Axon Body 2, X81077576, (3:37), (SJ 1615).

45. Axon Body 2, X81050544, (8:24), (SJ 1616).

46. Axon Body 2, X81093633, (8:13), (SJ 1617).

## On-Scene Consulting

47. Axon Body 2, X81049210, (6:49), (SJ 1618).

48. Axon Body 2, X81031794, (0:47), (SJ 1619).

49. Axon Body 2, X81167004, (0:49), (SJ 1620).

50. Axon Body 2, X81076539, (0:51), (SJ 1621).

51. Axon Body 2, X81051024, (0:27), (SJ 1622).

52. Axon Body 2, X81049085, (0:33), (SJ 1623).

53. Axon Body 2, X81051024, (8:27), (SJ 1624).

54. Axon Body 2, X81049085, (9:31), (SJ 1625).

55. Axon Body 2, X81050355, (54:37), (SJ 1626).

56. Axon Body 2, X81063743, (5:20), (SJ 1627).

57. Axon Body 2, X81055934, (13:06), (SJ 1628).

58. Axon Body 2, X81049085, (1:13), (SJ 1629).

59. Axon Body 2, X81049085, (1:29), (SJ 1630).

60. Axon Body 2, X81051392, (3:13), (SJ 1631).

61. Axon Body 2, X81053106, (0:27), (SJ 1632).

62. Axon Body 2, X81093635, (3:58), (SJ 1633).

63. Axon Body 2, X81076539, (0:09), (SJ 1634).

64. Axon Body 2, X81050544, (3:31), (SJ 1635).

65. Axon Body 2, X81050544, (1:30), (SJ 1636).

## On-Scene Consulting

66. Axon Body 2, X81055934, (0:16), (SJ 1637).

67. Axon Body 2, X81055934, (2:06), (SJ 1638).

68. Axon Body 2, X81055934, (0:22), (SJ 1639).

69. NVR, Sherlock, CH03, 3158 Penitencia, (4:59), (SJ 1664).

70. NVR, Sherlock, CH03, 3158 Penitencia, (5:00), (SJ 1664).

71. NVR, Sherlock, CH03, 3158 Penitencia, (5:00), (SJ 1664).

72. NVR, 3164 Penitencia Creek Road, (0:21), (SJ 1665).

73. NVR, 3164 Penitencia Creek Road, (2:26), (SJ 1665).

74. NVR, 3164 Penitencia Creek Road, (3:09), (SJ 1665).

75. NVR, 3164 Penitencia Creek Road, (0:39), (SJ 1665).

76. NVR, 3164 Penitencia Creek Road, (0:23), (SJ 1665).

77. NVR, 3164 Penitencia Creek Road, (1:13), (SJ 1665).

78. NVR, 3164 Penitencia Creek Road, (0:48), (SJ 1665).

79. NVR, 3164 Penitencia Creek Road, (0:02), (SJ 1665).

80. NVR, 3164 Penitencia Creek Road, (0:15), (SJ 1665).

81. NVR, 3164 Penitencia Creek Road, (1:39), (SJ 1665).

82. NVR, 3164 Penitencia Creek Road, (0:52), (SJ 1665).

83. NVR, 3164 Penitencia Creek Road, (1:45), (SJ 1665).

84. NVR, 3164 Penitencia Creek Road, (1:18), (SJ 1665).

## On-Scene Consulting

85.  NVR, 3164 Penitencia Creek Road, (0:59), (SJ 1665).

86.  NVR, 3164 Penitencia Creek Road, (1:26), (SJ 1665).

87.  NVR, 3164 Penitencia Creek Road, (0:17), (SJ 1665).

88.  NVR, 3164 Penitencia Creek Road, (0:48), (SJ 1665).

89.  DA/Homicide Video-Audio Interview of Officer Michael Pina, 9-16-17, (1:07:19).

90.  DA/Homicide Video-Audio Interview of Officer Alvaro Lopez, 9-16-17, (1:11:58).

91.  DA/Homicide Video-Audio Interview of Officer Kristoffer Ferguson, 9-16-17, (45:07).

92.  Telephonic Audio-Recorded Interview of Rhiannon Borunda, (23:59), (SJ 1666).

93.  Telephonic Audio-Recorded Interview of Leslie Bradley, (15:14), (SJ 1667).

94.  Telephonic Audio-Recorded Interview of Carlos Lovato, (27:26), (SJ 1668).

95.  Supplemental Case File, Documents & Medical Reports, (SJ 1672-1794).

96.  San Jose Police Department, Covert Response Unit, Operational Plan, Case No. 17-255-0757, (SJ 1960-1966).

97.  Defendant City of San Jose's Response to Plaintiff's Request for Production of Documents, Set Two (2), Case No. 5:18-cv-04826-BLF.

98.  Supplemental Photographs of Blood Stains, Interior/Exterior of Car, and Scene.

99.  Miscellaneous Email Correspondence.

100.  Communication Log.

101.  Answer to Amended Complaint, Demand for Jury Trial, Case No. 5:18-cv-04826-BLF.

## On-Scene Consulting ─────────────────────

102.  Defendant City of San Jose's Answer to Second Amended Complaint; Demand for Jury Trial, <u>Case No. 5:18-cv-04826-BLF</u>.

103.  Defendant Michael Pina's Answer to Second Amended Complaint, Demand for Jury Trial, <u>Case No. 5:18-cv-04826-BLF</u>.

104.  Deposition Transcript of Sergeant Michael Pina taken on March 3, 2021.

**<u>California POST Basic Learning Domains as Follows:</u>**
1.  #1: "Leadership, Professionalism and Ethics."
2.  #2: "Criminal Justice System."
3.  #3: "Policing in the Community."
4.  #19: "Vehicle Operations."
5.  #20: "Use of Force."
6.  #21: "Patrol Techniques."
7.  #22: "Vehicle Pullovers."
8.  #23: "Crimes in Progress."
9.  #33: "Arrest and Control."
10.  #35: "Firearms/Chemical Agents."

## <u>Summary</u>

The following statement summaries represent documents/statements that were used in part during my review but are in no way meant to be exhaustive. The documents listed in the <u>Materials Reviewed Section</u> of this report represent the full library of documents reviewed thus far and used as a basis for my opinions.

**<u>The below information is derived from "Report on the Fatal Shooting of Jacob Dominguez on 9/15/17, The County of Santa Clara, Jeffrey F. Rosen, District Attorney:"</u>**

*"When Dominguez reached North White Road, he came to a complete stop at the red light on eastbound Penitencia Creek as CRU approached from behind.  The front driver's door window was rolled partially down.  Officer Pina announced that three cars were going to initiate the VCT maneuver to apprehend Dominguez.  Officer Pina's SUV passed Dominguez on the left side, then cut in front of the stopped car, making Officer Pina's car perpendicular to Dominguez and his Kia.  Officer Ferguson stopped his sedan to the left*

## On-Scene Consulting

*of the Kia, and Officer Lopez pulled his SUV in behind it. The Kia started to back up, and Officer Lopez pulled forward, contacting Dominguez's car."*

*"After stopping, Officer Pina immediately exited his vehicle and took cover behind the hood of Officer Ferguson's vehicle, (__See Opinions 1-3__). Officer Ferguson exited his vehicle and took cover behind the driver's seat, aiming his rifle at Dominguez over the roof of his car. Officer Lopez exited his vehicle and took cover behind the driver's door of his car."*

*"When the VCT occurred, it was cleared this was a law enforcement operation. All three officers were pointing AR-15 rifles at Dominguez and wearing tactical vests with SJPD patches. The red/blue emergency lights on Officer Lopez's car, immediately behind the Kia, were flashing throughout the encounter and were visible in Officer Ferguson's body camera, as well as to civilian witness Carlos Lovato, who was stopped six cars back from the intersection. Sirens can be heard clearly on the bodycam video when the officers exited their vehicles, as well as five seconds before shots were fired."*

*"As Dominguez remained seated in the Kia, and Officers Ferguson and Pina pointed their rifles at the Kia, Officer Ferguson commanded, "Let me see your hands, motherfucker." During the next 15 seconds, the officers gave Dominguez repeated warnings that if he didn't put his hands up, "Your gonna get shot." Then, Dominguez suddenly lowered his hands and leaned forward. Two of the officers began frantically yelling, "Hands up!" with distinctly more urgency for an additional three seconds, after which time Officer Pina fired two shots at Dominguez, striking him once and killing him. In total, police ordered Dominguez to keep his hands up for a total of 18 seconds before the two shots were fired." (__See Opinions 4-7__).*

*"Immediately after shots were fired, Officers Ferguson and Pina continued to aim their rifle at Dominguez in the Kia, and CRU Sergeant Mauricio Jimenez arrived on the scene in his vehicle. Officer Lopez deployed a flashbang 12 seconds after the shooting, (if activated, releasing smoke one second after that, or 13 seconds after the shooting). Sergeant Jimenez then observed Officers Pina and Ferguson away from the shooting scene once he was able to establish cover for them, aiming his rifle at Dominguez from between Officer Ferguson and Officer Lopez's cars. Officer Pina, Officer Ferguson and Officer Lopez were separated immediately thereafter pending interviews at the San Jose Police Department."*

## On-Scene Consulting ────────────────────────

*"Because Dominguez was still in the vehicle and not responsive to police instructions after the shooting, a police canine unit was commanded to enter the vehicle to determine if he was alive or dead. Once it was determined that Dominguez was deceased, the scene was left untouched until the Medical Examiner and Crime Scene Unit arrived and processed the scene and critical evidence. During processing of the scene, no firearm was located in the vehicle or on Dominguez's person. On the passenger seat of the Kia was a folding-style knife."*

**Opinions:**

<u>Note</u>: None of my opinions are intended to usurp the province of the jury and are not stated as ultimate issues. Rather, my opinions involve the consistency of the officers' actions with standard police practices.

### Opinion Number 1

It is my opinion a reasonable law enforcement officer acting consistent with standard police practices would have immediately moved to a position of cover after he exited his vehicle following the initiation of the Vehicle Control Tactic, (<u>VCT</u>).

It is my opinion, San Jose Police Department Police Officer Michael Pina, made a <u>poor tactical decision</u> when he moved to the front driver's side quarter panel that did not provide him any form of cover from the waist up after he exited his vehicle following the initiation of the Vehicle Control Tactic.

In addition, it is my opinion based on my review of the facts and Body Worn Camera (<u>BWC</u>) videos, Police Officer Michael Pina should have moved to a position of cover to the rear of Officer Alvaro Lopez's vehicle to create distance from Mr. Jacob Dominguez whose vehicle was properly contained due to the successful Vehicle Control Tactic that was executed by Police Officer Michael Pina, Police Officer Kristoffer Ferguson and Police Officer Alvaro Lopez. In addition, based on my review of the facts in this matter, there were approximately <u>7-9 additional</u> San Jose Police Department Covert Response Units that were responding and San Jose Police Department Uniformed Police Officers that could have responded to assist in establishing a perimeter in the event that Mr. Jacob Dominguez fled on foot from the vehicle. In addition, San Jose Police Department Air Support (<u>Fixed Wing Airplane</u>) was providing overwatch of the incident and they could have requested a Police Helicopter in the event Mr. Jacob Dominguez fled from the vehicle and the Officers on the ground would need assistance with the establishment of a perimeter.

## On-Scene Consulting

In addition, by safely moving back to a position of cover it would have allowed Police Officer Michael Pina, Police Officer Kristoffer Ferguson and Police Officer Alvaro Lopez to establish a Contact and Cover Officers.  The Contact Officer could have been the <u>only</u> Officer to issue commands to Mr. Jacob Dominguez while the Cover Officers provided Lethal and Less Lethal Cover.  By having a designated Cover Officer negates any issue of multiple Police Officers issuing possible conflicting verbal commands simultaneously.

I base my opinion on <u>California Police Officer Standards and Training (POST), Learning Domain No. 23-Crimes in Progress, Chapter 3: Responding to Specific Crimes in Progress, 3-5:</u>

**<u>Establish a Contact Officer and Cover Officers:</u>**

**<u>Contact Officer:</u>**
The roles and responsibilities of each officer involved in a high-risk vehicle pullover must be clear.  The **<u>Contact Officer:</u>**
- Conducts the business of the pullover,
- Directs the driver and occupants(s) of the target vehicle,
- Takes necessary actions related to the investigation (<u>e.g., obtaining identification, searching suspects, etc.</u>).

**<u>Cover Officers:</u>**
It is general responsibility of any cover officers called to assist the primary officer at the scene of a high-risk vehicle pullover to:
- Protect the primary officer who is conducting the business of the pullover,
- Take and maintain proper positions of cover and concealment,
- Maintain their firearms at the ready, and
- Maintain visual contact with the vehicle occupant(s) at all times,
- Avoid a crossfire situation.

**<u>Communications Between Officers:</u>**
In order to ensure officer safety and help ensure an appropriate outcome, the primary officers and cover officers must effectively communicate with one another.  Appropriate communication involves:
- Advising the primary officer of any critical occurrences or safety issues,
- Avoid inappropriate interruptions and,
- Avoid giving directions which conflict with those given by the primary officer.

## On-Scene Consulting

In addition, I base my opinion on <u>California Police Officer Standards and Training (POST), Learning Domain No. 23-Crimes in Progress, Chapter 2: Basic Tactical Considerations, Tactical Approach</u>: Peace officers should always be aware of surrounding objects or areas that may be utilized for cover or concealment.

**<u>Cover</u>**:
- Anything that may stop or deflect an opponent's bullets.
- Should be used when involved in an armed encounter if possible.
- The type of cover will depend on the type of firearm received, (<u>firearm, shotgun, rifle</u>).

In addition, by moving to a position of cover, it would have allowed Police Officer Michael Pina, Police Officer Kristoffer Ferguson and Police Officer Alvaro Lopez to slow down and de-escalate the situation by utilizing effective verbal strategies and de-escalation techniques.

Defusing is a process of reducing the potential for violence and bringing emotional level to a manageable level to restore order. The primary objective is to calm the person so that a conversation can take place and the use of force can be avoided.

In addition, I base my opinion on my twenty eight years of law enforcement experience where I have been involved in vehicle pursuits and vehicle pullovers as Primary Officer, Secondary Officer, and a Supervisor.  In addition, I have received and provided training on Pursuit Policy, Pursuit Tactics, Post-Pursuit Tactics and Containment.  In addition, I have conducted over (<u>50</u>) Vehicle Pursuit Investigations during my last 14 years as a Supervisor with the Los Angeles Police Department.  In addition, as a Los Angeles Police Department Sergeant II+1 at Metropolitan Division K9 Platoon, I responded to hundreds of Vehicle Pursuits throughout all geographical patrol divisions to assist with containment, perimeter tactics and ultimately K9 searches.

In addition, I base my opinion on my twenty-eight years of law enforcement experience where I responded to thousands of calls for service and have effectively utilized defusing techniques, de-escalation techniques, verbal strategies, and active listening skills to reduce the potential for violence and bring the emotional level of the incident to a manageable level.

## On-Scene Consulting ─────────────────

In addition, I base my opinion on <u>San Jose Police Department, Policies, Rules, Procedures., L 2602.5 Tactical Conduct, 8/15/16, (SJ 1046-1047)</u>: Department members are expected to use tactics that are consistent with San Jose Police Department and California P.O.S.T. Commission training standards. <u>Department members shall consider the following relevant tactical considerations in any situation where an officer reasonably believes the use of physical force may become necessary</u>:

<u>COVER, CONCEALMENT, DISTANCE, AND TIME</u>: Department members shall consider tactically advantageous objects and/or positions at their disposal prior to and during a force encounter. The proper use of cover, concealment, distance, and the simple passage of time through negotiation and de-escalation are all tactics that may help a Department member avoid and/or minimize the use of physical force. Officers shall consider tactically repositioning themselves if doing so can be accomplished safely and may assist in de-escalating the situation.

<u>In addition, I base my opinion on the following facts and testimony in this matter</u>:

- According to Police Officer Alvaro Lopez, they felt that the vehicle was blocked in, (<u>Deposition Transcript of Alvaro Lopez, Page 35</u>).
- At <u>1:00</u>, Axon Body 2, (<u>SJ 1641</u>), Police Officer Michael Pina can be observed standing at the front quarter panel of Officer Kristoffer Ferguson's vehicle in an "open air environment" that does not provide him any cover from the waist up.
- According to Sergeant Michael Pina, he positioned himself by the front tire and wheel, (<u>Deposition Transcript of Michael Pina, Page 75</u>).

Lastly, I base my opinion on my twenty eight year law enforcement career where, as a Supervisor, I have investigated over 100 Use of Force Incidents as well as being personally involved in the use of lethal and less than lethal force incidents.

### **Opinion Number 2**

It is my opinion that Defendants including San Jose Police Department Police Officer Michael Pina failed to formulate a tactical plan from a position of cover immediately following the successful Vehicle Control Tactic that was executed by Police Officer Michael Pina, Police Officer Kristoffer Ferguson and Police Officer Alvaro Lopez.

Law Enforcement Officers are trained to work together and function as a team. In order to ensure officer safety and to ensure an appropriate outcome, the primary officers and cover officers must effectively communicate with one another. Appropriate

## On-Scene Consulting

communication involves advising the primary officer of any critical occurrences or safety issues as well as the following:

**Plan of Action:**
- Officers should discuss safety factors as well as possible plans for taking actions.
- Plans may include coordination of who will transmit radio traffic.
- Appropriate use of escalation of force.

**Poor or No Planning:**
- Rushing into the situation without any plan of action.
- Failure to establish plan of action prior to engaging the suspect.
- Not considering alternative actions.

**Inappropriate Attitude:**
- Careless or complacent.
- Overconfident.
- Too aggressive.

Officers must approach every contact with officer safety in mind.  Complacency, overconfidence, poor planning, or inappropriate positioning can leave officers vulnerable to attack.

The tactical plan should have outlined verbal skills (defusing and de-escalation techniques) and Less Lethal Force options such as: empty hands, physical strength and compliance techniques, soft or hard hand techniques, the X-26 Electronic Control Device (ECD) Taser with an effective range of 7-15 feet and maximum range of 21-25 feet, Ballistic Shield, K9, Pepper Ball Launcher with a maximum effective range of 60 feet, Sage 37/40mm with a maximum effective range of approximately 100 feet, ASP/ baton, Oleoresin Capsicum "OC" spray with an effective range of 2-15 feet, Noise Flash Device (NFD), baton or the deployment of the 870 Remington 12-Gauge Shotgun with a Drag Stabilized 12-Gauge Bean Bag Round.  The Drag Stabilized 12-Gauge Round is a translucent 12 Gauge shell loaded with a 40-Gram tear shaped bag made from a cotton and ballistic material blend and filled with #9 shot.  The design utilizes four stabilizing tails and smokeless powder as the propellant.  The round has a velocity of 270 feet per second (FPS) with a maximum effective range of 75 feet.

The Taser is an Electronic Controlled Device (ECD) as defined by the manufacturer, Axon.  It is a handheld, battery operated tool which uses controlled electrical current

## On-Scene Consulting

designed to disrupt a person's sensory and motor nervous system by means of deploying electrical energy sufficient to cause temporary uncontrolled muscle contractions, or Neuro Muscular Incapacitation, ("NMI").  As a result, the electrical energy can override the person's voluntary motor responses for a brief duration.  The use of Taser ECD deployment resulting in NMI may provide a brief opportunity during which physical restraint procedures can be initiated whenever practical.

In addition, in the event that Mr. Jacob Dominguez fled on foot from the vehicle, the involved San Jose Police Department Police Officer Michael Pina, Police Officer Kristoffer Ferguson and Police Officer Alvaro Lopez, could establish a perimeter with the assistance of the approximately 7-9 additional San Jose Police Department Covert Response Units to include a K9 Officer that were responding and San Jose Police Department Uniformed Police Officers that could have responded to assist.  In addition, San Jose Police Department Air Support, (Fixed Wing Airplane) was providing overwatch of the incident and they could have requested a Police Helicopter in the event Mr. Jacob Dominguez fled from the vehicle and the Officers on the ground would need assistance with the establishment of a perimeter.

One helicopter in the air can cover as much territory (more quickly) as 12 officers in patrol cars on the ground.  The primary function continues to be that of support for ground units.

In addition, I base my opinion on California POST Learning Domain No. 22-Chapter 3: High-Risk Vehicle Pullovers, 3-3:

Officer Reactions:

Because of the elevated level of potential danger along with the unpredictable responses of vehicles occupants associated with high-risk vehicle pullovers, patrol officers can encounter a multitude of different personal emotions or reactions.

In order to prepare for such responses and prevent them from compromising officer safety, officers can:

- Discuss hypothetical situations with their partners, ahead of time.
- Have a plan of action prior to initiating the vehicle pullover.
- Obtain appropriate ongoing training in advance to maintain skill levels.
- Work as a team.
- Maintain communication with dispatch and other involved officers.

## On-Scene Consulting

- Rely on known tactics and procedures while also remaining flexible enough to adapt or improvise if necessary.
- Exercise emotional restraint and self-control.

In addition, I base my opinion on <u>California Police Officer Standards and Training (POST), Learning Domain No. 23, Chapter 2: Basic Tactical Considerations Approach, Establishing a Perimeter, (2-9)</u>: It is the responsibility of the primary officer to initiate the coordination of security and containment of the crime scene.  This can be done by establishing a perimeter completely surrounding the area involved.

The establishment of a secure perimeter may be essential to safely resolve the crime in progress or to contain a suspect.  <u>Establishing a perimeter</u>:

- Contains and isolates the crime scene.
- Prevents the suspect from escaping the area.
- Prevents unauthorized entry onto the area.
- Can aid in apprehending the suspect.

<u>There are two types of perimeters at a crime scene</u>: **<u>inner perimeter</u>** and **<u>outer perimeter</u>:**

**<u>Inner Perimeter</u>:**

- Immediate area around the incident (<u>e.g., private residence, commercial establishment, vehicle, etc.</u>).

**<u>Outer Perimeter</u>:**

- Area surrounding the inner perimeter.
- Established to further contain and isolate the crime scene.

The outer perimeter may aid in apprehension if the suspect manages to breach the inner perimeter, providing protection and cover for inner perimeter officers, providing traffic control, assisting in public safety.

In addition, I base my opinion on <u>California Police Officer Standards and Training (POST), Learning Domain No. 21-Chapter 2: Patrol Methodologies and Tactics, 2-45:</u>

**<u>Plan of Action</u>:**

- Officers should discuss safety factors as well as possible plans for taking actions in situations involving fleeing subjects.
- Plans may include coordination of who will transmit radio traffic.

## On-Scene Consulting

- Appropriate use of escalation of force.

**Working with Partner:**
- If partner officers stay together during a foot pursuit, there is a greater likelihood that a safe and successful outcome will occur.
- If officers become separated, officers should reevaluate the level of risk before continuing the pursuit.

In addition, I base my opinion on <u>California Police Officer Standards and Training (POST), Learning Domain No. 21-Chapter 1: Basic Concepts of Law Enforcement Patrol, 1-21:</u>

**Inappropriate Attitude:**
- Careless or complacent.
- Overconfident.
- Too aggressive.

**Poor or No Planning:**
- Rushing into the situation without any plan of action.
- Failure to establish plan of action prior to engaging the suspect.
- Not considering alternative actions.

As set forth in <u>POST Learning Domain 22</u>, "Officers are trained to work together and function as a team.  In order to ensure officer safety and to ensure an appropriate outcome, the primary officers and cover officers must effectively communicate with one another.  Appropriate communication involves advising the primary officer of any critical occurrences or safety issues."

In addition, I base my opinion on <u>California Commission on Peace Officers Standards and Training, Student Materials, Learning Domain, No. 21-Chapter 1: Basic Concepts of Law Enforcement Patrol,1-22:</u>  The element of officer safety refers to the practical application of tactically sound procedures to perform law enforcement activities in a safe and effective manner to include the utilization of available resources.  Some of the available resources in this situation can include calling for backup officers, waiting for and deploying backup officers; remaining in a position of advantage, cover, and concealment; calling for K-9 and Police Helicopter, issuing commands and verbalization from a position of cover; using less-than-lethal and other tactics that officers are trained to use in these situations.

## On-Scene Consulting

In addition, I base my opinion on my twenty eight years of law enforcement experience as a Los Angeles Police Department Sergeant II+1 at Metropolitan Division K9 Platoon, I responded to hundreds of perimeters throughout all geographical patrol divisions to assist with containment, perimeter tactics and ultimately K9 searches. In addition, most of the K9 searches involved the assistance of an Air Unit(s).

In addition, I base my opinion on the following facts and testimony:

- At 1:00, Axon Body 2, (SJ 1641), Police Officer Michael Pina can be observed standing at the front quarter panel of Officer Kristoffer Ferguson's vehicle in an "open air environment" that does not provide him any cover from the waist up.
- According to Police Officer Alvaro Lopez, he believes that there were (10) surveillance Officers there, (Deposition Transcript of Alvaro Lopez, Page 98).
- According to Police Officer Kristoffer Ferguson, if an occupant of a vehicle does not agree to exit a vehicle, they will bring K9 up, (Deposition Transcript of Kristoffer Ferguson, Page 48).
- According to Police Officer Kristoffer Ferguson, in the past they have used rubber bullets, (Deposition Transcript of Kristoffer Ferguson, Pages 50-51).
- According to Police Officer Kristoffer Ferguson, rubber bullets can compel compliance from non-compliant subjects, (Deposition Transcript of Kristoffer Ferguson, Page 52).
- According to Police Officer Kristoffer Ferguson, he was going to deploy the Flash Bang based on the way that Mr. Jacob Dominguez was behaving in the vehicle, (Deposition Transcript of Kristoffer Ferguson, Page 80).
- According to Police Officer Kristoffer Ferguson, he was going to deploy the Flash Bang because people do not like it and it scares them and after that, they say, "okay it's pretty serious" and put their hands up, (Deposition Transcript of Kristoffer Ferguson, Page 81).
- According to Sergeant Michael Pina, he believes that there were at least (10) Officers on the surveillance of Mr. Jacob Dominguez, (Deposition Transcript of Michael Pina, Page 33).
- According to Sergeant Michael Pina, if someone will not come out, you can attempt to de-escalate the situation. Start slowly introducing force options, whether it is breaking out a window to introduce gas to get them to come out of the vehicle. You could use an NFD. K9 is the last option, (Deposition Transcript of Michael Pina, Pages 46-48).
- According to Sergeant Michael Pina, he believes that a barking dog could be used to get a person out of a car, (Deposition Transcript of Michael Pina, Page 49).

## On-Scene Consulting ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

- According to Sergeant Michael Pina, during the surveillance of Mr. Jacob Dominguez they called in Air Support, (Deposition Transcript of Michael Pina, Page 58).
- According to Sergeant Michael Pina, he recalls someone in his Unit call for a Flash Bang, (Deposition Transcript of Michael Pina, Page 93).

Lastly, In addition, I base my opinion on my twenty eight year law enforcement career whereas a Supervisor, I have investigated over 100 Use of Force Incidents as well as being personally involved in the use of lethal and less than lethal force incidents.

### **Opinion Number 3**

It is my opinion that if Police Officer Michael Pina, Police Officer Kristoffer Ferguson and Police Officer Alvaro Lopez used reasonable and proper police tactics as outlined in Opinions 1-2 of this report and if Mr. Jacob Dominguez failed to respond to proper de-escalation and defusing techniques and remained in his vehicle and refused to submit to arrest, he should have been treated as a possibly armed barricaded subject and a request should have been made to the San Jose Police Department Special Weapons and Tactics Team (SWAT)/Crisis Negotiation Team to respond.  SWAT are a highly trained and competent tactical team that specifically trains for armed subjects who barricade themselves and possibly pose extreme danger to the community.  The actions of first responders can mean the difference of whether a barricaded subject is taken into custody, without escalation of an already difficult situation.  Handling barricaded subjects requires special tools and expertise, which comes from specialized training.  The Special Weapons and Tactics (SWAT) team is equipped and trained to resolve these barricaded subject situations.  A barricaded subject is defined within the following limited criteria:

A.  The subject is possibly armed; and

B.  The subject is believed to have been involved in a criminal act; or is a potential threat to the lives of citizens and/or police; and

C.  The subject is in a position of advantage, affording him cover and/or concealment. The subject is contained in an open area and the presence or approach of police officers could precipitate an adverse reaction; and

D.  The subject refuses to submit to arrest.

Initial response by officers on scene is extremely important.  That response can be broken down into four areas referred to as the "Tactical Four C's."

A.  Containment

## On-Scene Consulting

B. <u>Control</u>

C. <u>Communicate</u>

D. <u>Call SWAT</u>.

<u>The Crisis Negotiation Team Structure will typically consist of the following</u>:

A. Primary Negotiator

B. Secondary Negotiator

C. Coach or Supervisor

D. Intelligence Coordinator

E. Mental Health Professional

The Primary Negotiator shall typically report to the Incident Commander and receive an appropriate briefing as to what transpired prior to his or her arrival. The Primary Negotiator shall be responsible for the initial contact and ensuing negotiations unless the role is changed during the negotiation process. <u>The Primary Negotiator should attempt to do the following once he or she has established dialogue</u>:

A. Attempt to put the subject at ease.

B. Keep communications open.

C. Elicit useful information.

D. Achieve a safe surrender of the subject with dignity.

<u>The Primary Negotiator should be aware of the following important principles</u>:

A. Listen actively to effectively understand what is being said and the various underlying meanings and messages.

B. Give the subject feedback so as to assure them that you understand their messages.

C. Be empathetic.

D. Understand what is being said and what message is really being given.

E. Find hopes, hooks-expand options.

F. Speak slowly and clearly.

## On-Scene Consulting

G. Ask about suicide.

H. Consider basic human needs.

I. Beware of suicide by cop.

The Secondary Negotiator is responsible for monitoring the negotiations so as to give feedback to the Primary Negotiator regarding the following:

A. Tempo.

B. Inflection.

C. Trigger words.

D. Interpretation of messages given by the subject.

E. Any additional useful information.

The Coach or CNT Supervisor will monitor the ongoing negotiations and will offer any advice or information that he or she deems important and useful.  The Coach or CNT Supervisor is separate from the tactical supervisor or Incident Commander.

The Coach or CNT Supervisor will perform the following functions:

A. Meeting with Negotiators.

B. Give advice to the Primary Negotiator.

C. Keep track of chronological events to include maintaining a white board, track "trigger" words, and maintain timeline such as identifiers, information, etc.

The Intelligence Coordinator, who is a trained negotiator, is responsible for assigning persons to gather information about the subject to include: description, criminal background, mental health history, medical history, family, financial issues, and other relationships.

In addition, I base my opinion on the following facts and testimony:

On-Scene Consulting ────────────────────

- According to Sergeant Michael Pina, he agrees that if there is a vehicle barricade and the subject will not come out, there is an option to call SWAT and Crisis Negotiators, (Deposition Transcript of Michael Pina, Page 46).
- According to Sergeant Michael Pina, if it is a vehicle barricade, where the person will not come out. It is going to be a long-drawn-out event. It is going to be hours until there is a plan to take him into custody. Lots of announcements, a lot of talk with the Tactical Negotiators, (Deposition Transcript of Michael Pina, Pages 49-50).

Lastly, I base my opinion on my twenty eight year law enforcement career and specifically during my assignment as a Sergeant II+1 at Los Angeles Police Department Special Weapons and Tactics (SWAT) where I supervised hundreds of SWAT incidents that involved the use of the SWAT's Crisis Negotiation Team.

## **Opinion Number 4**

It is my opinion that a reasonable law enforcement officer acting consistent with standard police practices and outlined in the California Commission on Peace Officers Standards and Training, Student Materials, Learning Domain, No. 20, Use of Force, Version 3.3, Pages 3-4, would have given a verbal warning to Mr. Jacob Dominguez if he were going to fire their service weapon. The Supreme Court applied the reasonableness test set forth in the Fourth Amendment (Tennessee v. Garner), "some warning be given prior to the use of deadly force where feasible..."

It is my opinion Santa Jose Police Department Police Officer Michael Pina should have given Mr. Jacob Dominguez a warning that he was going to use deadly force and give Mr. Jacob Dominguez a reasonable opportunity to comply.

Lastly, I base my opinion on my twenty year law enforcement career whereas a Supervisor, I have investigated over 100 Use of Force Incidents as well as being personally involved in the use of lethal and less than lethal force incidents.

## **Opinion Number 5**

It is my opinion that a reasonable officer acting consistent with standard police practices would not have used lethal force in this situation. The basis in determining whether force is "unreasonable" shall be consistent with the Supreme Court decision of Graham v. Connor, 490 U.S. 386 (1989). Officers are trained at the POST Basic academy that the use of force must meet an *"Objectively Reasonable"* standard. The following quote from POST typifies the training (emphasis added): *"A reasonable officer* is defined as an

## On-Scene Consulting

officer with similar training, experience, and background in a similar set of circumstances, who will react in a similar manner," (Learning Domain #20; "Introduction to the Use of Force," Pages 1-4).  When an officer uses deadly force in self-defense, standard police practices and most agencies polices dictate that the officer must be facing what is reasonably believed to be an imminent or immediate threat of death or serious bodily injury.   It is my expert opinion that a similarly trained San Jose Police Department Police Officer would not have considered Mr. Jacob Dominguez to be a lethal threat in this set of facts.

Lastly, I base my opinion on my twenty eight year law enforcement career whereas a Supervisor, I have investigated over 100 Use of Force Incidents as well as being personally involved in the use of lethal and less than lethal force incidents.

### **Opinion Number 6**

It is my opinion San Jose Police Department Police Officer Michael Pina's use of lethal force was inappropriate and unreasonable on September 15, 2017, when he fired two rounds from his AR-15, .223, semi-automatic rifle ultimately killing Mr. Jacob Dominguez.

In addition, I base my opinion on the following facts and testimony:

- According to Police Officer Alvaro Lopez, he did not have any information that led him to believe that Mr. Jacob Dominguez had possessed the gun at the time of the robbery of the Arco Gas Station, (Deposition Transcript of Alvaro Lopez, Page 35).
- According to Police Officer Alvaro Lopez, he did not see Mr. Jacob Dominguez with anything in his hands, (Deposition Transcript of Alvaro Lopez, Page 35).
- According to Police Officer Alvaro Lopez, he did not see Mr. Jacob Dominguez display any type of weapon before the shot was fired, (Deposition Transcript of Alvaro Lopez, Page 35).
- According to Police Officer Kristoffer Ferguson, he could see from Mr. Dominguez's mid-arm/shoulder up, (Deposition Transcript of Kristoffer Ferguson, Page 68).
- According to Police Officer Kristoffer Ferguson, he could not see anything in Mr. Jacob Dominguez's hands and if there was something in his hands, he would be able to see it, (Deposition Transcript of Kristoffer Ferguson, Pages 71-72).
- According to Police Officer Kristoffer Ferguson, he did not hear Mr. Jacob Dominguez say anything, (Deposition Transcript of Kristoffer Ferguson, Page 74).

## On-Scene Consulting ─────────────────

- According to Police Officer Kristoffer Ferguson, he could not see any weapons in the vehicle, (Deposition Transcript of Kristoffer Ferguson, Page 74).
- According to Police Officer Kristoffer Ferguson, he was 100% focused as to what was going on in the car, (Deposition Transcript of Kristoffer Ferguson, Page 77).
- According to Police Officer Kristoffer Ferguson, he never heard Mr. Jacob Dominguez say, "I got a gun and I'm going to shoot you," (Deposition Transcript of Kristoffer Ferguson, Page 83).
- According to Sergeant Michael Pina, when Mr. Jacob Dominguez had his hands up, he could see that there was nothing in his hands, no weapon, (Deposition Transcript of Michael Pina, Page 89).
- According to Sergeant Michael Pina, when he fired, he could not see what Mr. Jacob Dominguez' hands were doing, (Deposition Transcript of Michael Pina, Page 97).
- According to Sergeant Michael Pina, he could not see Mr. Jacob Dominguez' hands at all, (Deposition Transcript of Michael Pina, Page 98).
- According to Sergeant Michael Pina, Mr. Jacob Dominguez did not verbally threaten him, (Deposition Transcript of Michael Pina, Page 102).
- According to Sergeant Michael Pina, he encountered people who did not initially have their hands up or put them down and then back up, (Deposition Transcript of Michael Pina, Pages 106-107).

Lastly, I base my opinion on my twenty eight year law enforcement career whereas a Supervisor, I have investigated over 100 Use of Force Incidents as well as being personally involved in the use of lethal and less than lethal force incidents.

### Opinion Number 7

It is my opinion San Jose Police Department Police Officer Michael Pina's use of lethal force violated his training and caused the death of Mr. Jacob Dominguez, including but not limited to the following reasons:

- Highest level of force a Police Officer can use.
- This was not an immediate Defense of Life situation.
- Must be a last resort before using lethal force.
- Must be the direst of circumstances.
- Deadly force is likely to cause great bodily injury or death.
- Must show a reverence for human life.
- There were other reasonable measures available.

## On-Scene Consulting

- All other reasonable measures were not exhausted.
- Warnings when feasible that deadly force will be used.
- Officers are responsible for every shot.
- Subjective Fear is insufficient.
- Over reaction is excessive force.

Lastly, I base my opinion on my twenty eight year law enforcement career whereas a Supervisor, I have investigated over 100 Use of Force Incidents as well as being personally involved in the use of lethal and less than lethal force incidents.

### Opinion Number 8

It is my opinion San Jose Police Department Police Officer Michael Pina's tactical conduct and decisions preceding the use of deadly force in this matter was inappropriate based on the totality of the circumstances. It is my opinion that there was a departure from POST Standards by Police Officer Michael Pina in this incident. In addition, I base my opinion on the California Supreme Court opinion in Hayes v. County of San Diego, 2013 Cal LEXIS 6652. In Hayes, the California Supreme Court found that, under California negligence law, an officer's pre- shooting conduct leading up to a deadly use of force may affect whether a use of force is ultimately reasonable and therefore may be considered in the analysis of any use of deadly force. It is my opinion that there was a gross lack of situational awareness and fundamental tactical errors by San Jose Police Department Police Officer Michael Pina in this incident.

Lastly, I base my opinion on my twenty eight year law enforcement career whereas a Supervisor, I have investigated over 100 Use of Force Incidents as well as being personally involved in the use of lethal and less than lethal force incidents.

### My Qualifications for Reviewing this Case:

My opinions are based on my education, training, and experience. Upon my graduation in June 1988 from Northeastern University in Boston with a Bachelor's Degree in Criminal Justice, I was hired as Criminal Investigator/Special Agent GS-1811. Upon completion of Criminal Investigator/Basic Agent School at the Federal Law Enforcement Training Center (FLETC)-6-month academy, I was employed by the United States Customs Service and assigned to the Organized Crime Drug Task Force where I functioned as an agent and undercover operative. The investigations focused on targeting criminal organizations that were involved in large scale narcotic smuggling and money laundering operations.

## On-Scene Consulting

I was assigned to the United States Customs Service Office of the Special Agent In-Charge, in San Francisco from August 1988 until I joined the Los Angeles Police Department in November of 1989.  While in the Los Angeles Police Department Academy, I was selected by the staff to be my Recruit Class Leader.  Upon my graduation from the LAPD Academy, I was assigned to 77th Division.  In addition to being assigned to 77th Division, I was assigned to Northeast Division (Patrol), Northeast Division (Special Projects Unit-SPU), and Northeast Division C.R.A.S.H (Gang Detail).  I was selected to Operations Central Bureau C.R.A.S.H., where I worked a plain clothes detail targeting specific gangs throughout Operations Central Bureau which included Rampart Division, Hollenbeck Division, Central Division, and Northeast Division.

I applied and was selected to be a Police Officer III at Wilshire Area Vice where I functioned as an undercover operative targeting prostitution, gambling, bookmaking, and other Vice related offenses. While working Wilshire Vice, I was ambushed and received two gunshot wounds.  I received the Purple Heart in 2010 for the injures associated with being ambushed.  Upon return from my injuries, I attended mandated Field Training Officer (FTO) School and was assigned as a Field Training Officer at Wilshire Division.  I trained recruits upon their graduation from the Los Angeles Police Academy in tactics, use of force, report writing, vehicle stops, calls for service, court testimony, emergency procedures, pursuit policy, accident investigations, perimeters, Department policies and procedures, and effective communication skills. While assigned as a Field Training Officer, I was involved in an In-Policy Lethal Use of Force incident, while working with a Probationary Police Officer who had recently graduated from the Los Angeles Police Academy.

I was promoted to the rank of Detective and attended Basic Detective School.  Upon completion of Basic Detective School, I was assigned to Wilshire Area Narcotics, Field Enforcement Section (FES), where I functioned as an investigator in an undercover capacity.  As a Detective I wrote and served search and arrest warrants to include large-scale multiple search warrant services. I addition, I managed and utilized Confidential Reliable Informants (CRI's) during hundreds of street-level narcotic transactions and search warrant services.

I was promoted to the rank of Sergeant I and assigned to Hollenbeck Division.  Prior to my assignment, I attended mandated Basic Supervisor School.  In conjunction with Supervisor School, I was selected to attend the West Point Leadership Academy Supervisor Training.  The training focused on team building, leadership, and decision making.  While assigned to Hollenbeck Division, I conducted roll call training daily on

## On-Scene Consulting

numerous subject matters to include: Use of Force Options (Non-Lethal and Lethal), Tactics, Calls for Service, Calls for Service involving the Mentally Ill, Vehicle Pursuit Policy, LAPD Policies and Procedures, Use of Force Policy, Updated Legal Bulletins, Training Directives, and other Standardized Roll Call Training.  I directly supervised a Watch of Officers and provided supervisory oversight during calls for service, tactical situations, perimeter tactics, containment and control issues and use of force incidents.  I conducted audits, personnel investigations, Standard Based Assessments (Ratings), Use of Force Investigations, administrative projects, and prepared commendations for officer's field performance.  While assigned to Hollenbeck Division, I was selected as the Officer-In-Charge of Hollenbeck Division's Special Enforcement Group.  I directly supervised (14) Police Officers and Detectives assigned to the Unit.  Our unit worked in conjunction with Hollenbeck Detectives and specifically targeted career criminals in the Division.  In addition, I provided and supervised uniformed assistance with Operations Central Bureau Narcotics during street level narcotic transactions as well as during narcotic related search warrants.  I provided ongoing mandated Department Training as well tactical, firearms, less than lethal and search warrant tactics training to the Officers and Detectives.  As a Unit, we prepared and served numerous search warrants.  I provided search warrant tactical briefing and de-briefing of each warrant at the conclusion of the of the service.  I completed audits, administrative projects, Use of Force Investigations, personnel complaints, and other administrative duties as deemed necessary by the Area Commanding Officer.

During this time, I was selected to be loaned to Internal Affairs, Headquarters Section.  I investigated personnel complaints that were too large in scope for a geographical Division.  At the conclusion of my loan, I was selected to Management Services Division, Special Projects, and Office of the Chief of Police.  I completed numerous in-depth staff projects for review by the Chief of Police.  In addition, I was assigned with conducting research and editing the 2000 LAPD Department Manual.

Also, during this time, I earned my Master's Degree in Public Administration from California State University, Long Beach.

I applied and was selected as a Sergeant II at 77th Division Vice.  I directly supervised ten undercover officers and four uniformed officers.  I provided all facets of training to the officers assigned to Vice at that time to include: Use of Force Policy, Legal Updates, Department Directives, Training Bulletins, Standardized Roll Call Training, Tactics Training, Undercover Operations training, Surveillance training, and any other training

## On-Scene Consulting

deemed necessary by my Area Commanding Officer. I conducted audits, personnel investigations, administrative projects, Use of Force Investigations, and special projects.

During this time, I was selected by the Chief of Police to be loaned to the Rampart Corruption Task Force. I conducted Use of Force audits on Specialized Units in Central and South Bureaus. I reported directly to the Office of the Chief of Police. I assisted with the completion of final document presented to the Board of Inquiry overseeing the Rampart Corruption Task Force.

In 2000, I applied and was selected to Metropolitan Division K9 Platoon as a Sergeant II+1. I directly supervised (18) K9 Handlers. Metro K9 conducted K9 Operations for the entire Department covering all Patrol Divisions and Specialized Units. I provided all facets of training to the K9 Officers to include: K9 Operations, tactics, search warrant services, Mobile Field Force Options, Less than Lethal Force Options, Lethal Force Options, Department Directives, Training Bulletins, and other training dictated by the Officer-in-Charge and Commanding Officer. In addition, I taught K9 Operations at in-service training, Watch Commander School, Field Training Officer (FTO) School, and Basic Detective School. While at K9, I investigated and completed K9 contacts (bite investigations), personnel complaints, Use of Force Investigations. In addition, I directed and was directly involved in Use of Force incidents. I received the LAPD Medal of Valor and LAPD Police Star for two lethal use of force incidents while assigned to K9.

In 2005, I was selected as a Sergeant II+1 in Special Weapons and Tactics (SWAT). I directly supervised sixty SWAT Officers with (6) other SWAT Sergeants and (2) Lieutenants. I conducted and facilitated all facets of SWAT training to include: Weapons Training (.45 caliber, MP-5, M-4, Benelli Shotgun, Remington 870 Bean Bag Shotgun, .40mm, SAGE, MX-26 Taser) on a monthly basis. In addition, I facilitated and conducted training in the following training Cadres: Breacher (Explosive), Crisis Negotiation-Mental Health, MEU, SMART, Suicide Prevention, Counter-Terrorism Cadre, Climbing, Hostage Rescue, Sniper Training, Air Support Training (Fast rope, Aerial Platform Shooting). I directly supervised SWAT missions and High-Risk Search Warrant Services to include all facets (preparation, briefing, deployment, de-briefing). I was the Supervisor-in-Charge of the Crisis Negotiation Team. I provided on-going crisis negotiation training, mental health training, de-briefs, 40-hour POST Certified Crisis Negotiation Team (CNT) School, and suicide prevention training. I worked in conjunctional with the mental health community to provide and facilitate training with LAPD SMART, LAPD Mental Evaluation Unit (MEU), Behavioral Science Services Section (BSS), and the Didi Hirsch Suicide Prevention Center. In addition, I assisted the

## On-Scene Consulting

West Point Military Academy with the development of their crisis negotiation curriculum.

During this time, I was selected as the sole LAPD SWAT representative to respond to Mumbai India with Counterterrorism following the terrorist attack in November 2008. I taught use of force, tactics, and SWAT deployment to 250 Mumbai Special Tactical Police Officers. Upon my return, I assisted with the development of multiple venue/multiple attacker tactics.

In June 2010, I retired from the Los Angeles Police Department with 20 years in service to pursue an opportunity in the private sector. I held supervisory positions for the last 14 years of my career. During my tenure with the LAPD, I received over 100 Commendations to include: The Medal of Valor, Purple Heart, and the Police Star.

From June 2010 through April 2013, I was the Vice President of Security Operations at Caruso Affiliated in Los Angeles, CA. My responsibilities included: Identified and conducted Risk and Vulnerability Assessments for all Caruso Affiliated Developments, projected developments/investments, and residences. Utilized strategic-level analysis from the intelligence community, law enforcement and the private sector. Ensured a coordinated ability to identify and monitor potential or actual incidents among critical infrastructure domains and all personal and professional interests of Caruso Affiliated. Mitigated expected threats. Utilized preplanned, coordinated actions in response to infrastructure warnings or incidents. Responded to hostilities. Identified and eliminated the cause, or source, of an infrastructure event by the utilization of emergency response measures to include on-site security personnel, local law enforcement, medical and fire rescue, and relevant investigative agencies. Conducted all facets of security training for the company and employees. Formulated Business Continuity and CEO Succession Plans for the company and all affiliated business interests. Conducted ongoing audits and internal investigations.

From June 2013 to June 2014, I was hired as a Deputy Sheriff at the Riverside Sheriff's Department where I conducted all facets of patrol service to include calls for service, self-initiated field activity, arrests, citations, and court testimony. In addition, during my tenure with the Riverside County Sheriff's Department, I was assigned to Robert Presley Detention Center (RPDC). Processed and monitored inmate population from initial intake, housing, court, transportation, and release. Conducted searches of inmate population as well as the facility on an ongoing basis. Utilized experience as a gang officer, Detective and Sergeant with LAPD to conduct interviews and interrogations of prisoners regarding a myriad of

## On-Scene Consulting

investigations. Provided information to gang detail. Functioned as a mentor to newly appointed Deputy Sheriffs as well as Supervisors. Attended and certified in RSO Supplemental Jail Operations Core Course prior to deployment at RPDC. Attended on-going training to include: Use of Force (Lethal and Non-Lethal), Crisis Negotiation Training, Active Listening Skills Training, Report Writing, Response and Deployment to Critical Incidents, and Proper Protocols and Procedures when responding to a medical incident or suicide.

From June 2014 to March 2016, I was the Director of Security at Universal Protection Service where I supervised 84 Security Professionals at the City National Plaza. Conducted and or facilitated all Bureau of Security and Investigative Services (BSIS) training to Security Professionals.  Ensured all Security Professionals were compliant with BSIS security training and licensing.  Conducted the following training to Security Professionals and Tenants on an ongoing basis: Fire Life Safety, Evacuation Drills, Active Shooter, Workplace Violence, Security Procedures and Protocols, Responding to Incidents Involving the Mentally Ill, Hazardous Materials and Internal Theft.  Conducted ongoing Risk and Vulnerability Assessments of the City National Plaza to include security staffing and deployment, Closed Circuit Television (CCTV), Crime Prevention through Environmental Design (CPTED), and protocols to respond and mitigate threats. Developed Security and Fire Life Safety Manuals for Security Professionals and Tenants. Coordinated all security efforts to ensure safety at Special Events.  Conducted internal investigations and worked in conjunction with the Los Angeles Police Department (LAPD) and the Los Angeles Fire Department (LAFD) on an ongoing basis.

From March 2016 to September 5, 2017, I was the Director of Security at L&R Group of Companies.  Identified and conducted Risk and Vulnerability Assessments for all L&R Group of Companies developments and projected developments throughout the United States. Conducted and/or facilitated all Bureau of Security and Investigative Services (BSIS) training to Security Professionals.  Ensured all Security Professionals were compliant with BSIS security training and licensing.  Conducted the following training to Security Professionals and Tenants on an ongoing basis: Fire Life Safety, Evacuation Drills, Active Shooter, Workplace Violence, Security Procedures and Protocols, Responding to Incidents Involving the Mentally Ill, Hazardous Materials and Internal Theft.  Conducted ongoing Risk and Vulnerability Assessments to include security staffing and deployment, Closed Circuit Television (CCTV), Crime Prevention through Environmental Design (CPTED), and protocols to respond and mitigate threats. Developed Security and Fire Life Safety Manuals for Security Professionals and Tenants.

## On-Scene Consulting

Coordinated all security efforts to ensure safety at Special Events.  Conducted internal investigations and worked in conjunction with the Los Angeles Police Department (LAPD) and the Los Angeles Fire Department (LAFD) on an ongoing basis as well as respective law enforcement agencies throughout the United States on security matters.

Attached are my curriculum vitae, listing of testimony and fee schedule.

Scott A. DeFoe

# EXHIBIT 4

# DAVID E. BALASH

FIREARMS EXAMINER * FORENSIC SCIENCE CONSULTANT
41906 Echo Forest Ct. * Canton, Michigan 48188
Phone (734) 981-6788* Fax (734) 981-6459

September 27, 2021

Mr. John Kevin Crowley
Attorney at Law
125 South Market Street
San Jose, California 95113-2288

> RE:   Dominquez v. San Jose Police Department, et al
> Federal Court - Northern District of California
> Case No.: 5:18-cv-04826

The following list of police reports, evidence examinations, photographs, depositions, autopsy protocol, scene visit and video were reviewed by the undersigned and were used as source material for the opinions and conclusions reached in this report.

- 5/21/21   Proposed Stipulated Protective Order, Case No. 5:18-cy-04826-BLF
- 6/8/21   188 pages of police reports on this case
- 6/8/21   109 pages of police reports on this case
- 6/11/21   Flash drive containing;
    Depositions of officers Pena and Lopez
    Scene photographs
    Sweatshirt photographs
    Trajectory photographs
    Officer photographs
    3164 Penitencia Creek home video surveillance
    3158 Penitencia Creek home video surveillance
    Car exterior photographs
    Photographs taken at the Medical Examiner's Office – None during the Autopsy.
    Autopsy Protocol
- 9/3/21   Dropbox link containing;
    575 Photographs taken on this case.
- 9/3/21   San Jose's production of documents – 7 pages
- 9/7/21   Dropbox link containing;
    Officer Pena's video statement
    Scene photographs
    Body camera footage from two officers at the shooting.
- 9/9/21   Fly to San Jose – examine evidence (sweatshirt of Mr. Dominquez, bullet fragments from the autopsy, bullet fragments from the Dominquez vehicle and view the scene. Return to Michigan on 9/10/21.
- 9/9/21   Request to examine the involved Kia, however it was not maintained as evidence by the San Jose Police Department.

1

- 9/10/21    Defendant's Expert reports and disclosures
- 9/24/21    Report on the Fatal Shooting of Jacob Dominquez on 9/15/2017, the County of Santa Clara, Jeffery F. Rosen District Attorney

QUALIFICATIONS FOR OPINION

The opinions and conclusions reached on the above-mentioned shooting are based on the following:

- My review of all the above listed material and evidence.
- My experience as a Michigan State Police Officer for over 25 years rising to the rank of D/Lt. in charge of the Firearms, Tool-Mark and Bombs and Explosive Unit of the MSP Northville Forensic Science Laboratory
- My experience for over 20 years as a member of the Michigan State Police Forensic Science Laboratory in the Firearms Identification, Tool Mark, Bombs and Explosive Unit.
- The examination of hundreds of firearms for safety and function testing prior to firing as well as determining the causes of reported firearm failures.
- My experience with the Michigan State Police as a Crime Scene Analyst participating in and supervising hundreds of crime scene investigations during my years with the department.
- My experience at photographing and collecting evidence at crime scenes while with the Michigan State Police.
- My experience at photographing, participating in and collecting evidence at autopsies for over 20 years.
- Training sessions on crime scene reconstruction both as a member of the Michigan State Police and as a civilian examiner.
- My experience in investigating shooting crime scenes for over 20 years as a member of the Michigan State Police and then continuing to utilize that experience as a self-employed examiner in assessing shooting crime scenes for the past 28+ years.
- My experience at having examined hundreds of shooting victims at crime scenes, autopsies, hospitals and funeral homes.
- My experience at taking and interpreting X-rays in bomb squad work and training as well as at using and interpreting X-rays at crime scenes, autopsies and hospitals for the past 48+ years.
- I continue to follow new developments in the field of forensic testing through caseload and review of journals in the subject area.
- Training and review of new materials/techniques through the internet.
- See a copy of my C.V. for more specific information

2

INFORMATION

The following is a brief summary of the events leading up to the shooting death of Jacob Dominquez by San Jose Police Officer Michael Pina on September 15, 2017 as understood by the undersigned from reviewing the above listed material.

Mr. Dominquez was wanted on a felony warrant by the San Jose Police Department and was actively being pursued/surveilled for at least the past two days by members of the San Jose Police Department VCT squad. Information was obtained on the whereabouts of Mr. Dominquez and a surveillance team of approximately 12 officers in individual vehicles were assigned. The officers were advised that the suspect may be armed with a silver revolver due to .357 magnum caliber ammunition that was discovered during the serving of a search warrant.

Officers were aware that Mr. Dominquez frequently violated traffic laws by speeding, running stop signs and red lights, weaving in and out of traffic and making sudden "U" turns in an apparent effort to detect if he was being followed by law enforcement. This erratic pattern of driving required the pursuit teams to remain well out of sight so normal tailing was not possible, therefore a fixed wing aircraft was employed to allow the tailing vehicles to remain well back of the subject vehicle. The fixed wing aircraft advised the VCT team that the Dominquez vehicle had settled down and was traveling normally. A short time later the aircraft advised that the Dominquez vehicle, a black KIA Sportage, was stopped at the light on Penitencia Creek Road at the intersection of N. White Road.

At this point Officer Pena was the first car behind the suspect, Officer Ferguson was the second car with Officer Lopez in the third car. Officer Pena then pulled his undercover vehicle directly in front of the suspect's vehicle with Officer Pena's front passenger door either touching or very close to the front of Mr. Dominquez's front bumper roughly making the letter "T" with the two vehicles. Officer Pena immediately exits his vehicle and takes a position near the left front wheel of Officer Ferguson's vehicle with his M-4 rifle pointed at the suspect in the driver's seat of the Kia. Officer Pena reportedly yells "hands up-show me your hands and if you move, I will shoot you" to Mr. Dominquez in the Kia vehicle. At this time Officer Pena reports that Mr. Dominquez does not raise his hands for several seconds and then does raise his hands all while interacting with Officer Pena through a partially opened driver's door window. Then according to Officer Pena, Mr. Dominquez quickly lowers both of his hands toward his right lap area and leans his body forward (interview demonstration) at which time Officer Pena fires two shots at Mr. Dominquez because he believes he is reaching for a firearm. No firearm was located in the vehicle or on Mr. Dominquez.

When Officer Pena places his vehicle in a "T" position to the Dominquez vehicle, Officer Ferguson quickly positioned the right front tire of his vehicle very close to the driver's door of Mr. Dominquez's vehicle and immediately exits his vehicle with his M-4 rifle

3

standing in his open door and then standing on the floor board of his vehicle pointing his rifle over the roof of his vehicle. Officer Ferguson has essentially the same view of Mr. Dominquez as does Officer Pena and they are standing only 4-6 feet apart along the side of his vehicle. Officer Lopez quickly arrives positioning his vehicle immediately to the rear of and actually strikes the rear bumper of the Dominquez vehicle and immediately exits his vehicle with his M-4 rifle at which time two shots are heard on the body camera.

A flash bang is heard being deployed several seconds later and then all the officers retreat to cover positions for approximately 15 to 30 minutes before having a canine released into the Kia to determine the status of Mr. Dominquez.

COMMENTS AND OBSERVATIONS

The fatal wound to Mr. Dominquez's left lower jaw area was caused by a damaged fired rifle bullet in this examiner's opinion. The damage would have been the result of the bullet impacting the door window glass prior to striking Mr. Dominquez causing the large irregular bullet wound of entry. The fact that there was no exit from a .223 caliber rifle bullet attests to the severe damage done to this bullet prior to striking Mr. Dominquez. The bullet jacket recovered at autopsy was nearly complete, however the majority of the bullet core material (lead) was missing. This is not unusual given the fact that the bullet was badly damaged by the glass in this examiner's opinion. The weight of the bullet jacket and core material recovered at autopsy approximates ½ of an intact bullet in this caliber, with the missing core material possibly accounted for in the injuries to the left neck area of Mr. Dominquez or the remaining core material was not recoverable.

A bullet strike is noted in the interior of the Kia in the "B" pillar on the passenger's side of the vehicle. This hole is essentially a first strike bullet hole of entry and was caused by an undamaged/slightly damaged fired rifle bullet (note the perfectly round entry hole) in this examiner's opinion. Evidence technicians removed one portion of core material with some apparent jacket material from the area of the "B" pillar during the vehicle inspection at the police facility. The material recovered would represent only a portion of a whole fired rifle bullet, however the area in which the bullet struck could easily account for the missing jacket (inside the steel structure of the "B" pillar or much of the bullet could have escaped the vehicle after striking the interior of the passenger rear door) at the scene. The recovered core material was also approximately ½ the weight of a single fired rifle bullet in the .223 caliber class of bullets, however in noting the uniform bullet hole of entry pictured below with the damaged exit hole in the "B" pillar, this could not have been the missing portion of the fatal bullet in this examiner's opinion. This bullet hole was caused by an undamaged intact fired rifle bullet in the .223 class caliber.

4



Photo # 12363200



Photo # 12363185

The report issued by the Santa Clara County District Attorney Jeffery F. Rosen states that the Santa Clara County Criminalists concluded the following:

1. Officer Pena fired two successive shots approximately ½ second apart;
2. The projectile that killed Dominquez was a fragment of a copper (jacketing) recovered from his body. The combined weight of the (jacketing) and the lead core recovered from the doorframe amounted to the approximate weight of a single .223 bullet;
3. Only a single bullet entered the vehicle, meaning that the other shot fired by Officer Pena was a miss;

4. There was no way to tell definitively if the miss was the first or second shot, but according to firearms experts, when two shots are fired in rapid succession, a miss is more likely to occur on the second shot due to recoil.
5. The bullet that entered the vehicle struck the driver's window, shattering it;
6. Upon impact with the glass, the bullet broke up with the lead core going through the forearm of Dominquez's hooded sweatshirt and ultimately lodging in the rear passenger door frame;
7. The (jacketing) fragment that broke away upon impact with the glass traveled in a path that penetrated Dominquez's head, neck and spine causing his death;
8. Dominquez was leaning back in his seat immediately after the shooting;
9. There were two holes in the left forearm of the hooded sweatshirt (the hole on the frontside of the left sleeve was approximately 12 inches up from the edge of the cuff and the hole located on the backside of the left sleeve was approximately 11.5 inches up from the edge of the cuff) that were caused by a single bullet passing through (entrance and exit).

After reviewing the above reasons given by the District Attorney, this examiner is troubled by the sheer number of miss-representations contained in those 9 points which will be addressed below:

1. The Santa Clara Criminalists did NOT state that this was from one bullet due to the combined weight of the two fragments. What they did say in their report was that "It is not possible to determine if Items SJ182278-28 and SJ182278-28 are from one or more projectiles.
2. The criminalists did not say that one shot missed.
3. Apparently the District Attorney believes that a fired rifle bullet can break up causing the bullet jacket and core to separate and only the bullet jacket will be severely deformed and that the core, apparently undamaged by the violent interaction with the window glass now travels as an undamaged projectile to strike the "B" pillar leaving a perfectly round .223 caliber hole. It should be noted that if the hole in the "B" pillar were caused only by a .223 caliber **bullet core**, the hole would only be approximately .180 inches in diameter due the missing jacket. Did anyone take this into account? Bullet manufacturers design jacketed bullets to not have the core material and the jacket separate when impacting a target.
4. The recoil of .223 Remington caliber cartridge in a M-4 rifle (or in other semi-auto rifles) is designed to not cause muzzle jump. This is one of the reasons this caliber rifle is so popular, it is powerful and yet easy to fire and has very little recoil. For anyone to suggest that the recoil of a .223 caliber semi-auto rifle as the reason for a missed shot from less than ten feet into a large vehicle from a well-trained officer is ludicrous.
5. The turning of the bullet core approximately at a 45 degree or greater angle and then have it penetrate the sweatshirt and the "B" pillar needs explanation?
6. On page 18 of that report the District Attorney agrees that Mr. Dominquez's hands were probably up when Officer Pena fired his weapon.

The undersigned also examiner the black sweatshirt worn by Mr. Dominquez when he was shot. The reports issued by the Santa Clara Crime laboratory documents the thorough examination of the sweatshirt and the undersigned agrees with the conclusions drawn by the crime laboratory that the holes in the left sleeve of the black sweatshirt were consistent with the passage of a high-speed projectile. The below shown photographs depict the holes in the outside lower left sleeve (DSC-3555) and the inside lower left sleeve (DSC-3550) of the sweatshirt. This clearly indicates the passage of a bullet through the lower sleeve of the sweatshirt from the outside to the inside approximately 11-12 inches up from the cuff, however the bullet does not strike Mr. Dominquez.



DSC-3555



DSC-3550

Investigators examining the black Kia being driven by Mr. Dominquez conducted trajectory testing on the bullet hole located in the "B" pillar on the passenger side of the vehicle. The examinations consisted of placing a wooden dowel into the bullet strike in the "B" pillar with a colored string attached near the front of the dowel and then drawing that string out through the driver's side window. The below shown photograph shows this testing by the Santa Clara Crime Laboratory personnel.



Photo # 12363278

Laboratory photographs #12363212e+line through 12363278ce depict various trajectories from the single bullet strike in the "B" pillar with most of the string trajectory lines coming out of the driver's side window near the door handle, however in one of the photographs the orange-colored trajectory line appears to this examiner to be coming out further forward towards the windshield area of the vehicle. The reason these trajectory projections are important is that it appears the investigators are trying to correlate the bullet strike in the "B" pillar with a portion of the bullet from the fatal injury to Mr. Dominquez. The undersigned was unable to reproduce the above listed photos in this report due to the formatting in which the photographs were received by the undersigned.

The importance of the above material is that it appears investigators thought that the bullet strike in the "B" pillar was a portion of the fatal bullet strike to Mr. Dominquez and then it appears that a second version of the trajectory test was that the "B" pillar strike was an independent fired bullet. Investigators could have facilitated the examinations had they not used string taped to a wooden dowel (as shown in the above photo) and simply pulled the trajectory string all the way through the hole in the "B" pillar, centered that

8

string in the middle of the exit hole while centering the string in the center of the entrance hole and then projecting the string outside the driver's door window. This would have given them a much more accurate flight path of the bullet causing the hole in the "B" pillar. Investigators could have/should have utilized a laser to more accurately determine the angle of the bullet in the "B" pillar. Refer to photographs #'s 12363299 and 12363185 included in this report on page 5.

## OPINIONS AND CONCLUSIONS

Officer Pena's vehicle is the first to block in the Dominquez vehicle and Officer Pena immediately exits his vehicle and takes a position near the left front wheel /engine area of Officer Ferguson's vehicle which has blocked the driver's door of the Dominquez vehicle. Officer Pena reportedly begins yelling "show your hands" and "don't move or I will shoot you" commands to the driver of the stopped vehicle. Officer Pena states at first Mr. Dominquez does not comply with the hands up order, however after a few seconds he raised his hands. Within seconds Officer Pena states that Mr. Dominquez then quickly lowers his hands to his lap area and leans forward and it is at this time that Officer Pena fires 2 rounds at Mr. Dominquez stating that he (Pena) thought that Dominquez was reaching for firearm. No firearm was recovered from the vehicle or Mr. Dominquez.

The evidence clearly shows that the fatal wound to Mr. Dominquez (only one bullet wound) struck the partially lowered driver's side window prior to striking the victim in the lower left mouth area with no exit wounds associated with this fatal bullet strike, therefore the bullet hole in the "B" pillar had to be the result of a fragment of the fatal bullet core or an independent bullet strike. The independent bullet version accounts for both the holes in the sweatshirt as well as the round bullet entrance hole in the "B" pillar. The fragment of bullet core from the fatal shot version fails to explain either the round .223 caliber size bullet hole in the "B" pillar and does not explain how the holes in the sweatshirt were created. Officer Pena fired two rounds at Mr. Dominquez with only one bullet striking him. For the bullet strike in the "B" pillar to have been a fragment of the fatal bullet strike, the second shot fired by Officer Pena would have had to completely miss the vehicle (a distance of less than 10 feet with a person using a scoped rifle) as there are no other bullet holes in the Kia or any reported bullet strikes in the vicinity of the shooting. Officer Pena missing with the second shot is not a credible possibility in this examiner's opinion.

Having dismissed the possibility of a missed second shot, then the bullet strike in the "B" pillar was a direct bullet strike and the holes in the lower left sleeve of the sweatshirt had to have been caused by the passage of this fired bullet. The outer (entrance) bullet strike in the sweatshirt reportedly had powdered glass imbedded in the fabric (County of Santa Clara Crime Laboratory) which indicate that the second shot impacted glass prior to striking the sweatshirt, however the glass would have already been shattered from the first shot and would not have offered any substantial resistance to a bullet passing as would intact/non-damaged glass in this examiner's opinion.

After carefully reviewing the available information and evidence on this case it is the opinion of the undersigned examiner that Mr. Dominquez had to have had his arms/hands up above the level of the driver's door metal body for the bullet to have impacted the left sweatshirt sleeve and then struck the "B" panel, therefore the statement of Officer Pena that both of Mr. Dominquez's hands were down and out of sight when he fired his weapon is not correct. Mr. Dominquez's left arm/hand was above the level of the window opening in his vehicle when the bullet penetrated the sweatshirt. With the two fired rounds only separated by approximately ½ second and the shot to the sweatshirt (likely the second round fired), it is apparent that at least Mr. Dominquez's left hand/arm was up and above the driver's side window ledge when both rounds were fired.

The undersigned reserves the right to change or modify any of the opinions and conclusions expressed in this report if additional information or evidence becomes available.

Respectfully submitted,

David E. Balash

- A copy of my C.V. is attached
- A copy of my testimony document is attached

10

# EXHIBIT 5

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| JESSICA DOMINGUEZ,<br>INDIVIDUALLY AND AS GUARDIAN<br>AD LITEM FOR JACOB DOMINGUEZ,<br>JORDAN DOMINGUEZ AND JALIYAH<br>DOMINGUEZ,<br><br>            Plaintiffs,<br><br>vs.<br><br>CITY OF SAN JOSE, SAN JOSE<br>POLICE DEPARTMENT and DOE<br>POLICE OFFICERS 1, 2 and 3 and<br>DOES, inclusive,<br><br>            Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>) NO. 5:18-CV-04826-<br>)     BLF<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

_____


DEPOSITION OF DAVID BALASH


DATE:                   November 22, 2021

TIME:                   9:30 a.m.

LOCATION:               Remote Zoom Deposition


REPORTED BY:            BETTY A. SALOIS, RPR,
                        Certified Shorthand Reporter
                        License Number 4768
                        Appearing Remotely

_____
                  SALOIS & ASSOCIATES
             Certified Shorthand Reporters
             111 N. Market St., Suite 300
                San Jose, CA 95113-1112
                   (408) 279-DEPO

1

1                    A P P E A R A N C E S

2

3        For the Plaintiff:        THE CROWLEY FIRM
         Appearing Remotely        BY:  JOHN KEVIN CROWLEY, ESQ.
4                                  125 S. Market Street
                                   Suite 1200
5                                  San Jose, CA 95113
                                   408.288.8100
6

7
         For the Defendant:        CITY ATTORNEY'S OFFICE
8        Appearing Remotely        BY:  MAREN CLOUSE, ESQ.
                                   200 E. Santa Clara Street
9                                  16th Floor
                                   San Jose, CA 95113
10                                 408.535.1900

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                                              2

1                        INDEX OF EXAMINATION:

2                                                          Page:

3     Examination by Ms. Clouse                               4

4

5

6

7

8

9

10                        INDEX OF EXHIBITS:

11    Defendants              Description               Page:
      Exhibits:

12

13    1                Plaintiff's Rebuttal Expert         38
                       Witness Disclosure Pursuant
14                     To Stipulation and Order
                       Document 51
15

16

17

18

19

20

21

22

23

24

25

                                                              3

1     Q.   No problem.  Let me know when you are ready.

2     A.   I am set.

3     Q.   Have you formed any opinions that you would

4  offer at trial in this case that are not included in the

5  section following things and conclusions?

6     A.   Yes.

7     Q.   Okay.  What opinions have you formed that are

8  not in that section?

9     A.   Several -- at some point in time prior to my

10  writing the report I was E-mailed a report by a Mr.

11  Edwards, firearms examiner retained by the Defendant in

12  this particular case.  I had chosen not to review that

13  report until after I had formulated my report.  I don't

14  like to look at somebody else's work in the matter until

15  I formulated and come to my own conclusions.

16          As of Saturday I chose to review that.  I

17  reviewed it.  I made some notes on it.  I faxed those

18  notes to Mr. Crowley's office, and based on what Mr.

19  Edwards had said I would have formulated some opinions

20  as to the correctness of his report.

21     Q.   Okay.  What are those opinions?

22     A.   Well, not trying to make light of it, but if

23  Mr. Edwards is of the opinion that the first bullet was

24  the fatal bullet, that it went through the window, went

25  also through the sleeve, the left sleeve of

                                                          11

1    Mr. Dominguez and then struck Mr. Dominguez in the face

2    killing him he is of the opinion that the second shot

3    into the B pillar was a direct shot that didn't contact

4    anything and that the reason there is glass around the

5    hole where the shot in the sleeve and the hole, the

6    lower part of the Dominguez sweat shirt was due to the

7    fact that he must have had his arm up very high next to

8    his face at the point in time that the first bullet

9    struck him.  And I take -- I don't agree with that.  I

10   have several reasons as to why.

11       Q.   Okay.  Why don't we talk about those reasons?

12       A.   Okay.  Again I think everybody is aware of the

13   John F. Kennedy magic bullet they call it all the time,

14   couldn't have done all the damage that it did.

15            Well, in this regard this would also have to

16   have been a magic bullet because Mr. Edwards says that

17   the first bullet which is the fatal bullet, and it is

18   listed as item number 20 I believe by the San Jose

19   police department, is the bullet that struck the window.

20   It then goes through the sleeve of the sweat shirt and

21   then it impacts Mr. Dominguez in the lower jaw of -- the

22   left side of his jaw.  The reason I say it had to be the

23   magic bullet because the impact point of a 223 is a

24   jagged entry wound on the face of Mr. Dominguez on the

25   lower jaw.  The only reason that bullet didn't penetrate

                                                          12

1  completely and go out the back of his head was the fact

2  that it had been tremendously damaged prior to getting

3  there.  But if you read Mr. Edwards report the bullet

4  impacts the glass which would have caused the damage,

5  but now the bullet goes through the sweat shirt and only

6  makes minimal small holes going through the sweat shirt

7  and then only an inch or so between the outside edge of

8  the sweat shirt and Mr. Dominguez's face it now again

9  expands dramatically and only the jacket portion of the

10 bullet impacts Mr. Dominguez penetrating it to the skull

11 near the back of where it was removed at the autopsy and

12 that is just not possible.  The bullet couldn't possibly

13 have done that.

14         The bullet was damaged severely.  It couldn't

15 have been the bullet that went through the sleeve

16 because the holes in the sleeve would have been gapingly

17 large rips in the sleeve if the bullet prior impacted

18 undamaged window glass in my opinion.

19     Q.   Okay.  I want to be sure I understand what you

20 said.  So in your view the first bullet struck and

21 shattered the glass and then impacted Mr. Dominguez's

22 jaw.  Is that right?

23     A.   Correct.  Without going through the sleeve of

24 his sweat shirt.  That is my opinion.

25     Q.   The reason for that opinion is that if the --

13

1    having struck the glass the bullet was damaged and that

2    damage accounts for the way in which it impacted Mr.

3    Dominguez's jaw and lodged in the jaw area?

4        A.   Absolutely.  The bullet itself would be -- my

5    understanding it is an approximately 75 grade bullet

6    which is the weight of -- when it impacted the glass it

7    begins to disintegrate and therefore it is going to be

8    coming apart at the hole.  You see in Mr. Dominguez's

9    sweat shirt it doesn't show any characteristics

10   whatsoever of that on several of the photos that are

11   taken under alternate light sources.

12            You see more damage there which I suspect is

13   from the fragmented glass and fragmented some of the

14   possible bullet core material.  But the holes in the

15   sweat shirt would have been astronomically larger had

16   the bullet been damaged prior to going through that

17   sweat shirt.  It would have picked up, I would suspect

18   that the jacket itself with all the edges and catches to

19   it would have caught fabric and other material as well.

20       Q.   Is it your understanding that there was glass

21   noted in the area around the bullet hole on the sweat

22   shirt?

23       A.   It is my understanding there was, yes.

24       Q.   How do you account for that?

25       A.   Well, it is another point that Mr. Edwards

14

1    already had to have been up at that point in time in my

2    opinion.

3        Q.   Is that an opinion that you are offering in

4    this case as an expert witness?

5        A.   Not for the first bullet.  For the second, yes.

6        Q.   Okay.  Let me be clear about this.  Are you

7    offering an opinion about, in this case, as an expert

8    witness, about where Mr. Dominguez's arm was at the time

9    the first bullet was fired?

10       A.   I cannot.  No.

11       Q.   At the time the second bullet was fired it

12   sounds like you do have an opinion about where his arm

13   was at that time?

14       A.   Yes.  It had to be above the door frame area of

15   the window to allow the bullet passage through it.  It

16   would have been in line with the B pillar, and you could

17   probably have drawn out a reasonable bullet flight path

18   backwards from the hole in the B pillar back out to

19   where the bullet would have come through several inches

20   above the door frame itself, the lower part of the door

21   frame.

22       Q.   Do you have any other opinions about Mr.

23   Edwards report?

24       A.   Well, I don't -- I certainly don't agree that

25   Mr. Dominguez's arm was up and that the first bullet

21

1    clothing on this particular case and photographing it

2    under multiple light sources to give you different

3    angles and perspectives on it.  So I was pleased with

4    that.  But it is always something you want to look at.

5        Q.   When you say they did a good job do you mean

6    the crime lab?

7        A.   Yes.

8        Q.   Did you request to inspect the vehicle involved

9    in this incident?

10       A.   Yes.  I did.

11       Q.   You weren't able to?

12       A.   No.  The vehicle was not kept.  So it is gone.

13   I understand it is somewhere and still in California I

14   understand, but after several years and repairs you

15   would have had to do some physical damage to the vehicle

16   to look where I wanted to look.

17       Q.   Where did you want to look?

18       A.   Inside the steel portion of the B column.  It

19   is plastic on the outside.  It is a steel support beam

20   of the vehicle.  So I would have wanted to look down

21   into there to see if there were any jacket fragments

22   were in there.  They could have been in there or they

23   may well have made it out the hole and then would were

24   lost when the door was open.  I just don't know.

25       Q.   If there had been fragments in there what would

                                                          32

# EXHIBIT 6

Dominguez v. City of San Jose, et al.
Case No. 5:18-cv-04826-BLF

TO:              Maren J. Clouse, Senior Deputy City Attorney
Office of the City Attorney, City of San Jose
200 E. Santa Clara St., 16th Floor
San Jose, CA. 95113

FROM:        Rocky Edwards & Heather Heider
Rock Forensics, Inc.
160 W. Foothill Parkway #105-190
Corona, CA 92882

DATE:         May 19, 2021

SUBJECT:    Dominguez v. City of San Jose, et al.
Case No. 5:18-cv-04826-BLF

## INTRODUCTION

This comprehensive evaluation is being submitted by Rocky Edwards (Edwards) and Heather Heider (Heider) of Rock Forensics, Inc.

## SCOPE OF INVESTIGATION

Rock Forensics, Inc. was requested to evaluate and report findings regarding the September 15, 2017 Officer Involved Shooting (OIS) that occurred at the intersection of Penitencia Creek Road and North White Road in the City of San Jose, California. Specifically, Rock Forensics, Inc. was asked to evaluate the physical firearm-related evidence in this matter and determine if the evidence was consistent with the statements of the involved San Jose Police Officers. This evaluation was based upon the below listed investigative materials provided and the evidence reviewed.

## INCIDENT SYNOPSIS

Members of the San Jose Police Department's Covert Response Unit (CRU) conducted a vehicle control tactic (VCT) on the vehicle Dominguez was driving. After the successful application of the VCT, an OIS occurred resulting in Dominguez's death.

## INVESTIGATIVE MATERIALS REVIEWED

Body Worn Camera (BWC)
- SJ1751.mp4
- SJ1753.mp4
- SJ1759.mp4

Dominguez v. City of San Jose, et al.
Case No. 5:18-cv-04826-BLF

- SJ1760.mp4
- SJ1761.mp4
- SJ1762.mp4
- SJ1763.mp4
- SJ1764 - Pina.mp4
- SJ1765 - Jimenez.mp4
- SJ1766 - Ferguson.mp4
- AXON_Body_2_Video_2017-09-15_1847.mp4
- AXON_Body_2_Video_2017-09-15_1902.mp4
- AXON_Body_2_Video_2017-09-15_1903.mp4
- AXON_Body_2_Video_2017-09-15_1904-file 2.mp4

Officer Interviews

- 1728228 - Interview Transcript of Ofr Kristopher Ferguson.pdf
- 1728229 - Interview Transcript of Ofr Alvaro Lopez.pdf
- 1728230 -Interview Transcript of Ofr Michael Pina.pdf
- Number 02 Channel Ch4 Room Homicide Room 2 01-15-23 SD.mp4
- Number 01 Channel Ch3 Room Homicide Room 2 23-33-40 SD.mp4
- Number 02 Channel Ch4 Room Homicide Room 2 23-33-40 SD.mp4
- Number 01 Channel Ch3 Room Homicide Room 2 23-33-40 SD.mp4
- Number 02 Channel Ch4 Room Homicide Room 2 23-33-40 SD.mp4
- FOR PRODUCTION Number 01 Channel Ch3 Room Homicide Room 2 02-14-35 SD-final.mp4
- FOR PRODUCTION Number 02 Channel Ch4 Room Homicide Room 2 02-14-35 SD-final.mp4

Video

- NVR_Sherlock_ch3_main_20170915190000_20170915190500.avi
- NVR_Sherlock_ch3_main_20170915190500_20170915191000.avi
- NVR_Sherlock_ch3_main_20170915191000_20170915191500.avi
- HCVR_ch6_main_20170915183000_20170915183022.avi
- HCVR_ch6_main_20170915183034_20170915183259.avi
- HCVR_ch6_main_20170915183317_20170915183624.avi
- HCVR_ch6_main_20170915183628_20170915183705.avi
- HCVR_ch6_main_20170915183714_20170915183734.avi
- HCVR_ch6_main_20170915183756_20170915183926.avi
- HCVR_ch6_main_20170915183956_20170915184041.avi
- HCVR_ch6_main_20170915184048_20170915184051.avi
- HCVR_ch7_main_20170915183000_20170915183016.avi
- HCVR_ch7_main_20170915183038_20170915183214.avi
- HCVR_ch7_main_20170915183219_20170915183307.avi
- HCVR_ch7_main_20170915183315_20170915183459.avi
- HCVR_ch7_main_20170915183503_20170915183618.avi
- HCVR_ch7_main_20170915183636_20170915183732.avi

Dominguez v. City of San Jose, et al.
Case No. 5:18-cv-04826-BLF

- HCVR_ch7_main_20170915183801_20170915183923.avi
- HCVR_ch7_main_20170915183934_20170915183948.avi
- HCVR_ch7_main_20170915183955_20170915184039.avi

Interviews
- SJ1668 - 17-258-0283 Carlos Lavato Phone Interview 9.28.17.WMA
- SJ1667 - 11.17.2017 Leslie Bradley.WMA
- SJ1666 - 10.02.2017 Rhiannon Borunda.WMA

Depositions
- Sgt. Michael Pina.pdf
- Officer Alvaro Lopez.pdf
- Officer Kristoffer Ferguson.pdf

Documents
- 17-258-0283 Coroner Report.pdf
- 17-258-0283 Lab Reports.pdf
- 17-258-0283 Police Report.pdf
- CAD.pdf
- Event Details.pdf
- exam request 1.pdf
- exam request 1a.pdf
- notes 0.pdf
- notes 1.pdf
- report 0.pdf
- report 1.pdf
- J.Dominguez OIS 2-15-2017.pdf
- Autopsy Receipt.pdf
- Autopsy.pdf
- Examiner #1.pdf
- Inv. Report.pdf
- Receipt.pdf
- Notes  Laundrie.pdf
- Notes Laundrie (2).pdf
- Notes Martinez.pdf
- 17-258-0283.pdf
- 17-258-0283pina.pdf
- comm log 0.pdf
- comm log 1.pdf
- DOMINGUEZ031518-083941AM.PDF

Diagrams
- 17-258-0283evidence.pdf
- 17-258-0283evidence2.pdf
- 17-258-0283namesandplates.pdf
- 17-258-0283pina.pdf

Dominguez v. City of San Jose, et al.
Case No. 5:18-cv-04826-BLF

- Leica Scans

Photos

- photos.pdf
- LCV Mapping
  - _DSC0175.JPG - _DSC0259.jpg
  - BL-flipped.tif
  - BL+FL-flipped.jpg
  - bottomLcuff-flipped.tif
  - BR+FR-flipped.jpg
  - BRcuff-flipped.tif
  - FL-flipped.tif
  - FLcuff-flipped.tif
  - FLmid-flipped.tif
  - FRcuff-flipped.tif
  - topLcuff-flipped.tif
  - _DSC0175.NEF - _DSC0259.NEF
- Photos of Officer Ferguson
  - 12342425.jpg
  - 12342428.jpg
  - 12342431.jpg
  - 12342434.jpg
  - 12342437.jpg
  - 12342440.jpg
  - 12342443.jpg
- Photos of Officer Lopez
  - 12342446.jpg
  - 12342449.jpg
  - 12342452.jpg
  - 12342455.jpg
  - 12342458.jpg
  - 12342461.jpg
- Photos of Officer Pina
  - 12342464.jpg
  - 12342467.jpg
  - 12342470.jpg
  - 12342473.jpg
  - 12342476.jpg
  - 12342479.jpg
  - 12342482.jpg
  - 12342485.jpg
  - 12342488.jpg
- Canine Photos
  - AXON_Body_2_Video_2017-09-15_1910-file 2-1924ce.tif

Dominguez v. City of San Jose, et al.
Case No. 5:18-cv-04826-BLF

- o AXON_Body_2_Video_2017-09-15_1910-file 2-5539ce.tif
- o AXON_Body_2_Video_2017-09-15_1910-file 2-6262ce.tif
- o AXON_Body_2_Video_2017-09-15_1910-file 2-6285ce.tif
- o AXON_Body_2_Video_2017-09-15_1910-file 2-6286ce.tif
- o AXON_Body_2_Video_2017-09-15_1910-file 2-6289ce.tif
- o AXON_Body_2_Video_2017-09-15_1910-file 2-6401ce.tif
- o AXON_Body_2_Video_2017-09-15_1910-file 2-6454ce.tif
- o AXON_Body_2_Video_2017-09-15_1910-file 2-6498ce.tif
- o AXON_Body_2_Video_2017-09-15_1910-file 2-7789ce.tif
- o AXON_Body_2_Video_2017-09-15_1910-file 2-7801ce.tif
- o AXON_Body_2_Video_2017-09-15_1910-file 2-7849ce.tif
- o AXON_Body_2_Video_2017-09-15_1910-file 2-7939ce.tif
- Position
  - o 12343340ce.jpg
  - o 12343340ce.tif
  - o 12343433ce.tif
  - o 12343850ce-window.tif
  - o 12343850ce.tif
  - o 12343952ce.tif
  - o 12343979ce.tif
  - o 12344000e.tif
  - o AXON_Body_2_Video_2017-09-15_1847_28885ce.tif
  - o AXON_Body_2_Video_2017-09-15_1847_28886ce.tif
  - o AXON_Body_2_Video_2017-09-15_1847_29053ce.tif
  - o AXON_Body_2_Video_2017-09-15_1847_29095ce.tif
  - o AXON_Body_2_Video_2017-09-15_1847_29101ce.tif
  - o AXON_Body_2_Video_2017-09-15_1847-29066ce.tif
  - o AXON_Body_2_Video_2017-09-15_1902-4444ce.tif
  - o AXON_Body_2_Video_2017-09-15_1902-4609ce.tif
  - o AXON_Body_2_Video_2017-09-15_1903-294ce.tif
  - o AXON_Body_2_Video_2017-09-15_1903-852ce.tif
  - o AXON_Body_2_Video_2017-09-15_1903-853ce.tif
- Projectiles and Trajectiles
  - o 12352505.jpg
  - o 12363212e+line.tif
  - o 12363227ce+line.tif
  - o 12363230ce.tif
  - o 12363239+line.tif
  - o 12363266ce.tif
  - o 12363278ce.tif
  - o audio_of_gunshots_from_1847.bmp
  - o DSC_1880ce.tif
  - o DSC_1881ce.tif
  - o DSC_1884ce.tif

Dominguez v. City of San Jose, et al.
Case No. 5:18-cv-04826-BLF

- - DSC_1885ce.tif
  - trace photos.tif
- Sweatshirt
  - 12344003e-bw.tif
  - 12344003e.tif
  - 12352442ce.tif
  - 12352445e.tif
  - 12352451ce.tif
  - 12352457e.tif
  - _DSC0483.jpg - _DSC0484.jpg
  - B-DSC_3552.jpg - B-DSC_3554.jpg
  - BLsleeve-DSC_3555.jpg
  - BRsleeve-DSC_3557.jpg
  - F-DSC_3523.jpg
  - F-DSC_3528.jpg
  - FLsleeve-DSC_3550.jpg
  - FRsleeve-DSC_3549.jpg
  - _DSC0483.NEF - _DSC0484.NEF
  - DSC_3523.NEF
  - DSC_3528.NEF
  - DSC_3549.NEF
  - DSC_3550.NEF
  - DSC_3552.NEF
  - DSC_3553.NEF
  - DSC_3554.NEF
  - DSC_3555.NEF
  - DSC_3557.NEF
  - ir Hole  B.tif
  - ir Hole A again 2.tif
  - ir Hole A again.tif
  - ir Hole A.tif
  - ir total holes again 2.tif
  - ir total holes again.tif
  - ir total holes with paper.tif
  - ir total holes.tif
  - DSCF1420.jpg - DSCF1452.jpg
  - B-LAB_6714.jpg - B-LAB_6716.jpg
  - BLsleeve-LAB_6721.jpg
  - BLsleeve-LAB_6721c.jpg
  - BLsleeve-LAB_6722.jpg - BLsleeve-LAB_6723.jpg
  - BLsleeve-LAB_6725.jpg - BLsleeve-LAB_6726.jpg
  - BLsleeve-LAB_6729.jpg
  - BLsleeve-LAB_6741.jpg - BLsleeve-LAB_6742.jpg
  - BRsleeve-LAB_6732.jpg - BRsleeve-LAB_6734.jpg

Dominguez v. City of San Jose, et al.
Case No. 5:18-cv-04826-BLF

- o BRsleeve-LAB_6736.jpg - BRsleeve-LAB_6736c.jpg
- o BRsleeve-LAB_6739.jpg
- o F-LAB_6655.jpg - F-LAB_6656.jpg
- o F-LAB_6659.jpg - F-LAB_6661.jpg
- o F-LAB_6678.jpg - F-LAB_6679.jpg
- o F-LAB_6681.jpg - F-LAB_6694.jpg
- o F-LAB_6704.jpg
- o F-LAB_6707.jpg
- o FLsleeve-LAB_6662.jpg - FLsleeve-LAB_6667.jpg
- o FLsleeve-LAB_6674.jpg - FLsleeve-LAB_6677.jpg
- o FLsleeve-LAB_6743.jpg
- o FRsleeve-LAB_6657.jpg - FRsleeve-LAB_6658.jpg
- o FRsleeve-LAB_6695.jpg
- o FRsleeve-LAB_6698.jpg - FRsleeve-LAB_6703.jpg
- o FRsleeve-LAB_6712.jpg
- o FRsleeve-LAB_6712c.jpg
- o FRsleeve-LAB_6740.jpg
- o LAB_6655.NEF - LAB_6679.NEF
- o LAB_6681.NEF - LAB_6695.NEF
- o LAB_6698.NEF - LAB_6704.NEF
- o LAB_6707.NEF
- o LAB_6712.NEF
- o LAB_6714.NEF - LAB_6716.NEF
- o LAB_6721.NEF - LAB_6723.NEF
- o LAB_6725.NEF - LAB_6726.NEF
- o LAB_6729.NEF
- o LAB_6732.NEF - LAB_6734.NEF
- o LAB_6736.NEF
- o LAB_6739.NEF - LAB_6743.NEF
- Position, Bullet, Sweatshirt (Video Stills)
  - o AXON_Body_2_Video_2017-09-15_1847_28885.png
  - o AXON_Body_2_Video_2017-09-15_1847_28886.png
  - o AXON_Body_2_Video_2017-09-15_1847_29053.png
  - o AXON_Body_2_Video_2017-09-15_1847_29095.png
  - o AXON_Body_2_Video_2017-09-15_1847_29101.png
  - o AXON_Body_2_Video_2017-09-15_1847-29066.png
  - o AXON_Body_2_Video_2017-09-15_1902-4444.png
  - o AXON_Body_2_Video_2017-09-15_1902-4609.png
  - o AXON_Body_2_Video_2017-09-15_1903-294.png
  - o AXON_Body_2_Video_2017-09-15_1903-852.png
  - o AXON_Body_2_Video_2017-09-15_1903-853.png
  - o AXON_Body_2_Video_2017-09-15_1910-file 2-1924.png
  - o AXON_Body_2_Video_2017-09-15_1910-file 2-5539.png
  - o AXON_Body_2_Video_2017-09-15_1910-file 2-6262.png

Dominguez v. City of San Jose, et al.
Case No. 5:18-cv-04826-BLF

- o   AXON_Body_2_Video_2017-09-15_1910-file 2-6285.png
- o   AXON_Body_2_Video_2017-09-15_1910-file 2-6286.png
- o   AXON_Body_2_Video_2017-09-15_1910-file 2-6289.png
- o   AXON_Body_2_Video_2017-09-15_1910-file 2-6401.png
- o   AXON_Body_2_Video_2017-09-15_1910-file 2-6454.png
- o   AXON_Body_2_Video_2017-09-15_1910-file 2-6498.png
- o   AXON_Body_2_Video_2017-09-15_1910-file 2-7789.png
- o   AXON_Body_2_Video_2017-09-15_1910-file 2-7801.png
- o   AXON_Body_2_Video_2017-09-15_1910-file 2-7849.png
- o   AXON_Body_2_Video_2017-09-15_1910-file 2-7939.png
- o   AXON_Body_2_Video_2017-09-15_project.afp
- • Video Stills
  - o   AXON_Body_2_Video_2017-09-15_1847_28885.png
  - o   AXON_Body_2_Video_2017-09-15_1847_28886.png
  - o   AXON_Body_2_Video_2017-09-15_1847_29053.png
  - o   AXON_Body_2_Video_2017-09-15_1847_29095.png
  - o   AXON_Body_2_Video_2017-09-15_1847_29101.png
  - o   AXON_Body_2_Video_2017-09-15_1847-29066.png
  - o   AXON_Body_2_Video_2017-09-15_1902-4444.png
  - o   AXON_Body_2_Video_2017-09-15_1902-4609.png
  - o   AXON_Body_2_Video_2017-09-15_1903-294.png
  - o   AXON_Body_2_Video_2017-09-15_1903-852.png
  - o   AXON_Body_2_Video_2017-09-15_1903-853.png
  - o   AXON_Body_2_Video_2017-09-15_1910-file 2-1924.png
  - o   AXON_Body_2_Video_2017-09-15_1910-file 2-5539.png
  - o   AXON_Body_2_Video_2017-09-15_1910-file 2-6262.png
  - o   AXON_Body_2_Video_2017-09-15_1910-file 2-6285.png
  - o   AXON_Body_2_Video_2017-09-15_1910-file 2-6286.png
  - o   AXON_Body_2_Video_2017-09-15_1910-file 2-6289.png
  - o   AXON_Body_2_Video_2017-09-15_1910-file 2-6401.png
  - o   AXON_Body_2_Video_2017-09-15_1910-file 2-6454.png
  - o   AXON_Body_2_Video_2017-09-15_1910-file 2-6498.png
  - o   AXON_Body_2_Video_2017-09-15_1910-file 2-7789.png
  - o   AXON_Body_2_Video_2017-09-15_1910-file 2-7801.png
  - o   AXON_Body_2_Video_2017-09-15_1910-file 2-7849.png
  - o   AXON_Body_2_Video_2017-09-15_1910-file 2-7939.png
  - o   AXON_Body_2_Video_2017-09-15_1910-file 2.mp4
- • Scene Photos 1 (232 images numbered 12343235.jpg thru 12343928.jpg where the labels are n+1 (every third number))
- • Photos of Pina's Rifle (16 images numbered 12342491.jpg thru 12342536.jpg where the labels are n+1 (every third number))
- • Photos of Scene (94 images numbered 12343931.jpg thru 12344210.jpg where the labels are n+1 (every third number))

Dominguez v. City of San Jose, et al.
Case No. 5:18-cv-04826-BLF

- Evidence Photos (93 images numbered 12351387.jpg thru 12363809.jpg where the labels are n+1 (every third number))
- Autopsy Photos (60 images numbered 12352328.jpg thru 12352505.jpg where the labels are every third number)
- Bullet in B Pillar (58 images numbered 12363122.jpg thru 12363293.jpg where the labels are every third number)
- Untitled 2.png
- Untitled.png
- Image001.jpg
- Bloodstain
  - 12363272ce.tif
  - 12363272ce-bw.tif
  - 12344036e.tif
  - 12344006e.tif
  - 12344006e-bw.tif
  - 12344006e (1).tif
  - 12343997e.tif
  - 12343919e.tif
  - 12343907e.tif
  - 12343904ce.tif
  - 12343904ce-bw.tif
  - 12343889e.tif
  - 12343883e.tif
  - 12343883e-bw.tif
  - 12343880e.tif
  - 12343880e-bw.tif
  - 12343877e.tif
  - 12343877e-bw.tif
  - 12343874e.tif
  - 12343874e-bw.tif
  - 12343859e.tif
  - 12343859e-bw.tif
  - 12343856e.tif
  - 12343856e-bw.tif
  - 12343436e.tif
- Car Exterior
  - 12343376ce.tif
  - 12343514.tif
  - 12343835ce.tif
  - 12343838ce.tif
  - 12343841ce.tif
  - 12343850e.tif
  - 12343925ce.tif

Dominguez v. City of San Jose, et al.
Case No. 5:18-cv-04826-BLF

- o 12343952e.tif
- o 12343970e.tif
- o 12343973ce.tif
- o 12343976ce.tif
- o 12344165ce.tif
- o 12363122ce.tif
- o 12363215ce.tif
- Car Interior
  - o 12343853.jpg
  - o 12343862e.tif
  - o 12343865e.tif
  - o 12343868e.tif
  - o 12343871e.tif
  - o 12343886e.tif
  - o 12343892e.tif
  - o 12343895e.tif
  - o 12343898e.tif
  - o 12343922e.tif
  - o 12344009e.tif
  - o 12344012e.tif
  - o 12344021e.tif
  - o 12344024e.tif

Dominguez v. City of San Jose, et al.
Case No. 5:18-cv-04826-BLF

**INVESTIGATIVE PROCESS**

**Scene**

1. The OIS occurred on Friday, September 15, 2017 at approximately 7:04 p.m. in the evening in the east bound lanes of Penitencia Creek Road at the intersection of North White Road in a primarily residential neighborhood in San Jose, California. [SJ0049]

   a. Penitencia Creek Road runs east and west with two lanes of traffic with a left-hand turn lane in each direction. The street was divided by double yellow lines.

   b. North White Road was a two lane north-south street divided by a cement median. There was also a left-hand turn lane in each direction.

   c. Based upon the Santa Clara County Crime Lab's (SCCCL) diagrams, the eastbound lanes of Penitencia Creek Road at the approximately location of the OIS measured approximately 34' across (north to south and inclusive of the E/B left hand turn lane and the #1 and #2 E/B lanes). [17-258-0283evidence2.pdf, Notes Martinez.pdf, pp. 12]

2. At the time of the OIS the weather was cool with an approximate ambient temperature of between 65° and 68° Fahrenheit and mild winds between 12 and 16 miles per hour. [https://www.wunderground.com/history/daily/KSJC/date/2017-9-15]

3. The OIS occurred during dusk with the sun setting at approximately 6:57 p.m. (civil twilight/dusk at 7:22 p.m.)
   [https://www.timeanddate.com/sun/@5392181?month=9&year=2017]

   a. Civil twilight/dusk refers to the position of the sun (approximately 6° below the horizon), however due to the scattering of the light in Earth's atmosphere, artificial light is not generally required. [https://www.timeanddate.com/astronomy/civil-twilight.html]

Dominguez v. City of San Jose, et al.
Case No. 5:18-cv-04826-BLF



Graphic 1 (above) and Graphic 2 (below) represent visual overviews of the location of the OIS. The graphics utilize Google Earth underlays.



Dominguez v. City of San Jose, et al.
Case No. 5:18-cv-04826-BLF

4. Per the SCCCL crime scene photographs, a black four-door, 2016 Kia Sportage (Texas Plate No. GTX1026) was at located in the number two eastbound lane of Penitencia Creek Road facing eastbound past the white limit line.

   a. The left, front (driver's) window was shattered, and numerous pieces of glass were noted on the roadway below the window, on the driver's seat and on the driver's floorboard. All other windows appeared rolled up and intact. [17-258-0283.pdf, pp. 6]

      i. San Jose Police Department personnel determined at the scene that the driver's door window mechanism could still be rolled up, which indicated that the window was partially down at the time it was shattered. [17-258-0283.pdf, pp. 6]

   b. The driver's seat was reclined approximately 60° from the horizontal plane (30° backwards from the vertical plane)





Graphic 3 (above) represents a very approximate angle of how the driver's seat was reclined at the time of the OIS. The graphic is meant to merely assist the reader in visualizing Dominguez's seat position. The process included rotating the vehicle base to be in line with a 0° horizontal plane and then measuring the seat's angle of recline through Adobe Photoshop. This method is not exact, however provides the reader with an approximation of the recline angle.

Dominguez v. City of San Jose, et al.
Case No. 5:18-cv-04826-BLF

c. The rear bumper of the vehicle was in contact with the front bumper of San Jose
Police Department unmarked unit (gray Toyota 4-Runner CA License No. 7FKX456).

5. SCCCL recovered the following firearm-related evidence:

| Evidence Item (E/I) # | Description | Location Recovered | Photograph |
|---|---|---|---|
| 1 (Barcode SJ182278-1) | .223 Discharged Cartridge Case (DCC) "SPEER 15 223 REM" | Unmarked San Jose unit assigned to Officer Ferguson (Dark Gray Buick Lacrosse CA 7TVL357) parked facing southeast north of the Kia Sportage in the #1 and #2 lanes of Penitencia Creek Road. [SJ0029] |  SJ0455 |
| 1 Cont. | | |  SJ0461 |

Dominguez v. City of San Jose, et al.
Case No. 5:18-cv-04826-BLF

| Evidence Item (E/I) # | Description | Location Recovered | Photograph |
|---|---|---|---|
| | 1 Cont. | |  SJ0543 |
| | 1 Cont. | |  SJ0545 |
| 4 (Barcode SJ182278-4) | .223 DCC "SPEER 15 223 REM" | Under unmarked San Jose PD unit assigned to Officer Ferguson [SJ0032] *Vehicle removed for photograph* |  SJ0467 |

Dominguez v. City of San Jose, et al.
Case No. 5:18-cv-04826-BLF

| Evidence Item (E/I) # | Description | Location Recovered | Photograph |
|---|---|---|---|
| | 4 Cont. | |  SJ0470 |
| | 4 Cont. | |  SJ0550 |
| | 4 Cont. | |  SJ0551 |

Dominguez v. City of San Jose, et al.
Case No. 5:18-cv-04826-BLF

| Evidence Item (E/I) # | Description | Location Recovered | Photograph |
|---|---|---|---|
| 20 (Barcode SJ182278-19) | Copper Jacketing from autopsy "muscle R neck" | | <br>SJ0665 |
| | 20 Cont. | | <br>SJ0667 |
| 29 (Barcode SJ182278-28) | Projectile | Associated with bullet hole "C," removed from the interior right rear door of the Kia Sportage [SJ0035] | <br>SJ0742 |

CONFIDENTIAL REPORT – ROCK FORENSICS, INC.                    17

Dominguez v. City of San Jose, et al.
Case No. 5:18-cv-04826-BLF

| Evidence Item (E/I) # | Description | Location Recovered | Photograph |
|---|---|---|---|
| | 29 Cont. | |  |
| | 29 Cont. | |  |

a.  Evidence Item #20 (copper jacketing removed from right side of neck during autopsy) was later determined by SCCCL to a be a "…copper jacket of a nominal 22 caliber rifle bullet (indeterminate nose design) that had been fired through a barrel with six lands and grooves of conventional right twist rifling. The jacket weighed 31.5 grains. Additionally, a fired copper jacket fragment with indeterminate rifling and weighing four grains was also submitted. Multicolored possible fibers were collected from the copper jacket for return within the original packaging." [SJ1706]

    i.  "Powdered glass and possible bone were recovered from the jacketing." [SJ1709]

b.  Evidence Item #29 (projectile removed from the passenger side of the Kia Sportage) was a "…copper and lead bullet fragment weighing 29.1 grains and having no

Dominguez v. City of San Jose, et al.
Case No. 5:18-cv-04826-BLF

recognizable firearm produced markings. It was possibly the core of a fired bullet. A clear possible fiber was collected from the bullet fragment..." [SJ1706]

   i.   "Polymetric material was recovered from the projectile." [SJ1708]

c. The SCCCL concluded that "It is not possible to determine if Items SJ182278-19 [Evidence Item 20 – jacket from autopsy] and SJ182278-28 [Evidence Item 29 – projectile from passenger side of Kia Sportage] are from one or more projectiles. The combined weights of both items is [are] consistent with some bullets loaded in .223 Remington (nominal .22) caliber cartridges." [SJ1706]

6. SCCCL documented a single bullet hole within the OIS scene. The bullet hole (labeled "A" by SCCCL) was located in the interior of the passenger side "B" pillar approximately 45" up from ground level.

   a. Bullet hole "B," which was associated to bullet hole "A" was located on the "B" pillar's exterior approximately 45 ½" up from ground level.

   b. Bullet hole "C," which was associated to bullet holes "A" and "B" was located on the interior of the right rear passenger door approximately 45" up from ground level. [SJ0035]

7. Based upon tempered glass fragments located in the frame of the driver's side window, the SCCCL estimated that a bullet struck the window at approximately 53" above ground level.



SJ0284

Dominguez v. City of San Jose, et al.
Case No. 5:18-cv-04826-BLF



SJ0702



SJ0701

Dominguez v. City of San Jose, et al.
Case No. 5:18-cv-04826-BLF



SJ0712

SJ0708

Dominguez v. City of San Jose, et al.
Case No. 5:18-cv-04826-BLF



SJ0715



SJ0712

Dominguez v. City of San Jose, et al.
Case No. 5:18-cv-04826-BLF



SJ0732

8. SCCCL personnel completed a timeline of events based upon evaluation of surveillance and body worn camera video that captured the OIS. They determined that the time between shots fired was approximately 0.535 seconds. [Jacob Dominguez OIS Video Timeline.doc, SJ1769]]

**Jacob Arturo Dominguez ("Dominguez")**

1. At the time of the OIS, Dominguez was a 32-year-old (DOB: 10/30/1983) male Hispanic who was approximately 5'07" tall and weighed approximately 180lbs. [SJ0042]

2. At the time of the OIS, Dominguez was seated in the left front (driver's) seat of the black Kia Sportage.

3. At the time of the OIS, Dominguez was wearing a black knit cotton-polyester hooded sweatshirt labeled "ProBAY" size 2XL (later collected as Evidence Item 28 / Barcode SJ82278-27). [SJ0156, SJ1706]

   a. During examination, SCCCL located two defects in the left sleeve of the sweatshirt they labeled "A" and "B." Based upon testing, both defects were consistent with the passing of a bullet.

Dominguez v. City of San Jose, et al.
Case No. 5:18-cv-04826-BLF

i.  Hole "A" was approximately 5/16" x 5/16" in size and located on the frontside of the left sleeve approximately 12" up from the edge of the cuff.

   1.  The area of the sweatshirt adjacent hole "A" tested positive for lead.

ii.  Hole "B" was approximately ½" x ¾" in size and located on the backside of the left sleeve approximately 11 ½" up from the edge of the cuff.

   1.  The area of the sweatshirt adjacent hole "B" tested positive for lead. This area had a more pronounced response than the area surrounding hole "A."

   2.  The area of the sweatshirt adjacent hole "B" tested positive for nitrates.

   3.  A small copper fragment and a possible glass fragment were embedded in the fibers near hole "B." Later microscopic and scanning electron microscope (SEM) examinations revealed additional glass fragments and a "...high concentration of powdered glass embedded in the fabric threads."

iii.  Additional small holes were documented in between the holes "A" and "B."

iv.  Neither soot nor gunpowder residues were observed around either hole utilizing both traditional and Infrared Red (IR) photography.

v.  SEM and microscopy revealed that a high concentration of particulate was not observed surrounding the interior and exterior sides of hole "A" on the front of the left sleeve of the sweatshirt nor was it located on the interior side of hole "B."

   1.  Based upon these findings, SCCCL concluded that, "Assuming the two holes in the left sleeve were created by the same projectile, that projectile impacted glass prior to entering the back of the left sleeve and exited the front of the left sleeve of the sweatshirt." [SJ1715]

Dominguez v. City of San Jose, et al.
Case No. 5:18-cv-04826-BLF





Dominguez v. City of San Jose, et al.
Case No. 5:18-cv-04826-BLF





Dominguez v. City of San Jose, et al.
Case No. 5:18-cv-04826-BLF



4. No other bullet-related defects were located in Dominguez's clothing worn at the time of the OIS.

5. During autopsy, the Deputy Medical Examiner documented a bullet-related injury/gunshot wound (GSW) to the left corner of Dominguez's mouth.

    a. The GSW was located 6 ¼" below the top of his head and 1 ½" to of the left of the anterior midline.

    b. The entry GSW was described as a ½" diameter round defect with a 1/16" to 1/8" wide red marginal abrasion that was widest at the 2 o'clock position that demonstrated multiple 1/8" to 1 ½" long radiating lacerations.

    c. The wound was surrounded by multiple 1/16" x 1/8" irregular red abrasions consistent with fragmentation injury.

    d. Soot was not visible on the skin edges or within the hemorrhagic wound track.

    e. No stippling or gunpowder particles were on the skin surrounding the GSW.

    f. The wound track sequentially consisted of perforating the skin and subcutaneous tissue of the face, lower lip, mandible, tongue, and the soft tissues of the neck before

Dominguez v. City of San Jose, et al.
Case No. 5:18-cv-04826-BLF

penetrating the muscles on the right side of the first and second cervical vertebral bodies.

g.  A 2.4-gram deformed metal jacket fragment was recovered from the cervical bodies from where it was lodged. (Later labeled E/I #20)

h.  The trajectory was from front to back, left to right and downward.

**Projectile did not continue.**
Copper Jacket Recovered.





**Projectile did not continue.**
Copper Jacket Recovered

**Graphic 4a (above)** and **Graphic 4b (right)** are visual representations of the trajectory of the projectile path as documented by the Deputy Medical Examiner during autopsy. The graphics are meant merely to assist the reader in better visualizing the approximate location of the GSW.

*NOTE: The GSW was not perforating in nature. The rod is extended beyond the projectile's termination point to better assist the viewer in visualizing the approximate overall trajectory.*

Dominguez v. City of San Jose, et al.
Case No. 5:18-cv-04826-BLF

**Officer Michael Pina ("Pina")**

1. At the time of the OIS Pina was dressed in plain clothes consisting of jean pants, a t-shirt, a hat, and a tactical raid vest over his shirt. The vest had a San Jose Police Department patch on the front and the word "POLICE" on the back. Pina was assigned to the Covert Response Unit (CRU). [SJ0079]

2. At the time of the OIS, Pina's service/duty firearm that was utilized during the OIS was a Colt Defense M4 Carbine 5.56 x 45mm caliber rifle, serial number LE143767. [SJ0079, Notes Laundrie (2).pdf, pp. 1, SJ0203, SJ1771]

   a. Note: the firearm was also reported as a department issued Commando AR-15, .223 caliber rifle. [SJ0079]

   b. The capacity of the service/duty firearm's magazine was 30 cartridges. Prior to the OIS, Pina had loaded his magazine with 28 or 29 cartridges. [Notes Laundrie.pdf, pp. 1]

   c. During the OIS, Pina's service/duty rifle was loaded with SPEER 15 223 REM" ammunition. [SJ1771]

      i. The specific ammunition used was Speer LE Gold Dot Duty Ammunition .223 REM, which has a bullet weight of 75 grains and a muzzle velocity of approximately 2775 feet per second. [https://www.speer.com/ammunition/gold_dot/rifle/gold_dot_rifle_personal_protection/19-24469.html]

   d. After the OIS the firearm was determined to be loaded with one cartridge in the chamber and 28 cartridges in the magazine. [Notes Laundrie (2).pdf, pp.1]

   e. Examination of the rifle by SCCCL determined that it functioned properly, the safety was operational, and the trigger pull was measured to be approximately 7¼ pounds. No damage, modifications or excessive wear was noted. [SJ1771]

Dominguez v. City of San Jose, et al.
Case No. 5:18-cv-04826-BLF

**PROFESSIONAL OPINIONS**

A firearms-related evaluation was completed based upon review of the provided documentation of the incident. The recovered physical evidence, photographs, interviews, videos provided of the incident, documentation of Dominguez's GSW by the Deputy Medical Examiner at autopsy, the laboratory/examination findings of the SCCCL, and statements made by the officers were all considered.

The following professional opinions were established:

1. Due to the lack of soot and stippling around the GSW, as well as statements made by the involved officers, the locations of the recovered discharged cartridge cases and the video recordings during and directly after the incident, Dominguez's GSW is consistent with having been fired from a distance.

    a. Based upon the statements of Officer Pina and the measurements and diagrams produced by SCCCL, this distance is approximately 10 – 12 feet.

2. Based upon the statements of the involved officers, the location of Dominguez in the front, left (driver's) seat of the Kia Sportage, the video recordings of the incident, the diagrams and measurements of the scene by SCCCL, and the trajectory of Dominguez's GSW, Officer Pina was located north to northeast of Dominguez and fired in south to southwest direction.

3. Although the SCCCL could not definitively determine whether the copper jacket recovered from the right, backside of Dominguez's neck during autopsy (E/I #20) and the bullet core recovered from bullet hole C adjacent the "B" pillar of the Kia Sportage (E/I #29) were from the same projectile/missile (based upon bullet weight alone), it is most likely that each piece of evidence is from two separate and distinct shots. This is based upon the following:

    a. Analysis of the video recordings of the scene by SCCCL determined that the two shots were fired approximately 0.535 seconds apart.

    b. The characteristics of the bullet hole "A" in the interior "B" pillar of the right side of the Kia Sportage was consistent with a bullet hole made by a bullet in stable flight that had not begun to yaw due to striking an intermediary object (i.e., tempered glass vehicle window, etc.) prior to creating the hole.

        i. Bullet holes "A," "B," and "C" are consistent with the bullet path of a single shot.

    c. No other bullet holes and/or impacts were located within the Kia Sportage and all other windows had been rolled up and remained intact after the OIS.

Dominguez v. City of San Jose, et al.
Case No. 5:18-cv-04826-BLF

d.   No other bullet holes were located within the entirety of the OIS scene.

4.   The copper jacketing recovered from Domínguez's right rear neck at autopsy (E/I #20) was likely the result of the first of Officer Pina's two shots.  The second shot fired ("B" pillar) did not strike the tempered glass of the driver's side window nor did it strike Dominguez or his sweatshirt. This is based upon the following:

   a.   The analysis performed by the SCCCL that determined that the copper jacketing (E/I #20) contained both glass fragments and textile fibers.

   b.   The speed at which tempered glass fractures is between 4,000 – 5,000 feet per second[1] (approximately 2700 to 3,400 miles per hour). The time between shots fired was approximately 0.535 seconds. There was sufficient time between the two shots for the tempered glass to have fractured.  Subsequently, analysis of the of the bullet core recovered adjacent the "B" pillar of the interior right side of the Kia Sportage (E/I #29) determined that glass and fiber particles were not present. The trace evidence documented by the SCCCL during examination on the recovered core (E/I #29) from the "B" pillar disclosed the presence of polymers (plastic).

   c.   The characteristics of the bullet hole "A" in the "B" pillar of the interior right side of the Kia Sportage are consistent with the passing of a bullet in stable gyroscopic flight.

5.   Based upon these same set of facts and the analysis of the bullet-related defects in the left sleeve of Dominguez's sweatshirt by SCCCL, it is likely that Dominguez's left arm was in a position adjacent the left side of his face nearly simultaneously to having received the GSW to the left side of his mouth. Neither Dominguez's overall movement nor the specific movement of his left arm prior to and directly after the shot fired can be determined as the forensic evidence does not reveal the position of Dominguez's body and/or left arm prior to the first gunshot (resulting in Dominguez's GSW).

6.   Based upon the trajectory of Dominguez's GSW (starting at the left corner of his mouth and terminating lower in the right cervical region of his neck – back to front, left to right and downward), the measurements and diagrams produced by SCCCL and the statements of Officer Pina, Dominguez's face was likely turned some degree counterclockwise from his shoulders and towards Officer's Pina's direction at the time of being shot.

---

[1] F. Barstow, H. Edgerton, 1939; Glass-Fracture Velocity, Journal of the American Ceramic Society, Volume 22, Issue 1-12

https://ceramics.org/ceramic-tech-today/ceramic-video/video-speed-of-cracks-in-glass

https://www.wired.com/story/use-a-slo-mo-video-to-calculate-how-fast-glass-shatters/

Dominguez v. City of San Jose, et al.
Case No. 5:18-cv-04826-BLF

7.  During his deposition, Officer Pina stated the following:

Atkinson Baker, a Veritext Company
www.depo.com

```
 1      A.  I was trying to track where he was going and as he
 2  was coming back up, so his only target area was shoulders up.
 3      Q.  So you pulled the trigger when he started coming
 4  back up?
 5      A.  I remember finding my sight while he was leaning
 6  forward, and as he was coming back looking at me, looking
 7  kind of back movement is when I started firing.  I can't say
 8  for sure exactly what he was doing as he was coming up
 9  because I remember he's now -- I'm now looking at him solely
10  through the aim point of my rifle.
11      Q.  When did you release the safety?
12      A.  Just right before I shot.
13      Q.  And when you pulled the trigger, was he back up in
14  an erect position or partially erect?  Can you describe that
15  for us?
16      A.  After I shot him?
17      Q.  No, before.
18      A.  Before I pulled the trigger, he was -- he had
19  already been leaning low and then coming -- like I could just
20  turn my chair, so if you're me over there, he's now coming up
21  in this direction.
22      Q.  Okay.  So at that point, could you see where --
23  what his hands were doing?
24      A.  No.
```

Sgt. Michael Pina.pdf, pp. 97

a.  The firearm-related evidence is not inconsistent with Officer Pina's statements regarding his actions during the OIS.

Dominguez v. City of San Jose, et al.
Case No. 5:18-cv-04826-BLF



**Graphic 5** (left) is a visual representation of the approximate counterclockwise turn of Dominguez's head during the OIS and meant merely to assist the reader in better visualizing the trajectory of the GSW as documented by the Deputy Medical Examiner during autopsy. The angle cannot be determined exactly.



**Graphic 6** (above) is a visual representation of the OIS and meant merely to assist the reader in better visualizing the locations of firearm-related items within the scene (including E/I #1 and E/I #4 – discharged cartridge cases). The graphic is proportional and utilizes both a Google Earth and SCCCL diagram underlay.

Dominguez v. City of San Jose, et al.
Case No. 5:18-cv-04826-BLF



**Graphic 7** (above) is a visual representation of the OIS and meant merely to assist the reader in better visualizing the locations of items within the scene including the involved vehicles, Officer Pina, Dominguez and the bullet holes in/adjacent to the Kia Sportage's right "B" pillar. The graphic is proportional and utilizes both a Google Earth and SCCCL diagram underlay. The approximate trajectory (red) is meant to provide a visual approximation of both shots fired by Officer Pina and is based upon the measurements and diagrams produced by SCCCL.

Dominguez v. City of San Jose, et al.
Case No. 5:18-cv-04826-BLF



**Graphic 8** (above) is a visual representation of the OIS and meant merely to assist the reader in better visualizing the locations of items within the scene including the involved vehicles, Officer Pina and Dominguez. The graphic is proportional and utilizes both a Google Earth and SCCCL diagram underlay. This southward looking view is meant only to provide a visual approximation of the scene looking from the north to the south.

**These opinions are subject to change if additional facts are received at a future date.**

Dominguez v. City of San Jose, et al.
Case No. 5:18-cv-04826-BLF

-------------------------------------- **END** --------------------------------------

_Rocky L. Edwards_ | 05/19/2021
Rocky L. Edwards | Date

_Heather E. Heider_ | 05/19/2021
Heather E. Heider | Date

**Curriculum Vitae Rocky Edwards**
**Forensic Firearms & Toolmark Examiner**

ROCKY EDWARDS FORENSIC FIREARM & TOOLMARK EXAMINER & SHOOTING
RECONSTRUCTION

## EDUCATION

| | |
|---|---|
| The University of the State of New York (Excelsior College) Bachelor of Science Degree | 1993 |
| El Paso Community College Associate of Science | 1988 |

## AWARDS

| | |
|---|---|
| Santa Ana Police Department, Departmental Wide Award for work in 3D Analysis | 2014 |
| August Vollmer Award, International Association of Chiefs of Police (IACP) | 2009 |
| Exceptional Quality Service Award – City of Santa Ana, CA | 2005 |
| Orange County District Attorney's Award of Excellence | 2005 |

## EXPERT QUALIFICATION STATEMENT

I have testified in over 550 cases in firearms-related cases (Best Estimate) as an expert witness. I began my career in law enforcement 42 years ago. I was trained as a Special Agent in the United States Army Criminal Investigation Division (CID) in 1984 and served as a Special Agent for ten (10) years until my retirement in 1994. As a Federal Agent, I processed, diagrammed, and reconstructed crime scenes as part of the normal course of investigation. In 1989, I trained and studied at the US Army Crime Laboratory for two (2) years in the field of Forensic Firearm and Toolmark Examination. My training included microscopic analysis, the study of ammunition and ammunition components, gunpowder production and manufacturing techniques, reloading of ammunition, toolmark examination, gunshot wound analysis, processing of clothing for gunshot residues, bullet path interpretation, firearm functionality, and shooting reconstruction. I have been a Forensic Firearm Examiner for twenty-seven (27) years. I have worked as a Forensic Firearm Examiner in ASCLD Accredited Laboratories in the US Army and the Los Angeles Police Department. I have thirty-seven (37) years of crime scene processing as both a Special Agent (detective) and as a Forensic Firearm Examiner. Throughout my career I have utilized various scientific methods and techniques to collect, preserve and analyze physical evidence at crime scenes. I have investigated all categories of crimes, e.g. homicides, assaults, and officer involved shootings (OIS), and have conducted war/ combat shooting reconstructions from incidents in Somalia and Yugoslavia.

I am qualified as an expert in California Superior Court in the areas of Forensic Firearm and Toolmark Examination as well as Shooting Reconstruction. I am qualified in the US Federal Court system as an expert in Forensic Firearm and Toolmark Identification. I have qualified as a Forensic Firearm Examiner in all branches of the military and NATO Countries (Britain and Canada). I am qualified as an expert in the states of New Mexico and Arizona. I have worked both for defense and prosecution at both the state and federal levels.

I have been trained in firearm-related injuries and have studied at the Letterman Army Medical Center, Preside of San Francisco, and the Armed Forces Institute of Pathology in Washington, D.C. I have attended autopsies throughout my career. I also attended advanced training at the Southwestern institute of Forensic Sciences, Parkland Memorial Hospital, Dallas Texas, in microscopic examination, wound ballistics and the analysis and study of ricochet bullets. See below for further details.

## CRONOLOGICAL SUMMARY OF EXPERIENCE

### Shooting Reconstruction, Bullet Path Analysis, Wound Ballistics, Forensic Firearm & Toolmark Examiner

Responsible for the forensic examination of firearms, ammunition and ammunition components; the microscopic examination of questioned bullets, cartridge cases and toolmarks; the restoration of obliterated serial numbers; distance determinations (both gunshot residue and shotgun pattern analysis); fracture or physical matches; bullet path analysis, trajectory analysis and the examination of security devices; crime scene Investigation; responsible for the diagramming, preparation of written reports regarding findings and the presentation of those findings in State and Federal Jurisdictions; court qualified in 3D topographical comparative analysis of fired bullets; advises local jurisdictions on policies regarding forensic firearm examinations

I possess additional expertise in the processing of gunshot residues (GSR) and bullet impacts on clothing.

## POSITIONS HELD & RESPONSIBLITES

### Firearm and Tool-mark Examiner & Consultant, Stockton Police Department                    2013 to 2019

Responsible for the forensic examination of firearms, ammunition and ammunition components; the microscopic examination of questioned bullets, cartridge cases and toolmarks; the restoration of obliterated serial numbers; distance determinations (both gunshot residue and shotgun pattern analysis); fracture or physical matches; and the examination of security devices.

Responsible for the preparation of written reports regarding findings, the presentation of findings in judicial or non-judicial proceedings and gunshot wound analysis; provides training and lectures to officers and detectives; Creates and implements policy regarding forensic firearm examinations and procedures; evaluates firearm security-related policies and procedures; completes crime scene investigations, shooting reconstruction, diagramming of crime scenes related to firearm evidence and trajectory analysis.

### Firearm and Tool-mark Examiner, Santa Ana Police Department                    1996 to 2016

Responsible for the examination of firearms, ammunition and ammunition components; the microscopic examination of questioned bullets, cartridge cases and toolmarks; the restoration of obliterated serial numbers; distance determinations (both gunshot residue and shotgun pattern analysis); fracture or physical matches; and the examination of security devices.

Responsible for the preparation of written reports regarding findings, the presentation of findings in judicial or non-judicial proceedings and gunshot wound analysis; provides training and lectures to officers and detectives; Creates and implements policy regarding forensic firearm examinations and procedures; evaluates firearm security-related policies and procedures; completes crime scene investigations, shooting reconstruction, diagramming of crime scenes related to firearm evidence and trajectory analysis; provides forensic analysis on assigned Officer Involved Shootings.

**Firearm and Tool-mark Examiner, Consultant, Los Angeles Police Department**                           **1993 to 1996**

Responsible for the examination of firearms, ammunition and ammunition components; the microscopic examination of questioned bullets, cartridge cases and toolmarks; the restoration of obliterated serial numbers; distance determinations (both gunshot residue and shotgun pattern analysis); fracture or physical matches; and the examination of security devices.

Responsible for the preparation of written reports regarding findings, the presentation of findings in judicial or non-judicial proceedings and gunshot wound analysis; provides training and lectures to officers and detectives; Creates and implements policy regarding forensic firearm examinations and procedures; evaluates firearm security-related policies and procedures; completes crime scene investigations, shooting reconstruction, diagramming of crime scenes related to firearm evidence and trajectory analysis; provides forensic analysis on assigned Officer Involved Shootings.

**Firearm and Tool-mark Examiner, United States Army Criminal Investigation Laboratory Ft.**
**Gillem, Georgia and Frankfurt Germany- Casework with US Army, US Navy, US Air Force & US**
**Marines NATO Forces - Britain & Canada**                                                             **1989 to 1993**

Responsible for the examination of firearms, ammunition and ammunition components; the microscopic examination of questioned bullets, cartridge cases and toolmarks; the restoration of obliterated serial numbers; distance determinations (both gunshot residue and shotgun pattern analysis); fracture or physical matches; and the examination of security devices.

Responsible for the preparation of written reports regarding findings, the presentation of findings in judicial or non-judicial proceedings and gunshot wound analysis; provides training and lectures to officers and detectives; Creates and implements policy regarding forensic firearm examinations and procedures; evaluates firearm security-related policies and procedures; completes crime scene investigations, shooting reconstruction, diagramming of crime scenes related to firearm evidence and trajectory analysis; provided forensic firearm-related European Theater coverage and assisted in crime scene reconstruction on incidents which occurred in Desert Storm, Somalia and Yugoslavia.

**Special Agent, United States Army Criminal Investigation Command (CID)**
**3rd Region Ft Polk Field Office, Leesville, La & 6th Region, Ft Bliss Field Office, El Paso, TX**        **1983 to 1989**

Special Agent/Team Chief investigating and supervising Special Agents in the investigation of felony crimes, e.g. homicides, firearm-related incidents, sex crimes, drug-related offenses and economic crimes in the United States Army; processed, photographed, collected evidence, diagrammed, reconstructed and analyzed crime scenes; collected and preserved physical and testimonial evidence; supervised and trained probationary Criminal Investigators/Special Agents; provided written reports and testified in C Court proceedings; managed informants and conducted threat assessments of key and suspected targets (personnel and key area targets); assigned to Protective Services of dignitaries.

**Military Police Investigator (MPI), 2nd Region, Frankfurt Germany**                    **1980 to 1983**

Military Police Investigator responsible for the investigation of misdemeanor crimes, e.g. burglary, theft, vandalism, minor drug-related offenses, etc.; interviewed witnesses, completed suspect interrogations; crime scene processing, diagramming; and other duties as assigned.

**Military Police (MP), 230th MP Company, Rhine Ordinance Barracks, Kaiserslautern, Germany**                    **1978 to 1980**

Military Police Officer responsible for patrol of Kaiserslautern, Germany; detained and apprehended suspects; interviewed witnesses; conducted traffic and crowd control; completed accident investigation; provided convoy escort; trained in combat MP duties and field exercises.

**Military Police (MP), 164th Military Police Company, Miesau, Germany**                    **1977 to 1978**

Military Police Officer responsible for security and convoy transport of nuclear devices; monitored operations and security of military/civilian personnel servicing and working on nuclear devices.

**TECHNICAL/SPECIALIZED TRAINING**

- Forensic Shooting Incident Reconstruction Course, Forensic Science Consultants, San Diego County Sheriff's Office, San Diego, CA
- US Army Criminal Investigation Laboratory Firearm & Tool-mark (Firearm, Microscopic Comparisons, Tool-Mark Examiner, Wound Ballistics, Shooting Reconstruction, Clothing Analysis) Training Course, 2 years
- Wound Ballistic Training Course, Letterman Army Medical Center, Presidio of San Francisco, CA
- Wound Ballistic Training Course of Study at the US Armed Forces Institute of Pathology, Washington, DC Wound Ballistic Study at Medical Examiner's Office, Boston, MA
- Advanced Training in Comparative Analysis and Ricochet Analysis, Southwestern Institute of Forensics Services, Dallas, Tx
- US Army Criminal Investigation Academy, Ft. McClellan, Alabama, Sixteen (16) weeks training as a Special Agent in Army CID.
- US Army Military Police Academy, Vilseck Germany. Eight (8) weeks training as a Military Police Investigator.
- Street Survival Training, Dallas, TX
- Glock Police Armorers Course (Pistol), Smyrna, GA
- Smith & Wesson Armorer's Course (Pistol/Revolver), Smith and Wesson Factory, Springfield, MA Sturm, Ruger & Co. Armorers Course (Pistol, Revolver, Rifle and Shotgun) Ruger Factory, Newport, NH Sig Sauer Inc, Armors Course, Ilion, NY
- Beretta and M-16 Armors Training Course, Aberdeen Providing Grounds, Aberdeen, MD
- Opposing Forces Weapons Center, (WARSAW PACT WEAPONS), ie. AK47, AKM, AKMS, FPK, RPK and DUSKA Machine Gun.
- Remington Arms Inc, Armorer's Course, Remington Factory, Ilion, NY
- Charter Arms Inc. Factory Tour and Manufacturing Techniques, Shelton, Connecticut
- Dan Wesson, Factory Tour and Manufacturing Techniques, Monson, Massachusetts H&K Armorers Course, San Antonio, TX
- Winchester Arms Company, Manufacturing Techniques and Factory Tour, New Haven, CT Marlin Firearms Company, Manufacturing Techniques and Factory tour, North Haven, CT Savage Arms Company, Manufacturing and Factory Training Tour, West Springfield, MA Colt firearms Manufacturing Plant, Hartford, CT
- Colt firearms Manufacturing Plant (Factory 2), West Hartford, CT
- TECHNICAL/SPECIALIZED TRAINING (Continued)
- Winchester Ammunition Manufacturing Plant Training Tour, Olin, IL Remington Ammunition Manufacturing Plant Training Tour, Lonoke, AR
- Surreptitious Entry/Technical Surveillance Course, Atlanta, GA Foley-Belsaw Basic and Advanced Locksmith Course, Atlanta, GA
- Medeco High Security Locksmith Course, Medeco Factory, Salem, VA
- Serial Number Restoration Course, California Criminalistics Institute (CCI), Santa Ana, CA Firearms Collection, Smithsonian Institute, Washington, DC
- Firearms Collection, National Rifle Association, Washington, DC Radford Army Ammunition Plant (propellant), Radford, VA
- Thompson Center Arms, Manufacturing Tour and Plant, Rochester, NH Beretta USA Inc., Firearms Manufacturing Plant, Accokeek, MD
- West Point Firearms Collection, West Point Museum, States Military Academy, West Point, NY
- American Lock Company, Manufacturing Tour and Plant, Crete, IL Stanley Tools, Manufacturing Plant, Cheraw, SC
- Cooper Tools, Manufacturing Plant, Sumter, SC
- Wilson Arms Company, Manufacturing Plant, Bradford, CT

- H.K. Porter Tool Manufacturing Plant, Statesboro, GA Schrade Knife Manufacturing Plant, Ellenville, NY Camilius Knife Manufacturing Plant, Camilius, NY Utica Knife Manufacturing Plant, Utica, NY
- Marksman and Beeman BB & Air Rifle Manufacturing Plant, Huntington Beach, CA

- Drug Enforcement Cover/Surveillance Course, Drug Enforcement Administration (DEA), Anniston, AL Protective services Course, Military Police School, Department of the Army, Fort McClellan, AL Advanced Fraud Investigations Course (White Collar/Economic Crimes), Ft. Mc Clellan, AL Philippines National Police Crime Laboratory International Tour, Manila, Philippines

## MEMBERSHIPS

- Distinguished Member, Association of Firearm and Toolmark Examiners (AFTE)

## PROFESSIONAL TRAINING COURSES/SEMINARS

| | |
|---|---|
| Annual Training Conference, Association of Firearm and Toolmark Examiners, Omaha, NB | 1990 |
| Annual Training Conferences, Association of Firearm and Toolmark Examiners; Houston, TX | 1991 |
| Annual Training Conference, Association of Firearm and Toolmark Examiners, Miami, FL | 1992 |
| Training Conference, International Association of Forensic Sciences, Dusseldorf, Germany | 1993 |
| Annual Training Conference, Association of Firearm and Toolmark Examiners, Indianapolis, IN | 1995 |
| Annual Training Conference, Association of Firearm and Toolmark Examiners, Annapolis, Ma | 1997 |
| Annual Training Conference, Association of Firearm and Toolmark Examiners, St. Louis, MO | 2000 |
| Annual Training Conference, Association of Firearm and Toolmark Examiners, San Antonio, TX | 2002 |
| Annual Training Conference, Association of Firearm and Toolmark Examiners, San Francisco, CA | 2007 |
| Annual Training Conference, AFTE Henderson, NV | 2010 |
| Annual Training Conference, Association of Firearm and Toolmark Examiners, Chicago, IL | 2011 |
| Annual Training Conference Association of Firearm and Toolmark Examiners Seattle, WA | 2013 |
| Annual Training Conference Association of Firearm and Toolmark Examiners, San Diego, CA | 2014 |
| Annual Training Conference Association of Firearm and Toolmark Examiners, Dallas, TX | 2016 |
| Annual Training Conference Association of Firearm and Toolmark Examiners, New Orleans, LA | 2016 |
| Homicide Investigators Conference, New Orleans, LA | 2016 |
| Annual Training Conference, Association of Firearm and Toolmark Examiners, Denver, CO | 2017 |
| Annual Training Conference, Association of Firearm and Toolmark Examiners, Charleston, Virgina | 2018 |
| Annual Training Conference, Association of Firearm and Toolmark Examiners, Chicago, IL | 2019 |
| NE Regional Training Conference, AFTE, FBI Academy Quantico, Virgina | 2019 |

## FORENSIC SCIENCE PRESENTATIONS

- "The Advance Combat Rifles" (Combat rifles tested by the United States Army for the future), presented before members of the 22nd Annual Meeting for the Association of Firearm and Tool Mark Examiners, (AFTE), Houston, Texas, 1991
- Tracking Firearm Related Incidents, (AFTE Training Seminar) Dallas, TX
- Tracking Firearm Related Incidents, Interpol Forensic Firearm Seminar, Pretoria, South Africa
- 3D Topographical Examinations using the IBIS Bulletrax System, Interpol Forensic Firearm Seminar, Montreal, Canada
- 3D Topographical Examinations Using IBIS Bulletrax System, Cancun, Mexico

## AGENCY ASSISTS

- Federal Bureau of Investigations (FBI)
- Alcohol Tobacco & Firearms (ATF)
- Hawthorne Police Department (HPD)
- Anaheim Police Department (APD)
- Inglewood Police Department (IPD)
- Simi Valley Police Department (SVPD)
- Oxnard Police Department (OPD)
- Tustin Police Department (TPD)
- Fullerton Police Department (FPD)
- El Cajon Police Department (ECPD)
- Canadian Military (Quebec Canada)

## FORENSIC SCIENCE PUBLICATIONS

- Rocky L. Edwards, "Circumferential Fractures", AFTE Journal 1991
- Rocky L. Edwards & Michael I. Kelley, "Straight-Line Knives"', AFTE Journal 1992
- Rocky L. Edwards & Michael I. Kelley, "FPK Sniper Rifle: AFTE Journal 1993
- Rocky L. Edwards & James Moss, "MFS Ammunition"., AFTE Journal 1993
- Rocky L. Edwards "Fighting Gang Violence through NIBIN" Forensic Technology Inc. Website

## GUEST SPEAKER APPEARENCES

- Association of Firearm and Toolmark Examiners (AFTE) Training Seminar, San Francisco, 2006
- 13 Critical Tasks Workshop presented to District Attorney's, ATF and Law Enforcement, Indiana 2008
- International Forensic Science Symposium, South Africa 2006
- International Forensic Science Symposium, Mexico 2008
- European Network of Forensic Science Institutes (ENFSI), Cyprus 2010
- International Forensic Firearms Symposium, Interpol, Lyon, France 2011
- Association of Firearms & Toolmark Examiners (AFTE) Training Seminar, "3D Analysis of Fired Bullets Through Obliterated Barrels," Chicago, ILL, 2011
- International Forensic Science Symposium, Montreal Canada, 2013
- Association of Firearm & Toolmark Examiners (AFTE) Training Seminar Dallas, TX 2014

## **CERTIFICATIONS**

- Certified by the United States Department of the Army to Conduct Forensic Examinations for Department of Defense as a Firearm & Toolmark Examiner.

**TESTIMONY**

*2014 – Present: Trial and Deposition Testimony (Note: Testimony from 1990 to 2013 not listed)*

| Case Name | Case Number | Type of Testimony |
|---|---|---|
| People v. Foshay | CR-20124578 | Deposition Jury Trial |
| United States v. Perez | Unk | Jury Trial |
| People v. Andrade | 106812 | Jury Trial |
| People v. Miller et al. | 105785 | Jury Trial |
| People v. Quiruz | 103586 | Jury Trial |
| People v. Ruiz | 108254 | Jury Trial |
| People v. McDonald et al. | 117008 | Jury Trial |
| People v. McKenzie | 115377 | Jury Trial |
| People v. Corrales et al. | 116547 | Jury Trial |
| People v. Edwards et al. | 119923 | Jury Trial |
| People v. Richardson | 120882 | Jury Trial |
| People v. Torn et al. | 121959 | Jury Trial |
| People v. Farley | 121923 | Jury Trial |
| People v. Queen | 122965 | Jury Trial |
| People v. Gomez | 10CF3362 | Jury Trial |
| People v. Brambila | 10VF3025 | Jury Trial |
| People v. Castro | 09CF1139 | Jury Trial |
| People v. Tlamasico | 10CF1258 | Jury Trial |
| People v. Rodriquez | 12CF0355 | Preliminary Hearing |
| People v. Romero | 10CF2439 | Jury Trial |
| People v. Carter | 12CF0863 | Jury Trial |
| People v. Gomez | 12CF1430 | Jury Trial |
| People v. Figueroa | 10CF0530 | Jury Trial |
| People v. Mendoza | 11CF3286 | Preliminary Hearing |
| People v. Uriate et al. | 11CF0192 | Jury Trial |
| People v. Carranza | 11CF2429 | Jury Trial |
| People v. Flores | 11CF2519 | Preliminary Hearing |
| Juvenile Matter | J149878 | Jury Trial |
| People v. Gonzalez | 09CF1140 | Jury Trial |
| People v. Nhem et al. | 10CF0102 | Jury Trial |
| People v. Cabezas et al. | 11CF0862 | Jury Trial |
| People v. Orozco et al. | 12NF3903 | Jury Trial |
| People v. Estudilla et al. | 12NF3769 | Jury Trial |
| People v. Velasquez et al. | 13CF2197 | Jury Trial |

| People v. Balanzar | 13CF0451 | Jury Trial |
| People v. Marquez | 13CF2128 | Preliminary Hearing |
| People v. Quirino | 14CF1858 | Jury Trial |
| People v. Lopez | 10CF3188 | Jury Trial |
| People v. Merida et al. | 10CF1982 | Jury Trial |
| People v. Cerda | 12CF3286 | Jury Trial |
| People v. Sanchez et al. | 12HF1198 | Jury Trial |
| People v. Montes | 12CF2292 | Jury Trial |
| People v. Alcala | 12CF3455 | Jury Trial |
| People v. Vega | 07CF2786 | Jury Trial |
| People v. Burciaga | 10CF2410 | Jury Trial |
| People v. Salinas | 12CF3719 | Jury Trial |
| People v. Ayala | 12CF0772 | Jury Trial |
| People v. Lopez | 14CF2507 | Jury Trial |
| People v. Medina | 13CF1715 | Jury Trial |
| People v. Dannelley | 14CF2336 | Jury Trial |
| People v. Wojtal | 14CF0232 | Jury Trial |
| People v. Daniels | 14CF0866 | Jury Trial |
| People v. Tellez | 13CF2980 | Jury Trial |
| People v. Quezada et al. | 14CF2240 | Grand Jury |
| People v. Sanchez | 08CF1227 | Jury Trial |
| People v. McDonald | 14CF2681 | Grand Jury Jury Trial |
| People v. Mendez et al. | 15CF0568 | Jury Trial |
| People v. Sotelo et al. | 12C1604 | Jury Trial |
| People v. Ochoa | 13CF3311 | Preliminary Hearing |
| Escobedo v. City of Los Angeles | CV15-04911-DSF(RAO) | Designated, Settled |
| DeLeon v. City of Los Angeles | CV16-03721FMO (RAO) | Report written, Pending trial |
| Sarasith v. City of Los Angeles | CV16-02548 JAK (MRWx) | Deposition, Settled |
| Curry v. City of Los Angeles | CV16-04125DSF (PJW) | Deposition, Testified, Settled |
| Watkins v. City of Los Angeles | CV17-00485 JFW (FFMx) | Report, Testified,Defense Verdict |
| Nicholson v. City of Los Angeles | CV15-07594DDP (RAO) | Deposition, Summary Judgement |
| Jimmy Truong v. State of CA | DA Case No: 16F01554 | Testified |
| Mendez v. City of Los Angeles | CV18-1230 | Federal Complaint withdrawn |
| Sanchez v. City of Los Angeles | CV18-1230 | Federal Complaint withdrawn |
| Dominquez v. City of Los Angeles | CV17-04557 DMG | Designated, Deposition, trial, Defense Verdict |
| M.A.C. v. City of Los Angeles | CV16-04477 DMG | Designated, Deposition, Defense Verdict |
| McCullum v. City of Los Angeles | CV14-03262 DMG | Designated, Deposition Completed |

| | | |
|---|---|---|
| Barron vs State of California | 30-2017-00911997CUCRCJC | Designated, Deposed,Testified |
| Barragan vs City of Los Angeles | 2:17cv-04364-R-AGR | Report Rendered, Settled |
| Risher Vs City of Los Angeles | CV17-00995 | Designated, Deposed |
| Vaughn vs City of Los Angeles | F067-15 | Report, Deposed- Testified |
| Santibanez vs City of Los Angeles | CV17-04189 ODW | Report,  Deposed |
| Villanueva vs State of California | 8:17-CV-01302-JLS-KES | Report, Trial – State Prevailed |
| Gonzales vs City of Los Angeles | CV17-06432 R (SSX) | Report, Defense Verdict |
| SJCDA Jury Trial 06937 DA# CR-2017 - 35081 | Jury Testimony ref: CR# SP16-26227/26-06937 | Report, Testimony, Guilty Verdict |
| SJCDA Trial Aaron Moore Trial (17-22579, 17-23512, and 17-24492) | Aaron Moore Trial (17-22579, 17-23512, and 17-24492) | Report, Two plaintiffs plead guilty, 3rd Defendant guilty all counts |
| DeAndrew Jordan vs State of California | 17-47789 | Plead Guilty |
| Jerrell Brown | (Minnesota) MPD CAPRS 8-268508 | Appeal – Defense Case - Case Transfered - Case transferred |
| MJLH et.al vs City of Pasadena | Case No: 2:18-03249 | Report – Settled |
| Mora v City of Garden Grove | Case No: 8:19-cv-00418-JLS-JDE | Settled |
| Nelson v City of Los Angeles | Case No: 08-07-20581 | Rule 26 Completed - Deposed |
| Ewnetu et. al. v.  County of Los Angeles | Case No: BC702015 | Working- Report prepared |
| Morgan v. City of LA | Case No: CV17-06693 (JEMx) | Rule 26 Report Submitted, Deposed-Feb 3, 2020. |
| Barrillas-Flores v City of LA | Case No. F076-17 | Designated -Deposed |
| Hernandez v City of LA | Case No.  009-18 | Designated - Working |
| Sandoval v City of LA | Case No. F082-17 | Designated - Working |
| Magana v City of LA | Case No. F036-18 | Designated - Deposed-Working |
| Starks v County of Los Angeles | Case No. 19STCV38462 | Designated - Deposed -Sum Judgement |
| Cooke vs State of California | Case No. F016-17 | Designated - State Court-Working |
| Dominguez v. City of San Jose | Case No. 18-cv-04826 | Designated - Working |
| Speer v City of San Bernandino | 5:20-cv-00044-JGB (SPx) | Rule 26 Report , Depo Pending |
| Guardado vs State of California | | Working |

38 Civil Cases
Career Estimate on
depositions around 25

**Additional Testimonial Experience**

- Provided testimony for both Prosecution and Defense in the following courts: United States Military Court (United States and Germany)
- United States Military Article 32 Hearings (United States and Germany)
- Canadian Military Court (Canada & Germany)
- Superior Court Los Angeles
- Superior Court Kern County Superior Court
- Ventura County Court
- San Bernardino County Superior Court
- San Diego County
- Superior Court Orange County
- Superior Court Riverside County
- Superior Court San Joaquin County
- Federal Court, Duong Trial, FBI, AUSA, San Jose, CA (Federal Trial) Prosecution
- Court qualified expert witness in using advanced ICM 3D analysis in bullet comparisons, Gonzales vs. State of California, 2012.
- Oregon Case, Christensen Death Row Federal Appeals Court Resentenced-Murder 1 - Manslaughter Reconstruction (Removed from Death Row)
- Federal Court, Los Angeles, CA

**Rocky Edwards**
**Firearms Consultant**

**(323-216-1584)**
*rockforensics@gmail.com*

**EFFECTIVE: JANUARY 2018**

## GENERAL FEE SCHEDULE AND EXPENSE POLICY
## FOR CONSULTING SERVICES

•<u>HOURLY RATE:</u>  $200.00 PER HOUR for all professional services rendered, including consultation, administrative set-up file, report writing, computer analysis and preparation of diagrams &/or court exhibits, research, site inspections & shooting reconstruction, travel time, preparation for testimony, and telephone conferences which exceed 30 minutes. Travel time is calculated portal-to-portal and from the actual time of departure and arrival. Any work or meetings specifically requested by the client to be performed on a Saturday, Sunday, or holiday will be at the hourly rate of $275.00.

• <u>RETAINER:</u>  Normally, a minimum retainer of $3,000.00 must be received prior to working on the case or reviewing of documents. The retainer may be negotiable after initial consultation with the client. The retainer is also required if the client declares the consultant, with or without his permission, as an expert witness to the court or opposing counsel. Preliminary telephonic discussions of potential cases are welcome and there is no charge for this service. RETAINERS ARE NOT REQUIRED FROM GOVERNMENTAL AGENCIES. The retainer will be credited toward work completed with the first hour ($200.00) as non-refundable in the event the matter is resolved or settled after consultant is retained, but before completing the work requested.

• <u>DEPOSITIONS AND COURT TESTIMONY:</u>  The fee for deposition is $475.00 PER HOUR (minimum one hour) and $475.00 PER HOUR for court testimony with no minimum requirement. The client is responsible for payment of travel time of consultant to and from the deposition or court at the rate of $200.00 PER HOUR. This also includes preparation and "waiting time" prior to and following testimony. Payment of the minimum fee must be received from deposing counsel prior to the start of and/or continuation of the deposition. The client is responsible for notifying opposing counsel of the deposition fee.

•<u>CHARGES FOR OUT-OF-STATE SERVICES OR DEPOSITIONS:</u> These services are $1,800.00 PER DAY. This also includes work that is performed outside of the Los Angeles metropolitan area in excess of 250 miles. Travel, lodging, meals, and other incidental expenses are the responsibility of the party requesting the service or deposition. Generally, travel costs are payable in advance.

• <u>INVOICES:</u> Itemized invoices submitted to the client are payable within 30 days of receipt. The statement may include incidental expenses such as parking fees and film processing. The client is invited to request explanation for any portion of a statement. Any unpaid balance in excess of sixty (60) days may reflect a service charge of 1.5% per month. All work may cease on the case, including trial appearance, with a balance that is delinquent for more than forty five (45) days.

It is the responsibility of the client to pay the invoice upon receipt and not to request that the payment be delayed until monies are received by the client from whatever source. The client is identified as the law firm representing either the plaintiff or defendant, not the party or parties that they represent as legal counsel for this particular action. It is understood that the client and consultant are entering into a professional relationship and that the client is solely responsible for payment of all professional services.

FEESC12

## Curriculum Vitae (as of February 1, 2021):
## Daniel L. Sudakin, MD, MPH, FACMT, FACOEM, FAACT, FASAM

Daniel L. Sudakin, MD, MPH, FACMT, FACOEM, FAACT, FASAM
9370 SW Greenburg Rd, Suite 201
Portland, OR 97223
(503) 477-6622
www.medicaltox.com
sudakind@medicaltox.com

Practicing Addiction Medicine at Aspire PDX
www.aspirepdx.com

### EDUCATION, BOARD CERTIFICATIONS, PROFESSIONAL HONORS

| | |
|---|---|
| 2015: | Fellow, American Academy of Clinical Toxicology |
| 2015: | Fellow, American Society of Addiction Medicine |
| 2014: | Board certified in Addiction Medicine (American Board of Addiction Medicine) |
| | • Certified by the American Board of Preventive Medicine in 2021 |
| 2014-7: | Member, American Board of Emergency Medicine, Medical Toxicology Sub-board |
| 2004: | Fellow, American College of Medical Toxicology |
| 2004: | Fellow, American College of Occupational and Environmental Medicine |
| 2000: | Board certified in the subspecialty of Medical Toxicology (American Board of Preventive Medicine). |
| | • Recertified in 2009, 2020. |
| 2000: | Board certified in the specialty of Public Health and General Preventive Medicine (American Board of Preventive Medicine). |
| | • Recertified in 2010, 2020. |
| 1998-2000: | Medical Toxicology Fellowship, Veterans Administration Medical Center, Portland, Oregon |
| 1999: | Master of Public Health (Biostatistics and Epidemiology), Oregon Health and Science University, Portland, Oregon |
| 1996-8: | Residency, Public Health and General Preventive Medicine (Occupational and Environmental Medicine track), Oregon Health Sciences University, Portland, Oregon |
| 1995-6: | Clinical Anesthesiology, Year One, Stanford University Health Services, Palo Alto, California |
| 1994-5: | Internal Medicine Internship, Legacy Hospitals, Portland, Oregon |
| 1994: | Doctor of Medicine, Wayne State University School of Medicine, Detroit, Michigan |
| 1993: | Alpha Omega Alpha, National Medical Honor Society |
| 1990: | Bachelor of Science (Biopsychology), University of Michigan, Ann Arbor |

## EMPLOYMENT INFORMATION, AND ACADEMIC APPOINTMENTS

| | |
|---|---|
| 2017-present: | Private Practice, Addiction Medicine, at Aspire PDX |
| 2016: | Addiction Medicine Physician at Ascension Medical Group |
| 2014-2016: | Director of Addiction Medicine, Pathways Northwest |
| 2014-2016: | Affiliate Faculty, Oregon State University Department of Environmental and Molecular Toxicology |
| 2006-2014: | Associate Professor (with indefinite tenure), Oregon State University Department of Environmental and Molecular Toxicology |
| 2000-2006: | Assistant Professor, Oregon State University Department of Environmental and Molecular Toxicology |
| 2008-present: | Affiliate Associate Professor, Oregon Health and Science University, Department of Emergency Medicine |
| 1999-present: | Consulting and expert witness services (Daniel L. Sudakin, MD, MPH, LLC, Medicaltox Consulting) |

## PART-TIME EMPLOYMENT

| | |
|---|---|
| 2015-2016: | Medical Director, ACME Counseling (Corvallis, Oregon) |
| 2004-2008: | Veritox, Inc., Medical Toxicologist |
| 1997-2000: | Oregon Medical Assistance Programs, Drug Utilization Review Council Member |
| 1998-1999: | Adjunct Faculty, Occupational Health Clinics, Oregon Health and Science University |
| 1996-1998: | Urgent Care Provider, Kaiser Permanente, Northwest Region Clinics |

## PUBLICATIONS, PRESENTATIONS, AND TECHNICAL REPORTS

### Journal Articles

Sudakin D. Naltrexone: Not Just for Opioids Anymore. *Journal of Medical Toxicology*, 2016;12(1)71-5.

Rohlman Diana, Syron Laura, Hobbie Kevin, Anderson Kim A., Scaffidi Christopher, Sudakin Daniel, Peterson Elena S., Waters Katrina M., Haynes Erin, Arkin Lisa, Feezel Paul, and Kincl Laurel. A. community-based approach to developing a mobile device for measuring ambient

2

air exposure, location, and respiratory health. *Environmental Justice.* August 2015, 8(4): 126-134.

Madeen E, Corley RA, Crowell S, Turteltaub K, Ognibene T, Malfatti T, McQuistan TJ, Garrard M, Sudakin D, Williams DE.  Human in vivo pharmacokinetics of [$^{14}$C]dibenzo[*def,p*]chrysene by accelerator mass spectrometry following oral microdosing. *Chemical Research in Toxicology*, 2014; December 10.

Motorykin O, Schrlau J, Jia Y, Harper B, Harris S, Harding A, Stone D, Kile M, Sudakin D, Massey Simonich SI.  Determination of parent and hydroxyl PAHs in personal PM2.5 and urine samples collected during Native American fish smoking activities.  Accepted for publication and in press in *Science of the Total Environment*, 2015;505:694-73.

Kile L Molly, Coker S Eric, Smit  Ellen, Sudakin  Daniel, Molitor  John, Harding K Anna.  A cross-sectional study of the association between ventilation of gas stoves and chronic respiratory illness in U.S. children enrolled in NHANESIII.  *Environmental Health* 2014, **13**:71.

Sudakin DL, Cardenas A, Smit E, Harding A. Naphthalene biomarkers and relationship with hemoglobin and hematocrit in white, black, and Hispanic adults: Results from the 2003-4 National Health and Nutrition Examination Survey. *Journal of Medical Toxicology* (2013).9(2):133-8.

Keith DJ, Butler JA, Berner B, Dixon B, Johnson S, Garrard M, Sudakin DL, Christensen JM, Hagen TM.  Age and gender dependent bioavailability of R- and R,S-alpha lipoic acid:  a pilot study.  *Pharmacol Res* (2012). 66(3):199-206.

Sudakin DL, Stone D.  Dialkyl phosphates as biomarkers of organophosphates:  The current divide between epidemiology and clinical toxicology.  *Clinical Toxicology* (2011).49(9):771-81.

Sudakin DL, Stone D, Power L.  Naphthalene mothballs:  Emerging and recurring issues and their relevance to environmental health.  Current Topics in Toxicology. 2011, Volume 7. Pages 13-19.

Caleb J. Banta-Green, Jennifer A. Field, et al. (2009). "The spatial epidemiology of cocaine, methamphetamine and 3,4-methylenedioxymethamphetamine (MDMA) use: a demonstration using a population measure of community drug load derived from municipal wastewater." *Addiction* **2009.** 104(11):1874-80.

Stone DL, Sudakin DL, Jenkins JJ.  "Longitudinal trends in organophosphate incidents reported to the National Pesticide Information Center, 1995-2007." *Environ Health* 2009;8:18.

Sudakin DL, Power LE.  "Regional and Temporal Variation in Methamphetamine-related Incidents:  Applications of Geographic Information Systems and Spatial Scan Statistics." *Clinical Toxicology* (2009), 47(3):243-7.

3

Sudakin Daniel L; Power Laura E   Regional variation in the severity of pesticide exposure outcomes: applications of geographic information systems and spatial scan statistics.   *Clinical Toxicology* (Philadelphia, Pa.)  (2009), 47(3), 248-52.

Sudakin DL, Fallah P.  "Toxigenic Fungi and Mycotoxins in Outdoor, Recreational Environments. *Clinical Toxicology.* 2008;46(8):738-44.

Sudakin DL.  "Fatality After a Single Dermal Application of Lindane Lotion." *Arch Environ Occup Health.* 2007;62(4):201-3.

Power LE, Sudakin DL.  "Pyrethrin and pyrethroid exposures in the United States:  a longitudinal analysis of incidents reported to poison centers. *J Med Toxicol.* 2007;3(3):94-9.

Sudakin DL.  "Informational Sources on Pesticides and Health (Appendix)" Invited publication in *Journal of Agromedicine,* 2007;12(1):77-82.

Sudakin DL, Power, LE. "Longitudinal Trends in the Incidence of Organophosphate Exposures in the United States." *Journal of Toxicology and Environmental Health, Part A.* 2007;70(2):141-7.

Sudakin DL.  "Pyrethroid Insecticides:  Advances and Challenges in Biomonitoring. *Clinical Toxicology* 2006;*44(1)*:31-7.

Sudakin DL.  "Pesticide Exposures:  Web-Based Resources for Health Care Providers" *Journal of Agromedicine* 2005;10(1):43-9.

Sudakin DL.  "Occupational Exposure to Phosphine Gas?  A Suspected Case Report and Review of the Literature" *Human and Experimental Toxicology* 2005;24:27-33.

Sudakin DL.  "Biopesticides" *Toxicological Reviews* 2003:22(2):83-90.

Sudakin DL, Trevathan W.  "DEET:  A Review and Update of Safety and Risk in the General Population" *Journal of Toxicology--Clinical Toxicology* 2003;41(6):831-9.

Sudakin DL.  "Trichothecenes in the Environment:  Relevance to Human Health" *Toxicology Letters* 2003;143(2):97-107.

Sudakin DL.  "Dietary Aflatoxins and Chemoprevention of Cancer:  A Clinical Review." *Journal of Toxicology--Clinical Toxicology* 2003;41(2):195-204.

Sudakin DL, Horowitz BZ, Giffin S.  "Regional Variation in the Incidence of Symptomatic Pesticide Exposures:  Applications of Geographic Information Systems." *Journal of Toxicology--Clinical Toxicology* 2002;40(6):767-773.

4

Sudakin DL.  "*Stachybotrys chartarum:*  Current Knowledge of its Role in Disease." *Medscape General Medicine,* February 29, 2000.

Sudakin DL, Mullins ME, Horowitz BZ, Abshier V, Letzig L.  "Intermediate Syndrome After Malathion Ingestion Despite Continuous Infusion of Pralidoxime." *Journal of Toxicology--Clinical Toxicology,* 2000;38(1):47-50.

Sudakin DL.  "Toxigenic Fungi in a Water-Damaged Building:  An Intervention Study." *American Journal of Industrial Medicine* 1999:34(2)183-90.

## Book Chapters

Sudakin DL. "Rodenticides." Hamilton & Hardy's Industrial Toxicology, 6th Edition (2015).

Sudakin DL. "Cholinesterase Inhibitors: Organophosphates and Carbamates" in Advanced Hazmat Life Support, 4th Edition (2014)

Sudakin DL.  "DEET" in Hayes' Handbook of Pesticide Toxicology, Third Edition (2010).

Sudakin DL.  "Fungicides" in Critical Care Toxicology:  Diagnosis and Management of the Critically Poisoned Patient (2005).

Sudakin DL. "Mycotoxins and Toxigenic Fungi" in Medical Toxicology, Third Edition (2004).

## Invited, Peer-Selected Presentations at Regional and National Scientific Meetings

Invited Speaker, Northwest Institute of Addiction Studies. Portland, Oregon. July 11, 2019. Lecture title: "Medication Assisted Treatment: Challenges and Opportunities."

Continuing Medical Education Lecture, American College of Medical Toxicology Addiction Medicine Academy.  Clearwater Beach, Florida. March 26, 2015.  Lecture title: "Naltrexone: Not Just for Opioids Anymore."

Continuing Medical Education lecture, Good Samaritan Regional Medical Center.  Corvallis, Oregon.  July 25, 2014.  Lecture title: "Opioid Use Disorders:  Treatment Options in the Outpatient Setting.

Continuing Medical Education lecture, American Occupational Health Conference.  Orlando, Florida. April 29, 2013.  Lecture title: "Pesticides and Biomonitoring:  The Growing Divide Between Epidemiology and Clinical Toxicology."

Continuing Medical Education webinar, Centers for Disease Control and Prevention. August 29, 2012. Presentation title: "Pesticide Residues in the Indoor Environment:  Assessment and Health Effects."

Invited Speaker, Platform Session (Epidemiology), North American Congress of Clinical Toxicology. Toronto, Ontario, Canada. September 15, 2008. Presentation title: "Regional Variation in Methamphetamine-related Incidents: Applications of GIS and Spatial Scan Statistics."

Invited Speaker and Session Organizer, American Occupational Health Conference. New Orleans, LA. May 9, 2007. Lecture title: "Perchlorate and Other Environmental Chemicals: Clinical and Epidemiological Studies of Effects on Thyroid Function."

Invited Speaker, American College of Medical Toxicology Spring Meeting. Miami, FL. March 17, 2007. Lecture titles: "Pesticides and Food Poisoning," and "Organophosphates: Biomarkers of Exposure, Effect, and Genetic Susceptibility."

Invited Speaker, American Occupational Health Conference. Millennium Series: Emerging Issues in Toxicology. Los Angeles, CA. May 9, 2006. Lecture title: "Challenges in Interpreting Biomonitoring Studies: Insecticides as Example."

Invited Speaker, Pesticide Regulatory Education Program. University of California, Davis. August 8, 2005. Lecture title: "Pesticides: Real Risks, Perceived Risks, and Informational Resources."

Invited Speaker, Northwest Association of Occupational and Environmental Medicine Annual Meeting. Mt. Hood, Oregon. February 26, 2005. Lecture title: "Interpreting Data from Biomonitoring Studies: The CDC Third Report of Human Exposure to Environmental Chemicals."

Invited Speaker, American Industrial Hygiene Association Tele-Web Conference: Toxicological and Occupational Medicine Perspectives on Molds and Mycotoxins. February 16, 2005. Lecture title: "Clinical Toxicology of Mycotoxins."

Invited Speaker, Environmental Protection Agency Regional Emergency Response Meeting. Las Vegas, Nevada. February 8, 2005. Lecture title: "Inhalation Risks from Phosphide Fumigants, Methyl Bromide, and other Restricted Chemicals."

Invited Speaker, Western Migrant Stream Forum. San Diego, California. January 29, 2005. Lecture title: "Pesticide Toxicology: Electronic Resources for Clinicians and Public Health Providers."

Invited Speaker, Agency for Toxic Substances and Disease Registry / American College of Medical Toxicology Chemical Weapons of Convenience/Opportunity Course. Oregon Health and Science University, Portland, OR. December 11, 2004. Lecture title: "Hazards of Fumigants and Cyanide."

Invited Speaker, American College of Occupational and Environmental Medicine, State of the Art Conference. San Antonio, TX. November 6, 2004. Lecture title: "Methylmercury and other Environmental Neurotoxins."

Invited Speaker, Oregon Department of Health Services, Public Health Grand Rounds. Portland, OR. Portland, OR. August 25, 2004. Lecture title: "Pesticide Exposures: Internet Resources for Clinicians and Public Health Providers."

Invited speaker, American Industrial Hygiene Association Conference and Exposition. Atlanta, GA. May 12, 2004. Lecture title: "Human Mycotoxicoses and Biomarkers of Exposure to Mycotoxins."

Invited speaker, American Occupational Health Conference, Millenium Lecture Series (Agricultural Toxicology). Kansas City, MO. May 2, 2004. Lecture title: "Pesticides and Electronic Resources for Clinicians."

Invited speaker, Agency for Toxic Substances and Diseases Registry Partners in Public Health Meeting, Atlanta, Georgia. March 30, 2004. Lecture title: "The NPMMP: An Informational Resource in the Clinical Toxicology of Pesticides."

Invited speaker, Northwest Occupational and Environmental Medicine Winter Meeting, Mt. Hood, Oregon. February 22, 2004. Lecture title: "Phosphine Gas Poisoning: Epidemiology and Clinical Toxicology."

Invited speaker, Pesticide Safety, Health, and Medicine Course (Pacific Northwest Agricultural Safety and Health Center), Yakima, Washington. February 19, 2004. Lecture: "Acute Toxicity of Pesticides."

Invited speaker, Recognition, Management and Prevention of Asthma and Pesticide Illnesses: A Course for Health Care Professionals, Environmental Professionals, Emergency Responders, School Leaders, and Nez Perce Community Members. Lapwai, Idaho, July 30, 2003. Lecture: "Pesticide Surveillance Tracking Systems, and Interaction with the National Pesticide Information Center"

Invited speaker, 2003 Northwest Association of Occupational and Environmental Medicine Winter Meeting (Mt. Hood, Oregon). March 1, 2003. Lecture: "Mycotoxins: Exposure Sources, Pathways, and Clinical Toxicology"

Invited speaker, American College of Occupational and Environmental Medicine, State of the Art Conference. Baltimore, Maryland October 27, 2002. Lecture: "Fungicides and Fumigants"

Symposium organizer and presenter, American Academy of Clinical Toxicology, Occupational and Environmental Toxicology Symposium. North American Congress of Clinical Toxicology. Palm Springs, California. September 27, 2002. Symposium title: "Mycotoxins in

7

the Indoor and Outdoor Environment." Lecture: "Mycotoxins: Exposure Sources, Pathways, and Clinical Toxicology"

Invited speaker, Agriculture Safety and Health Mini-Symposium, Center for Research in Occupational and Environmental Toxicology, Oregon Health and Science University.  March 18, 2002, Portland, Oregon. Lecture: "Organophosphates in Agriculture: In and Out of the Field"

Invited speaker, American College of Medical Toxicology Symposium Presentation for Fellows-in-Training.  Lecture: "The Medical Toxicologist as Epidemiologist" North American Congress of Clinical Toxicology, Montreal, Quebec. October 6, 2001

Invited speaker, Council of State and Territorial Epidemiologists Annual meeting. Lecture: "Case Finding Through Collaboration With Poison Control Centers and Other National Telecommunication Services." June 12, 2001.  Portland, Oregon.

**Other Peer-Reviewed Presentations:**

Environmental Medicine Presentation Package, a 1-hour audiovisual Powerpoint presentation prepared with contract funding from the Association of Occupational and Environmental Clinics.  Title: "Recognizing, Treating and Preventing Health Risks from Agricultural Pesticides."  Completed August, 2007.

**Published abstracts and Poster Presentations (peer reviewed):**

Madeen EP, Corley R, Turtletaub K, Olgnibene T, Malfatti M, Garrard M, Sudakin D, McQuistan T, Williams DE.  In vivo human pharmacokinetics of dibenzo (def,p) chrysene following microdosing: Bridging the gap between high dose animal data and environmentally relevant human exposures. (October, 2012). Presented at the 25th Annual Superfund Research Program meeting, Research Triangle Park, North Carolina.

Cardenas A, Sudakin D, Smit E, Harding A. Naphthalene exposure and relationship withhemoglobin and hematocrit in White, Black, and Hispanic adults: Results from the 2003-4 National Health andNutrition Examination Survey. (October, 2012). Presented at the American Public Health Association Meeting, San Francisco, CA.

Stone DL and Sudakin DL.  "Longitudinal Trends in Organophosphate Incidents Reported to NPIC:  Role of Regulation." Presented as a Poster at the North American Congress of Clinical Toxicology meeting.  September 22, 2009. San Antonio, TX.  Published in *Clinical Toxicology.*

Sudakin DL, Power, LE.  "Regional Variation in Methamphetamine-related Incidents: Applications of GIS and Spatial Scan Statistics."  Presented as a Platform Presentation at the North American Congress of Clinical Toxicology meeting.  September 15, 2008.  Toronto, Canada.  Published in *Clinical Toxicology* 2008;46(7).

8

Chiaia, Aurea C.; Sudakin, Daniel L.; Banta-Green, Caleb; Field, Jennifer A.   Determination of illicit drugs and biomarkers in raw municipal wastewater influent as a tool for drug epidemiology.   Abstracts of Papers, 234th ACS National Meeting, Boston, MA, United States, August 19-23, 2007.

Sudakin DL.  "Fatality After a Single Dermal Application of Lindane Lotion."  Presented at the European Association of Poison Centers and Clinical Toxicologists meeting.  May 4, 2007. Athens, Greece.  Published in Clinical Toxicology 2007;45(4).

Power LE, Sudakin DL.  "Non-Specific Reporting of "Other" Pesticide Classifications in Annual Poison Control Center Reports."  Presented at the European Association of Poison Centers and Clinical Toxicologists meeting.  May 4, 2007.  Athens, Greece.  Published in Clinical Toxicology 2007;45(4).

Sudakin DL.  "Longitudinal Trends in the Incidence of Organophosphate Exposures Reported to Poison Centers in the United States.  Presented at the European Association of Poison Centers and Clinical Toxicologists meeting.  April 21, 2006.  Published in Clinical Toxicology 2006;44.

Sudakin DL.  "Pyrethroid Insecticides:  Advances and Limitations in Biomonitoring". Accepted for presentation at the North American Congress of Clinical Toxicology.  September 13, 2004.  Seattle, WA.  Published in *Journal of Toxicology—Clinical Toxicology* 2004;42(5):788.

Sudakin DL, Horowitz BZ, Giffin S.  "Regional variation in the incidence of symptomatic pesticide exposures: applications of GIS".  Presented at the International Society for Exposure Assessment / International Society for Environmental Epidemiology Meeting.  August 11, 2002.  Vancouver, British Columbia.  Published in *Epidemiology* 2002;13(4): page S208

Thomsen C, Horowitz BZ, Sudakin DL.  "Improving reporting by a poison center to a pesticide poisoning surveillance system."  Presented at the International Society for Exposure Assessment / International Society for Environmental Epidemiology Meeting.  August 11, 2002.  Vancouver, British Columbia.  Published in *Epidemiology* 2002;13(4): page S211

Sudakin DL.  "Toxigenic Fungi and Mycotoxins in the Indoor Environment."  Mycological Society of North America.  June 22, 2002.  Corvallis, OR.

Sudakin DL, Wagner SL.  "Human Pesticide Exposures, Trends and Informational Needs." North American Congress of Clinical Toxicology.  October, 2001.  Montreal, Quebec. Abstract published in *Journal of Toxicology--Clinical Toxicology* 2001;39(5):528.

Sudakin DL, Horowitz BZ, Giffin S.  "Regional Variation in the Incidence of Intentional Exposures."  North American Congress of Clinical Toxicology, Tucson, Arizona, September, 2000.  Abstract published in *Journal of Toxicology--Clinical Toxicology* 2000;38(5).

9

Mirkin D, Sudakin DL, Horowitz BZ, Parker S. "Plumbism in Pregnancy Treated with DMSA." North American Congress of Clinical Toxicology, Tucson, Arizona, September, 2000. Abstract published in *Journal of Toxicology--Clinical Toxicology* 2000;38(5).

Mirkin D, Sudakin DL. "Lead Chelation in the Neonate." North American Congress of Clinical Toxicology, Tucson, Arizona, September, 2000. Abstract published in *Journal of Toxicology--Clinical Toxicology* 2000;38(5).

Sudakin DL, Horowitz BZ. "Geographic Information Systems and Poison Center Management." North American Congress of Clinical Toxicology. La Jolla, California. September, 1999. Abstract published in *Journal of Toxicology--Clinical Toxicology*, 1999;37(5).

Sudakin DL, Horowitz BZ. "Geographic Distribution of Hospitals and their Influence on Poison Center Penetrance." North American Congress of Clinical Toxicology. La Jolla, California. September, 1999. Abstract published in *Journal of Toxicology--Clinical Toxicology*, 1999;37(5).

Sudakin DL, Mullins ME, Horowitz BZ, Abshier V. "Intermediate Syndrome After Malathion Ingestion Despite Continuous Infusion of 2-PAM." North American Congress of Clinical Toxicology La Jolla, California, September, 1999. Abstract published in *Journal of Toxicology--Clinical Toxicology*, 1999;37(5).

## Non-credit Seminars (Continuing Education Lectures for Faculty, Fellows, Residents and Medical Students at Oregon Health and Science University, and Portland State University)

- Invited Lecture, Portland State University Counseling 507: Addiction Pharmacology. Lecture Title: Treatment of Opioid, Alcohol, and Stimulant Use Disorders in the Outpatient Setting. October 25, 2017.
- Invited Lecture, Portland State University Counseling 507: Addiction Pharmacology: Title: Medication Assisted Treatment Options in the Outpatient Setting. April 8, 2016.
- Invited Lecture, Western Regional Toxicology Fellowship Meeting, Oregon Health and Science University
  - Biomarkers of pesticide poisoning, April 24, 2014
- Invited Lecture, Oregon Health and Science University Medical Toxicology Fellowship Program
  - Dram Shop Cases and Widmark Calculations. October 3, 2018.
  - THC and per se DUI limits. August 17, 2018.
  - Addiction medicine update: 2016. August 15, 2016.
  - Kratom and other remedies in opioid withdrawal syndrome, June 11, 2015
  - Naltrexone in clinical practice, February 19, 2015
  - Buprenorphine in clinical practice and overdose, February 28, 2014
  - Methamphetamine death while in police custody, August 5, 2013

- o  Postmortem redistribution of THC, May 13, 2013
- o  Biomarkers of Exposure to Pesticides, February 26, 2013
- Invited Speaker, Oregon Health Sciences University Preventive Medicine Resident Lecture Series, Portland, Oregon:
  - o  "Biotechnology and Food Safety," February 3, 2005
  - o  "Pesticide Toxicology:  Electronic Resources for Health Care Providers," December 9, 2005
  - o  "Dietary Aflatoxins and Chemoprevention of Cancer," April 24, 2003
  - o  "Regulatory and Clinical Toxicology of Dietary Supplements" May 22, 2003
  - o  "Mold in the Indoor Environment: Role of Mycotoxins in Building-Related Illness" June 6, 2002
  - o  "Pesticide Exposures:  Clinical and Regulatory Issues," January 10, 2002.
- Invited Speaker, Oregon Health and Science University Medical Toxicology Fellowship Lecture Series, Portland, Oregon.
  - o  "Antidotes in the Treatment of Aflatoxin-associated Liver Disease" June 6, 2002

**Technical Reports (peer-reviewed)**

Co-author (Thomas Kurt, MD), with the ACMT Clinical Practice Committee.  American College of Medical Toxicology Comment:  Institute of Medicine Report on Damp Indoor Spaces and Health. June, 2006.

Expert writer, Centers for Disease Control and Prevention (CDC), ***Third National Report on Human Exposure to Environmental Chemicals.*** Published July 21, 2005.
Sections authored and updated include:
*Pyrethroid Pesticides*
*Herbicides*
*Organophosphate Insecticides: Specific Metabolites*
*Organophosphate Insecticides: Dialkyl Phosphate Metabolites*
*Organochlorine insecticides*
*Other Pesticides (including DEET)*

**Acknowledged Contributions to Peer-Reviewed Publications and Reports:**
Pesticide Poisoning from Synthetic Pyrethroids, Oregon Department of Health Services Communicable Disease (CD) Summary 2004;53(6).
Acute Idiopathic Pulmonary Hemorrhage in Infants:  Recommendations from the Working Group for Investigation and Surveillance, *Morbidity and Mortality World Report,* Centers for Disease Control and Prevention. March 12, 2004;53(RR02)1-12.
Poisoning by an Illegally Imported Chinese Rodenticide Containing Tetramethylenedisulfotetramine: New York City, 2002. *Morbidity and Mortality  World Report,* Centers for Disease Control and Prevention.  March 14, 2003;52(10):199-201.
Agency for Toxic Substances and Disease Registry (ATSDR) Case Studies in Environmental Medicine. Radiation Exposure from Iodine-131. November, 2002.
http://www.atsdr.cdc.gov/HEC/CSEM/iodine/iodine131.pdf

11

**Letters to the Editor:**

Sudakin DL. "Bioaerosol Lung Damage in a Worker with Repeated Exposure to Fungi in a Water-damaged Building" *Environmental Health Perspectives* 2001;109(11):516.

Sudakin DL, Mullins ME, Horowitz BZ. "Poison Control Centers and Occupational Exposures." *Journal of Occupational and Environmental Medicine,* 2000;42(1):1-2.

Sudakin DL. "Mycotoxins and Pulmonary Hemorrhage." *Archives of Pediatrics and Adolescent Medicine,* 1999;153:205.

Sudakin DL. "Integrating Preventive Medicine in a Medical Resident Practice." *Archives of Internal Medicine* 1998;158(15):1719.

Sudakin DL. "Effects of Mycotoxins in Health and Disease." *Journal of the American Medical Association.* 1997:278(13):1063.

**Non-refereed Publications (outreach, research and related activities featured in):**

*BBC News,* "DEET Bug Repellent, Toxic Worry." August 5, 2009.

*Oregon's Agricultural Progress,* Winter, 2008: "New Method Pinpoints Meth Hotspots."

*Oregon State University News and Communication Services.* September 15, 2008. "OSU Study Uses New Method to Identify Meth Hot Spots in Oregon."

*Oregon's Agricultural Progress,* Fall, 2005. "Profile: Dr. Dan Sudakin Spans the Worlds of Public Health, Medicine, and Toxicology."

*Forbes,* April 11, 2005, Daniel Fisher, "Dr. Mold"

*Los Angeles Times,* July 5, 2004. Kelly Young, "Repellent Works, but Fears Linger"

*Wall Street Journal,* June 26, 2004, Tara Pope-Parker, "Backyard Dilemna: Which is Worse DEET or Possibility of West Nile Virus?"

*Pesticide and Toxic Chemical News,* June 21, 2004, "Mysterious Poisoning Death Attributed to Pesticide"

*Jacksonville Daily News,* June 13, 2004, Roselee Papandrea, "Odd Poison Killed Child"

*American College of Medical Toxicology Newsletter,* Spring, 2004, "Toxicologists in the News"

*Ag Connections* (National Institute of Occupational Safety and Health, Agricultural Research Centers), Spring, 2003, "Logging In: Valuable Resources"

*Science,* April 14, 2000, Michael Hagmann, "A Toxic Mold's Legacy Revisited"

## TEACHING AND ADVISING

**Course Development and Instruction at Oregon State University:**

Instructor, Oregon State University, Toxicology 429/529: Toxic Substances in Food.

Instructor, Oregon State University, Toxicology 512: Target Organ Toxicology (Neurotoxicology lecture sequence).

Guest Lecturer, Oregon State University, Public Health 540 (Environmental Health). April 20, 2010. Lecture: "Pesticide Residues in Food: Toxicology and Risk Assessment."

Guest Lecturer, Oregon State University, Biology/Toxicology 430/430H/530 (Baccalaureate Core), Biotechnologies: Agriculture, Food, and Resource Issues. 2004-2010. Lectures: Tacogate (Starlink Corn and Plant-Incorporated Protectants), and Dietary Supplements

Guest Lecturer and Moderator, Oregon State University, Public Health 591 (Environmental Policy). October 14, 2009.

12

Guest Lecturer, Oregon State University, Toxicology 360 (Baccalaureate Core). Lecture: Your Body Fighting the Toxin. October 13, 2009.
Guest Lecturer, Oregon State University, Toxicology 360 (Baccalaureate Core). Lecture: Your Body Fighting the Toxin. October 12, 2008.
Guest Lecturer, Oregon State University, Public Health 512: Occupational and Environmental Health. Lecture: Regulation and Clinical Toxicology of Pesticides. October 13, 2005.
Guest Lecturer, Oregon State University, Public Health 512: Occupational and Environmental Health. Lecture: Pesticide Toxicology. May 11, 2005.
Guest Lecturer, Oregon State University, Food, Science, & Technology 102: Maraschino Cherry. Lecture: Food Toxicology and the Maraschino Cherry. February 9, 2005.
Guest Lecturer, Oregon State University, Animal Science 490: Toxicants and Poisonous Plants. November 22, 2004. Lecture: Dietary Exposure to Aflatoxins in Food and Animal Feed.
Guest Lecturer, Oregon State University, Public Health 448/548: Public Health Toxicology and Risk Assessment. October 29, 2004. Lecture: Arsenic Toxicology and Epidemiology
Guest Lecturer, Oregon State University, Public Health 542: Environmental and Occupational Health. Lecture: Pesticide Toxicology and Informational Resources. April 21, 2004.
Guest Lecturer, Oregon State University, Food, Science, & Technology 102: Maraschino Cherry. Lecture: Food Toxicology and the Maraschino Cherry. February 11, 2004.
Guest Lecturer, Oregon State University, Public Health 411: Environmental Health Policy and Regulations. Lecture: Regulation and Toxicology of Dietary Supplements. November 24, 2003.
Guest Lecturer, Oregon State University, Public Health 542: Environmental and Occupational Health. Lecture: Pesticide Toxicology and Informational Resources. May 28, 2003.
Guest Lecturer, Oregon State University, Public Health 591: Issues and Research in Addictive Behaviors. Lecture: Marijuana Addiction. February 27, 2003.
Guest Lecturer, Oregon State University, Toxicology 507 Seminar. Toxicoepidemiology: Applications of GIS. November 12, 2001.

## GRANTS, COOPERATIVE AGREEMENTS, CONTRACTS

Co-Investigator: Dietary HDAC Inhibitors (funded by NIH R01 CA 122959-01A2), 2012-2014

Co-Investigator: Pharmacokinetics of Phenanthrene and I3C in Post-Menopausal Women (funded by NIH (funded by NIH P01 CA090890), 2010-2014

Co-Investigator: Lipoic Acid Bioavailability in Young and Elderly Adults- Phase II (funded by USANA), 2009-2014

National Pesticide Medical Monitoring Program (U.S. EPA Cooperative Agreement)
Principal Investigator (2001-2010).

National Pesticide Information Center (U.S. EPA Cooperative Agreement)
Co-Principal Investigator (2001-2015).

Integrative Health Science Facility Core (IHSFC), Environmental Health Science Center (funded by National Institute of Environmental Health Sciences). Co-Director of Clinical Research Center (2006-2014).

13

Superfund Research Program (SRP), funded by the National Institute of Environmental Health Sciences. Director, Research Translation Core (RTC), 2009-2014

Principal Investigator, Memorandum of Understanding, Oregon Department of Agriculture. Consultation activities to the State of Oregon Pesticide Analytical and Response Center.  2001-2014

Contract, Environmental Medicine Presentation Package (Pesticide Residues in the Indoor Environment: Clinical Toxicology and Health Effects).  Contract awarded by the American College of Medical Toxicology. August, 2010.

Contract, Environmental Medicine Presentation Module (Recognizing, Diagnostic, and Preventing Pesticide Illness in Agricultural Workers).  Contract awarded by the Association of Occupational and Environmental Clinics. July 2006-June 2007.

Principal Investigator, Oregon Health and Science University Medical Research Foundation Grant. Grant title:  Monitoring Community Drug Abuse: Methamphetamine in Municipal Wastewater and its Spatial Correlation with Poisoning Incidents in Oregon. Project period 8/1/06-8/1/08.

## SERVICE

### Service to the Profession

Member, US EPA National Advisory Committee to Develop Acute Exposure Guideline Levels for Hazardous Substances (NAC/AEGL, 2006-2010)

Member and Fellow, American College of Occupational and Environmental Medicine
    Occupational and Clinical Toxicology Committee
        Committee chair (2005-2008)
        House of Delegates (2004-5)

Member and Fellow, American College of Medical Toxicology
    Ethics Task Force
    Grants and Contracts Committee

Review Panel, Medical Toxicology of Natural Substances:  Foods, Fungi, Medicinal Herbs, by Donald Barceloux (2008).

National Review Board, Pesticide Information Gateway project of the *National Strategies for Health Care Providers:  Pesticides Initiative.* National Environmental Education and Training Foundation, Inc..  December, 2002.
        Peer-reviewer of technical documents: "National Pesticide Competency Guidelines for Medical and Nursing Education" and "National Pesticide Practice Skills Guidelines for Medical and Nursing Practice"

Member, Roster of Experts in Biological Sciences.  Food and Agriculture Organization of the
United Nations/World Health Organization Joint Expert Committee on Food Additives
(2002)

Invited member of Peer Review Panels:

Scientific Review Panel, National Institute of Environmental Health Sciences (NIEHS),
Environmental Health Science Centers.  August, 2010.

EPA Region 10 Project Proposal: "An Evaluation of the Human Health Effects of TCE
Contamination at the View-Master Toy Factory in Beaverton, OR."  August 26, 2005

NIEHS RFA ES-03-004: "Centers for Children's Environmental Health and Disease
Prevention Research."  August 4, 2003

EPA 2002 STAR "Biomarkers for the Assessment of Exposure & Toxicity in Children"
Washington, D.C., August 23, 2002

Member, Editorial Board
*Journal of Medical Toxicology* (2005-2014)
Section Editor (Occupational and Environmental Toxicology)

Peer Reviewer for scientific journals:
*American Journal of Emergency Medicine*
*Pharmacodepidemiology and Drug Safety*
*Toxicology Letters*
*Archives of Environmental and Occupational Health*
*Journal of Toxicology--Clinical Toxicology*
*Journal of Medical Toxicology*
*Medscape General Medicine*
*Pediatrics*
*Perceptual and Motor Skills (Psychological Reports)*
*Pesticide Biochemistry and Physiology*

Abstract Review Committee, North American Congress of Clinical Toxicology, 2000-2001, 2007,
2008, 2009.

Reviewer of Technical Documents and Extension Publications:

Purdue Pesticide Programs, Cooperative Extension Service.  *Farm Family Exposure to
Pesticides:  A Conversation with Farm Women.*

Agency for Toxic Substances and Diseases Registry (ATSDR) *Chemical and Technical
Summary Document for DEET.*  May, 2004

15

Western Wood Products Association Technical Report: *Mold, Housing, and Wood.* 2001.

Expert Panel Member, Centers for Disease Control and Prevention Environmental/Laboratory Investigation Panel for Acute Idiopathic Pulmonary Hemorrhage, July 2000.

Research Advisory Committee for NIEHS grant R01 ES98707, "Reducing Pesticide Exposure in Minority Families" 2001-2004

Research Advisory Committee for EPA Cooperative Agreement, "Saving Lives by Changing Practice" 2005-present

Invited speaker, Sacred Heart Medical Center Weekly Physician Conference. Eugene, OR. June 14, 2005. Lecture: "Pediatric Toxicology: Heavy Metals and Dietary Supplements."

Invited speaker, OHSU School of Dentistry Continuing Education Lecture Series. Portland, OR. February 10, 2005. Lecture: "Toxicology of Dental Amalgams"

Invited speaker, Advanced Hazmat Life Support, Provider Course (Lecture Topics: Toxic Inhalations and Antidotes in Detail). September 25, 2004. Eugene, Oregon

Invited speaker, Good Samaritan Regional Medical Center, Corvallis, OR. April 23, 2004. Lecture: "Chemical Exposures in the Workplace."

Invited speaker, Advanced Hazmat Life Support, Provider Course (Lecture Topics: Toxic Inhalations and Antidotes in Detail). September 27, 2003. Brooks, Oregon

Invited speaker, Continuing Medical Education lecture, Good Samaritan Hospital. Lecture: "Pesticide Exposure in the Home." May 12, 2001, Corvallis, Oregon

Invited speaker, Northwest Association of Occupational and Environmental Medicine monthly meeting. Lecture: "Mold: Indoor Air and the Occupational Physician" May, 2000

## Service to the Public (Professionally Related)

Appointee, Governor's Cannabis Research Task Force (Oregon), 2015-6

Invited Speaker, OSU Extension Non-Crop Vegetation Management Conference, Corvallis, OR. January 28, 2010. Title: "Health Effects of Herbicides"

Testimony in support of Oregon House Bill 3450 (Carbon Monoxide Poisoning), to Oregon Human Services Committee. Salem, OR. April 6, 2009.

Invited Speaker, Corvallis, Oregon. Public Outreach Session of the Pacific Northwest Association of Toxicologists Annual Meeting. September 20, 2008. Presentation: "Methamphetamine: Health Risks in the Lab and in the Community."

16

Invited Speaker, Eugene, Oregon.  Pesticide Applicator Training Course:  Policy and Practice.  February 7, 2006.  Presentation: "Longitudinal Trends in Organophosphate Incidents in the United States."

Invited Speaker, Oregon Vegetation Management Association Course.  Seaside, Oregon. November 14, 2005.  Presentation: "Reliable Resources in Pesticide Toxicology"

Invited Speaker, OSU Extension Service Non-Crop Vegetation Management Course. Corvallis, Oregon.  February 2, 2005.  Presentation: "Case Studies of Pesticide Poisoning and Lessons Learned for Pesticide Applicators."

Invited Speaker, Benton County Environmental Health Advisory Committee Public Meeting.  Corvallis, Oregon.  September 28, 2004.  Presentation: "Children's Health and the Environment."

Invited Speaker, Corvallis Senior Center.  Corvallis, Oregon.  August 20, 2004.  Lecture: "Medications and Dietary Supplements:  A Physician's Perspective"

Invited Speaker, Central Oregon Pest Management Course.  Bend, Oregon.  February 18, 2004.  Lecture: "Pesticides and Effects in Humans"

Invited Speaker, OSU Extension Service Non-Crop Vegetation Management Course.  Corvallis, Oregon.  February 11, 2004.  Lecture: "Pesticide Poisoning:  Signs and Symptoms"

Invited Speaker, Oregon State University Extension Service:  Pesticide Chemistry, Toxicology, and Policy Short Course. Ontario, Oregon.  February 10, 2004.  Lecture: "Pesticides and Effects in Humans

Invited Speaker, Willamette Dietetic Association, Corvallis, Oregon.  January 26, 2004 Lecture: "Dietary Supplements:  Regulation and Toxicity"

Invited Speaker, American Society of Safety Engineers Chapter meeting, Salem Oregon.  August 5, 2003.  Lecture: "Chemical Incidents:  Responding to Disasters and Avoiding the Pitfalls"

Oregon State University, EHSC SMILE Program High School Challenge Event in IAQ, Environmental Physician Expert session. Oregon State University, April 25, 2003.

Invited Speaker, North American Truffling Society, Corvallis, Oregon, April 8, 2003.  Presentation: "Mycotoxins:  Human Health Hazards from Above-ground Fungi"

Invited Speaker, 2003 Southern Oregon Pesticide Recertification Short Course.  January 22, 2003, Medford, Oregon.  Presentations: "Pesticide Poisoning:  What the Pesticide Applicator Should Know" and "Pesticide Poisonings in Oregon and the Pacific Northwest"

17

Invited speaker, 2003 Chemical Applicator Short Course, January 15, 2003, Portland, Oregon. Lecture: "Pesticide Poisoning:  Signs, Symptoms, and First Aid"

Invited Presenter, Oregon Private Pesticide Applicator CORE Training Video.  "Pesticide Exposures: What the Pesticide Applicator Should Know," November 8, 2002

Invited Speaker, EHSC Summer Institute for Pilot School teachers.  "The Role of the Public Health Physician."  June 18, 2002.  Corvallis, Oregon.

Invited Speaker, Wilbur-Ellis Company Private Pesticide Applicators- Core Credit Meeting, Albany, Oregon, March 6, 2002. Presentation: "Pesticide Exposures in Oregon"

Invited Speaker, Pacific Northwest Agricultural Chemistry, Toxicology, and Policy Short Course, Eugene, Oregon, February 20, 2002.  Lectures: "Pesticides and Effects on Humans" and "Pesticide Exposures in Oregon and the Pacific Northwest"

Invited Speaker, Chemical Applicators Short Course, Portland, Oregon.  January 10, 2002. "Pesticide Exposures in Oregon, What the Pesticide Applicator Should Know"

## AWARDS

2006:  Winner, American Academy of Clinical Toxicology, Lampe-Kunkle Award for Research in Natural Products of Toxicology.

1998:  Winner, Resident Paper Competition, Oregon Health and Science University Sommer Memorial Lecture.  Paper: "*Stachybotrys chartarum:*  Current Knowledge of Its Role in Disease."

## Trial and Deposition Testimony of Daniel L. Sudakin, MD, MPH

1. **Fazli v. Action Management**
   Deposition testimony, February 16, 2021

2. **Olmos v. ABM Industries, Inc.**
   Deposition testimony, February 2, 2021

3. **Zacharias v. Velqui-I, LLC, et al.**
   Deposition testimony, November 23, 2020

4. **Rose v. Holt**
   Deposition testimony, July 30, 2020

5. **Serrano v. Premo**
   Deposition testimony, March 20, 2020

6. **Glisson v. Lee**
   Deposition testimony, March 3, 2020

7. **Bruner v. H & H Roofing**
   Deposition testimony, October 11, 2019

8. **Marchese v. Farbenbloom**
   Deposition testimony, September 25, 2019

9. **State of Washington v. Heng**
   Trial testimony, September 18, 2019

10. **Vakoff v Arapahoe House**
    Trial testimony, March 7, 2019

11. **Revel v. Fromm**
    Deposition testimony, January 14, 2019

12. **Maria Vega Gonzalez v. SAIF**
    Deposition testimony, January 4, 2019

13. **Deyo-Bundy v. SAIF**
    Hearing testimony, August 23, 2018

14. **State of Washington v. Donald Siegler**
    Hearing testimony, July 18, 2018

15. **Rapp v. Boone Hospital Center**
    Deposition testimony, March 19, 2018

16. **Williams v. Stoltz**
    Deposition testimony, March 6, 2018

17. **Graves v. Bonyo**
    Deposition testimony, February 23, 2018

18. **Oregon v. Logan**
    Trial testimony, February 2, 2018

19.   **Longmire v. 1022 10th St HOA**
      Deposition testimony, June 16, 2017
      Trial testimony, November 3, 2017

20.   **Keene v. Mitchell**
      **Superior Court of State of California, County of Los Angeles**
      Deposition testimony, April 19, 2017

**EXHIBIT 7**

Atkinson-Baker, a Veritext Company
www.depo.com

1          UNITED STATES DISTRICT COURT

2          NORTHERN DISTRICT OF CALIFORNIA

3          _____

4     Jessica Dominguez,        )    **CERTIFIED COPY**

5     individually, and         )

6     Jessica Dominguez as       )

7     Guardian ad Litem          ) Case No:

8     for JAD (1), JAD (2)       ) 5:18-cv-04826

9     and JAD (3),               )

10          Plaintiffs,          )

11    vs.                        )

12    City of San Jose,          )

13    San Jose Police            )

14    Department, Michael        )

15    Pina and Doe Police        )

16    Officers 2-5,              )

17          Defendants.          )

18

19          _____

20          DEPOSITION OF ROCKY EDWARDS

21          (The following is the deposition of Rocky

22    Edwards, taken pursuant to Federal Rule of Civil

23    Procedure 30(b)(6), taken remotely commencing at

24    approximately 1:00 p.m., PDT, November 1, 2021.)

25

Atkinson-Baker, a Veritext Company
www.depo.com

```
 1  APPEARANCES:

 2          On behalf of the Plaintiffs:
            Mr. John Kevin Crowley
 3          Attorney at Law
            125 S. Market Street, Suite 1200
 4          San Jose, CA  95113

 5          On behalf of the Defendants:
            Ms. Maren Clouse
 6          Chief Deputy City Attorney
            200 E. Santa Clara St. Fl 16
 7          San Jose, CA  95113-1903

 8

 9                      EXHIBIT INDEX
10
            EXAMINATION   WITNESS            PAGE
11          John Crowley  Rocky Edwards      3

12
            EXHIBIT       DESCRIPTION        PAGE
13
            A             SJ 1628 Report     52
14

15

16

17

18

19

20

21

22

23

24

25
```

| | | |
|---|---|---|
| 1 | pillar? | 14:38:04 |
| 2 |     Q.  Well, they have two of them. | 14:38:04 |
| 3 |     A.  Okay. | 14:38:06 |
| 4 |     Q.  And then there's a section there that | 14:38:06 |
| 5 | says, "Results and Conclusions."  The jacketing and | 14:38:11 |
| 6 | projectile were examined with, you know, scientific | 14:38:15 |
| 7 | stuff and materials recovered.  And then it says, | 14:38:19 |
| 8 | "powdered glass and possible bone were recovered | 14:38:23 |
| 9 | from the jacketing," right? | 14:38:27 |
| 10 |     A.  Okay. | 14:38:30 |
| 11 |     Q.  "Polymeric material was recovered from the | 14:38:31 |
| 12 | projectile.  No fibers were observed on the | 14:38:34 |
| 13 | jacketing and projectile." | 14:38:37 |
| 14 |     A.  Okay. | 14:38:46 |
| 15 |     Q.  So where is it that you found that there | 14:38:46 |
| 16 | was textile fibers or material found on any of these | 14:38:48 |
| 17 | bullets? | 14:38:52 |
| 18 |     A.  I'm looking at the criminalist's notes and | 14:38:57 |
| 19 | -- I don't know.  I'd have to go back and look where | 14:40:19 |
| 20 | I got that from. | 14:40:21 |
| 21 |     Q.  You would agree that it's unusual for a | 14:40:23 |
| 22 | bullet of this type to have textile fibers on it? | 14:40:24 |
| 23 |     A.  Yeah, if it's moving really fast.  So | 14:40:37 |
| 24 | you're not always going to find fibers on the bullet | 14:40:43 |
| 25 | moving so quickly.  No fibers were observed on the | 14:40:46 |

```
 1   30-degree angle with his arm, left arm above the      14:49:21
 2   windowsill.  That's not what Pina said, is it?        14:49:25
 3          MS. CLOUSE:  Objection, misstates the          14:49:30
 4   testimony.                                             14:49:31
 5       Q.  Well, where did you find him saying that       14:49:33
 6   in his deposition?                                     14:49:36
 7       A.  Well, I think that the position of the         14:49:36
 8   seat was after -- when they were doing the             14:49:41
 9   examination of the scene, that the position of the     14:49:42
10   chair, the way it's positioned in the driver's seat,   14:49:44
11   was in that position.                                  14:49:46
12       Q.  So when he was shot he leaned back into        14:49:49
13   the seat, correct?                                     14:49:53
14          MS. CLOUSE:  Objection, vague.                  14:49:56
15       Q.  Right?                                         14:50:03
16       A.  I don't know.  I don't recall.                 14:50:04
17       Q.  Well, he didn't fall forward and crouch --     14:50:05
18       A.  No, he had to go backwards.                    14:50:08
19       Q.  -- and end up in a clump, did he?             14:50:10
20       A.  No, he did not.                                14:50:13
21       Q.  So -- so had he been shot when he was          14:50:13
22   leaning forward, the -- his body would have fallen     14:50:15
23   forward and collapsed, right?                          14:50:21
24       A.  Yes.                                           14:50:23
25       Q.  So he was shot when he was sitting up,         14:50:23
```

| | | |
|---|---|---|
| 1 | correct? | 14:50:27 |
| 2 | A.   Correct. | 14:50:27 |
| 3 | Q.   And he was shot when his left hand was | 14:50:28 |
| 4 | raised, correct? | 14:50:45 |
| 5 | MS. CLOUSE:  Objection, vague. | 14:50:46 |
| 6 | Q.   Well, he was shot when his left arm was | 14:50:47 |
| 7 | raised above the windowsill next to his head, | 14:50:51 |
| 8 | correct? | 14:50:56 |
| 9 | MS. CLOUSE:  Objection, misstates -- well, | 14:50:57 |
| 10 | it's compound, and I'll leave it at that. | 14:51:00 |
| 11 | A.   Well, obviously his sleeve was in | 14:51:05 |
| 12 | alignment with the trajectory of the bullet as the | 14:51:08 |
| 13 | bullet path went through his sweatshirt and impacted | 14:51:11 |
| 14 | in his face, so that's where your alignment comes | 14:51:14 |
| 15 | in. | 14:51:18 |
| 16 | Q.   Okay.  So the answer is "yes," correct? | 14:51:19 |
| 17 | MS. CLOUSE:  Objection, argumentative, and | 14:51:24 |
| 18 | misstates the testimony. | 14:51:26 |
| 19 | MR. CROWLEY:  It isn't argumentative.  I | 14:51:29 |
| 20 | asked him the question; it's not argumentative. | 14:51:30 |
| 21 | It's in his report. | 14:51:31 |
| 22 | MS. CLOUSE:  If it's in his report, then | 14:51:34 |
| 23 | why do you need to ask him the question? | 14:51:35 |
| 24 | BY MR. CROWLEY: | 14:51:37 |
| 25 | Q.   Okay.  Okay.  Let me read you this from | 14:51:37 |

| | | |
|---|---|---|
| 1 | your report.  "Number five:  It is likely | 14:51:39 |
| 2 | Dominguez's left arm was in a position adjacent to | 14:51:41 |
| 3 | the left side of his face," okay? | 14:51:44 |
| 4 | A.  Okay.  I agree with that. | 14:51:49 |
| 5 | Q.  That means his arm was raised, correct? | 14:51:51 |
| 6 | MS. CLOUSE:  Objection, vague. | 14:51:57 |
| 7 | Q.  And that means when he was shot, correct? | 14:51:58 |
| 8 | A.  Well, his arm had to be raised -- | 14:52:00 |
| 9 | Q.  Well, "yes" or "no"? | 14:52:02 |
| 10 | A.  -- in order to get the trajectory.  Yes, | 14:52:03 |
| 11 | it was raised. | 14:52:05 |
| 12 | Q.  Of course.  Of course.  And you read the | 14:52:05 |
| 13 | entire deposition of Mr. Pina, right? | 14:52:37 |
| 14 | A.  Yes. | 14:52:40 |
| 15 | Q.  In reading my ballistic's expert David | 14:52:55 |
| 16 | Balash's report, do you have any criticism of his | 14:52:59 |
| 17 | report? | 14:53:03 |
| 18 | A.  No.  I just -- I think I kind of disagree | 14:53:03 |
| 19 | on the path.  I think he believed that the path of | 14:53:06 |
| 20 | the bullet that hit the pillar went through his | 14:53:10 |
| 21 | sweatshirt and hit the pillar.  I think it was the | 14:53:13 |
| 22 | second shot.  I think that's the only discrepancy | 14:53:15 |
| 23 | that I saw between him and I. | 14:53:19 |
| 24 | Q.  Did you visit the scene? | 14:53:26 |
| 25 | A.  Yes. | 14:53:28 |

# EXHIBIT 8





**EXHIBIT**

**A**

## County of Santa Clara Crime Laboratory

Office of the District Attorney
250 West Hedding Street
San Jose, California 95110-1717
(408) 808-5900
(408) 275-6245 FAX

### PHYSICAL EVIDENCE EXAMINATION REPORT
### Supplemental Report Number 1

| Agency Case Number 172580283 | Agency San Jose Police Department | | Laboratory Number M171328 |
|---|---|---|---|
| Suspect Dominguez, Jacob | Offense 211 PC | Analyst Melissa Dupée | |
| Victim Officer Mike Pina #3930 | Report Date 3/26/2018 | Agency Contact Veronica Martinez | |

### EVIDENCE

| Bar Code / SJPD Bar Code / Item No. | Description |
|---|---|
| AA171682 / SJ182278-19 / Item 20 | Copper colored jacketing |
| AA171683 / SJ182278-28 / Item 29 | Silver and copper colored projectile |
| AA171534 / not listed / Item 28 | "black hoodie sweatshirt" per the Laboratory Information Management System |

### REQUESTED ANALYSIS

Examine the jacketing and projectile for trace evidence materials including glass and fibers from the sweatshirt.

### RESULTS AND CONCLUSIONS

The jacketing and projectile were examined with stereomicroscopy for trace evidence materials. Materials recovered were examined with stereomicroscopy, polarized light microscopy, Fourier transform infrared spectroscopy and scanning electron microscopy and energy dispersive spectroscopy, as appropriate.

Powdered glass and possible bone were recovered from the jacketing. Polymeric material was recovered from the projectile. No fibers were observed on the jacketing and projectile.

The sweatshirt was not opened or examined.

### DISPOSITION OF EVIDENCE

Digital images taken during the course of analysis were uploaded to the Laboratory Information Management System.

Item 28 remains in the Property/Evidence Unit pending another laboratory analysis. Items 20 and 29 will be released to the Property/Evidence Unit upon completion of the technical review process. Once available, please arrange to retrieve your evidence at your earliest convenience.

Melissa A. Dupée
Criminalist

---

Accredited by the American Society of Crime Laboratory Directors/Laboratory Accreditation Board

Electronically stored instrumental data files generated in the course of analysis may be available upon specific request only. These files may require specialized software to open and view; the Laboratory cannot provide any such software.

Review: [signature] 3/28/2018   ARAB 4-5-18   Page 1 of 1

**SJ1628**

# EXHIBIT 9

# REPORT ON THE FATAL SHOOTING OF JACOB DOMINGUEZ ON SEPTEMBER 15, 2017



## JEFFREY F. ROSEN
### DISTRICT ATTORNEY

## **TABLE OF CONTENTS**

PREAMBLE...................................................................................................3

SUMMARY OF FACTS...............................................................................3

    Events leading up to the Officer-Involved Shooting........................................3

    Covert Response Unit Briefing and Operations Plan........................................4

    Surveillance of Jacob Dominguez.............................................................5

    Attempted apprehension and Shooting of Jacob Dominguez.............................5

LAW ENFORCEMENT WITNESS STATEMENTS...........................................7

    Officer Michael Pina..........................................................................7

    Officer Kris Ferguson.........................................................................8

    Officer Alvaro Lopez..........................................................................8

CIVILIAN WITNESS STATEMENTS..............................................................9

    Carlos Lovato...................................................................................9

    Leslie Bradley and Rhiannon Borunda.....................................................10

JAIL CALL EVIDENCE...............................................................................10

EVIDENCE COLLECTION AND PROCESSING................................................10

    Ballistics Evidence............................................................................10

    Kia Sportage...................................................................................11

    Clothing.........................................................................................12

AUDIO AND VIDEO EVIDENCE...................................................................12

    Private Surveillance Video...................................................................12

    Police Officer Body Camera Recordings...................................................13

AUTOPSY OF JACOB DOMINGUEZ..............................................................14

CRIME LAB ANALYSIS..............................................................................14

RELEVANT LEGAL PRINCIPLES.................................................................15

ANALYSIS................................................................................................17

CONCLUSION...........................................................................................19

## PREAMBLE

The evaluation of this incident was prepared after a review of the reports prepared by the San Jose Police Department, the Santa Clara County Crime Lab, and the Santa Clara County Medical Examiner's Office. San Jose Police Department Detective Sergeants Raul Corral and Bertrand Milliken and District Attorney Investigator Tom Newland conducted the investigation. The submission included: reports of the responding police officers; reports summarizing interviews of the involved officers and civilian witnesses; recordings of interviews; body worn camera footage; photographs; Medical Examiner's report; 911/police radio communications; Crime Lab reports; and surveillance video from nearby homes. This review is being conducted pursuant to the Officer-Involved Incident Guidelines adopted by the Santa Clara County Police Chief's Association on December 8, 2016.

## SUMMARY OF FACTS

The following summarizes the events leading up to, and including, the officer-involved shooting at Penitencia Creek Road and North White Road in San Jose, CA on September 15, 2017, which led to the death of Jacob Dominguez.

### Events Leading Up to the Officer-Involved Shooting

On August 28, 2017, Trach Ngo's 2012 Honda Accord was stolen from the carport of his home in San Jose. The victim described the thief as a "clean-shaven Hispanic male" between the ages of 30 and 35.[1]

On August 31, 2017, Mr. Ngo's Honda Accord was backed into a parking stall at TP Pure Water. Andrew Anchondo and Patricia Ruiz exited the vehicle and entered the store while an unidentified male passenger remained in the rear of the car. After spending a short time inside the store, Anchondo had a brief conversation with Ruiz, then exited the store and had a conversation with the unidentified male. The victim store employee, worried a violent crime was about to be committed, went to the store entrance. Anchondo approached the victim and pulled out a silver revolver from his pocket, causing the victim to run to a nearby business. Anchondo took the register drawer with $50 in it and got into the driver's seat of the Accord. Ruiz got into the front passenger seat, and the car left the scene with the three occupants.[2]

On September 12, 2017, members of the Regional Auto Theft Task Force (RATTF) were conducting surveillance on Andrew Anchondo as he was driving a stolen Mercedes.[3] The team observed the stolen Mercedes pull into the Arco gas station at 2357 Quimby Road in San Jose. Andrew Anchondo was the driver, Patricia Ruiz was the front passenger, and Jacob Dominquez was the rear seat passenger. Upon arriving at the Arco, Dominguez exited the vehicle, entered the station's convenience store, paid for gas, and bought some water. Dominguez then returned to the Mercedes, after which Anchondo masked himself up with a bandana, entered the store, and robbed three employees at gunpoint (described as a black handgun) of approximately $350 in cash.

---

[1] The theft of Mr. Ngo's car was documented in SJPD case number 17-240-0526.

[2] The robbery of TP Pure Water was documented in SJPD case number 17-243-0326

[3] The robbery of the Arco gas station was documented in SJPD case number 17-255-0757.

3

Once RATTF learned an armed robbery occurred inside the Arco station, the San Jose Police Department's (SJPD) Covert Response Unit (CRU) took over surveillance and apprehension of the vehicle's occupants due to the nature of the crime and Anchondo being a suspect in a gang-related shooting that occurred the week before. Surveillance was ultimately lost and the operation was terminated for the day.

On Wednesday, September 13, 2017, the Santa Clara County Probation Department notified SJPD that Anchondo, Ruiz, and Sheila Franco, the girlfriend of Jacob Dominguez, were at 17641 Calle Mazatlan, Morgan Hill. Members of CRU set up surveillance at that location at around noon that day. The three people were seen entering a Chevy Malibu, which CRU stopped using the Vehicle Control Tactic, or "VCT," which is a method used by law enforcement to apprehend a suspect during a vehicle pursuit. If executed correctly, the suspect vehicle has no room to maneuver forward or backward, making it impossible to drive off. CRU took Anchondo and Ruiz into custody and released Franco after being detained. The firearm used in the Arco robbery was not recovered.

On Thursday, September 14, 2017, Jacob Dominguez booked a one-way American Airlines flight from Oakland, CA to Dayton, OH, departing on Saturday, September 16, 2017, at 6:00 a.m.

## Covert Response Unit (CRU) Briefing and Operations Plan

Late Friday morning on September 15, 2017, CRU Officer Peter Szemeredi conducted a briefing to advise other CRU members of the Operational Plan ("OP Plan") to apprehend Dominguez on an arrest warrant for the Arco station armed robbery. Officer Michael Pina was present for this briefing. Below is the information relayed to CRU officers in the written OP Plan about the suspect, Jacob Dominguez, with added notations in brackets for clarity:

> "On 9/12/2017, an armed robbery occurred at the Arco gas station in San Jose (Quimby/White). Andrew Anchondo, Patricia Ruiz and Jacob Dominguez were identified as suspects in the robbery. CRU apprehended Anchondo and Ruiz on 9/13/2017. GIU [Gang Investigations Unit] has requested CRU's assistance in apprehending Dominguez. . .

> No probation, no parole.

> Priors: 211pc [robbery], 212.5pc (robbery with gun), 215pc [carjacking] (dismissed), 12020pc [felon in possession of firearm], 11550pc [being under the influence of a controlled substance], 10851vc [auto theft], 496pc [receiving stolen property], 148pc [obstructing police officer], 186.22pc [gang crime], 29800pc [firearm offense], 242pc [battery]."

CRU personnel were also advised in the OP Plan of specific safety concerns:

> "Dominguez is an active SJG [San Jose Grande] gang member and believed to be armed with a revolver. The handgun used in the [Arco] robbery is currently outstanding. Dominguez is aware he is wanted and it is believed he is aware of surveillance tactics. Franco [Sheila Franco, Dominguez's girlfriend] was present during apprehension of Anchondo and may be familiar with CRU Cars/personnel."

4

**Surveillance of Jacob Dominguez**

Shortly after the briefing, CRU found Sheila Franco and her Chevy Malibu in a parking lot at Capitol Expressway and Alum Rock at approximately 12:30 p.m. CRU initiated surveillance on Franco in the hope that Dominguez would attempt to contact her.

At approximately 2:00 p.m., while CRU was surveilling Franco, an unknown male (not Dominguez) used a false ID to rent a Kia Sportage (license plate GTX1026) at the San Jose Airport Hertz counter.

Just after 3:00 p.m., Officer Gustavo Perez observed Dominguez enter the parking lot at Capitol Expressway and Alum Rock driving the Kia Sportage rented from the San Jose Airport Hertz counter an hour earlier. When Dominguez arrived, he was hunched over and had his shirt pulled up over his face. After meeting with Sheila Franco, Dominguez drove off and CRU lost surveillance.

Dominguez was eventually located driving the black Kia near Brokaw Road and Junction Avenue, at which time CRU reinitiated surveillance. During the surveillance, Dominguez engaged in counter-surveillance tactics such as driving on the shoulder, passing vehicles, stopping in the middle of the street, and making illegal U-turns. Consequently, CRU decided to follow at a distance and rely on aerial surveillance to let Dominguez "cool down." Officer Fonseca was the lead car trailing Dominguez, followed by Officer Michael Pina, Officer Kris Ferguson, and Officer Alvaro Lopez.

Just before 7:00 p.m., aerial surveillance announced that Dominguez started driving normally and turned eastbound on Penitencia Creek from northbound Capitol Expressway. Officer Fonseca kept driving straight on Capitol Expressway and Officer Pina turned eastbound on Penitencia Creek, making him the lead car. Officer Pina was followed closely by Officer Ferguson and Officer Lopez.

**Attempted Apprehension and Shooting of Dominguez**

When Dominguez reached North White Road, he came to a complete stop at the red light on eastbound Penitencia Creek as CRU approached from behind. The front driver's door window was rolled partially down. Officer Pina announced that three cars were going to initiate the VCT maneuver to apprehend Dominguez. Officer Pina's SUV passed Dominguez on the left, then cut in front of the stopped car, making Officer Pina's car perpendicular to Dominguez and his Kia. Officer Ferguson stopped his sedan to the left of the Kia, and Officer Lopez pulled his SUV in behind it. The Kia started to back up, and Officer Lopez pulled forward, contacting Dominguez's car.

The photograph on the next page shows the locations of the vehicles following the successful execution of the VCT:

5



After stopping, Officer Pina immediately exited his vehicle and took cover behind the hood of Officer Ferguson's vehicle. Officer Ferguson exited his vehicle and took cover behind the driver's seat, aiming his rifle at Dominguez over the roof of his car. Officer Lopez exited his vehicle and took cover behind the driver's door of his car.

When the VCT occurred, it was clear this was a law enforcement operation. All three officers were pointing AR-15 rifles at Dominguez and wearing tactical vests with SJPD patches. The red/blue emergency lights on Officer Lopez's car, immediately behind the Kia, were flashing throughout the encounter and were visible in Officer Ferguson's body camera, as well as to civilian witness Carlos Lovato, who was stopped six cars back from the intersection. Sirens can be heard clearly on the bodycam video when the officers exited their vehicles, as well as five seconds before shots were fired.

As Dominguez remained seated in the Kia, and Officers Ferguson and Pina pointed their rifles at the Kia, Officer Ferguson commanded, "Let me see your hands, motherfucker." During the next 15 seconds, the officers gave Dominguez repeated warnings that if he didn't put his hands up, "You're gonna get shot." Then, Dominguez suddenly lowered his hands and leaned forward. Two of the officers began frantically yelling, "Hands up!" with distinctly more urgency for an additional three seconds, after which time Officer Pina fired two shots at Dominguez, striking him once and killing him. In total, police ordered Dominguez to keep his hands up for a total of 18 seconds before the two shots were fired.

Immediately after shots were fired, Officers Ferguson and Pina continued to aim their rifles at Dominguez in the Kia, and CRU Sergeant Mauricio Jimenez arrived on the scene in his vehicle. Officer Lopez deployed a flashbang 12 seconds after the shooting (it activated, releasing smoke one second after that, or 13 seconds after the shooting). Sergeant Jimenez then ordered Officers Pina and Ferguson away from the shooting scene once he was able to establish cover for them, aiming his rifle at Dominguez from between Officer Ferguson and Officer Lopez's cars. Officer Pina, Officer Ferguson and Officer Lopez were separated immediately thereafter pending interviews at the San Jose Police Department.

Because Dominguez was still in the vehicle and was not responsive to police instructions after the shooting, a police canine unit was commanded to enter the vehicle to determine if he was alive or dead. Once it was determined that Dominguez was deceased, the scene was left untouched until the Medical Examiner and Crime Scene Unit arrived and processed the scene and critical evidence. During processing of the scene, no firearm was located in the vehicle or on Dominguez's person. On the passenger seat of the Kia was a folding-style knife.

## LAW ENFORCEMENT WITNESS STATEMENTS

### Officer Michael Pina

Officer Michael Pina has been a SJPD officer for almost 12 years. He has been assigned to CRU for the last three and a half years. He was in plain clothes on September 15, 2017 but wearing a tactical raid vest with an SJPD badge patch on the front, and the words "Police" on the back. He was armed with a .223 caliber AR-15 rifle, as well as a department-issued 9 mm Glock semiautomatic pistol. At the time of the incident, he was driving solo in an unmarked silver Toyota 4Runner, equipped with emergency lights.

In addition to the information contained in the OP Plan described on page four of this report, Officer Pina said that Officer Szmeredi, who was leading the briefing, reported that there was a recent sweep of SJG where assault rifles were seized.

Officer Pina's description of the events leading up to the Kia turning eastbound on Penitencia Creek Road was included in the Summary of Facts section of this report. When Officer Pina was about 200 yards behind the Kia, he was advised by aerial surveillance that the Kia had stopped at the red light at Penitencia Creek and North White Road. Officer Pina approached and did not see any pedestrians or vehicles in the intersection other than the Kia. At this time, due to surveillance, Officer Pina knew that Dominguez was the driver and only occupant of the Kia.

Officer Pina advised Officers Ferguson and Lopez they would initiate the VCT maneuver. He then pulled his car directly in front of, and perpendicular to, the Kia in the #1 position. Officer Ferguson stopped in the #2 position, blocking the driver's door. Officer Lopez pulled up behind into the #3 position.

Once stopped, Officer Pina ran from his car, as he was trained, to stay out of the line of fire and took cover behind Officer Ferguson's vehicle. He immediately began yelling to Dominguez that he was police and repeatedly yelled for Dominguez to put his hands up.

Officer Pina was standing behind the driver's side engine block of Officer Ferguson's vehicle, and Officer Ferguson was standing next to Officer Pina. Officer Pina recognized Dominguez seated in the driver's seat. Officer Pina said Dominguez had a look on his face that he was not going to listen to him. Officer Pina told Dominguez to put his hands up or he would shoot him, to which Dominguez replied, "Fuck you. Shoot me, bitch." Officer Pina then said, "Don't give me a reason to shoot you! Put your hands up!"

Officer Pina said at that point Dominguez put his hands up and stared at him. As Officer Pina continued yelling at Dominguez to keep his hands up, Dominguez dropped his hands out of sight and leaned forward as if grabbing something. At that moment, Officer Pina believed Dominguez was retrieving a gun to shoot him or Officer Ferguson. Officer Pina believed Dominguez was

armed and dangerous, and there was no reason for him to drop his hands out of sight and lean forward.

When Dominguez dropped his hands and leaned forward, Officer Pina fired what he believed were two rounds from his AR-15. He could tell one round hit Dominguez as he, Dominguez, leaned backward. Sergeant Jimenez told Officer Pina to retreat to cover. He was then separated from the group as an "involved" officer.

Officer Pina estimated he was yelling commands for 10 seconds before Dominguez dropped his hands. He realized after the shooting that his body camera was not activated. When he realized this, he activated it. Officer Pina did not recall how low the suspect driver window was at the time of the shooting. He remembered hearing the siren, but also recalled hearing Dominguez, so he wasn't sure if the siren remained on.

Officer Pina viewed his body camera footage and had nothing to add.

**Officer Kris Ferguson**

Officer Ferguson's description of the events leading up to the Kia turning eastbound on Penitencia Creek Road was included in the Summary of Facts section of this report. At the intersection, Officer Ferguson stopped his vehicle in the #2 position directly adjacent to the driver's door of the Kia. He exited his car wearing a tactical vest with an SJPD badge patch on the front and "POLICE" on the back. He was armed with a .223 caliber AR-15 rifle. Officer Ferguson said Officer Lopez stopped his vehicle in the #3 position behind the Kia and had emergency lights and siren on.

Officers Pina and Ferguson were out of the car and commanded Dominguez to put his hands up. Officer Pina was near the driver side front tire. Officer Ferguson was next to the door of his car, looking over the roof. Dominguez started to back up the Kia and Officer Lopez's vehicle collided with it. When Officer Lopez's vehicle hit the rear bumper of the Kia, Dominguez put his hands up and "looked unsure what he was going to do." Officer Ferguson couldn't tell how low the Kia window was rolled down, but it was open. Officer Ferguson yelled for Officer Lopez to "bang up," but it didn't happen, so he reached for a Noise Flash Distraction Device ("NFD").

As Officer Ferguson was getting the NFD, Dominguez dropped his hands and looked down. Officer Ferguson, as that point, believed Dominguez was attempting to arm himself. He then heard what he initially thought was an NFD and saw glass breaking. When Officer Ferguson realized what he heard were two gunshots, he dropped his NFD and went back to his rifle, but he could no longer see Dominguez.

At that point, everyone was ordered back. Dominguez was given commands over the bullhorn, but there was no response. A canine was sent in to determine whether Dominguez was ignoring police commands or incapacitated.

**Officer Alvaro Lopez**

Officer Lopez's description of the events leading up to the Kia turning eastbound on Penitencia Creek Road was included in the Summary of Facts section of this report. As Officer Lopez drove eastbound on Penitencia Creek Road, air support advised that the Kia stopped at

Penitencia Creek and North White Road.  This surprised Officer Lopez, as the Kia had previously run red lights.

Officer Pina advised they would initiate a VCT.  Officer Pina drove in front of the Kia and blocked it in the #1 position.  Officer Ferguson stopped in the #2 position, blocking the driver's door.  Officer Lopez lagged a little behind, and when he saw the Kia backing up, he contacted the rear bumper pushing it forward slightly.  The Kia was now blocked in on three sides.  Officer Lopez activated his emergency lights and siren so the driver would know they were the police.

Officer Lopez turned off the siren but left the red/blue flashing lights on as he exited his vehicle.  Officer Lopez yelled "Police, hands up."  He heard Officers Pina and Ferguson identify themselves as police officers and yell for Dominguez to "put his hands up."  Officer Lopez saw Officer Pina move from his vehicle in position #1 to the driver's side of Officer Ferguson's car in position #2.  Officer Lopez was standing on the driver's side of his car in position #3 behind the door jam, and he could see Dominguez's hands up over his shoulders, "but low."  Officer Lopez heard Officer Pina tell Dominguez, "Don't give me a reason," and then someone called for "a bang," which meant an instruction to deploy a flashbang.  When Officer Lopez reached for his flashbang, he saw Dominguez drop his hands and lean forward.

Officer Lopez heard two shots.  He did not recall if he deployed the flashbang before or after hearing the shots.  The flashbang landed about a foot next to the driver's door.  Officer Lopez heard the Kia window break.

After the shots were fired, Officer Lopez heard Officer Pina and Officer Ferguson yell "hands up," but Dominguez was non-responsive.  A police canine was deployed to bite Dominguez to determine whether he was ignoring police commands or incapacitated.  Someone called out that Dominguez was deceased, and the officers backed away from the Kia.  Officer Lopez remembered hearing loud music playing from inside the Kia.

## CIVILIAN WITNESS STATEMENTS

Investigators canvassed the neighborhood and attempted to locate anyone who was present at the time of the shooting.  Ultimately, SJPD was able to identify and interview three civilian witnesses.

### Carlos Lovato

Mr. Lovato was southbound on Piedmont facing North White, six cars back waiting to turn left onto Penitencia Creek.  He observed police block the Kia, and then saw officers carrying assault rifles and bullet proof vests taking cover.  He recognized the cars as unmarked police vehicles because of the red flashing lights.  It was obvious to him they were police officers.  He heard two shots and then saw a flash grenade.  After the shooting, another officer took cover behind Lovato's vehicle and caused a paint chip.  He expressed frustration that the officer used him "as a human shield," but he supported the San Jose Police Department.  Mr. Lovato's vehicle was visible in the surveillance video as the red sedan that pulled into the intersection after the flashbang was deployed.

**Leslie Bradley and Rhiannon Borunda**

These two friends were taking photos at Alum Rock Park prior to the shooting.  Driving home in separate vehicles, the two women could be seen in the surveillance video arriving at the scene on westbound Penitencia Creek at North White Road 22 seconds after the flashbang was deployed.[4] Both women said they observed smoke and initially believed there was a traffic accident.

Ms. Borunda videotaped what she saw upon her arrival.  She also posted two still photos to Facebook, which she later provided to police.  District Attorney Investigator Thomas Newland obtained the video from Ms. Borunda in April 2018.  Due to the arrival of both women well after the shooting, their observations and the video were not helpful in evaluating this case.

## JAIL CALL EVIDENCE

On October 12, 2017, District Attorney Investigator Pete Ramirez was reviewing recorded jail calls from an unrelated case.  He heard a conversation between inmate Brandon Delatorre and another unknown male that was recorded on Saturday, September 16, 2017, at 11:50 a.m.  Brandon Delatorre, who was housed in the Elmwood Correctional Facility, called an unknown male and expressed dismay at the death of Dominguez.  The unknown male responded, "I guess he tried to shoot at the cops.  He told me he wasn't going back to jail. . . He knew it was bad; the other day he called his girl to say goodbye to them."

## EVIDENCE COLLECTION AND PROCESSING

**Ballistics Evidence**

Following the shooting, San Jose Police Crime Scene Unit photographed and collected evidence at the scene.  Two .223 round spent shell casings were found on the hood and roof of Officer Ferguson's Buick sedan, consistent with Officer Pina firing from a position behind the hood.

Crime scene investigators conducted an extensive examination of the Kia for ballistics evidence. The initial search of the Kia occurred shortly after the incident, and investigators located a lead core bullet inside the rear passenger doorframe, as shown in the photograph below.



---

[4] Ms. Bradley was driving a white SUV and was directly in front of Ms. Borunda's dark Toyota Sienna minivan, visible in the 3158 Penitencia Creek surveillance video.

In conjunction with the crime-scene reconstruction, investigators conducted a subsequent search of the Kia in January 2019. Investigators could locate no other bullets or fragments inside the Kia during that second examination.

No firearms were located inside the vehicle or on Dominguez's person.

**Kia Sportage**

On the day of the shooting at approximately 2:00 p.m., the Kia Sportage was rented at Hertz at San Jose Airport. Surveillance video from Hertz showed a white or light-skinned Hispanic male wearing a sport coat and white dress shirt renting the Kia under the name Mark Sepeda. Mark Sepeda was contacted by SJPD and said he has never been to San Jose. The man in the surveillance video did not match photos of Dominguez or Sepeda, and his identity remains unknown.

Inside the Kia, the CSU investigators discovered that the driver's side window was at least partially rolled down, but they were unable to determine how far since the glass was shattered. Shattered window glass was on the driver's side floorboard and seat. The remaining windows were closed and intact.

In the center console was a wallet, a $100 bill, and a baggie containing 8.55 grams of methamphetamine.

Related to the shooting, there was blood spatter as would be expected on the driver and front passenger seat area.

A one-way American Airlines ticket that was booked at around 2 p.m. on September 14, 2017, under the name Jacob Dominguez, was found in a black backpack on the front passenger seat. The flight was scheduled to depart Oakland, CA on September 16, 2017 at 6:00 a.m. and arrive in Dayton, OH, at 8:25 p.m., with stopovers in Phoenix and Chicago.

Beneath the backpack on the front passenger seat was a closed folding knife, as seen in photograph below, which would have been within arms-reach of Dominguez.



**Clothing**

The hooded sweatshirt worn by Dominguez when he was shot was sent to the Crime Lab for analysis.

## AUDIO AND VIDEO EVIDENCE

The video evidence related to this investigation consists of two residential surveillance videos and the body camera videos of the five officers present at the time of the shooting.

**Private Surveillance Video**

Investigators collected surveillance video from two homes. The residence located at 3158 Penitencia Creek Road is on the south side of Penitencia Creek Road at the intersection of Cayman Way, seven houses down from the location of the shooting. The camera appeared to be mounted on the roof and was pointed eastbound, almost directly at the intersection of Penitencia Creek Road and North White. This video had no internal timestamp, so the Windows Media Player timestamp was used when reviewing it.

The residence at 3164 Penitencia Creek Road is on the south side of Penitencia Creek Road and adjacent to 3158 Penitencia Creek Road. It is six houses down from the intersection where the shooting occurred. The camera appeared to be mounted at street level, facing northeast. On the right side of the video, the intersection where the shooting occurred can be seen. This video has an internal timestamp, but it was off by approximately 30 minutes.

Although neither video had audio, both were helpful in showing that approximately 33 seconds elapsed between the time officers executed the VCT and the deployment of the flashbang. That, in conjunction with Officer Ferguson's body camera in which the flashbang was deployed 12 seconds after the shooting, showed officers out of their vehicles and commanding Dominguez for 18 seconds prior to Officer Pina discharging his weapon.

Below is a timeline of events captured on the two surveillance videos using the moment the Kia stopped at the red light at Penitencia and North White Road[5] as a point of reference. The shots fired cannot be observed on the videos but are noted in bold brackets below by comparing the surveillance video with audio and video from Officer Ferguson's body camera.

    00:00   Dominguez stopped the Kia at the red light.

    00:15   Three undercover SJPD vehicles appeared on the video, traveling eastbound on Penitencia Creek Road.

    00:27   VCT was executed.

    00:30   Police were visible outside of their vehicles.

    00:47   Sgt. Jimenez parked to the rear and right of Officer Lopez's SUV.

    00:48   **First shot fired.**

---

[5] In the 3158 surveillance video, the Kia stopped at 2:20 Windows Media Player timestamp; in the 3164 surveillance video, the Kia stopped at 6:31:15 internal timestamp.

00:49    Officer Krauel parked to the right of Jimenez's vehicle.

**Second shot fired.**

01:00    Officer Lopez threw flashbang next to the driver's door of the Kia and moved behind Officer Ferguson's car.

01:01    Smoke from flashbang rose from driver's side of the Kia.

## Police Officer Body Camera Recordings

The body cameras of the five officers that were present when the flashbang was deployed were reviewed. Officer Pina's body camera was of little value. There was no audio until after the shots were fired, the camera was obscured by Officer Pina's rifle for most of the encounter, and it did not capture the shooting. Officer Lopez did not turn on his body camera until after deploying the flashbang, so it did not contain any valuable evidence of what transpired leading up to the shooting. Sergeant Jimenez parked almost simultaneously with the first shot, so his camera did not capture any valuable audio or video. Officer Krauel arrived right as the second shot was fired, so his camera was similarly not helpful.

Officer Ferguson's body camera video, on the other hand, was crucial in evaluating the evidence and reconstructing the events surrounding the shooting. Although the video was largely obscured by the officer's AR-15, the body camera recorded audio of virtually the entire incident.

Below is a timeline based on Officer Ferguson's body camera timestamp:

15:44    Officer Ferguson's car door opened, sirens can be heard.

15:46    "Let's see your fuckin' hands, motherfucker!"

15:50    Officer Pina yelled, "Put your hands up or you're gonna get shot!" Sirens stopped.

15:51    Officer Ferguson said, "Bang up, bang up!"

15:52    Officer Pina said, "… or you're gonna get shot."

15:58    Officer Ferguson can be seen pointing his rifle at the suspect's car over his car.

15:59    Officer Ferguson commanded Dominguez to "Keep your hands there!"

16:00    Officer Pina yelled, "Keep your hands up!" with increased urgency.

16:01    Officer Pina and Officer Ferguson yelled, "Keep your hands up!"

16:02    Officer Pina and Officer Ferguson continued yelling, "Hands up!"

16:03    **First shot.**

16:04    **Second shot.**

16:10    Flashing red lights on Officer Lopez's vehicle captured on video.

16:14    "Shots fired" is yelled out.

16:15    Video captured Officer Lopez throwing the flashbang from his car to the driver's door of the Kia Sportage.

13

16:16   Flashbang detonates, releasing smoke.

## AUTOPSY OF JACOB DOMINGUEZ

Dr. Joseph O'Hara, a forensic pathologist employed by the Santa Clara County Medical Examiner's Office, conducted the autopsy.  Dominguez was 33 years of age.  Dr. O'Hara determined the cause of death as a "penetrating gunshot wound to head and neck without exit." The entrance wound was the left corner of Dominguez's mouth.  The projectile caused a fatal hemorrhagic injury, traveling across his body in a downward trajectory through his jaw bone, tongue, and the soft neck tissue before becoming lodged internally against his spine.  There was no soot, stippling or gunpower near the entrance wound, though he did have fresh minor lacerations to his neck, which were likely caused by the police canine when checking for his responsiveness.  The Crime Lab later determined that the projectile collected at autopsy was a fragment of copper jacketing, not a lead core bullet.

Dr. O'Hara also diagnosed Dominguez with "acute methamphetamine and phencyclidine intoxication."  The National Institute of Health website[6] describes the effects of phencyclidine (PCP) intoxication as follows:

> Low to moderate doses can cause numbness throughout your body and loss of coordination.

> Large doses may cause you to be very suspicious and not trust others. You might even hear voices that are not there.  As a result, you may act strangely or become aggressive and violent.

> It can increase heart rate, blood pressure, breathing rate, and body temperature.  At high doses, PCP can have an opposite and dangerous effect on these functions.

> Because of the pain-killing (analgesic) properties of PCP, if you get seriously injured, you might not feel pain.

> Using PCP for a long time can cause memory loss, thinking problems, and problems talking clearly, such as slurring words or stuttering.

> Mood problems, such as depression or anxiety, can develop.  This can lead to suicide attempts.

## CRIME LAB ANALYSIS

Criminalists in the Santa Clara County Crime Lab began examining the evidence collected during this investigation on September 18, 2017 and completed their examination in February 2019.  Criminalists conducted crime-scene reconstruction, which began on August 21, 2018 and was completed on November 15, 2018.  To complete the reconstruction, criminalists conducted extensive firearms and trace evidence analysis of Dominguez's hooded sweatshirt, the fragment of jacketing that killed Dominguez, and the bullet that lodged in the rear passenger doorframe. The criminalists also enhanced the body camera video and audio.

---

[6]https://medlineplus.gov/ency/patientinstructions/000797.htm

The criminalists concluded the following:

1. Officer Pina fired two successive shots, approximately one half second apart;

2. The projectile that killed Dominguez was a fragment of copper jacketing recovered from his body.  The combined weight of the jacketing and the lead core recovered from the doorframe amounted to the approximate weight of a single .223 bullet;

3. Only a single bullet entered the vehicle, meaning that the other shot fired by Officer Pina was a miss;

4. There was no way to tell definitively if the miss was fired first or second, but according to firearms experts, when two shots are fired in rapid succession, a miss is more likely to occur on the second shot due to recoil;

5. The bullet that entered the vehicle struck the driver's window, shattering it;

6. Upon impact with the glass, the bullet broke up, with the lead core going through the forearm of Dominguez's hooded sweatshirt and ultimately lodging in the rear passenger doorframe;

7. The jacketing fragment that broke away upon impact with the glass traveled in a path that penetrated Dominguez's head, neck and spine, causing his death;

8. Dominguez was leaning back in his seat immediately after the shooting.

9. There were two holes in the left forearm of the hooded sweatshirt (the hole on the frontside of the left sleeve was approximately 12 inches up from the edge of the cuff, and the hole located on the backside of the left sleeve was approximately 11.5 inches up from the edge of the cuff) that were caused by a single bullet passing through (entrance and exit).

## RELEVANT LEGAL PRINCIPLES

This review was conducted pursuant to the joint protocol between this office and all Santa Clara County law enforcement agencies, which calls upon the District Attorney to conduct an independent assessment of the circumstances surrounding the use of deadly force.  This review does not examine issues such as: compliance with the policies and procedures of any law enforcement agency; ways to improve training or tactics; or possible civil liability.  Accordingly, the District Attorney's review should not be interpreted as expressing an opinion on those matters.

Possible criminal charges against an officer involved in a fatal shooting include murder (Penal Code section 187) and manslaughter (Penal Code section 192).  To convict an officer of a homicide charge, however, it would be necessary to prove beyond a reasonable doubt that no legal justification existed for the officer's actions.  (*People v. Banks* (1976) 67 Cal.App.3d 379, 383-384.)  Several justifications may apply in any given case, and they are set forth in Penal Code sections 196 and 197.  The justifications pertinent to this case are use of force in self-defense and defense of others, which are found in Penal Code section 197.

California law permits all persons to use deadly force to protect themselves from the imminent threat of death or great bodily injury.  Penal Code section 197 provides that the use of deadly force by any person is justifiable when used in self-defense or in defense of others.  The relevant criminal jury instruction, as written by the Judicial Council of California, is set forth in CALCRIM 505 ("Justifiable Homicide: Self-Defense or Defense of Another").  The instruction states that a person acts in lawful self-defense or defense of another if: 1) he reasonably believed that he or someone else was in imminent danger of being killed or suffering great bodily injury; and 2) he reasonably believed that the immediate use of deadly force was necessary to defend against that danger.  In lawful self-defense or defense of another, a person may use no more force than is reasonably necessary to defend against the danger.  (CALCRIM 505.)

A person may resort to the use of deadly force in self-defense or in defense of another where there is a reasonable need to protect oneself or someone else from an apparent, imminent threat of death or great bodily injury.  Perfect self-defense requires both subjective honesty and objective reasonableness.  (*People v. Aris* (1989) 215 Cal.App.3d 1178, 1186.)  Additionally, "[i]mminence is a critical component of both prongs of self-defense."  (*People v. Humphrey* (1996) 13 Cal.4th 1073, 1094.)  In *Aris*, the trial court's clarifying instruction to the jury on the subject was to the point and later cited with approval by the California Supreme Court: "An imminent peril is one that, from appearances, must be instantly dealt with."  (*In re Christian S.* (1994) 7 Cal.4th 768, 783.)

A person's right of self-defense is the same whether the danger is real or merely apparent. (*People v. Jackson* (1965) 233 Cal.App.2d 639.)  If the person's beliefs were reasonable, the danger does not need to have actually existed.  (CALCRIM 505.)  What constitutes "reasonable" self-defense or defense of others is controlled by the circumstances.  The question is whether action was instantly required to avoid death or great bodily injury.  In this regard, there is no duty to wait until an injury has been inflicted to be sure that deadly force is indeed appropriate.  In one case, a robber pointed a gun at his victim and a deputy sheriff was called to the scene of the robbery.  Before the robber could get off a shot, the deputy fired his weapon, wounding the robber.  The appellate court remarked that "[s]uch aggressive actions required immediate reaction unless an officer is to be held to the unreasonable requirement that an armed robber be given the courtesy of the first shot."  (*People v. Reed* (1969) 270 Cal.App.2d 37, 45.)

There is no requirement that a person (including a police officer) retreat even if safety could have been achieved by retreating.  (CALCRIM 505.)  In addition, police officers are not constitutionally required to use all feasible alternatives to avoid a situation where the use of deadly force is reasonable and justified.  (*Martinez v. County of Los Angeles* (1996) 47 Cal.App.4th 334, 348.)

When deciding whether a person's beliefs were reasonable, a jury considers all the circumstances as they were known to and appeared to the person and considers what a reasonable person in a similar situation with similar knowledge would have believed.  (CALCRIM 505.)

In the related context of cases alleging excessive force by police, the test of reasonableness of an officer's use of deadly force is an objective one, viewed from the vantage of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.  (*Graham v. Conner* (1989) 490 U.S. 386, 396.)  It is also highly deferential to the police officer's need to protect himself and others. The calculus of reasonableness must embody the allowance for the fact that "police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and

rapidly evolving—about the amount of force that is necessary in a particular situation." (*Id.* at 396-397.)

## ANALYSIS

When evaluating whether Officer Pina lawfully used deadly force that resulted in the death of Jacob Dominguez on September 15, 2017, we examined his recorded statements, the reports of law enforcement officers who witnessed the shooting, the statements of percipient civilian witnesses, body camera video, surveillance video, audio recordings of the incident, as well as the expert witness reports described herein.

Determining whether Officer Pina was legally justified in his use of a firearm under the principles of self-defense and defense of others involves a two-part analysis:

1.  Did he subjectively and honestly believe he needed to protect himself or others from an apparent, imminent threat of death or great bodily injury; and

2.  Was his belief in the need to protect himself or others from an apparent, imminent threat of death or great bodily injury objectively reasonable?

The following facts and circumstances support the conclusion that Officer Pina's fear of imminent danger of great bodily injury or death to himself and other officers at the scene was genuine and objectively reasonable under the circumstances.

Officer Pina and two other officers were attempting to apprehend a known gang member wanted for his participation in an armed robbery five days earlier where the weapon had not been located. Officer Pina was advised that Dominguez was believed to be armed with a handgun and had prior convictions for violent crimes and firearm offenses. Further, several assault rifles were recently seized from Dominguez's gang, San Jose Grande.

The co-participant in that robbery, Andrew Anchondo, had been arrested two days earlier, and it is a reasonable inference that Dominguez was aware of that arrest and believed that law enforcement officials were looking to arrest him as well. Shortly after Anchondo's arrest and to avoid apprehension, Dominguez purchased an airline ticket to depart in two days' time for Dayton, Ohio, and he began saying his goodbyes to loved ones. He also made arrangements for an unknown male to acquire and provide him with the rented Kia, presumably to avoid detection by the authorities, which he was driving when the officers attempted to arrest him.

Not only was Dominguez desperate to avoid jail, he was also under the influence of methamphetamine and PCP. The use of PCP, in particular, can have the effect of impairing judgment, inducing aggression, and triggering violent behavior. These facts are relevant to understanding Dominguez's mental state when the officers attempted to arrest him on September 15, 2017.

When the officers conducted their operation, Dominguez was plainly on notice that this was a police action. Officer Lopez's siren and red and blue flashing lights were activated at the time of the stop, and his red and blue lights were on throughout the encounter. The sirens of other officers' vehicles can be heard prior to the shooting on Officer Ferguson's body camera. Moreover, Dominguez employed counter surveillance tactics throughout the afternoon while attempting to shake the undercover SJPD vehicles.

17

When he was finally stopped and faced with three SJPD officers commanding him to keep his hands up, Officer Pina heard Dominguez say to him, "Fuck you. Shoot me, bitch." Such a statement demonstrated that Dominguez had little regard for his own life and, consequently, no regard for the life of the officers. Tragically, after 15 seconds of warnings, Dominguez dropped his hands and leaned forward into his vehicle. At that moment, the officers would have been justified discharging their firearms in self-defense and defense of others.

However, rather than fire immediately, Officers Pina and Ferguson gave Dominguez an extra three seconds to show his hands. After the first 15 seconds of attempting to get Dominguez to sufficiently comply so that he could be taken into custody, the officers began furiously yelling "Hands up!" with renewed urgency for three seconds before Officer Pina discharged his firearm. The officers' change in tone appeared to be the moment they perceived an increased threat when Dominguez dropped his hands and leaned forward for no legitimate reason. At that point, with no compliance from Dominguez, the use of force was justified.

Lawful self-defense or defense of others does not require proof that the person who presented a threat intended to fire at the officers. Such proof of intent is not required for deadly force to be justified. The critical issue is not the state of mind of Dominguez. Rather, the issue is whether Officer Pina acted reasonably under the circumstances. Here, Dominguez did not respond to the presence of uniformed officers by complying with simple commands. Rather, he acted like someone attempting to arm himself.

When Dominguez dropped his hands and moved forward, Officer Pina used no more force than necessary to incapacitate Dominguez. Officer Pina fired only two shots, one of which hit Dominguez. Once Officer Pina realized that Dominguez was hit, he stopped firing.

Our analysis includes careful consideration of the meticulous crime-scene reconstruction conducted by the Crime Lab, detailed in the "Crime Lab Analysis" section of this report. That reconstruction supports the reasonable inference that when Officer Pina discharged his firearm (most likely the first time), Dominguez's left arm was in a position that permitted the bullet to pass through the window and then the left sleeve of the hooded sweatshirt. That Dominguez's left arm was in that position, however, does not change our conclusion that Officer Pina fired in lawful self-defense for two reasons.

First, the possibility that Officer Pina intentionally shot a man with his left hand up is inconsistent with the audio recordings from the officers' body cameras. The officers can be clearly heard telling Dominguez to "Keep your hands up," indicating he did have them up initially. Then, the officers' tone suddenly became more urgent, supporting their statements to investigators that they could no longer see Dominguez's hands, which is why they yelled more forcefully for him to put them back up.

Second, while it is very likely that Dominguez was holding his left hand up when the bullet shattered the window, it is also reasonable to conclude, based on all the evidence, that Dominguez chose to re-raise at least his left hand at precisely the same moment Officer Pina pulled the trigger on his weapon.

We can never prove with certainty the position of Dominguez's left arm when he was struck by the bullet fragment. The rapidly evolving events in this case exemplify how police officers are required to make split-second judgments—in circumstances that are tense, uncertain, and rapidly

evolving—about the amount of force that is necessary in a situation.  By examining all the evidence, we conclude that the facts and circumstances known to Officer Pina justified his use of deadly force.

## **CONCLUSION**

Based on the evidence reviewed in this case, Officer Pina actually and reasonably believed that he needed to use deadly force to protect himself and others when Dominguez, a known violent gang member, ignored explicit and repeated commands at gunpoint to keep his hands up, and decided to drop his hands out of view.  Further, Officer Pina used only that force which was necessary to guard against that threat.  Under the facts, circumstances, and applicable law in this matter, Officer Pina's use of deadly force was justifiable in the defense of self and other self.  Consequently, no criminal liability attaches to him.

Dated: March 8, 2019

Respectfully submitted,

ROBERT BAKER
Deputy District Attorney

JEFFREY F. ROSEN
District Attorney

# EXHIBIT 10

# EXHIBIT 10

## IS THE VIDEO RECORDING OF OFFICER PINA CONDUCTED BY SAN JOSE POLICE INTERNAL AFFAIRS THE EVENING OF SEPTEMBER 15, 2017

## THE VIDEO IS BEING SUBMITTED UNDER SEAL TO THE CLERK OF THE COURT ALONG WITH PLAINTIFFS' ADMINISTRATIVE MOTION TO FILE WITH NO SEAL

# EXHIBIT 11

1          UNITED STATES DISTRICT COURT

2         NORTHERN DISTRICT OF CALIFORNIA

3

4    JESSICA DOMINGUEZ, INDIVIDUALLY   )
     AND JESSICA DOMINGUEZ AS          )
5    GUARDIAN AD LITEM FOR JAD (1),    )
     JAD (2) AND JAD (3),              )
6                                      )
                  Plaintiffs,          )
7                                      )      Case No.:
          vs.                          )      5:18-CV-O4826
8                                      )
     CITY OF SAN JOSE, SAN JOSE POLICE )
9    DEPARTMENT, MICHAEL PINA, AND     )
     DOE POLICE OFFICERS 2 through 5,  )
10                                     )
                  Defendants.          )
11   _____)

12

13

14

15              DEPOSITION OF

16          OFFICER ALVARO LOPEZ

17           SAN JOSE, CALIFORNIA

18              MARCH 1, 2021

19

20

21

22   ATKINSON-BAKER, a Veritext Company
     (800) 288-3376
23   www.depo.com

24   REPORTED BY:   THERESA KIELTY, CSR NO. 5037

25   FILE NO.:    AE088F4

**CERTIFIED COPY**

Atkinson-Baker, a Veritext Company
www.depo.com

1          UNITED STATES DISTRICT COURT

2          NORTHERN DISTRICT OF CALIFORNIA

3

4   JESSICA DOMINGUEZ INDIVIDUALLY     )
    AND JESSICA DOMINGUEZ AS           )
5   GUARDIAN AD LITEM FOR JAD (1),     )
    JAD (2) AND JAD (3),               )
6                                      )
              Plaintiffs,              )
7                                      )      Case No.:
         vs.                           )      5:18-CV-O4826
8                                      )
    CITY OF SAN JOSE, SAN JOSE POLICE  )
9   DEPARTMENT, MICHAEL PINA, AND      )
    DOE POLICE OFFICERS 2 through 5,   )
10                                     )
              Defendants.              )
11  _____)

12

13

14

15

16          Deposition of OFFICER ALVARO LOPEZ, taken on

17  behalf of Plaintiffs, at 200 East Santa Clara Street, San

18  Jose, California, 95113, commencing at 11:35 a.m., Monday,

19  March 1, 2021, before Theresa Kielty, CSR No. 5037.

20

21

22

23

24

25

```
 1              A P P E A R A N C E S:

 2    FOR PLAINTIFFS:

 3    LAW OFFICES OF JOHN KEVIN CROWLEY
      BY:   JOHN KEVIN CROWLEY, Esq.
 4    125 S. Market Street
      Suite 1200
 5    San Jose, California    95113
      (408) 288-8100
 6    jkclaw@pacbell.net

 7    FOR DEFENDANTS:

 8    OFFICE OF THE CITY ATTORNEY
      BY:   MAREN CLOUSE, Esq.
 9    200 E. Santa Clara Street
      16th Floor
10    San Jose, California    95113
      (408) 535-1948
11    maren.clouse@sanjoseca.gov

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1        A.   I couldn't give you a specific time.  Maybe a

2    couple minutes after.

3        Q.   So it was after.  Now, you don't agree that the

4    shot to the head was intended to kill the suspect?

5        MS. CLOUSE:  Objection, assumes facts.

6        THE WITNESS:  I didn't know where he had been shot.

7    BY MR. CROWLEY:

8        Q.   Well, generally, in your training and experience,

9    shooting somebody in the head is intended to kill the person,

10   right?

11       A.   We don't shoot to kill anyone, we shoot to stop the

12   threat.

13       Q.   Okay.  Well, you also can shoot to disarm the

14   person or disable them?

15       A.   What we train is to stop the threat.

16       Q.   And shooting in the head stops the threat?

17       A.   Yes.

18       Q.   Permanently?

19       MS. CLOUSE:  Objection, vague, calls for speculation.

20       THE WITNESS:  Like I said, I was not aware of where he

21   had been shot until after the shooting.

22   BY MR. CROWLEY:

23       Q.   So I just want to know about your training.  So

24   you're trained that shooting someone in the head is an

25   effective way to stop the threat?

Atkinson-Baker, a Veritext Company
www.depo.com

1        A.    Yes.

2        Q.    Is that another way of saying it's an effective way

3   to kill somebody?

4        A.    No.

5        Q.    What's the distinction?

6        A.    Because we don't shoot to kill people, we shoot to

7   stop the threat.

8        Q.    Okay.

9        A.    If that is an outcome of the shooting, then that's

10  what the outcome is, but we're not trained to kill people.

11       Q.    So at the time the suspect put his hands down and

12  bent over, were there any other plausible alternatives the

13  police could have engaged in to -- what's the word I'm

14  thinking of?  Plausible alternative to reduce the threat.

15       A.    I don't think so.

16       Q.    Other than -- in your mind, when the suspect put

17  his hands down and reached over, were there any other

18  plausible alternatives, in your mind, other than having him

19  get a gun, go for a gun?

20       A.    Not at that moment.

21       Q.    That was it, a hundred percent certainty he was

22  going for a gun, no other possibilities of anything else?

23       MS. CLOUSE:  Objection, argumentative, it's been asked

24  and answered.

25       MR. CROWLEY:  I'm just asking him.  He can answer.