NORA FRIMANN, City Attorney (93249)
ARDELL JOHNSON, Assistant City Attorney (95340)
MAREN J. CLOUSE, Chief Deputy City Attorney (228726)
Office of the City Attorney
200 East Santa Clara Street, 16th Floor
San José, California  95113-1905
Telephone Number: (408) 535-1900
Facsimile Number:  (408) 998-3131
E-Mail Address:  cao.main@sanjoseca.gov

Attorneys for Defendants
CITY OF SAN JOSE and OFFICER MICHAEL PINA

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| JESSICA DOMINGUEZ, INDIVIDUALLY AND AS GUARDIAN AD LITEM FOR JACOB DOMINGUEZ, JORDAN DOMINGUEZ AND J, <br><br> Plaintiffs, <br><br> v. <br><br> CITY OF SAN JOSE, SAN JOSE POLICE DEPARTMENT and DOE POLICE OFFICERS 1, 2 AND 3, and DOES, inclusive, <br><br> Defendants. | Case Number:  5:18-cv-04826-BLF <br><br> **DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** <br><br> Date:         April 21, 2022 <br> Time:        9:00 a.m. <br> Courtroom:  Courtroom 3, 5th Floor <br> Judge:       Hon. Beth Labson Freeman <br><br> Trial Date:   August 22, 2022 |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# **TABLE OF CONTENTS**

I.   INTRODUCTION ....................................................................................................1

II   FACTS ...................................................................................................................2

III.  PLAINTIFFS' CLAIMS.........................................................................................9

IV.  LEGAL STANDARD .............................................................................................9

V.   ARGUMENT .........................................................................................................10

    A.   THE DEFENDANT OFFICER DID NOT VIOLATE THE
        CONSTITUTION BY REACTING TO AN IMMINENT DEADLY
        THREAT. ......................................................................................................10

        1. *Graham v. Connor* establishes the reasonableness inquiry....................10

        2. Officer Pina reasonably perceived an imminent deadly threat. ................10

        3. The Constitution does not require officers to view a weapon
           before reacting to threatening conduct.......................................................12

        4. The remaining *Graham* factors favor Defendants. ...................................16

    B.   OFFICER PINA IS ENTITLED TO QUALIFIED IMMUNITY.............................17

    C.   THERE IS NO EVIDENCE TO SUPPORT THE CITY'S LIABILITY
        UNDER SECTION 1983. ...........................................................................20

    D.   PLAINTIFFS CANNOT PROVE A VIOLATION OF STATE LAW. ...................21

        1. Officer Pina's actions did not violate the Bane Act .................................21

        2. There is no evidence officers' actions were racially motivated
           in violation of the Ralph Act .....................................................................22

VI.  CONCLUSION......................................................................................................24

# TABLE OF AUTHORITIES

<u>Cases</u>

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) .........................................................................................9

*Anderson v. Russell*,
247 F.3d 125 (4th Cir. 2001) .........................................................................13

*Blanford v. Sacramento Cty.*,
406 F.3d 1110 (9th Cir. 2005) .......................................................................18

*Burrell v. McIlroy*,
464 F.3d 853 (9th Cir. 2006) .........................................................................11

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) .........................................................................................9

*City of Los Angeles v. Heller*,
475 U.S. 796 (1986) .......................................................................................20

*City of Tahlequah, Okla. v. Bond*,
142 S. Ct. 9 (2021) .........................................................................................17

*Cornell v. City & Cty. of San Francisco*,
17 Cal. App. 5th 766 (Cal. App. 2017).........................................................21

*Devereaux v. Abbey*,
263 F.3d 1070 (9th Cir. 2001) .........................................................................9

*District of Columbia v. Wesby*,
138 S. Ct. 577 (2018) .....................................................................................17

*Dougherty v. City of Covina*,
654 F.3d 892 (9th Cir. 2011) .........................................................................20

*Dunn v. Castro*,
621 F.3d 1196 (9th Cir. 2010) .......................................................................19

*George v. Morris*,
736 F.3d 829 (9th Cir. 2013) .........................................................................12

*Graham v. Connor*,
490 U.S. 386 (1989) .......................................................................................10

*Hunter v. Cty. of Sacramento*,
652 F.3d 1225 (9th Cir. 2011) .......................................................................20

i

*Hutton v. City of Berkeley Police Dep't*,
   2014 WL 4674295 (N.D. Cal. Sept. 9, 2014) ...................................................22

*Kingsley v. Hendrickson*,
   576 U.S. 389 (2015) ...........................................................................................10

*Kisela v. Hughes*,
   138 S. Ct. 1148 (2018) ..................................................................................17, 18

*Knapps v. City of Oakland*,
   647 F. Supp. 2d 1129 (N.D. Cal. 2009) ............................................................22

*Lamont v. New Jersey*,
   637 F.3d 177 (3d Cir. 2011) ..............................................................................14

*Lindsey v. SLT Los Angeles, LLC*,
   447 F.3d 1138 (9th Cir. 2006) ...........................................................................22

*Long v. City of Honolulu*,
   511 F.3d 901 (9th Cir. 2007) .............................................................................20

*Malley v. Briggs*,
   475 U.S. 335 (1986) ...........................................................................................17

*Miller v. Clark Cty.*,
   340 F.3d 959 (9th Cir. 2009) .............................................................................10

*Monell v. Dep't of Soc. Servs.*,
   436 U.S. 658 (1978) ...........................................................................................20

*Mullenix v. Luna*,
   577 U.S. 7 (2015) ...............................................................................................17

*Neal v. City of Fresno*,
   2015 WL 1137077 (E.D. Cal. Mar. 12, 2015) ..................................................15

*Pearson v. Callahan*,
   555 U.S. 223 (2009) ...........................................................................................17

*Reese v. Anderson*,
   926 F.2d 494 (5th Cir. 1991) .............................................................................12

*Reese v. Cty. of Sacramento*,
   888 F.3d 1030 (9th Cir. 2018) ...........................................................................21

*Saucier v. Katz*,
   533 U.S. 194 (2001) ......................................................................................17, 18

ii

*Shafer v. Cty. of Santa Barbara,*
   868 F.3d 1110 (9th Cir. 2017) ........................................................................18

*Slattery v. Rizzo,*
   939 F.2d 213 (4th Cir. 1991) ..........................................................................19

*Smith v. City of Hemet,*
   394 F.3d 689 (9th Cir. 2005) ..........................................................................10

*Thompson v. Hubbard,*
   257 F.3d 896 (8th Cir. 2001) ..........................................................................14

*White v. Pauly,*
   137 S. Ct. 548 (2017) ......................................................................................17

*Wilkinson v. Torres,*
   610 F.3d 546 (9th Cir. 2010) ..........................................................................10

<u>Other</u>

18 U.S.C. § 1983 ....................................................................................................9

Cal. Civ. Code § 51.7 .........................................................................................9, 22

Cal. Civ. Code § 52.1 .........................................................................................9, 21

Fed. R. Civ. P. 56..................................................................................................9

TABLE OF AUTHORITIES                                   Case Number: :  5:18-cv-04826-BLF

## NOTICE OF MOTION AND MOTION

PLEASE TAKE NOTICE that on April 21, 2022 at 9:00 a.m., or as soon thereafter as counsel may be heard by the above-entitled Court, located at 280 South First Street, San Jose, California, Courtroom 3, Defendants the City of San Jose and Officer Michael Pina will, and hereby do, move the Court, pursuant to Federal Rule of Civil Procedure 56, for summary judgment on all claims brought by Plaintiffs on the grounds that the undisputed material facts show that Defendants are entitled to judgment as a matter of law. This motion is based on this Notice of Motion, the accompanying Memorandum of Points and Authorities and Declarations, all of the pleadings and papers on file, and any oral argument that may be made at the hearing of this matter.

## STATEMENT OF ISSUES TO BE DECIDED

1.      Was it reasonable for the Defendant Officer to use deadly force when, during the attempted apprehension of Decedent, he dropped his hands and leaned forward, appearing to reach for a gun officers believed he possessed?

2.      Is the Defendant Officer entitled to qualified immunity for his use of force in reaction to Decedent's actions?

3.      Is there any evidence of policy, custom, or practice to support a Section 1983 claim against the City of San Jose?

4.      Is there evidence the Defendant Officer acted with the specific intent to violate Decedent's constitutional rights, or was motivated by Decedent's race or ethnicity, as required to support Plaintiffs' claims under California law?

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.      INTRODUCTION

Plaintiffs challenge the use of lethal force that resulted when Jacob Dominguez, who was being arrested for armed robbery, raised his hands in response to police commands, told police "f**k you" and "shoot me," then quickly dropped his hands and leaned down and forward in the driver's seat where he sat. That movement led officers to think that Dominguez was retrieving the revolver they were told he had with him. Officer

1

Pina, believing he was about to be shot, reacted quickly and shot Dominguez as he came back up, killing him. It was later determined there was no weapon in the vehicle. But there was no way for Officer Pina to know that at the time Dominguez stopped complying with officers' commands and dropped his hands out of sight. To the contrary, Officer Pina had specific information that Dominguez was armed with a revolver that day and other reasons to believe that Dominguez would be in possession of a gun.

The undisputed facts establish that Officer Pina's belief that he was about to be shot was reasonable, and the case law confirms that an officer who uses lethal force to protect himself when a suspect appears to reach for a weapon does not violate the Constitution. An officer need not wait to see whether a suspect in fact produces and fires a gun to use lethal force to prevent that from happening. When an officer's reasonable belief that a suspect is retrieving a weapon is not borne out by subsequent investigation, an officer is nonetheless entitled to qualified immunity. Defendants therefore seek summary judgment of Plaintiffs' claims.

## II.    FACTS

Armed Robbery, September 12, 2017

On September 12, 2017, a San Jose gas station was robbed at gunpoint. Leading up to the robbery, the Covert Response Unit of the San Jose Police Department ("CRU") was asked to assist the Regional Auto Theft Task Force ("RATTF") in surveilling a stolen Mercedes driven by Andrew Anchondo. (Ex. 6 Pina Depo. at 27:4-22.)[1] Anchondo was the suspect in a drive-by shooting that occurred the week before and was believed to be armed. (*Id.* at 27:18-28:9.) RATTF officers followed Anchondo to an Arco gas station and requested that CRU officers take over. (*Id.* at 28:23-29:4.) As CRU was responding to the location, RATTF officers reported that the gas station was robbed. (*Id.* at 29:6-7.) A person later identified as Jacob Dominguez got out of the stolen Mercedes and bought water at the gas

---

[1]  Exhibits 6-11 are attached to the supporting Declaration of Maren Clouse. Exhibits 1-5 are manually filed attachments to the supporting Declaration of Keith Neumer.

station, then Anchondo entered with a gun and robbed the gas station. (Ex. 8 Ferguson Depo. at 20:8-14.) The two men returned to the stolen Mercedes and fled. (Ex. 6 Pina Depo. at 30:19-31:3.) CRU officers followed and identified Anchondo as the driver. (*Id.*)

Surveillance, September 12, 2017

CRU officers continued following the stolen Mercedes. At least ten officers in vehicles worked to follow the Mercedes, relaying information over the radio. (*Id.* at 32:7-33:15.) Officers followed the Mercedes to an area near San Jose City College, where its occupants—Anchondo, Dominguez, and a woman later identified as Patricia Ruiz—got out of the stolen Mercedes and got into another car, which also appeared to be stolen. (*Id.* at 33:16-34:1; Ex. 7 Lopez Depo. at 19:20-20:4, 38:11-14.) Officers continued surveillance and followed that car to Blossom Hill Road; the three occupants went to a house, where they were picked up in another vehicle by Sheila Franco, who officers were told was Dominguez's girlfriend. (Ex. 6 Pina Depo. at 34:5-35:20; Ex. 7 Lopez Depo. at 38:11-39:12.)

Franco drove to a parking lot in East San Jose, where Anchondo, Dominguez, and Ruiz got out and into another vehicle, a dark-colored Kia or similar boxy vehicle. (Ex. 7 Lopez Depo. at 39:5-14; Ex. 8 Ferguson Depo. at 23:14-24:4.) Officers ultimately lost the vehicle that night. (Ex. 8 Ferguson Depo. at 24:1-4.)

Arrest of Anchondo, September 13, 2017

The next day, Anchondo and Ruiz were arrested at a house in Morgan Hill. (Ex. 6 Pina Depo.at 37:25-38:1; Ex. 7 Lopez Depo. at 49:11-18.) CRU officers participated in the arrests. (*Id.*) While officers were at the house to conduct the arrests, they saw Dominguez drive by in the Kia they had followed the night before. (Ex. 7 Lopez Depo. at 52:22-53:4.) CRU officers attempted to follow Dominguez but were unsuccessful. (*Id.*) When officers searched the house, they recovered ammunition for a .357 gun. (Ex. 6 Pina Depo. at 40:2-17.) The gun was not located, however. (*Id.*)

Briefing, September 15, 2017

With Dominguez still outstanding and a warrant for his arrest (Ex. 4), CRU officers met on September 15, 2017 to discuss his apprehension. (Ex. 6 Pina Depo. at 20:9-15.) Officer

3

Szemeredi conducted the briefing, at which Officers Pina, Lopez, and Ferguson were present. (*Id.* at 20:16-25.) At the briefing, CRU officers were informed of Dominguez's history of arrests and convictions, which included: armed robbery with a gun; carjacking; resisting arrest; possession of a firearm and illegal weapons; a gang enhancement; and being under the influence of a controlled substance. (*Id.* at 54:1-15.) Officers were also informed of additional factors that raised safety concerns: Dominguez was an active gang member, and officers know from experience that gang members are frequently armed in anticipation of confrontations with members of rival gangs or police. (Ex. 7 Lopez Depo. at 36:14-20.) In addition, Dominguez was aware he was wanted by law enforcement; his girlfriend Franco was present when Anchondo and Ruiz were arrested September 13 and might have advised Dominguez about CRU officers, vehicles, or apprehension tactics. (Ex. 6 Pina Depo. at 54:25-55:10.) Finally, Officer Szemeredi advised that he had information from a source that Dominguez was armed with a revolver. (*Id.* at 55:16-56:6; Ex. 8 Ferguson Depo. at 74:2-23.)

Surveillance and Apprehension, September 15, 2017

CRU officers left the briefing and drove to locations identified by Officer Szemeredi where Dominguez might be found. (Ex. 6 Pina Depo. at 57:3-12.) Officers located Franco and maintained surveillance of her. (*Id.* at 57:13-23.) Dominguez arrived at Franco's location, driving a black Kia. (*Id.*) CRU officers attempted to surveille Dominguez as he drove the Kia erratically around San Jose; his erratic driving led officers to believe Dominguez knew he was being followed and was trying to avoid being arrested. (Ex. 7 Lopez Depo. at 59:15-60:14.) An aircraft was used to assist in the surveillance, and it located Dominguez and relayed his location. (*Id.* at 51:6-14.) CRU officers planned to apprehend Dominguez when the opportunity presented itself. (Ex. 6 Pina Depo. at 59:10-17.) The airplane identified Dominguez stopped at the intersection of Penitencia Creek and North White Roads in San Jose. (*Id.* at 60:21-25.)

Vehicle Containment Technique and Shooting, September 15, 2017

CRU officers initiated a Vehicle Containment Technique ("VCT"), an apprehension tactic they were trained on and familiar with. (*Id.* at 59:18-6.) Officer Pina, Officer Ferguson,

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT             Case Number: 5:18-cv-04826-BLF

1895797_2

and Officer Lopez approached the Kia driven by Dominguez in their three separate vehicles. (*Id.* at 61:1-62:22.) Officer Pina drove his vehicle in front of the Kia; Officer Ferguson stopped near the Kia's driver's side door; and Officer Lopez drove up to the rear of the Kia. (*Id.*) The VCT is shown in Exhibit 3, a portion of surveillance video obtained from a nearby resident. The video shows the Kia driven by Dominguez stopped at a light, then shows the three officer-driven vehicles drive up near it. Officer Lopez sounded his siren, and red and blue lights in his car were flashing throughout the encounter. (*Id.*; Ex. 7 Lopez Depo. at 67:10-21.)

Officer Pina exited his vehicle with his rifle and ran toward Officer Ferguson's car, which was stopped alongside the Kia. (Ex. 6 Pina Depo. at 67:11-24; Ex. 3.) From this position, Officer Pina was relatively close to Dominguez, just across the hood of a car from where Dominguez sat in the driver's seat. (Ex. 1 at 0:09, 0:28; Ex. 3.) Officer Pina could tell that Dominguez tried to reverse out of the vehicle containment. (Ex. 6 Pina Depo. at 65:24-66:4.) As he approached Officer Ferguson's car, Officer Pina began yelling commands to Dominguez. (*Id.* at 68:11-15.) Officer Pina yelled, "Police, hands up." (*Id.*; Ex. 2 at 0:48.) Dominguez's hands were out of sight, and he did not comply. (Ex. 6 Pina Depo. at 72:15-73:25.) Instead, Dominguez gave Officer Pina a "'screw you' type look" that made it obvious to Officer Pina that Dominguez was disregarding his commands. (*Id.*) Officer Pina was then standing behind the front wheel area of Officer Ferguson's vehicle and giving Dominguez additional commands. (*Id.* at 75:14-23.) Officer Pina became more authoritative and told Dominguez, "something to the effect of 'I'll f**king shoot you. Get your f**king hands up.'" (*Id.* at 78:5-11.)

Dominguez then put his hands up to approximately shoulder level. (*Id.* at 79:9-80:16.) Officer Ferguson explained that Dominguez put his hands up with "limp wrists … kind of like just not wanting to go on the program but kind of getting them up there just enough so we could see them in the window." (Ex. 8 Ferguson Depo. at 72:5-12.) It looked to Officer Ferguson that Dominguez "didn't want to give up, like he didn't want to 100 percent commit to our commands." (*Id.* at 73:16-21.)

Officer Pina warned Dominguez that if he brought his hands down, he would be shot,

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT          Case Number: 5:18-cv-04826-BLF

1895797_2

saying "[s]omething to the effect of, 'Don't move or you're going to get shot,' or 'Move and you're going to get shot.'" (Ex. 6 Pina Depo. at 83:16-25.) Dominguez stared at Officer Pina with a "hostile kind of aggressive type" expression and said, "[e]ither … 'F**k you, shoot me, bitch' or 'F**k you, bitch, shoot me.'" (*Id.* at 91:13-92:13.) Officer Pina responded, "'Don't give me a reason,' or 'If you give me a reason.'" (*Id.* at 92:20-93:3.)

Dominguez had his hands up for a few seconds. (Ex. 6 Pina Depo. at 89:6-9; Ex. 8 Ferguson Depo. at 78:7-11; Ex. 7 Lopez Depo. at 75:7-8.) Then, he quickly dropped his hands out of sight and leaned down and forward towards the seat or floor. (Ex. 6 Pina Depo. at 95:2-22.) Officer Ferguson and Officer Lopez saw that movement too. Officer Ferguson, who was standing in the driver's door frame of his vehicle, opposite Dominguez, explained that Dominguez "kind of looked down towards his lap and his hands kind of go right down to the crotch area, I mean that direction, towards the waistband, towards—I mean obviously I could not see it. Once his hands crossed below the lower part of the window on the door, I couldn't see his hands, and they went from here and then just kind of leaning forward movement toward his lap, towards his lap or seat area, and I couldn't see once they lowered." (Ex. 8 Ferguson Depo. at 67:7-20, 79:16-80:2.) Officer Lopez was positioned to the rear of the Kia, standing in the door frame of his vehicle. (Ex. 7 Lopez Depo. 63:21-24, 69:21-25.) He saw Dominguez's hands raised, then saw him bring his hands down and lean forward "as if he's reaching for something." (*Id.* at 75:9-76:14.)

Officer Pina "started urgently yelling for [Dominguez] to get his hands back up." (Ex. 6 Pina Depo. at 96:8-12.) He also began aiming his rifle. (*Id.* at 95:23-96:7.) Officer Pina explained: "I remember finding my sight while [Dominguez] was leaning forward, and as he was coming back looking at me, looking kind of back movement is when I started firing. I can't say for sure exactly what he was doing as he was coming up because I remember he's now—I'm now looking at him solely through the aim point of my rifle." (*Id.* at 97:3-10.)

Officer Pina believed Dominguez was retrieving a gun and that Dominguez was about to shoot him or Officer Ferguson. (*Id.* at 95:23-96:7, 98:23-99:5.) Officer Ferguson and Officer Lopez had the same thought. As Officer Lopez explained, "all the information that I had led

6

me to believe that he was still armed and that he knew he was being followed by police, and at that point, I don't think he was willing to go to jail peacefully." (Ex. 7 Lopez Depo. at 86:5-8.) So, when Dominguez dropped his hands and leaned forward as if reaching for something, the only possibility was that Dominguez was reaching for a weapon. (*Id.* at 92:2-7.) Officer Lopez therefore perceived an imminent deadly threat. (*Id.* at 92:8-15.) So did Officer Ferguson. (Ex. 8 Ferguson Depo. at 80:3-7.) Officer Ferguson believed deadly force was the only option in response to Dominguez's movement to drop his hands and lean forward. (*Id.* at 83:7-10.)

Neither Officer Ferguson nor Officer Lopez fired because each of them had been working to access other equipment at the time Dominguez dropped his hands and leaned forward. (Ex. 8 Ferguson Depo. at 80:8-12; Ex. 7 Lopez Depo. at 92:16-18.) Both officers had been reaching for a "flash bang," a device that emits a loud noise and flash of light when thrown, designed to distract a suspect. (*Id.*; Ex. 8 Ferguson Depo. at 81:1-11.) If that had not been the case, those officers would both have fired in response to the imminent deadly threat they perceived when Dominguez dropped his hands and reached down. (Ex. 8 Ferguson Depo. at 80:3-12; Ex. 7 Lopez Depo. at 92:16-18.)

Officer Pina fired two shots. From the time he exited his vehicle to the time he fired was less than 30 seconds. (Ex. 6 Pina Depo. at 101:15-18; Ex. 1; Ex. 2 at 0:40-1:05.)[1] Dominguez died at the scene. A subsequent search of the car did not yield any weapon.

Forensic and Expert Evidence

Following the shooting, the Santa Clara County Crime Lab determined that a portion of

---

[1]  Officer Pina's bodyworn camera recorded the incident without sound. (Ex. 1.) Officer Pina believed he turned the camera on when he got out of his vehicle, but he did not in fact do so until after the shooting. (Ex. 6 Pina Depo. at 107:10-108:21.) Because the camera was in buffering mode, it captured video of the previous 30 seconds, but not audio. (*Id.*) In addition, the camera is obscured by Officer Pina's shirt. (*Id.*) Officer Ferguson's bodyworn camera was on and recorded video and audio, but the video is partially obscured for much of the incident. (Ex. 2.)

a bullet struck Dominguez in the jaw and lodged in his neck. (Ex. 10 Balash Report at 6.) A second bullet was recovered from the interior of the passenger side of the Kia. (*Id.* at 4.) The Kia's window was shattered. (*Id.*) There was no other damage to the vehicle. (*See id.* at 5-6.) The Crime Lab also determined that there was a bullet hole through the left forearm of the sleeve of the sweatshirt Dominguez was wearing. (*Id.* at 6.) Dominguez's seatbelt was not fastened at the time of the shooting, as shown in photos taken by SJPD's Crime Scene Unit after the event. (Ex. 5.)

Plaintiff offered the opinion of a ballistics expert, Mr. David Balash. (Ex. 10 Balash Report.) Mr. Balash reviewed the Crime Lab's materials and examined the bullet pieces and sweatshirt. (*Id.*) According to Mr. Balash, the first bullet fired by Officer Pina struck the car window, shattering the glass and deforming the bullet, before striking Dominguez in the jaw and lodging in his neck. (Ex. 9 Balash Depo. at 19:10-14.) Mr. Balash explains that it is because the bullet was deformed when it struck the glass that it lodged in Dominguez's neck, rather than passing through his body. (*Id.* at 19:24-20:8.) The second bullet passed through Dominguez's sweatshirt sleeve before striking the opposite side of the vehicle. (*Id.* at 20:9-14.) Mr. Balash opines that the sleeve of the sweatshirt must have been above the level of the car door's window frame when the second bullet contacted it. (*Id.* at 21:11-21.) However, Mr. Balash is not able to offer any opinion about the position of Dominguez's arm at the time Officer Pina fired the first shot. (*Id.* at 21:6-10.)

Defendants engaged expert Dr. John Black, an expert in police training and decision-making. (Ex. 11 Black Report.) Dr. Black explains that officers are trained that, in terms of timing, "the initiator of an action (often the suspect) will have an advantage." (*Id.* at 11.) That training is supported by research showing that "when the suspect/threat is the initiator of the action, the officer will be unable to react quicker than the suspect." (*Id.*) Studies show it takes an officer from .31 to .39 seconds to react to a subject's movements by firing his or her weapon. (*Id.* at 9-10.)

According to Dr. Black, the research "supports [Officer Pina's] perception that the movement or action of Mr. Dominguez (which he interpreted as reaching for a weapon) would

8

be quicker than he could react." (*Id.* at 21.) Having made the decision to react to the perceived imminent deadly threat, "Sgt. Pina did not have sufficient time to ascertain with any degree of certainty if Mr. Dominguez actually had gained control of a firearm." (*Id.* at 23.) Because Officer Pina was reacting, "he would be anywhere from ¼ to ½ a second behind Mr. Dominguez's movements." (*Id.* at 24.) When Officer Pina shifted to the sights on his rifle in reaction to Dominguez's movement, Officer Pina was focused on his sighting system, and "it would not be expected that he would see nor perceive the arm of Mr. Dominguez since it would most likely be outside his field of view." (*Id.* at 24.)

In other words, by the time Officer Pina perceived and reacted to Dominguez's movements and made the decision to react to the imminent threat by aiming and firing his rifle, he would not reasonably be expected to see the position of Dominguez's arm, or to have the time to determine whether it in fact held the revolver he believed it would, before firing his shots.

### III.   PLAINTIFFS' CLAIMS

Plaintiffs are Mr. Dominguez's wife and three minor children. In their operative Second Amended Complaint (Dkt. No. 37), they assert claims for excessive force in violation of the Fourth Amendment under 18 U.S.C. section 1983. They also assert claims under California law for violation of the Bane Act, Civil Code section 52.1, and the Ralph act, Civil Code section 51.7. Plaintiffs purport to bring each claim against "all Defendants."

### IV.   LEGAL STANDARD

Summary judgment is appropriate where there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden to show there is no genuine factual dispute. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). Where the non-moving party bears the burden of proof at trial, the moving party need only highlight the absence of evidence supporting the non-moving party's claims. *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001). If the moving party satisfies its burden, the non-moving party must identify facts that would be admissible establishing a material issue for trial. Fed. R. Civ. P. 56(c), (e).

9

The court views the evidence in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

## V.   ARGUMENT

### A. THE DEFENDANT OFFICER DID NOT VIOLATE THE CONSTITUTION BY REACTING TO AN IMMINENT DEADLY THREAT.

#### 1. *Graham v. Connor* establishes the reasonableness inquiry.

"Apprehension by deadly force is a seizure subject to the Fourth Amendment's reasonableness requirement." *Wilkinson v. Torres*, 610 F.3d 546, 550 (9th Cir. 2010) (citing *Graham v. Connor*, 490 U.S. 386, 395 (1989)).

> The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. … The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgements—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.

*Graham*, 490 U.S. at 396-97. The inquiry is conducted in a three-step analysis set forth in *Graham*. "First, we assess the gravity of the particular intrusion on Fourth Amendment interests by evaluating the type and amount of force inflicted." *Miller v. Clark Cty.*, 340 F.3d 959, 964 (9th Cir. 2009). Second, the court analyzes "the importance of the government interests at stake by evaluating: (i) the severity of the crime at issue; (ii) whether the suspect poses an immediate threat to the safety of officers or others, and (iii) whether he was actively resisting arrest or attempting to evade arrest by flight." *Id.* Finally, in the third step, the court weighs "the gravity of the intrusion against the government's interest to determine whether the force used was constitutionally reasonable." *Id.* Of the *Graham* factors, the "most important single element" in assessing reasonableness is "whether the suspect poses an immediate threat to the safety of the officers or others." *Smith v. City of Hemet*, 394 F.3d 689, 702 (9th Cir. 2005) (quotation omitted).

#### 2. Officer Pina reasonably perceived an imminent deadly threat.

Officer Pina unquestionably used the highest level of force in his effort to address the threat he believed Dominguez posed. He did so based on the most important

10

of government interests: protection of himself and others. Defendants acknowledge that, as it turned out, Dominguez would not in fact have posed an imminent threat of death to officers because he did not have access to a firearm in the vehicle. But the *Graham* analysis instructs that "objective reasonableness turns on the 'facts and circumstances of each particular case.' A court must make this determination from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight." *Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2015) (quoting *Graham*, 490 U.S. at 396). What Officer Pina observed when he encountered Dominguez, combined with the information he had about him at that point, made it reasonable to believe he posed an imminent deadly threat at the time Officer Pina fired.

Officer Pina had specific information that led him to believe Dominguez was armed with a specific weapon. Officer Pina and other CRU officers were attempting to arrest Dominguez for his participation in an armed robbery that took place three days earlier. When they arrested the other participants in that robbery, officers located ammunition but not the gun used. They therefore believed Dominguez had the gun. In addition, Officer Pina and other CRU officers were briefed that a source told police Dominguez was armed with a revolver.

Officers also knew Dominguez's prior criminal history involved firearms possession and that he was an active gang member, which often involves carrying guns. Even absent the specific information they had that Dominguez was armed, it would have been reasonable for Officer Pina and the other officers to believe that someone with Dominguez's criminal history and gang involvement who recently participated in an armed robbery for which he knew police were pursuing him was armed that day too. *See, e.g., Burrell v. McIlroy*, 464 F.3d 853, 858 (9th Cir. 2006) (where suspect had shot someone and an informant reported suspect kept a gun in his bedroom, "[t]here was no reason to think that the gun in the bedroom was the only firearm that [suspect] possessed, or that he did not carry it, or other weapons when he was outside the apartment," so that "the police may be permitted to act on the assumption that he may be armed and dangerous").

11

Moreover, officers understood that Dominguez knew he was sought by police and was trying to evade arrest. Dominguez knew his co-perpetrators had been arrested—his girlfriend was present at the house where the arrests took place, and Dominguez drove by the location shortly after, while officers were still there. Dominguez's conduct as officers surveilled him on September 15 also led officers to believe Dominguez expected he was being followed and was trying to avoid being arrested.

As a result, when Dominguez dropped his hands and lean forward during the arrest, it was reasonable for Officer Pina to believe he was retrieving the revolver officers thought Dominguez had with him and would shoot at officers. Indeed, Officer Ferguson and Officer Lopez believed the same thing. In addition, Dominguez's behavior up to that point contributed to the threat he posed. Dominguez initially did not respond to officers' commands to put his hands up. He stared at Officer Pina with a defiant expression. When he did put his hands up, he did so half-heartedly. Once Dominguez put his hands up, officers instructed Dominguez to keep his hands up and warned he would be shot if he did not. In response, Dominguez told Officer Pina to shoot him. Then Dominguez quickly dropped his hands toward his lap while leaning down and forward. Officers could think of no good reason why, having put his hands up, Dominguez would suddenly drop them out of sight and lean down and forward. Officers' only thought was that Dominguez was reaching for a gun.

### 3. The Constitution does not require officers to view a weapon before reacting to threatening conduct.

It was reasonable for officers to view Dominguez's actions as an imminent threat. Officer Pina did not need to wait to see whether Dominguez sat back up with a gun in his hand before using deadly force to protect himself. "If the person is armed—or reasonably suspected of being armed—a furtive movement, harrowing gesture, or serious verbal threat might create an immediate threat." *George v. Morris*, 736 F.3d 829, 838 (9th Cir. 2013). That is exactly what happened here.

The Fifth Circuit in *Reese v. Anderson*, 926 F.2d 494 (5th Cir. 1991), determined that an officer's use of deadly force was a reasonable reaction to a suspect's movements that were similar to Dominguez's. In *Reese*, officers responded to a reported robbery and engaged in a high-speed chase of the suspects. *Id.* at 500. When the suspect vehicle stopped, the officer drew his gun, pointed it at the driver and passenger, and ordered them to put up their hands. *Id.* The suspects initially complied, then the passenger "reached down in defiance of [the officer]'s orders. At least twice, [the suspect] reached below [the officer's] sight line. The second time, [the suspect] tipped his shoulder and reached further down." *Id.* at 500-01. The Fifth Circuit reasoned that, at that point, the officer "could reasonably believe that [the suspect] had retrieved a gun and was about to shoot," and so the use of deadly force was justified. *Id.* at 501.

The court went on to explain that "[t]he fact that the vehicle was 'totally surrounded' by police does not change matters; had [the suspect] in fact retrieved a gun from beneath his seat, he could have caused injury or death despite the presence of numerous police officers. Also irrelevant is the fact that [the suspect] was actually unarmed. [The officer] did not and could not have known this. The sad truth is [the suspect]'s actions alone could cause a reasonable officer to fear imminent and serious physical harm." *Id.* The *Reese* court reached that conclusion even though the only to reason to believe the suspect was armed was that he looked like someone the officer had previously arrested for armed robbery. *See id.* Here, in contrast, officers had specific reasons to believe Dominguez was armed that day. Other than that difference, however, the situation in which Officer Pina found himself was quite like the one analyzed in *Reese*. In both cases, an officer could reasonably believe he was about to be shot and therefore could reasonably use deadly force to protect himself.

Similarly, in *Anderson v. Russell*, 247 F.3d 125 (4th Cir. 2001), the Fourth Circuit affirmed summary judgment in favor of an officer who fired at a suspect who initially complied with commands to put his hands up, then lowered them. In that case, a citizen informed officers of a man who appeared to have a gun under his sweater. *Id.* at 128.

13

Officers approached the suspect and instructed him to put his hands up. *Id.* The suspect initially complied, then, "without explanation to the officers," lowered his hands. *Id.* It turned out the suspect was unarmed; the bulge under his sweater was an eyeglass case, and he put his hand down to turn off the Walkman in his pocket. *Id.* Under those circumstances, the Fourth Circuit concluded that, "[t]he evidence establishes that immediately before Russell fired, Anderson was reaching toward what Russell believed to be a gun. Any reasonable officer in Russell's position would have imminently feared for his safety and the safety of others. … Accordingly, because Russell had sound reason to believe that Anderson was armed, Russell acted reasonably by firing on Anderson as a protective measure before directly observing a deadly weapon." *Id.* at 131.

As *Reese* and *Anderson* indicate, courts recognize that officers need not confirm that a suspect is actually pulling a gun on them before using deadly force when it is reasonable for them to believe the suspect is reaching for a gun. The Eighth Circuit has explained that "an officer is not constitutionally required to wait until he sets eyes upon the weapon before employing deadly force to protect himself against a fleeing suspect who turns and moves as though to draw a gun." *Thompson v. Hubbard,* 257 F.3d 896, 899 (8th Cir. 2001). In that case, an officer responded to an armed robbery and approached a person who matched the suspect description; the suspect initially appeared to surrender, then fled, and the officer pursued. *Id.* at 898. The suspect fell, got up, looked over his shoulder at the officer, and "moved his arms as though reaching for a weapon at waist level." *Id.* at 898. The officer could not see the suspect's hands. *Id.* The officer yelled for the suspect to "stop." *Id.* When the suspect continued to move his arms, the officer fired, striking the suspect in the back. *Id.* Though no weapon was found, the Eighth Circuit affirmed summary judgment in favor of the officer.

In *Lamont v. New Jersey*, 637 F.3d 177 (3d Cir. 2011), the court determined the use of deadly force was a reasonable reaction to a suspect who quickly moved as though he was drawing a gun from his waistband, even though there was no specific information the suspect had a gun. Officers pursued on foot a suspect who had fled police in a stolen

14

vehicle. *Id.* at 179-80. Officers ordered the suspect to put his hands up and freeze. *Id.* at 180. The suspect's left hand was up, but his right hand appeared to be clutching an object in his waistband. *Id.* "Suddenly, the suspect pulled his right hand out of his waistband, not as if he were surrendering, but quickly and as if he were drawing a pistol." *Id.* Officers shot the suspect. *Id.* It turned out the suspect was clutching a crack pipe and had no weapon. *Id.* The Third Circuit determined the officers were "justified in opening fire" in response to that movement and concluded that "[w]aiting in such circumstances could well prove fatal." *Id.* at 183.

Ninth Circuit district courts follow those authorities in holding that an officer does not violate the Constitution by shooting someone he believes is about to pull out a gun, even if that belief turns out to be incorrect. In *Neal v. City of Fresno*, 2015 WL 1137077, at *5 (E.D. Cal. Mar. 12, 2015), for instance, the court reasoned that "[t]he fact that it was ultimately determined that [decedent] was unarmed is not dispositive." That was the case because officers responded to a report of a robbery involving a gun, and when they encountered a suspect and ordered him to freeze, "[he] did not freeze but rather moved his hands towards his waistband, an action which the officer believed was a motion to reach for a weapon." *Id.* The officer fired. *Id.* The court granted summary judgment for the officer. *Id.* at *7.

Summary judgment is appropriate here too. Officer Pina did not shoot Dominguez merely because he believed him to be armed. Nor did he shoot merely because Dominguez did not initially comply with commands. Instead, the testimony of Officer Pina and Officer Ferguson, as well as the video from their bodyworn cameras, establishes that when officers first encountered Dominguez, they could not see his hands, and he did not comply with commands to put his hands up. Officers did not shoot. Instead, they gave Dominguez the opportunity to put his hands up. When he chose to comply by raising his hands to shoulder level, the officers told Dominguez to keep his hands up. It was only when Dominguez then dropped his hands and leaned forward as if reaching for something that Officer Pina fired his weapon.

15

There can be no genuine dispute that Dominguez made the movement described. All officers at the scene described the same movement. They all independently relayed it to detectives when they were interviewed after the incident and did not discuss their observations with any other officer before doing so. (Pina Decl.; Ferguson Decl.; Lopez Decl.) There is no evidence that the movement did not occur as the officers described it.

To the extent there is a dispute about where exactly Dominguez's left arm was at the time a bullet went through the sweatshirt sleeve, such a dispute is not material. Officer Pina made the decision to shoot after he observed Dominguez drop his hands and lean down and forward, which led Officer Pina to believe Dominguez was retrieving the revolver Officer Pina believed Dominguez had with him. Officer Pina fired as Dominguez he saw Dominguez coming back up. He did not need to wait to verify what was in Dominguez's hands. As explained in the cases detailed above, when a suspect is reasonably believed to be armed and drops his hands out of sight to where a weapon can be retrieved, an officer is not required to wait to see what happens before using deadly force to protect himself. As the case law recognizes, waiting can be deadly. That is confirmed by the research explained by Dr. Black.

**4. The remaining *Graham* factors favor Defendants.**

Though the imminent threat Dominguez posed to officers is the most important factor, the other factors—the severity of the crime at issue and whether the suspect was actively resisting arrest or attempting to flee—weigh in favor of the use of force. Officers were seeking to arrest Dominguez on a warrant for felony robbery. (Ex. 5.) Officers knew that robbery involved a gun. That is a serious crime, and the government has a strong interest in apprehending a suspect who is involved in a robbery involving a firearm.

And officers' interest in apprehending Dominguez was heightened given his efforts to avoid detection. Officers tailed Dominguez and the other robbery suspects for many hours over several days. The suspects drove stolen vehicles and made efforts to avoid surveillance. When officers executed the Vehicle Containment Technique, Dominguez tried to reverse and drive away. Then, when officers gave him commands to put his hands

16

up, he was defiant and non-compliant before limply putting his hands up at shoulder height. With his final movement, by dropping his hands out of sight and leaning down and forward, Dominguez was actively resisting officers' efforts to take him in to custody.

## B.  OFFICER PINA IS ENTITLED TO QUALIFIED IMMUNITY.

"The doctrine of qualified immunity shields officers from civil liability so long as their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *City of Tahlequah, Oklahoma v. Bond*, 142 S. Ct. 9, 10 (2021) (per curiam) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). The Supreme Court has repeatedly reiterated that specificity matters in assessing qualified immunity. "It is not enough that a rule be suggested by then-existing precedent; the "rule's contours must be so well defined that it is 'clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'" *Id.* (quoting *District of Columbia v. Wesby*, 138 S. Ct. 577, 590 (2018)). "Use of excessive force is an area of the law in which the result depends very much on the facts of each case, and thus police officers are entitled to qualified immunity unless existing precedent squarely governs the specific facts at issue." *Kisela v. Hughes*, 138 S. Ct. 1148, 1153 (2018) (quotation omitted). "Specificity is 'especially important in the Fourth Amendment context,' where it is 'sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts.'" *Id.* (quoting *Mullenix v. Luna*, 577 U.S. 7, 12 (2015)).

"Excessive force claims … are evaluated for objective reasonableness based upon the information the officers had when the conduct occurred." *Saucier v. Katz*, 533 U.S. 194, 207 (2001). Qualified immunity protects "'all but the plainly incompetent or those who knowingly violate the law.'" *Wesby*, 138 S. Ct. at 589 (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). Officer Pina does not fit in either of those categories.

Law is "clearly established" when a court can "identify a case where an officer acting under similar circumstances as [the defendant] was held to have violated" the Constitution. *White v. Pauly*, 137 S. Ct. 548, 552 (2017). "Where constitutional guidelines

17

1  seem inapplicable or too remote, it does not suffice for a court simply to state that an

2  officer may not use unreasonable and excessive force, deny qualified immunity, and then

3  remit the case for a trial on the question of reasonableness." *Kisela*, 138 S. Ct. at 1153.

4  "It is the plaintiff who bears the burden of showing that the rights allegedly violated were

5  clearly established." *Shafer v. Cty. of Santa Barbara*, 868 F.3d 1110, 1118 (9th Cir.

6  2017) (internal quotation omitted).

7      In light of the cases catalogued in section V.A., above, Plaintiffs will be unsuccessful

8  in identifying a case where an officer was found to have violated the Constitution when a

9  suspect reasonably believed to be armed put his hands up, then dropped them as he

10  appeared to be retrieving a weapon. Plaintiffs' task will be further complicated by the fact

11  that qualified immunity extends to "reasonable, but mistaken, beliefs as to the facts"

12  leading to police actions. *Saucier*, 533 U.S. at 206.

13      In *Blanford v. Sacramento County*, 406 F.3d 1110 (9th Cir. 2005), for instance,

14  officers shot a man carrying a sword after he ignored warnings to stop and drop the

15  weapon and tried to enter a house, first through the front door, then through back yard.

16  The man never advanced on officers, but officers were concerned he posed a threat to

17  anyone in the house, so they shot him when he went through a gate to the back yard,

18  again when he tried to open a garage door, and again when he walked away toward the

19  back yard. *Id.* at 1113. As it turned out, the man was trying to enter his own home (but had

20  forgotten the keys) and did not hear officers because he was listening to headphones

21  (which officers could not see because he was wearing a ski hat). *Id.* at 1112-13. And there

22  was not, in fact, anyone in the house or yard the man was trying to enter. *Id.* at 1116. But

23  officers were entitled to qualified immunity because, though mistaken, their belief that the

24  man posed a danger to occupants of the house was reasonable. *Id.* at 1119.

25      And in *Kisela*, 138 S. Ct. at 1152, an officer shot a woman carrying a large kitchen

26  knife because he believed she posed a threat to a woman standing six feet away. In fact,

27  the women were roommates having an argument, and the woman the officer believed to

28  be in immediate danger did not feel threatened. *Id.* at 1151. But because officers were

18

responding to a report of a woman with a knife behaving erratically, and the woman did not drop the knife on command, the officer's decision to shoot when he had "mere seconds to assess the potential danger" was entitled to qualified immunity. *Id.* at 1153-54. That was true even though two other officers on the scene did not shoot and even though the officer did not issue a warning before shooting. *See id.* at 1151, 1155. The Court reasoned that the situation facing the officer was "far from an obvious case in which any competent officer would have known that shooting [the suspect] to protect [the other woman] would violate the Fourth Amendment." *Id.* at 1153. The Court rejected the argument that Ninth Circuit cases could clearly establish that deadly force was improper because those cases did not require officers to assess potential danger to bystanders in a matter of seconds under similar circumstances. *Id.* at 1154.

As a final example, Supreme Court Justice Powell, sitting by designation on the Court of Appeal, determined that qualified immunity protected an officer who shot a suspect seated in his car during an undercover operation because the suspect did not respond when commanded to raise his hands, and the officer could see the suspect's hand "appeared to be partially closed around an object." *Slattery v. Rizzo*, 939 F.2d 213, 215 (4th Cir. 1991). The suspect turned his head slowly toward the officer, turned away, then turned his upper body toward the officer. *Id.* At that point, the officer believed the suspect was "coming at him with a weapon" and fired. *Id.* It turned out the suspect was holding a beer bottle. *Id.* Justice Powell held that a reasonable officer could have believed the suspect posed a "serious threat of personal harm at the time that [the officer] pulled the trigger." *Id.* at 216.

Here, the Court can determine based on the undisputed facts that Officer Pina reasonably believed Dominguez was retrieving a gun and about to shoot officers. And the Court can and should grant qualified immunity on that basis. So, although the *Graham* factors all weigh heavily in favor of Officer Pina's use of force, the Court need not decide whether *Graham*'s application yields the conclusion that Officer Pina's conduct was reasonable. Rather, the Court can grant summary judgment because it was not clearly

19

established that an officer facing similar circumstances could not react as the Defendant Officer did. *See, e.g.*, *Dunn v. Castro*, 621 F.3d 1196, 1199 (9th Cir. 2010) (explaining that court would "address only the second prong of the qualified immunity analysis").

## C.   THERE IS NO EVIDENCE TO SUPPORT THE CITY'S LIABILITY UNDER SECTION 1983.

Plaintiffs' Section 1983 claim is pled against the City as well as individual defendants. To begin with, the City is not liable because there was no constitutional violation, and "[i]f no constitutional violation occurred, the municipality cannot be held liable." *Long v. City of Honolulu*, 511 F.3d 901, 907 (9th Cir. 2007) (*citing City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986)). But even if there were facts that could support a constitutional violation, Plaintiffs are unable to prove any violation by the City. Municipal liability for violation of Section 1983 attaches only to the entity's own unconstitutional practices and cannot be based on respondeat superior. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978). To establish that the City is liable for a constitutional violation, Plaintiffs would have to show that a policy, custom, or practice of the City was the "moving force" behind the violation. *Monell*, 436 U.S. at 694; *accord Dougherty v. City of Covina*, 654 F.3d 892, 900 (9th Cir. 2011).

There is no evidence in the case that any policy, practice, or custom of the City or Police Department was behind Officer Pina's use of force. Officer Pina used deadly force in reaction to what he perceived as an imminent deadly threat. It is unclear how any policy, custom, or practice could have governed Officer Pina's use of force in the rapidly unfolding circumstances that occurred here. In addition, for Plaintiffs to show that the City is liable for an unconstitutional custom or practice, they would have to show a pattern of similar incidents. *Hunter v. Cty. of Sacramento*, 652 F.3d 1225, 1233 (9th Cir. 2011) ("[L]iability for improper custom may not be predicated on isolated or sporadic incidents.") (quotation omitted). There is no evidence at issue beyond this incident from which Plaintiffs could argue that any custom or practice of the City or Police Department led to the Defendant Officer's actions.

**B.  PLAINTIFFS CANNOT PROVE A VIOLATION OF STATE LAW.**

**1. Officer Pina's actions did not violate the Bane Act.**

The Bane Act makes actionable "interfere[nce] by threat, intimidation, or coercion, or attempts to interfere by threat, intimidation, or coercion, with the exercise or enjoyment by any individual or individuals of rights secured by the Constitution or laws of the United States, or of the rights secured by the Constitution or laws of this state …." Cal. Civ. Code § 52.1. Plaintiffs' Bane Act claim is based on the same facts as their Section 1983 claim. (SAC ¶ 27.) Because those facts do not amount to a constitutional violation, Plaintiffs cannot prevail on a Bane Act claim.

Even if that were not the case, however, Plaintiffs would be unable to prove a Bane Act violation. "[T]he statutory phrase 'threat, intimidation or coercion' serves as an aggravator justifying the conclusion that the underlying violation of rights is sufficiently egregious to warrant enhanced statutory remedies, beyond tort relief." *Cornell v. City & Cty. of San Francisco*, 17 Cal. App. 5th 766, 800 (Cal. App. 2017), *as modified* (Nov. 17, 2017), *review denied* (Feb. 28, 2018). Therefore, where a Fourth Amendment violation is alleged, "the Bane Act requires 'a specific intent to violate the arrestee's right to freedom from unreasonable seizure.'" *Reese v. Cty. of Sacramento*, 888 F.3d 1030, 1043 (9th Cir. 2018) (quoting *Cornell*, 17 Cal. App. 5th at 801). That requires a showing that a defendant "intended not only the force, but its unreasonableness, its character as more than necessary under the circumstances." *Id.* at 1045 (internal quotation omitted). "[A] mere intention to use force that the jury ultimately finds unreasonable … is insufficient." *Id.*

No reasonable jury could conclude Officer Pina intended to use more force than he thought he needed to. The evidence is that Officer Pina intended to apprehend Dominguez pursuant to a warrant for his arrest, instructed him how to comply, and gave him the opportunity to do so. Indeed, Officer Pina did not use force even though Dominguez initially did not comply with his instructions. Force was only used when Dominguez, after having complied by raising his hands, stopped complying and quickly leaned forward and

21

reached down. Believing Dominguez was about to shoot him, Officer Pina fired two shots. That is not egregious conduct that amounts to a Bane Act violation under California law.

In contrast, *Cornell*, where the court held plaintiff's version of events could amount to a Bane Act violation, involved a series of deliberately spiteful acts. 17 Cal. App. 5th at 771. Officers allegedly chased down plaintiff with guns drawn after they saw him stopped in an area known for drug activity. *Id.* at 771. When officers apprehended plaintiff, they learned he was an off-duty police trainee who had been out for a jog, not realizing officers were trying to stop him. *Id.* at 775. Officers nonetheless took plaintiff to the station for questioning, surreptitiously recorded him, left him on display for other officers, detained him for six hours, and eventually cited him for resisting arrest. *Id.* at 776. As a result of the citation, plaintiff's employment was terminated, making it impossible for him to find other work in law enforcement. *Id.* The court concluded that evidence, if believed, supported a finding of specific intent because it showed "not only that [defendant officers] were unconcerned from the outset with whether there was legal cause to detain or arrest [plaintiff], but that when they realized their error, they doubled-down on it, knowing they were inflicting grievous injury on their prisoner." *Id.* at 804. Officer Pina, in contrast, knew there was a warrant for Mr. Dominguez's arrest, believed he was armed, and reacted with force only when he believed he was about to be shot.

**2. There is no evidence officers' actions were racially motivated in violation of the Ralph Act.**

The Ralph Act, California Civil Code section 51.7, provides that "[a]ll persons within [California] have the right to be free from any violence, or intimidation by threat of violence, committed against their persons or property" because of race. To establish a Ralph Act claim, a plaintiff must show, among other things, that the defendant "threatened or committed violent acts against the plaintiff" and "was motivated by his perception of plaintiff's race" or another protected category. *Knapps v. City of Oakland,* 647 F. Supp. 2d 1129, 1167 (N.D. Cal. 2009) (citation omitted). "[T]o survive summary judgment based on

22

circumstantial evidence of racial bias, that evidence must be 'specific and substantial.' A plaintiff's subjective belief that a defendant's conduct is motivated by discriminatory intent is not sufficient to defeat summary judgment." *Hutton v. City of Berkeley Police Dep't*, 2014 WL 4674295, at *10 (N.D. Cal. Sept. 9, 2014) (quoting *Lindsey v. SLT Los Angeles, LLC,* 447 F.3d 1138, 1152 (9th Cir. 2006)).

There is no evidence, let alone any specific or substantial evidence, that Officer Pina was motivated to shoot Dominguez because of his race, and not because Officer Pina sought to defend himself. There is no evidence, for instance, of any racial epithet about Dominguez on the part of Officer Pina or any other San Jose Police officer. Officer Pina's use of force was motivated by his perception that Dominguez was reaching for a gun to shoot him. Officer Pina believed Dominguez had a gun because he and other officers had specifically been so informed, based on information relayed from reliable source, and because the gun involved in the armed robbery for which Mr. Dominguez was wanted was still outstanding. In the face of that specific information, Plaintiffs must do more to survive summary judgment than argue that Officer Pina perceived Dominguez as dangerous because of his race. But the facts provide Plaintiffs no support.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

23

## VI.    <u>CONCLUSION</u>

San Jose Police officers lawfully attempted to arrest a felony robbery suspect who they were told was armed with a revolver. The suspect reluctantly raised his hands and made defiant statements before making a movement that led officers to believe he was reaching for a gun and was about to shoot them. Defendant Officer Pina had split seconds to react to the imminent deadly threat he reasonably believed he faced. He is not liable for violating the Constitution or state law for using lethal force to protect himself and fellow officers in that situation. For the foregoing reasons, Defendants respectfully request the Court grant judgment in their favor on all Plaintiffs' claims.

Respectfully submitted,

Dated:  March 17, 2022

NORA FRIMANN, City Attorney

By:    */s/ Maren J. Clouse*
MAREN J. CLOUSE
Chief Deputy City Attorney

Attorneys for Defendants
CITY OF SAN JOSE
and OFFICER MICHAEL PINA

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT                Case Number: 5:18-cv-04826-BLF

1895797_2