1  NORA FRIMANN, City Attorney (93249)
   ARDELL JOHNSON, Assistant City Attorney (95340)
2  MAREN CLOUSE, Chief Deputy City Attorney (228726)
   Office of the City Attorney
3  200 East Santa Clara Street, 16th Floor
   San José, California  95113-1905
4  Telephone Number: (408) 535-1900
   Facsimile Number:  (408) 998-3131
5  E-Mail Address:  cao.main@sanjoseca.gov

6  Attorneys for CITY OF SAN JOSE and OFFICER
   MICHAEL PINA
7

8                  UNITED STATES DISTRICT COURT

9                NORTHERN DISTRICT OF CALIFORNIA

10                      SAN JOSE DIVISION

11  JESSICA DOMINGUEZ, INDIVIDUALLY          Case Number:  5:18-cv-04826-BLF
    AND AS GUARDIAN AD LITEM FOR
12  JACOB DOMINGUEZ, JORDAN                  **DECLARATION OF MAREN J. CLOUSE
    DOMINGUEZ AND JALIYAH                    IN SUPPORT OF DEFENDANTS'
13  DOMINGUEZ,                               MOTION FOR SUMMARY JUDGMENT**

14                   Plaintiffs,

15          v.                               Date:      April 21, 2022
                                             Time:      9:00 a.m.
16  CITY OF SAN JOSE, SAN JOSE POLICE        Room:      Courtroom 3,  5th Floor
    DEPARTMENT and DOE POLICE                Judge:     Hon. Beth Labson Freeman
17  OFFICERS 1, 2 AND 3, and DOES,
    inclusive,                               Trial Date:  August 22, 2022
18
                     Defendants.
19

20

21          I, Maren J. Clouse, declare:

22          1.      I am an attorney licensed to practice in the State of California and represent

23  the Defendants in the above matter.

24          2.      Based on my personal knowledge, and if called as a witness could so testify

25  that I have prepared this Motion for Summary Judgment and attest that the following

26  documents are true and accurate copies of what they are represented to be.

27  / / /

28  / / /

                                             1

**EXHIBIT**   **DOCUMENT**

6    Attached collectively hereto as Exhibit 6 are true and correct copies of excerpts of the deposition of Sergeant Michael Pina, taken on March 3, 2021.

7    Attached collectively hereto as Exhibit 7 are true and correct copies of excerpts of the deposition of Officer Alvaro Lopez, taken on March 1, 2021.

8    Attached collectively hereto as Exhibit 8 are true and correct copies of excerpts of the deposition of Officer Kristoffer Ferguson, taken on March 4, 2021.

9    Attached collectively hereto as Exhibit 9 are true and correct copies of excerpts of the deposition of David Balash, taken on November 22, 2021.

10    Attached hereto as Exhibit 10 is a true and correct copy of an excerpt of the opinion of David Balash offered in this matter, dated September 27, 2021.

11    Attached hereto as Exhibit 11 is a true and correct copy of an excerpt of the opinion of John Black offered in this matter, dated May 20, 2021.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct and that this declaration was executed on March 17, 2022 in San José, California.

_/s/ Maren J. Clouse_____

MAREN J. CLOUSE

DECLARATION OF MAREN J. CLOUSE IN SUPPORT OF
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Case No. 5:18-cv-04826-BLF

1895772

EXHIBIT 6

Atkinson Baker, a Veritext Company
www.depo.com

1              UNITED STATES DISTRICT COURT

2            NORTHERN DISTRICT OF CALIFORNIA

3

4   JESSICA DOMINGUEZ INDIVIDUALLY   )
    AND JESSICA DOMINGUEZ AS         )
5   GUARDIAN AD LITEM FOR JAD (1),   )     **CERTIFIED COPY**
    JAD (2) AND JAD (3),             )
6                                    )
                    Plaintiffs,      )
7                                    )     Case No.:
         vs.                         )     5:18-CV-04826
8                                    )
    CITY OF SAN JOSE, SAN JOSE POLICE )
9   DEPARTMENT, MICHAEL PINA, AND    )
    DOE POLICE OFFICERS 2 through 5, )
10                                   )
                    Defendants.      )
11  _____)

12

13

14

15

16

17                 DEPOSITION OF

18            SERGEANT MICHAEL PINA

19             SAN JOSE, CALIFORNIA

20               MARCH 3, 2021

21

22  ATKINSON-BAKER, a Veritext Company
    (800) 288-3376
23  www.depo.com

24  REPORTED BY:   THERESA KIELTY, CSR NO. 5037

25  FILE NO.:      AE08206

1    Q.   Okay.  So I want to focus on this particular case,

2    the subject matter of this lawsuit, and kind of go back in

3    history to the background of your involvement in the work-up

4    and the investigation and the briefing and those kinds of

5    things.  So as I understand it, there was a briefing

6    conducted by your department regarding Mr. Dominguez and some

7    of the activities he was involved with.

8        A.   Yes.

9        Q.   How many briefings were there?

10       A.   There was -- specifically for Dominguez or the case

11   involved with his co-conspirators?

12       Q.   Specifically with Dominguez.

13       A.   There was a formal briefing on September 15th.

14       Q.   September 15th?

15       A.   Yes.

16       Q.   Okay.  And you were present?

17       A.   Yes.

18       Q.   Was Officer Lopez present?

19       A.   Yes.

20       Q.   And Officer Ferguson?

21       A.   Yes.

22       Q.   And how many -- there was one officer who did the

23   briefing, I can't pronounce the name.  I think it starts with

24   an S.

25       A.   Yes, Officer Szemeredi.

Atkinson Baker, a Veritext Company
www.depo.com

1   event, and can we just refer to this as the Arco armed

2   robbery?

3       A.   Yes.

4       Q.   Okay.  So tell us about -- were you in surveillance

5   or what were you doing at that time?

6       A.   At that time, we were responding to relieve RATTF

7   from their surveillance.

8       Q.   And for the record, RATTF is?

9       A.   The Regional Auto Theft Task Force.  They were

10  following Anchondo around.

11      Q.   Okay.  And that's Andrew Anchondo?

12      A.   Yes, sir.

13      Q.   Is he a gang person?

14      A.   Yes.

15      Q.   And does he have a rank in the gang, like sergeant

16  or lieutenant or whatever?

17      A.   I don't know.  I don't know what his rank is.

18      Q.   So RATTF was following him around on the belief

19  that he had stolen a vehicle?

20      A.   So he was driving a stolen vehicle and he was

21  suspected to be a shooter in a gang-related shooting the week

22  before.

23      Q.   Weeks before?

24      A.   The week before.

25      Q.   What shooting was that, if you recall?

Atkinson Baker, a Veritext Company
www.depo.com

1      A.    I don't know exactly what shooting it was.  The

2   information to me provided was that it was -- he shot another

3   Norteno gang member, like red-on-red, and they could not file

4   charges for the shooting at the time because the victim was

5   sedated, so they were still working on the arraignment for

6   the shooting, for the attempted homicide, so that's why CRU

7   got involved was because he was armed and he was wanted for

8   felony evading, possession of stolen property and he was

9   driving a stolen vehicle.

10      Q.    So for the record, what does red-on-red mean?

11      A.    Norteno gang shooting another Norteno.

12      Q.    Okay.  And was there any information gathered about

13   what type of gun that Anchondo used in the shooting on the

14   red-on-red shooting?

15      A.    I didn't have that information.

16      Q.    Okay.  So the vehicle at this time, in September,

17   2017, the vehicle Anchondo believed was to have stolen, was

18   that a Mercedes?

19      A.    Yes.  It was a white Mercedes sedan.

20      Q.    And so you picked up from RATTF.  Were you

21   following the Mercedes to the Arco station?

22      A.    No.

23      Q.    So the Mercedes was at the Arco station, and did

24   the armed robbery occur and then you guys came into it, or

25   explain that to me.

1      A.   So they followed in a -- RATTF followed Anchondo, a

2  female and another unknown male to the Arco gas station and

3  they requested us to assist the surveillance and take over

4  the case because Anchondo was supposedly armed.

5      Q.   Okay.

6      A.   As we were responding and getting to the area, the

7  armed robbery occurs at that gas station.

8      Q.   Okay.  So you didn't witness the armed robbery?

9      A.   I did not, no.

10      Q.   Did RATTF?

11      A.   RATTF relayed it to us.

12      Q.   And was it videotaped, if you know?

13      A.   I'm not sure.  I'm sure there was surveillance

14  cameras inside.

15      Q.   So at that time, was there reliable evidence that

16  Mr. Jacob Dominguez was in the Mercedes Benz at the Arco

17  station?

18      A.   He wasn't identified.  We saw him in there but we

19  didn't know who he was.

20      Q.   So you actually saw him in the Arco station?

21      A.   We saw him in the Mercedes.

22      Q.   And where was he seated in the Mercedes?

23      A.   In the rear seat.

24      Q.   Passenger or driver side?

25      A.   I don't recall.

Atkinson Baker, a Veritext Company
www.depo.com

1      Q.   Was there any reasonable suspicion at that time

2    that it was Dominguez?

3      MS. CLOUSE:  Objection, vague.

4    BY MR. CROWLEY:

5      Q.   Well, did he have any articulatable facts that

6    would lead a reasonable officer to believe that it was

7    Dominguez in the back of the Mercedes at that time?

8      A.   Well, several of us saw him during surveillance.

9    We didn't -- he was not identified to us yet so we didn't

10   know who he was.

11     Q.   But you were able to identify Anchondo?

12     A.   Yes.

13     Q.   And was the female identified to you at that time?

14     A.   Not initially.

15     Q.   Later on, was the female identified?

16     A.   Yes.

17     Q.   And that was Ruiz?

18     A.   Yes.

19     Q.   Okay.  So let's pick it up from where you entered

20   into the investigation of the Arco robbery.  What did you do

21   next?

22     A.   So they fled the scene, and the CRU officer,

23   Officer Flores, immediately picked up the car leaving the

24   parking lot and evading out Eastridge Loop towards Tully

25   Road, and he positively identifies Anchondo as the driver,

Atkinson Baker, a Veritext Company
www.depo.com

1    and he articulates over the radio that they are changing

2    clothes inside the vehicle, so the rest of us catch up to the

3    surveillance and now we follow them.

4         Q.   So was it specific as to who was changing clothes?

5         A.   He just kind of just generalized, "They're

6    switching clothes" or "Taking off sweatshirts," or I don't

7    recall exactly the words he used but it was specified they

8    were changing clothes.

9         Q.   Was there any information conveyed to you or did

10   you witness any information about a gun being displayed at

11   the Arco station robbery?

12        A.   Yes.

13        Q.   What kind of a gun?

14        A.   It was described -- I don't want to say for sure.

15   I don't know when I learned the information.  I don't know if

16   they described it or they just said it was a robbery with a

17   gun.  I don't remember for sure.

18        Q.   Do you remember if they said it was a black

19   handgun?

20        A.   I remember hearing it.  I don't remember when I

21   heard it.

22        Q.   Okay.  Fair enough.  So at that point in the

23   surveillance of the Mercedes and its occupants, what

24   happened?

25        A.   So we followed them as they go westbound on Tully

Atkinson Baker, a Veritext Company
www.depo.com

1    onto the freeway, on the 101, and they go southbound 101 to

2    northbound 85 to northbound 87, back to northbound 280, so

3    they take this long, exaggerated loop and then eventually

4    park in the area near Moorpark and Leigh, I don't know the

5    street name or address, it was in that general area by San

6    Jose City College south of 280.

7        Q.   And who was the team pursuing the -- this was the

8    white Mercedes at the time?

9        A.   Yes.

10       Q.   Who was pursuing that?  You were pursuing it in

11   your vehicle?

12       A.   When you say "pursuing," do you mean conducting

13   surveillance?

14       Q.   Yeah, surveillance.

15       A.   Yes.

16       Q.   And you were solo in your vehicle?

17       A.   Yes.

18       Q.   And was Officer Lopez in surveillance?

19       A.   Yes.

20       Q.   And he was solo in his vehicle?

21       A.   Yes.

22       Q.   Officer Ferguson, was he also part of the team in

23   surveillance?

24       A.   Yes.

25       Q.   And he was solo in his vehicle?

Atkinson Baker, a Veritext Company
www.depo.com

1          A.    Yes.

2          Q.    Anybody else?

3          A.    I mean the whole unit.  I don't know who was off

4    that day so whoever was working that day.  There was at least

5    10 of us.

6          Q.    Okay.

7          A.    But there could have been a couple people off that

8    I'm unaware of.  It's hard to remember.

9          Q.    Okay.  So you followed them to an area near San

10   Jose City College, and what happened?  What did you observe,

11   if anything, there?

12         A.    I didn't observe it but I know what was being

13   relayed over the radio.

14         Q.    So it's information you got, so that's fair game.

15   What was it?

16         A.    So that they park the white Mercedes, they exit and

17   they walk over to a blue BMW sedan and get into that and

18   drive away.

19         Q.    All three occupants?

20         A.    Yes.

21         Q.    Did you guys run the plates on the BMW?

22         A.    I remember that it came back either as a stolen

23   plate or the plate didn't match the vehicle, or something

24   similar to that.  I don't know if the BMW was stolen or if

25   the plates were stolen.  I remember the plate might have come

1    back stolen.

2         Q.   So you pursued -- you continued the surveillance of

3    the BMW?

4         A.   Yes.

5         Q.   And tell us about what you did.  What happened?

6         A.   We continued surveillance.  The route they took, I

7    cannot remember.  I know they went from near City College all

8    the way down to like Blossom Hill, west of Almaden.  There's

9    like this church parking lot there, and they parked on the

10   south side of Blossom Hill Road.  I don't know if that street

11   is called Russo, R-u-s-s-o.  They parked, they walked across

12   the street, they walked across Blossom Hill Road, and the

13   street they walked on might have been Russo, I'm drawing a

14   blank on the street, but they walked to a house.

15        Q.   So they parked on one side of Blossom Hill?

16        A.   Yes.

17        Q.   Walked across Blossom Hill and went to a residence?

18        A.   Yes.

19        Q.   All three of them?

20        A.   Yes.

21        Q.   And they were being surveilled at this time?

22        A.   Yes.

23        Q.   Could you see anybody carrying any kind of a

24   package or gun or anything like that?

25        A.   I remember someone saying that someone was carrying

1    a bag or a backpack.  They were carrying some kind of bag.

2        Q.   So was the -- when they changed cars from the

3    Mercedes to the BMW, was the Mercedes surveilled?

4        A.   No, not at that time.

5        Q.   Were you able to identify the residence?

6        A.   The residence was identified.  I don't recall whose

7    it was.

8        Q.   Was that Sheila Franco's residence or is that where

9    she was?

10       A.   I don't know.  What I know, she appeared there.  I

11   don't know if that was her house.

12       Q.   So you observed the three suspects going into the

13   residence, someone's residence.  What happened next?

14       A.   So I personally didn't observe it but our

15   surveillance team did.

16       Q.   Thank you.

17       A.   They were in there for, I don't know, maybe 30

18   minutes, I'm guessing, approximately, and then Sheila Franco

19   arrives in her white Malibu and the three of them exit and

20   enter into the white Malibu.

21       Q.   Okay.  And did you see that?

22       A.   I was, at one point, following the car.  I didn't

23   see them exit the car.  I'm sorry, I didn't see them exit the

24   house.

25       Q.   Did you see Sheila -- this was a white Malibu she

Atkinson Baker, a Veritext Company
www.depo.com

1    surveillance.  Do you want me to tell you how it ended?

2        Q.   Well, it culminated -- did you lose them?

3        A.   Ultimately, yes.

4        Q.   You lost them?

5        A.   Ultimately.

6        Q.   Okay.  And this all occurred on -- do you remember

7    the day?  Was it September 12th?

8        A.   Tuesday, September 12th.

9        Q.   Okay.  And do you know how it is that you lost

10   them?

11       A.   Yes.  They pulled down a street, I want to say

12   Ryland, near Coleman, they stopped in the middle of the road,

13   and when we started setting surveillance points around where

14   they were stopped, whoever had visual of it did not see them

15   turn and we ultimately lost them momentarily, and then we

16   tried to re-acquire them and we didn't know where they went

17   from there.

18       Q.   Okay.  So any other events you recall after you

19   lost them that day or evening?

20       A.   That day, we just ended surveillance that day.

21       Q.   The next day, did you pick up the trail, if you

22   will?

23       A.   Yes.

24       Q.   Tell me about that.

25       A.   So the next day is when Anchondo was located at a

1    house in Morgan Hill.

2        Q.    Okay.  And you weren't the ones that located him

3    but you were informed of it?

4        A.    Correct.

5        Q.    And you were called in to assist?

6        A.    Yes.

7        Q.    To do what?

8        A.    To take Anchondo into custody.

9        Q.    Okay.  And did you participate in that?

10       A.    Yes.

11       Q.    Tell us about what happened there.

12       A.    So he was positively identified arriving at a house

13   in Morgan Hill.  Also, there was Patricia Ruiz and Sheila

14   Franco.  And as they were getting into Sheila Franco's white

15   Malibu, I know Officer Szemeredi, and I don't know who the

16   other two officers, conducted a Vehicle Detainment Technique

17   to take them into custody.  They were parked in front of the

18   residence.  I responded to the area but they were being taken

19   into custody pretty much as I was arriving.

20       Q.    Okay.  And that was all four or all three people?

21       A.    Three people, yes, sir.

22       Q.    Was Dominguez there?

23       A.    Not during that moment.

24       Q.    Did anybody know where Dominguez was at that time,

25   September 13th?

Atkinson Baker, a Veritext Company
www.depo.com

1   threat to life or any of the searching detectives.

2       Q.   Did you or anyone else find any kind of weapons in

3   the house?

4       A.   I remember seeing -- they might have been air soft

5   guns.  There was some kind of rifles in an upstairs bedroom

6   near a window.  I didn't confirm if they were -- what they

7   were.  I remember during the search someone saying "There's

8   guns in here," but I never -- I don't know what they ended up

9   being.

10      Q.   Any handguns?

11      A.   Ammunition.

12      Q.   Yes.  What did you find there?

13      A.   So I didn't find it but I was informed during the

14  search of the Malibu there was .357 handgun ammunition inside

15  the vehicle.

16      Q.   Okay.  So it was the ammunition, not the gun?

17      A.   Correct.

18      Q.   The ammunition?  Okay.  So did you participate in

19  the interrogation of any of the suspects taken into custody

20  on the 13th?

21      A.   No.

22      Q.   So you were participating in clearing the house of

23  threats and you were informed that one officer saw Jacob

24  Dominguez drive by?

25      A.   Yes.

Atkinson Baker, a Veritext Company
www.depo.com

1       Q.   Okay.  So you were informed of the history of prior

2   arrests and convictions of Mr. Dominguez; is that right?

3       A.   Yes.

4       Q.   Do you recall the specific charges, and I wouldn't

5   hold you to it, believe me, if you don't, but do you remember

6   any of the specific charges that they said he was charged or

7   convicted of?

8       A.   Yes.  He was -- and this -- I'm going to tell you

9   what I remember, and I don't know if it was a conviction or a

10  charge, but there was mention of armed robbery with a gun, a

11  carjacking, which I believe was dismissed, resisting arrest,

12  under the influence of a controlled substance, possession of

13  a firearm, possession of illegal weapons, a gang enhancement

14  charge, a 186.22.  I don't recall -- oh, possession of stolen

15  property, I believe.  There was a theft charge.

16      Q.   Okay.  Not bad.  So the armed robbery with a gun

17  was -- do you know if that was the Arco case?

18      A.   I don't know if there was an additional one prior

19  to that.  I can't say for sure.

20      Q.   Did anybody in the briefing ask?

21      A.   I don't recall.

22      Q.   So part of the briefing dealt with safety concerns

23  of officers and pedestrians and even the suspect, right?

24      A.   Yes.

25      Q.   And what were the -- what do you recall the safety

1    Q.   Okay.  So you were informed of the history of prior

2    arrests and convictions of Mr. Dominguez; is that right?

3    A.   Yes.

4    Q.   Do you recall the specific charges, and I wouldn't

5    hold you to it, believe me, if you don't, but do you remember

6    any of the specific charges that they said he was charged or

7    convicted of?

8    A.   Yes.  He was -- and this -- I'm going to tell you

9    what I remember, and I don't know if it was a conviction or a

10   charge, but there was mention of armed robbery with a gun, a

11   carjacking, which I believe was dismissed, resisting arrest,

12   under the influence of a controlled substance, possession of

13   a firearm, possession of illegal weapons, a gang enhancement

14   charge, a 186.22.  I don't recall -- oh, possession of stolen

15   property, I believe.  There was a theft charge.

16   Q.   Okay.  Not bad.  So the armed robbery with a gun

17   was -- do you know if that was the Arco case?

18   A.   I don't know if there was an additional one prior

19   to that.  I can't say for sure.

20   Q.   Did anybody in the briefing ask?

21   A.   I don't recall.

22   Q.   So part of the briefing dealt with safety concerns

23   of officers and pedestrians and even the suspect, right?

24   A.   Yes.

25   Q.   And what were the -- what do you recall the safety

Atkinson Baker, a Veritext Company
www.depo.com

1    concerns to be at the briefing?

2       A.   For Dominguez?

3       Q.   Yes.

4       A.   That he was an active San Jose Grande Norteno gang

5    member, that he was armed with a silver revolver, that he was

6    aware that he's wanted, that his girl friend, Sheila Franco,

7    was present during the arrest of Anchondo and Ruiz and she

8    may have relayed to him or he may have saw CRU cars and CRU

9    personnel and was familiar with our tactics.  I knew stuff

10   beyond what was listed on the safety concerns about him.

11       Q.   So was one of the most significant factors in terms

12   of the safety concerns was the fact that he was -- he may be

13   armed with a silver revolver?

14       A.   One more time.  Was that the -- did you say that

15   was the most significant?

16       Q.   Do you think that was of the highest significant in

17   terms of safety, that he might be armed with a silver

18   revolver?

19       A.   Yeah, that's obviously very high on the threat

20   assessment.

21       Q.   Okay.  And the origin of that information was what,

22   if you recall?

23       A.   It was relayed by Officer Szemeredi.  I want to say

24   one of two people, I can't say for sure.  It was either

25   through the interview of Sheila Franco or the confidential

Atkinson Baker, a Veritext Company
www.depo.com

1   informant that had it.

2       Q.   What was given to you by the confidential

3   informant?  What information was given?

4       A.   About Dominguez?

5       Q.   Yes, about Dominguez and the gun.

6       A.   That he was armed with a silver revolver.

7       Q.   And was that, in your mind, reliable and

8   trustworthy information?

9       A.   In my mind, yes.

10      Q.   Why?

11      A.   From information that was being provided from

12  Officer Szemeredi, a lot of that confidential informant-type

13  information was turning out to be reliable.

14      Q.   Okay.  And the information from Sheila Franco, did

15  you consider that reliable?

16      A.   So I don't know if she said it or the informant

17  said it.  I know it was mentioned.  I don't know where he got

18  that information.

19      Q.   Do you know if the interview of Sheila Franco

20  indicated that she was saying Dominguez had possession of a

21  gun?

22      MS. CLOUSE:  Objection, assumes facts.

23      MR. CROWLEY:  I'm just asking if he knows, if he was

24  informed that.

25      THE WITNESS:  I probably would have knew three years

Atkinson Baker, a Veritext Company
www.depo.com

1    ago.  I don't recall.

2    BY MR. CROWLEY:

3        Q.   Okay.  So after the briefing, what's the next

4    significant thing you remember happened?

5        A.   Going out to look for him.

6        Q.   And did you find him?

7        A.   Yes.

8        Q.   What led up to finding him?

9        A.   Officer Szemeredi sent us out to known hangout

10   locations, to known association residences, and we located

11   Sheila Franco at a business center near Alum Rock and

12   Capitol.

13       Q.   And what did you do there?

14       A.   Officers maintained surveillance of Sheila.  I

15   don't know what the period of time was, but a short time or

16   maybe a couple hours, Dominguez ended up arriving to Sheila.

17       Q.   Okay.  Did you witness that?

18       A.   I didn't, no.

19       Q.   So did you have information of what kind of vehicle

20   Mr. Dominguez was occupying?

21       A.   Not until he showed up to Sheila's house.

22       Q.   What was the kind of vehicle?

23       A.   It was a black Kia Sportage.

24       Q.   Did anybody witness any exchanges between Sheila

25   Franco and Dominguez, exchange of material, bags, guns,

Atkinson Baker, a Veritext Company
www.depo.com

1     A.   It was a fixed wing aircraft.

2     Q.   And you eventually picked him up?

3     A.   Eventually, yes.

4     Q.   And you got information to where he was located?

5     A.   Helped with providing information for us from the

6  sky.

7     Q.   And the CRU unit was still active and ready to see

8  if they can make a containment and arrest?

9     A.   Correct.

10    Q.   So after you got the information from the fixed

11 wing air support, what did you do?

12    A.   We continued following at a distance, at a close

13 distance but out of his view.

14    Q.   And was there a plan exchanged between the

15 officers?

16    A.   The plan was to arrest Dominguez at the -- whenever

17 an opportunity presented itself.

18    Q.   So was, at some point, a Vehicle Containment

19 Technique instituted?

20    A.   Yes, sir.

21    Q.   And who called for it?

22    A.   I'm the one who started setting the VCT up over the

23 radio.

24    Q.   What led you to believe that would be the

25 appropriate procedure for containment?

Atkinson Baker, a Veritext Company
www.depo.com

1     A.   It's one of the retention techniques we're all

2   trained to do and are very familiar with and it's an option,

3   and when the air support relayed it was a good spot, he was

4   stopped, and he finally stopped at a stoplight for the first

5   time all day, we executed our tactic at that location.

6     Q.   So the team that executed the Vehicle Containment

7   Tactic was you, Officer Ferguson and Officer Lopez; is that

8   right?

9     A.   Yes, sir.

10     Q.   Who was Officer Franseca?

11     A.   Fonseco?

12     Q.   Yeah.

13     A.   He was a CRU officer at the time.

14     Q.   Was he also part of the Vehicle Containment

15   Technique?

16     A.   Not one of the first three cars.  He arrived

17   shortly after.

18     Q.   Okay.  And each of your vehicles was unmarked,

19   correct?

20     A.   Yes, sir.

21     Q.   And so you got information that the suspect was

22   parked at Penitencia Creek, and what was the cross street?

23     A.   North White Road.

24     Q.   And that he was stopped at the intersection?

25     A.   Yes, sir.

Atkinson Baker, a Veritext Company
www.depo.com

1      Q.   And that was a good opportunity to institute the

2  Vehicle Containment Technique?

3      A.   Yes, sir.

4      Q.   And were you the first one there?

5      A.   I was, yes.

6      Q.   And tell us where you parked your vehicle.

7      A.   Directly in front of Dominguez's vehicle.

8      Q.   Okay.

9      A.   Perpendicular.

10     Q.   And the other vehicles, the vehicles driven by

11  Officer Lopez and Ferguson, did they also engage in the

12  technique?

13     A.   Yes.

14     Q.   And where did Officer Ferguson's car come to rest?

15     A.   Near the driver's side door of Dominguez's vehicle.

16     Q.   So you were driving a Toyota 4Runner?

17     A.   Yes, a silver one.

18     Q.   And Dominguez was driving a Chevy of some sort?

19     A.   Dominguez?

20     Q.   Excuse me.

21     A.   Ferguson?

22     Q.   Maybe I need to take a break.   Officer Ferguson was

23  driving a dark Chevy?

24     A.   I want to say it was a Buick.

25     Q.   But it was a sedan?

Atkinson Baker, a Veritext Company
www.depo.com

1      A.   It was a dark gray sedan, yes.

2      Q.   And Officer Lopez was driving an SUV?

3      A.   I believe it was a black 4Runner as well.

4      Q.   Okay.  And Dominguez's vehicle was a Kia?

5      A.   Kia Sportage, yeah.

6      Q.   So Ferguson caused his vehicle to come to rest on

7   the driver's side portion of the Kia?

8      A.   Yes.

9      Q.   And Officer Lopez came up to the rear and blocked

10   the rear of the vehicle?

11      A.   Yes, sir.

12      Q.   Okay.  So at that time, were there any sirens or

13   emergency lights being displayed by the officers' vehicles?

14      A.   Yes.

15      Q.   Tell me whose and what.

16      A.   Well, I saw Officer Lopez's.  I know he did a siren

17   blare long enough and loud enough to hear it and left his

18   visor with his lights down, so the red and blue lights were

19   flashing during the encounter.  And then I can't say for

20   certain who but I was hearing oncoming, arriving CRU officers

21   with their lights and sirens.  I can't say whose; I'm not

22   sure.

23      Q.   Are you done?

24      A.   Yes.

25      Q.   Was this before you got out of the vehicle?

1    understand that.

2         Q.    So before you exited your vehicle, Ferguson or

3    Lopez exited their vehicle, was it clear that Dominguez

4    wasn't going to try to jockey around and get out of the

5    containment?

6         A.    It wasn't clear for me.

7         Q.    Why not?

8         A.    Well, I didn't hang out in the car, I got out

9    immediately and started running.

10        Q.    Did you get out before Lopez stopped his car?

11        A.    I don't know.

12        Q.    So would you have gotten out of the car if there

13   was a threat that Dominguez was going to start backing his

14   car around?

15        A.    Yeah, I would have still got out.

16        Q.    So what I'm trying to get to is whether or not in

17   your mind you can articulate facts that lead a reasonable

18   officer to believe that Dominguez had an intent to escape

19   with his vehicle.

20        MS. CLOUSE:   Objection, vague and lacks foundation.

21        THE WITNESS:   I don't know what his intent was.   He

22   wasn't listening.

23   BY MR. CROWLEY:

24        Q.    Okay.   But based on the results, based on what the

25   activity of the vehicle was, did you draw a conclusion that

Atkinson Baker, a Veritext Company
www.depo.com

1    it was -- he was trying to get away or banged the car back

2    and forth and escape or anything like that?

3        A.   I mean I was aware that he tried to reverse out of

4    it but I don't remember when I recall that.

5        Q.   Okay.

6        A.   So it's hard for me to answer at that time.

7        Q.   All right.  So did you hear Lopez's vehicle come

8    into collision with the rear portion of Dominguez's vehicle?

9        A.   I'm sure I did.  I don't know if it was a loud

10   collision or not.  I don't recall.

11       Q.   So it was still evident in your mind that Dominguez

12   might take his car and start trying to escape?

13       MS. CLOUSE:  Objection, vague.

14       THE WITNESS:  I don't recall at that moment what I was

15   perceiving as far as him driving out of the VCT.

16   BY MR. CROWLEY:

17       Q.   Was there any damage to the passenger side portion

18   of your silver Toyota 4Runner?

19       A.   I believe there was.

20       Q.   What kind of damage?

21       A.   I didn't get a chance to see.  I remember there was

22   contact with it.

23       Q.   Well, was the contact from you coming up and

24   scraping the front of his car or contact from his car trying

25   to drive into your car?

1      A.   I don't know.  I never saw that car after that.

2      Q.   Well, how do you know there was damage to it, the

3  passenger side?

4      A.   How do I know there was passenger side?  When I

5  pulled back and could see he was in the car, it was on the

6  car.  I don't know how bad the damage was.

7      Q.   Okay.  So upon your car coming to rest, you put it

8  in park and engaged the foot brake or whatever it is, the

9  safety brake, or do you remember?

10     A.   I don't remember if I did or not.

11     Q.   So you exited the vehicle with your carbine rifle?

12     A.   Yes.

13     Q.   And when did you take the safety off?

14     A.   When I made a decision to shoot.

15     Q.   Okay.  So the safety was on as you exited the

16  vehicle?

17     A.   Safety on the hand rifle, is that what you were

18  asking?

19     Q.   Right.

20     A.   Yeah, I did leave it on.

21     Q.   So you exited the vehicle, and where did you

22  position yourself?

23     A.   So I ran from my driver's seat to the rear of my

24  car towards Officer Ferguson.

25     Q.   And at that time, could you -- were you yelling

Atkinson Baker, a Veritext Company
www.depo.com

1  commands at -- so from the time you got out of your

2  vehicle -- or strike that. Did you yell any commands when

3  you were in the vehicle?

4      A.   When I was in the vehicle?

5      Q.   Right.

6      A.   No.

7      Q.   So I mean I can imagine you can roll down the

8  windows and find a bullhorn and yell at him, but that never

9  happened?

10      A.   No.  That would be unreasonable to do that.

11      Q.   So you got out of your vehicle.  When you got out

12  of the vehicle, before you took, say, three or four steps,

13  were you yelling commands at the driver, the suspect?

14      A.   Once I started running from the rear towards

15  Officer Ferguson, I was yelling "Police, hands up."

16      Q.   So you exited your vehicle, carbine rifle over your

17  shoulder or strapped --

18      A.   It's attached to my vest.  It attaches straight to

19  the vest.

20      Q.   And you went to the rear driver portion of your

21  vehicle, and at the -- by the time you got to the rear of the

22  vehicle, you started yelling commands?

23      A.   No, the other side.

24      Q.   Towards the passenger side?

25      A.   Passenger side rear, yeah.

Atkinson Baker, a Veritext Company
www.depo.com

1   verbally could say to you?

2       A.   Not that I am aware of.

3       Q.   So it was sufficient non-ambient noise, if you

4   will, you could hear what he's saying, he could hear what

5   you're saying, as far as you know?

6       A.   I definitely was able to hear what he told me.

7       Q.   Okay.  So I kind of want to go through what you

8   recall to be the verbal commands that you made, what you

9   heard other officers say and what you heard the suspect say

10  back, okay?

11      A.   Okay.

12      Q.   And we're talking about in terms of time, what, 20

13  seconds, 30 seconds?

14      A.   Probably.

15      Q.   Okay.  So what was your first command that you

16  remember directing the verbal command to the suspect?

17      A.   "Police, hands up."

18      Q.   And at that point, did you hear any other officer

19  issue a verbal command?

20      A.   I was hearing commands.  I can't tell you what they

21  said, though.

22      Q.   And this was not -- you used a loud voice?

23      A.   Yes.

24      Q.   How would you characterize it?  Screamed it?

25      A.   I mean a loud, assertive, authoritative type

Atkinson Baker, a Veritext Company
www.depo.com

1    command.

2        Q.    Okay.   Did he give you a verbal response to your

3    initial command?

4        A.    Not initially.

5        Q.    Did he give you any other -- a physical response?

6        A.    He just kind of stared at me.

7        Q.    Where were his hands at this point?

8        A.    They were down, out of sight.

9        Q.    You couldn't tell if they were on the wheel or next

10   to his side or --

11       A.    I didn't see his hands.

12       Q.    Okay.   And his upper arm was -- could you see his

13   upper arm?

14       A.    Not at that time.   I couldn't see either.

15       Q.    When he looked at you, did he look -- did he

16   display a look of confusion?

17       A.    Absolutely not.

18       Q.    How would you describe what kind of look he was

19   giving you?

20       A.    The look like he's not listening to what I'm

21   telling him type look, like a "screw you" type look.

22       Q.    And what does that look -- how was that look

23   displayed?

24       A.    Just very nonchalant.   He's looking at me like

25   you're obviously just disregarding my order.

Atkinson Baker, a Veritext Company
www.depo.com

1   high.

2       Q.   Yeah.  So you're focused on a hundred percent of

3   what's going on in that cabin of the suspect's vehicle.

4       A.   Yes.

5       Q.   And even though as you're moving, are you sensing

6   where Ferguson's car is but you're still focused on the

7   suspect?

8       A.   Yes.

9       Q.   You didn't take your eyes off him once?

10      A.   Me?

11      Q.   Right.

12      A.   I don't know if I took my eyes off him once.  I

13  can't say for sure.

14      Q.   Okay.  So you positioned yourself.  Did you lay on

15  the front of Ferguson's driver's side portion of his vehicle?

16      A.   Lay on it?

17      Q.   Well --

18      A.   I'm just trying to understand.

19      Q.   Did you squat down?  Tell us how you positioned

20  yourself.

21      A.   I stood next to it, next to the -- I want to say

22  like the front tire wheel and was giving him additional

23  commands.

24      Q.   Were you in a standing position or squatting

25  position?

Atkinson Baker, a Veritext Company
www.depo.com

1      Q.   Before you issued the verbal command, do you recall

2   any of the other officers issuing verbal commands?

3      A.   I was hearing Ferguson, I believe I was hearing

4   Lopez, too.  I don't know what they said, though.

5      Q.   Okay.  What's the next command that you recall

6   issuing to the suspect?

7      A.   Well, I remember him giving me that look I just

8   explained, the defiant look, so I said something to the

9   effect of "I'll fucking shoot you.  Get your fucking hands

10  up."  More authoritative commands to try to overwhelm his

11  fight or flight and get him to put his hands up.

12     Q.   Did you have a taser weapon on your person at this

13  time?

14     A.   I don't remember what my setup was.

15     Q.   Did you have, of course I'm learning this, a flash

16  bang grenade or canister?

17     A.   Yeah, I should have.  I should have had one.

18     Q.   Okay.  So you issued a second command in response

19  to his look of defiance saying "I'll fucking shoot you," or

20  something to that effect.  Do you remember the words you

21  used?

22     MS. CLOUSE:  Objection, misstates the testimony.

23     MR. CROWLEY:  What?

24     MS. CLOUSE:  Misstates the testimony.

25     MR. CROWLEY:  That's why I want to get it straight.

Atkinson Baker, a Veritext Company
www.depo.com

```
 1   BY MR. CROWLEY:
 2        Q.   So do you want to go back to what the court
 3   reporter --
 4        A.   Sure.
 5        MR. CROWLEY:  So Madam Court Reporter, can you refresh
 6   our recollection of what the witness said?
 7             (Record read.)
 8   BY MR. CROWLEY:
 9        Q.   So your second command -- the second command is
10   "I'll fucking shoot you.  Get your fucking hands up," right?
11        A.   Yes.
12        Q.   And did you get any evidence indicating that he
13   heard what you said?
14        A.   Yeah, he heard me.
15        Q.   How do you know?
16        A.   At some point, he put his hands up.
17        Q.   Okay.  So he complied with the command?
18        A.   Eventually, yes.
19        Q.   And when you say "eventually" --
20        A.   Well, sorry.
21        Q.   So we'll just go step by step.  I mean I know he
22   put his hands down, or whatever, but at this point, your
23   second command, he complied, he put his hands up?
24        A.   Yes.
25        Q.   Both hands?
```

Atkinson Baker, a Veritext Company
www.depo.com

1        A.    Yes.

2        Q.    And you could see it from your perspective?

3        A.    Yes.

4        Q.    How high did he put his hands?

5        A.    Probably like head height.  A little over the

6   shoulders.

7        Q.    So it looks like your thumbs are equal to your

8   ears.

9        A.    Yeah, your hands over your shoulder.  At least

10   that's how I perceived how high it was.

11        MS. CLOUSE:  I'd just like to note for the record that

12   the motion that Sergeant Pina just made from my perspective,

13   he had his thumbs just about shoulder height.

14   BY MR. CROWLEY:

15        Q.    So it's about shoulder height, like this?

16        A.    Give or take a couple inches.

17        Q.    So how was the seat?  Was the sheet straight up or

18   was the seat leaned back, if you know, or do you remember?

19        A.    I don't know how his seat was because I don't know

20   if he was leaning back in the seat.  I don't know.  He could

21   have just been sitting up, but he was kind of slightly leaned

22   but it wasn't like all the way back.

23        Q.    It wasn't like way back?

24        A.    Well, when I was giving him commands, he wasn't

25   that far back.

Atkinson Baker, a Veritext Company
www.depo.com

```
 1        THE REPORTER:  I need to change my paper.
 2        MR. CROWLEY:  Okay.
 3             (Recess.)
 4   BY MR. CROWLEY:
 5        Q.   I think we left at the degree of the suspect, how
 6   he was sitting up or lying down.  Have we covered that fully?
 7   Is your best estimate somewhere between vertical and --
 8        A.   Closer to vertical but not like 90.
 9        Q.   Okay.  So the -- I'll just number these, the verbal
10   commands, rather than repeating it.  So the response to the
11   second verbal command you administered, did you get a
12   response from that?
13        MS. CLOUSE:  Objection, asked and answered.  Go ahead.
14        THE WITNESS:  He put his hands up.
15   BY MR. CROWLEY:
16        Q.   Okay.  Did he say anything to you at that point?
17        A.   I think I gave him more commands and then he said
18   something back to me.
19        Q.   What other commands did you give him?
20        A.   Something to the effect of "Don't move or you're
21   going to get shot," or "Move and you're going to get shot."
22   I was giving him the command to verify that if he brought his
23   hands down, I would shoot.
24        Q.   So we can call this the third command?
25        A.   Yes.
```

Atkinson Baker, a Veritext Company
www.depo.com

1   like Officer Ferguson at one point said "Let me see your

2   hands, mother fucker," but I don't know where in the

3   sequence, where he said that, so when I was giving -- he

4   could have been saying that as he was just coming out.  I'm

5   not certain when that was said.

6       Q.   So do you have a recollection as to how much time

7   the suspect complied with your request, how many seconds did

8   he comply with your request?

9       A.   It was a few seconds.

10      Q.   Is that three, five, six, best estimate?

11      A.   Between there.

12      Q.   So when he held his hands up, you could see there

13  was nothing in his hands?

14      A.   Yes.

15      Q.   No weapon?

16      A.   No weapon.

17      Q.   His hands were bare, they weren't gloved?

18      A.   I don't remember him having gloves on.

19      Q.   Okay.  That's something you'd probably remember,

20  right?

21      A.   Probably.

22      Q.   Did he have long sleeves or short sleeves?

23      A.   I believe it was a sweatshirt.

24      Q.   Sweatshirt.  Okay.  Do you have any reason to

25  believe he could have had a gun in -- you know, strapped to

Atkinson Baker, a Veritext Company
www.depo.com

```
1        A.   I don't know if his car was on or off.  I don't
2   know.
3        Q.   And what kind of a gear shift did it have, if you
4   know?  Was it on the floor console, kind of automatic, or --
5        A.   I don't know.
6        Q.   Or was it on the -- you know, what do they call it?
7   The steering wheel stem, you know?  One of those --
8        A.   Yeah, I know what you mean.  I never saw the inside
9   of the car after.  I don't know.
10       Q.   The vehicle wasn't moving at this point; is that
11  right?
12       A.   It was stationary.
13       Q.   So in response to your third commands to him, what
14  did the suspect do, if anything, do or say?
15       A.   He said one of two things.  Either he said "Fuck
16  you, shoot me, bitch," or "Fuck you, bitch, shoot me," one of
17  those two things.
18       Q.   And how did you interpret that reply from the
19  suspect?
20       A.   Defiance.
21       Q.   Defiance?  Was it a form of taunting?
22       MS. CLOUSE:  Objection, lacks foundation.
23       THE WITNESS:  I didn't find it as a form of taunting, I
24  looked at it more as him not necessarily following commands
25  to an extent.
```

Atkinson Baker, a Veritext Company
www.depo.com

1    BY MR. CROWLEY:

2         Q.   And when he said that, where were his hands?

3         A.   They were -- I believe they were still up.

4         Q.   And were you able to see his face when he gave you

5    that reply?  Did he look at you with his hands up and --

6         A.   Yeah, he was staring at me pretty much the whole

7    time.

8         Q.   And what kind of expression on his face did he

9    demonstrate when he said what he said to you in response to

10   your statement?

11        A.   What kind of expression?

12        Q.   Yes.

13        A.   Hostile kind of aggressive type statement.

14        Q.   Did he have his head straight up or was it leaned

15   over or can you describe for us?

16        A.   He was looking at me.

17        Q.   Okay.  And at this point, do you remember any of

18   the other officers saying anything?

19        A.   I don't know what they were saying.

20        Q.   And after he responded to you this third time, did

21   you again make a statement to him?

22        A.   I said something similar to "Don't give me a

23   reason," or "If you give me a reason," in regards to shooting

24   him if he doesn't keep his hands up.

25        Q.   Why did you say that to him?

1      A.   Because his hands were up and he was saying -- he

2   said "Fuck you, bitch.  Shoot me."  Essentially "Don't give

3   me reason to."

4      Q.   And did you have any belief or indication that he

5   didn't hear what you said to him when you said something

6   along the lines of "Don't give me a reason"?

7      A.   I don't know.  I believe he heard me.

8      Q.   Okay.  Did he respond to your of fourth statement?

9      A.   His response was dropping his hands out of sight.

10     Q.   Okay.  Now, did you hear anyone else in your unit

11  yell for a flash bang?

12     A.   I think I remember hearing it, yeah.

13     Q.   Who was it that said it?

14     A.   I don't know who said it.

15     Q.   So at that point, if you didn't say it and Lopez

16  didn't say it, would the only person be Ferguson who would

17  have said it?

18     MS. CLOUSE:  Objection, lacks foundation.  You can

19  answer if you can.

20     THE WITNESS:  By process of elimination, it could have

21  been Ferguson, or if you're saying Lopez didn't say it, then

22  whoever was arriving next, but I want to say it was Ferguson

23  because I remember hearing it.

24  BY MR. CROWLEY:

25     Q.   Okay.  So basically, I'm trying to eliminate if

Atkinson Baker, a Veritext Company
www.depo.com

1   senses.  But I don't know if that was his reason.

2       Q.   So when you saw the suspect put his hands down,

3   describe for us what you saw.

4       A.   So he quickly dropped his hands out of sight, low

5   enough for me to no longer see them in the direction towards

6   his seat or towards the floor of where he was sitting.

7       Q.   Okay.  So from where you could see, you could see

8   his hands, both hands, being dropped.  How far were they

9   dropped before they went out of your vision, your view?

10      A.   Well, they were up.  They were above his shoulders.

11      Q.   Okay.  So when he dropped them down, when he

12  dropped them down to his shoulders, you could still see them?

13      A.   Yes.

14      Q.   When he dropped them down further, could you still

15  see them?

16      A.   That's not how he dropped them.

17      Q.   Describe for us.

18      A.   He quickly dropped them and leaned down out of

19  sight, so his body started going forward as well.

20      Q.   So in one movement, he dropped his hands and his

21  upper body to the right?

22      A.   Towards like front right area, yes.

23      Q.   And did you have any reason to believe that he was

24  going for anything else other than a deadly weapon?

25      A.   No.  I had -- the only thing in my mind is he was

Atkinson Baker, a Veritext Company
www.depo.com

1    reaching for a firearm.

2        Q.   And at that point, what did you do?

3        A.   I gave him a few verbal commands to get his hands

4    back up while acquiring a sight for my rifle because I am now

5    perceiving imminent threat that he's going to produce a

6    handgun and shoot either me or Officer Ferguson standing next

7    to me.

8        Q.   So as he was involved in the dropping his hands and

9    lowering his upper body movement, you gave him another

10    command?

11        A.   I started urgently yelling for him to get his hands

12    back up.

13        Q.   Okay.  And how long, what time frame, what time

14    period lapsed from the time he started -- put his hands down

15    and bent forward until you pulled the trigger?

16        A.   Well, I know I said initially "Put your hands up,"

17    and I said "Hands up, hands up," and at that point, that's

18    probably three seconds.

19        Q.   Okay.  So within that period of about three seconds

20    went by before you pulled the trigger after he started

21    dropping his hands?

22        A.   After he dropped his hands.

23        Q.   And where was your carbine aimed?

24        A.   At him.

25        Q.   Whereabouts?

Atkinson Baker, a Veritext Company
www.depo.com

1      A.   I was trying to track where he was going and as he

2  was coming back up, so his only target area was shoulders up.

3      Q.   So you pulled the trigger when he started coming

4  back up?

5      A.   I remember finding my sight while he was leaning

6  forward, and as he was coming back looking at me, looking

7  kind of back movement is when I started firing.  I can't say

8  for sure exactly what he was doing as he was coming up

9  because I remember he's now -- I'm now looking at him solely

10  through the aim point of my rifle.

11      Q.   When did you release the safety?

12      A.   Just right before I shot.

13      Q.   And when you pulled the trigger, was he back up in

14  an erect position or partially erect?  Can you describe that

15  for us?

16      A.   After I shot him?

17      Q.   No, before.

18      A.   Before I pulled the trigger, he was -- he had

19  already been leaning low and then coming -- like I could just

20  turn my chair, so if you're me over there, he's now coming up

21  in this direction.

22      Q.   Okay.  So at that point, could you see where --

23  what his hands were doing?

24      A.   No.

25      Q.   Could you see if both hands had grasped anything,

1   or only one hand, or could you see anything at all?

2        A.   I could not see his hands at all.

3        Q.   And at that moment, was Officer Ferguson, did he

4   have his carbine focused on the suspect, too, as far as you

5   know?

6        A.   I know based on his body-worn camera.  I didn't

7   know at the time.

8        Q.   I'm talking at the time.

9        A.   Yeah.  I didn't know what he was doing at the time.

10       Q.   Before you pulled the trigger, was there a flash

11  bang grenade discharged?

12       A.   No, I think it was after.

13       Q.   And you shot at his head?

14       A.   I shot at the only target to stop the threat.

15       Q.   And that was his head?

16       A.   I was only aiming for a target to stop the threat,

17  I wasn't focusing on shooting at his head.  I was focusing on

18  taking a shot to stop the threat.

19       Q.   But where were you -- your focus is on taking a

20  shot to stop the threat.  What part of his anatomy were you

21  focused on?

22       A.   The portion I could see, so the shoulders and up.

23       Q.   So right when you pulled the trigger, who was in

24  imminent peril of great bodily harm or death, and they were

25  in peril of grave harm or death of what?

1      MS. CLOUSE:  Objection, vague.  You can answer as best

2  you can.

3      THE WITNESS:  I believe it was necessary to use force at

4  that time because I felt he was going to grab the silver

5  revolver and shoot me or Officer Ferguson.

6  BY MR. CROWLEY:

7      Q.   And you trusted your intel enough to believe that

8  it was accurate and reliable such that you used lethal force

9  on this individual for your belief of the imminent peril or

10  grave bodily harm that would have been directed to you or

11  Officer Ferguson?

12      MS. CLOUSE:  Objection, compound, misstates the

13  testimony.  You can answer if you understand the question.

14      THE WITNESS:  Could you ask it another way, or could you

15  repeat it?

16      MR. CROWLEY:  Madam Court Reporter will assist me in

17  doing that.

18          (Record read.)

19      MS. CLOUSE:  Same objection.  You can go ahead and

20  answer it if you can.

21      THE WITNESS:  Yes, he acted in such a way that would

22  make me believe that such was true.

23  BY MR. CROWLEY:

24      Q.   Based on his reply to you?

25      A.   Based on his movement to drop his hands as if

Atkinson Baker, a Veritext Company
www.depo.com

1  didn't see it.

2      Q.   Potentially three carbines?

3      MS. CLOUSE:  Objection, misstates the testimony.

4      THE WITNESS:  The only one that I saw was mine.

5  BY MR. CROWLEY:

6      Q.   And Officer Ferguson, did you see him in a position

7  where his carbine was directed towards the suspect?

8      A.   At a point in time, it was.  It appeared, based on

9  our commands for him to put his hands back up, that Officer

10 Ferguson had his rifle down at that time.

11     Q.   And just to kind of get an idea of Officer

12 Ferguson's placement, was his car door open and he was

13 between the A pillar and the top of the car door?

14     A.   Yes, sir.

15     Q.   Do you have a recollection of the time that elapsed

16 from the time that you exited your vehicle until you pulled

17 the trigger?

18     A.   Twenty, 25 seconds.

19     Q.   And how many times on your weapon did you pull the

20 trigger?  Do you have to pull the trigger each time the

21 cartridge discharged?

22     A.   Yes.  It's a semi-automatic so I pulled it two

23 times about a half second apart.

24     Q.   And at the time you pulled the trigger, your

25 testimony is his hands were down, they weren't up, there was

Atkinson Baker, a Veritext Company
www.depo.com

1  initially have their hands up or put them down and back up.

2  I wouldn't go as far as how you're describing as taunting or

3  they're purposely going up and down.

4      Q.   Was there anything like that that Dominguez was

5  engaged in, he put his hands up, put it down, put it up and

6  put it down, anything like that?

7      A.   No, sir.

8      MS. CLOUSE:  I object as vague.

9  BY MR. CROWLEY:

10      Q.   Was your body cam working at the time?

11      A.   Working, yes.

12      Q.   Did you have it engaged?

13      A.   I thought I did but it -- not until right after the

14  shooting.

15      Q.   Why did you think you did?

16      A.   I had it in what we call buffering mode, where it's

17  always recording, but it's not until you press it, so it was

18  on, it just wasn't recording.  So as I'm getting out of the

19  car, I thought I did but my shirt got stuck on it so I had no

20  idea it wasn't until I looked down and saw it was off.

21      Q.   So is that good video and audio?

22      A.   It goes back with video.

23      Q.   But was it recording audio?

24      A.   It doesn't go back audio, it only goes back 30

25  seconds video.

Atkinson Baker, a Veritext Company
www.depo.com

1      Q.   So did you review what it had recorded?

2      A.   Yes.

3      Q.   What did it show?

4      MS. CLOUSE:  Objection, vague and it calls for a

5 narrative.

6 BY MR. CROWLEY:

7      Q.   Well, what do you remember it showing?

8      MS. CLOUSE:  You can answer as best you can.

9      THE WITNESS:  I can see me pulling in front of his car

10 in the crosswalk, you could see the street light, you can see

11 me jumping out of the car and it gets caught on the shirt,

12 now the shirt's hanging there and I have my rifle up, and the

13 only thing I'm focused on now is leaning.

14 BY MR. CROWLEY:

15      Q.   Right.

16      A.   And it's apparently off that whole time until I

17 look down and see it's green and then I turned it on, and I

18 turned it on knowing it would go back 30 seconds hoping it

19 would capture what I saw.

20      Q.   Did it?

21      A.   Not really because of the shirt.

22      Q.   Would you agree that use of deadly force is, of

23 course, only to be used only as a last resort?

24      A.   Yes.

25      Q.   And in your mind, at the time when Mr. Dominguez

Atkinson Baker, a Veritext Company
www.depo.com

1                     REPORTER'S CERTIFICATE

2

3

4       I, THERESA KIELTY, CSR No. 5037, Certified Shorthand

5 Reporter, certify:

6       That the foregoing proceedings were taken before me at

7 the time and place therein set forth, at which time the

8 witness was put under oath by me;

9       That the testimony of the witness, the questions

10 propounded, and all objections and statements made at the

11 time of the examination were recorded stenographically by me

12 and were thereafter transcribed;

13       That the foregoing is a true and correct transcript of

14 my shorthand notes so taken.

15       I further certify that I am not a relative or employee

16 of any attorney of the parties, nor financially interested in

17 the action.

18       I declare under penalty of perjury under the laws of

19 California that the foregoing is true and correct.

20       Dated this 12th day of March, 2021.

21

22

23 _____

     THERESA KIELTY, CSR No. 5037

24

25

EXHIBIT 7

Atkinson-Baker, a Veritext Company
www.depo.com

1               UNITED STATES DISTRICT COURT

2            NORTHERN DISTRICT OF CALIFORNIA

3

4   JESSICA DOMINGUEZ, INDIVIDUALLY  )   **CERTIFIED COPY**
    AND JESSICA DOMINGUEZ AS         )
5   GUARDIAN AD LITEM FOR JAD (1),   )
    JAD (2) AND JAD (3),             )
6                                    )
                    Plaintiffs,      )
7                                    )   Case No.:
          vs.                        )   5:18-CV-O4826
8                                    )
    CITY OF SAN JOSE, SAN JOSE POLICE )
9   DEPARTMENT, MICHAEL PINA, AND    )
    DOE POLICE OFFICERS 2 through 5, )
10                                   )
                    Defendants.      )
11  _____)

12

13

14

15               DEPOSITION OF

16            OFFICER ALVARO LOPEZ

17            SAN JOSE, CALIFORNIA

18               MARCH 1, 2021

19

20

21

22  ATKINSON-BAKER, a Veritext Company
    (800) 288-3376
23  www.depo.com

24  REPORTED BY:   THERESA KIELTY, CSR NO. 5037

25  FILE NO.:      AE088F4

Atkinson-Baker, a Veritext Company
www.depo.com

1  found, possible relatives, friends, associates, criminal

2  history.  I think I mentioned that already.  And any wants,

3  whatever he's wanted for.

4       Q.   Did you have any criticisms about the way the

5  briefing was held, the information you were given or anything

6  like that?

7       A.   No.

8       Q.   In the briefing, was there a mention of a person by

9  the name of Andrew Anchondo?

10      A.   Yes.

11      Q.   What do you remember about that?

12      A.   He was one of the suspects wanted for an armed

13  robbery that we in-viewed during surveillance.

14      Q.   Was that the Arco station?

15      A.   I'm not sure it's Arco but it's at Eastridge,

16  Capitol and Quimby.

17      Q.   We'll get to that.  Did you have any dealings with

18  this individual, Andrew Anchondo, before the briefing?

19      A.   Yes.

20      Q.   Could you tell us a little bit about that?

21      A.   So we were asked to assist another unit, which is

22  RATTF.  They mainly focus on recovering and surveillance of

23  stolen vehicles, and they asked for our assistance, being the

24  Covert Response Unit.  When we arrived at that gas station on

25  Quimby and Capitol Expressway, we took over surveillance of a

Atkinson-Baker, a Veritext Company
www.depo.com

1    vehicle that was occupied by Anchondo, Dominguez and a

2    female, I believe Ruiz, and during that surveillance, we

3    in-viewed Anchondo commit an armed robbery there at the gas

4    station.

5        Q.   That was kind of the sum of the subject matter you

6    guys were discussing at the briefing?

7        A.   Yes.

8        Q.   And you were involved in that incident as an

9    officer, right?

10       A.   Yes.

11       Q.   So before that incident, had you had any contact

12   with Anchondo?

13       A.   No.

14       Q.   Is he suspected of being part of a gang?

15       A.   Yes.

16       Q.   What gang is that?

17       A.   I believe San Jose Grande.

18       Q.   And how about Patricia Ruiz, had you been -- let me

19   ask you this.  Was Patricia Ruiz participating in that armed

20   robbery you described?

21       A.   I believe she was in the vehicle during the

22   robbery.

23       Q.   Okay.  So she was one of the people involved

24   directly or indirectly?

25       A.   Yes.

Atkinson-Baker, a Veritext Company
www.depo.com

1      THE WITNESS:  I don't know.

2  BY MR. CROWLEY:

3      Q.   There was another crime he was said to have been

4  charged with, it's a carjacking, but it was dismissed.  Do

5  you know anything about that incident?

6      A.   I don't know.  I don't remember any details.

7      Q.   How about Penal Code Section 12020, Felony

8  Possession of a Firearm.  Do you remember any information

9  about that?

10      A.   No, not right now.

11      Q.   You don't remember any of the charges that were

12  listed?

13      A.   No, not right now.

14      Q.   What was your -- after listening to the criminal

15  history, what was your take away from that?  What kind of

16  image did you have of Mr. Dominguez?

17      A.   That he's a pretty violent person.  He's done some

18  time in prison and he's a gang member.  Based on my training

19  and experience, gang members are often armed to attack or

20  defend themselves from other gangs and from the police.

21      Q.   And he was part of that San Jose Grande?

22      A.   Yes.

23      Q.   And did you ever investigate that gang?

24      A.   Not specifically.

25      Q.   When was the last reliable information that

1      Q.   And is it fair to say that you had never

2  encountered Mr. Dominguez in gang activities?

3      A.   Yes.

4      Q.   And during the -- strike that.  So you had the Arco

5  incident where you kind of picked up the surveillance after

6  the crime was committed and tried to follow them, right?

7      A.   Correct.

8      Q.   But you lost them?

9      A.   No.

10      Q.   Okay.  Tell me how I'm wrong.

11      A.   We continued surveillance until they arrived in the

12  area of San Jose City College.  They abandoned the car that

13  they left -- that they did the robbery in and got into

14  another vehicle, I believe it was also stolen, I don't

15  remember the make and model of that car.  We continued

16  surveillance of that vehicle waiting for an opportunity -- a

17  safe opportunity to take them into custody, and they

18  continued driving to Almaden Valley near the area of the

19  Costco, and there they drove that vehicle that they were in

20  into a church parking lot where they abandoned that vehicle,

21  and then the three of them ran across the street northbound

22  across Blossom Hill Road into a residence.  Once in that

23  residence, we were starting to plan to surround the house and

24  secure a perimeter around the house to take them into custody

25  and -- well, while that plan is getting worked out and

Atkinson-Baker, a Veritext Company
www.depo.com

1   resources are getting called in, a female, I don't remember

2   her name -- it's Dominguez's girl friend.  I'm forgetting her

3   name.

4       Q.   Hang on.  Sheila Franco?

5       A.   Sheila Franco arrives, stops in front of that

6   residence.  The three of them exit the residence and we

7   conduct surveillance on Sheila Franco's vehicle.  They drive

8   to the east side of San Jose, to the area of White Road and

9   Aborn, they were in the southwest corner of the intersection,

10  they went to the parking lot, and the three of them exit,

11  Sheila stays in the vehicle, she drives in a different

12  direction.

13          I believe they enter a Kia, it's a small box

14  vehicle, and we continue surveillance of them in the vehicle.

15  They're driving in the area of Jackson Avenue towards

16  Regional Medical Center, and I believe we set up an arrest

17  team as they turned westbound on I believe it's Alexander,

18  southern street just south of Regional Medical Center that

19  runs east and west, and the arrest doesn't happen there.  We

20  had information that there was a motorcycle that was

21  associated with them that we're calling like a tail gunner,

22  and that was ready to shoot out with police if police tried

23  to apprehend them.

24          I don't know if it was a coincidence or it was in

25  fact true that that happened but there was -- right as the

Atkinson-Baker, a Veritext Company
www.depo.com

1      A.   Correct.

2      Q.   About what time was that?

3      A.   It was late at night.  I don't remember the exact

4   time.

5      Q.   Do you remember what day it was?

6      A.   It was the 12th.

7      Q.   Okay.  So that was the 12th.  Now, when you say

8   "the next day," was that also like the 12th or was it the

9   13th, the next day?

10      A.   The 13th, the next day.

11      Q.   So what happened on the 13th?

12      A.   Now I don't remember if it was the 13th or the

13   14th, but we ended up in Morgan Hill, and this is before the

14   shooting, and we served a search warrant in Morgan Hill where

15   we identified Anchondo at the residence, and Ruiz and Sheila

16   were there.

17      Q.   Ruiz and Franco, Sheila Franco?

18      A.   Franco.

19      Q.   Okay.  So you obtained a search warrant on the

20   Morgan Hill residence, which was the Sheila Franco residence?

21      A.   I'm not sure if it was her residence but she was

22   there.

23      Q.   She was there, Ruiz was there and Anchondo was

24   there?

25      A.   Correct.

Atkinson-Baker, a Veritext Company
www.depo.com

1   entrance into the residence.

2        Q.   Okay.  So you detained Anchondo, Ruiz and Franco in

3   the residence?

4        A.   Outside.  We called them out.

5        Q.   Okay.  See, I didn't know that.

6        A.   We surround the residence and call everyone out of

7   the residence.

8        Q.   Like with a bullhorn, "Everyone come out with your

9   hands up," stuff like that?

10       A.   Yes.

11       Q.   Then you searched the residence?

12       A.   Correct.

13       Q.   What did you find, if anything, in terms of

14   weapons?

15       A.   There were a couple of replica -- I believe there

16   was one replica assault rifle and then at least -- I think at

17   least one more handgun that was also a replica.

18       Q.   What kind of a handgun was it?

19       A.   I don't remember.

20       Q.   Was it silver?

21       A.   I don't remember the color.

22       Q.   Any other handguns?

23       A.   There might have been.  I don't remember right now.

24       Q.   And did you interview any of those -- the arrestees

25   or suspects yourself?

Atkinson-Baker, a Veritext Company
www.depo.com

1    A.    I did not.

2    Q.    Were you present when they were interviewed?

3    A.    No.

4    Q.    And so Sheila Franco was detained and went to the

5  police department and was interviewed there?

6    A.    I'm not sure where she was interviewed.

7    Q.    But that's where the information came that Mr.

8  Dominguez had a handgun?

9    A.    Yes.  And we also -- we didn't believe we had found

10  the gun that was used during the robbery.

11    Q.    Because why?

12    A.    I don't remember if we had -- I don't remember the

13  specifics of the gun but it was relayed to us and we believed

14  that that gun had not been recovered yet.

15    Q.    Was that gun ever found?

16    A.    I don't think so.

17    Q.    It was never found in the Kia after the shooting;

18  is that right?

19    A.    Correct.

20    Q.    No gun was found in the vehicle?

21    A.    Correct.

22    Q.    So after the completion of the arrest of the

23  suspects, what happened next?

24    A.    While we were outside after the search warrant

25  waiting for detectives to arrive, we saw Dominguez drive by

Atkinson-Baker, a Veritext Company
www.depo.com

1    with another male in the Kia.  Drove in front of the

2    residence, saw a couple of the officers standing outside and

3    drove off.  We attempted to conduct surveillance on him and

4    we didn't locate him.

5         Q.   Did you see -- strike that.  Were you able to

6    identify Dominguez specifically as an occupant of that Kia?

7         A.   Not me specifically.

8         Q.   Okay.  Who did?

9         A.   Another CRU officer that was outside.  I don't

10   remember who.

11        Q.   And were you able to identify the other male

12   occupant of the vehicle?

13        A.   I'm not sure if he was identified.

14        Q.   But at that time, there was two male occupants in

15   the front passenger and driver seat?

16        A.   Yes.

17        Q.   But you didn't see it?

18        A.   I didn't see it.

19        Q.   Did anybody else -- how many officers saw it?

20        A.   I don't know how many.  At least one.

21        Q.   Okay.  And do you know who that was?

22        A.   I don't remember who it was.

23        Q.   And then you attempted surveillance and it was

24   ineffective?

25        A.   Correct.

1    this was going on?

2         A.    In the surrounding area.

3         Q.    So nobody saw Dominguez?

4         A.    No.

5         Q.    So the Kia's gone, and what do you guys do?

6         A.    We start looking in certain addresses that we have

7    listed for him of associates and family members, and

8    eventually, someone else locates the vehicle.

9         Q.    Who is this someone else?

10        A.    Another CRU officer.

11        Q.    Okay.  And you re-engage the surveillance?

12        A.    Correct.

13        Q.    Which actually does it turn out to be a pursuit?

14        A.    No.

15        Q.    So tell me about the next stage of the

16   surveillance.

17        A.    So we conduct surveillance.  He's driving on

18   Capitol Expressway, he's doing some evasive driving, erratic

19   driving, he's making random U-turns, going in circles,

20   driving through neighborhoods, kind of doing some counter-

21   surveillance, what we believe was counter-surveillance, and

22   just random driving, just makes no sense.

23        Q.    Right.  So I want to ask a couple questions about

24   that.  It seemed a little erratic and not only dangerous but

25   unpredictable.  Did you have any reason to believe that he,

1    Dominguez, was aware he was being surveilled?

2         A.   Yes.

3         Q.   What, if anything, independent of the erratic

4    driving and the things you described?

5         A.   Well, just the day before, when we arrested

6    Anchondo in Morgan Hill, he knew that.  He obviously knew

7    police are looking for him.

8         Q.   Because he drove by?

9         A.   Because he drove by and he saw police just

10   arresting his co-defendant and his girl friend and Ruiz, who

11   were there during the robbery.

12        Q.   Okay.

13        A.   So we have every reason to believe that he's

14   being -- he's driving that erratic to avoid being arrested.

15        Q.   Fair enough.  And the decision was made to kind of

16   back off so he doesn't endanger somebody else or himself by

17   his erratic driving, something like that?

18        A.   Yeah.  I don't remember that decision being made.

19        Q.   Okay.  So did you continue to follow him?

20        A.   We continued to follow as best as we could just

21   having that in mind, just citizens in the street and the way

22   he's been driving, and at some point, we lost him again.

23        Q.   Okay.

24        A.   And then the CRU officers found him again.  After

25   that, we lost him like two or three times during that day of

Atkinson-Baker, a Veritext Company
www.depo.com

1      A.   Piedmont.

2      Q.   Okay, Piedmont.  So it's a T intersection?

3      A.   Correct.

4      Q.   He couldn't go straight so he was in the right kind

5  of a -- the right turn section?

6      A.   You could go straight.  He could go straight.

7      Q.   Oh, so it was -- it wasn't a T intersection?

8      A.   No, sorry, it's a four way intersection.

9      Q.   Okay.  My fault.  I'm sorry.  So he could go

10  straight but he looked like he was going to go right and that

11  was a perfect placement of the vehicle that you guys could

12  execute the Vehicle Containment Procedure?

13      A.   No.  He was stopped to go straight, continue

14  eastbound.

15      Q.   Okay.

16      A.   Correct.

17      Q.   So he was going to go through the intersection, so

18  far as you know?

19      A.   Yes.

20      Q.   All right.

21      A.   So there were three vehicles involved in the

22  containment.  Your vehicle was directly behind the suspect

23  vehicle.

24      A.   Correct.

25      Q.   Pina's vehicle was in the front of the vehicle.

Atkinson-Baker, a Veritext Company
www.depo.com

1    if that had happened?

2         A.   Just let him go.

3         Q.   Shoot out the tires, or something?

4         A.   No, we don't shoot tires.

5         Q.   That's just in the movies?

6         A.   Yeah.

7         Q.   Okay.  So after your vehicle came to a stop, did

8    you get out of the vehicle?

9         A.   Yes.

10        Q.   And before you got out of the vehicle, did you turn

11   off the siren, the lights, or do anything?

12        A.   I turned on the lights before I got out of the

13   vehicle.  Before I hit him from the rear, my lights and

14   sirens were on, I pushed him forward into Pina's car and then

15   I kind of halfway step out of the car and bring my rifle up

16   and we yell "Police, hands up," and once you felt like he

17   wasn't trying to pull his car back, that's when I got out of

18   my car.

19        Q.   Did you turn off the siren?

20        A.   I turned off the siren and left my red and blue

21   lights on.

22        Q.   Would any other vehicle have their sirens on?

23        MS. CLOUSE:  Objection, vague.

24   BY MR. CROWLEY:

25        Q.   I'm just talking about the containment vehicles.

Atkinson-Baker, a Veritext Company
www.depo.com

1    the vehicle, you could hear it?

2        A.   Yes.

3        Q.   Pretty well?  Well enough?

4        MS. CLOUSE:  Objection, vague.

5        THE WITNESS:  It would depend how loud they're speaking.

6    BY MR. CROWLEY:

7        Q.   True.  Fair enough.  But was the driver window down

8    a little bit?

9        A.   Yes, it was partially open.

10       Q.   So if he's yelling out the window, you could

11   probably hear it from the distance you were at?

12       A.   Yes.

13       Q.   So when you got out of your vehicle, you had your

14   rifle?

15       A.   Yes.

16       Q.   Was your safety disengaged?

17       A.   No.

18       Q.   Okay.  And did you ever disengage your safety that

19   evening?

20       A.   Not that I remember.

21       Q.   So about how far -- when you got out of the

22   vehicle, where did you position yourself?

23       A.   I was in my door frame.

24       Q.   Door open?

25       A.   Yes.

Atkinson-Baker, a Veritext Company
www.depo.com

1      Q.   In the frame, looking at the suspect between the --

2  what's this called in the car, the B pillar of the vehicle?

3  No, wait, it's the A pillar of the vehicle and the door

4  itself.

5      A.   Yes.

6      Q.   Did I describe that well enough?

7      A.   Yes.  With my door open, yes.

8      Q.   Your door open, you have what's called the A pillar

9  of the vehicle where the windshield is.

10     A.   Yes.

11     Q.   And you got the door and you're between the A

12  pillar and the door, and you're viewing the suspect with your

13  gun?

14     A.   Correct.

15     Q.   Is your gun pointed at the suspect?

16     A.   In the general area, not specifically at him.

17     Q.   Okay.  So you did that for safety reasons, you

18  leave the safety on, you don't point it at him just for

19  safety, right?

20     A.   Yeah.  You don't take the safety off until you're

21  ready to shoot.

22     Q.   Fair enough.  So how far away were you at that

23  point?

24     MS. CLOUSE:  Objection, vague.

25     MR. CROWLEY:  Okay.  Do I need to go back through that?

Atkinson-Baker, a Veritext Company
www.depo.com

1      Q.   You could still see.

2      A.   Yes.

3      Q.   Did you see if Dominguez had gloves on?

4      A.   No.

5      Q.   Anything in his hand?

6      A.   No.

7      Q.   How long did he stay compliant with the command?

8      A.   I couldn't give you a time.   A few seconds.

9      Q.   Then what happened?

10     A.   Then he brought his hands down and leaned forward

11  as if he's reaching for something.

12     Q.   I want to take it moment by moment, if you will.

13  So how high were his hands, if you can describe it for us?

14     A.    From my position, I could see about half his hand

15  over his shoulders and like the car seat, the rear of the

16  seat.

17     Q.    Okay.   So they were like this, (indicating)?

18     A.    Yes.

19     Q.    Like I'm demonstrating kind of where my shoulders

20  are.

21     A.    Yes.

22     Q.    Did he do anything weird with his hands at that

23  point?

24     A.    No, he was just holding them up.

25     Q.    Did he give any kind of physical gesture, like flip

Atkinson-Baker, a Veritext Company
www.depo.com

1   the finger or anything like that?

2       A.   No, I don't remember that.

3       Q.   And he had them up there for what did you say?

4       A.   A few seconds.

5       Q.   Few seconds.  Then he put them down and leaned

6   forward?

7       A.   Yes.

8       Q.   Did he put them down?

9       A.   Yes.

10      Q.   And did he put both of them down towards the front

11  of his chest or the side?

12      A.   I couldn't see where they were going at that point.

13  Once he brought them down, I lost sight of his hands.  I

14  don't know where they were.

15      Q.   Once he brought them down, was there a reaction

16  from the officers verbally?

17      A.   I don't remember.  At some point, someone yelled

18  "Bang up," which means they are asking to deploy an FB, which

19  is a noise flash device.

20      Q.   Did you hear any comments from the occupant of the

21  vehicle?

22      A.   No, I couldn't hear what he was saying.

23      Q.   You heard a response from one of the officers,

24  though, to the occupant?

25      A.   Yes, there was communication between the two.

1    Q.   So did you have any reason to believe that was

2    going on here?

3    A.   No.

4    Q.   Why not?

5    A.   Because all the information that I had led me to

6    believe that he was still armed and that he knew he was being

7    followed by police, and at that point, I don't think he was

8    willing to go to jail peacefully.

9    Q.   And that's based on information you heard from

10   somebody in the jail?

11   A.   I never had any information from anyone from the

12   jail.

13   Q.   Okay.  So what was the basis of your belief that he

14   wasn't going to --

15   A.   That was information that was given to us during

16   the briefing.

17   Q.   Hold on.  Time out.  Let me finish the question.

18   So what was the origin of the information that you received

19   that he was not going to jail again?

20   MS. CLOUSE:  Objection, assumes facts and misstates the

21   testimony.

22   BY MR. CROWLEY:

23   Q.   Okay.  Did you have some information that led you

24   to believe that Mr. Dominguez was not going to be cooperative

25   in any arrest?

1     A.   I don't think so.  He wasn't asked for that.

2     Q.   Do you have any reason to believe that he was

3  bending over to pick up something other than a weapon?

4     A.   No.

5     Q.   That was the only thing that was in your mind that

6  was possible?

7     A.   Yes.

8     Q.   And that was an imminent lethal threat to you and

9  the other officers?

10    A.   Yes.  We believed he was armed.

11    Q.   So it was an imminent lethal threat when he put his

12  hands down and bent over?

13    A.   Yes.

14    Q.   Justifying the use of deadly force?

15    A.   Yes.

16    Q.   And you would have shot him, too, had you not been

17  working with the flash bang?

18    A.   Correct.

19         (Recess.)

20  BY MR. CROWLEY:

21    Q.   So you heard no verbal threat by the occupant of

22  the vehicle?

23    A.   I couldn't hear anything that was -- any of the

24  conversation that was coming from his end.

25    Q.   Okay.  At no time did he appear to try to exit the

Atkinson-Baker, a Veritext Company
www.depo.com

1          REPORTER'S CERTIFICATION OF CERTIFIED COPY

2

3

4

5

6

7          I, THERESA KIELTY, CSR No. 5037, a Certified Shorthand

8     Reporter in the State of California, certify that the

9     foregoing pages 1 through 104, constitute a true and correct

10    copy of the original deposition of OFFICER ALVARO LOPEZ taken

11    on MARCH 1, 2021.

12          I declare under penalty of perjury under the laws of

13    the State of California that the foregoing is true and

14    correct.

15

16          Dated this 10th day of March, 2021.

17

18

19                         THERESA KIELTY, CSR No. 5037

20

21

22

23

24

25

EXHIBIT 8

Atkinson-Baker, a Veritext Company
www.depo.com

1               UNITED STATES DISTRICT COURT

2             NORTHERN DISTRICT OF CALIFORNIA

3

4   JESSICA DOMINGUEZ INDIVIDUALLY    )
    AND JESSICA DOMINGUEZ AS          )   CERTIFIED COPY
5   GUARDIAN AD LITEM FOR JAD (1),    )
    JAD (2) AND JAD (3),              )
6                                     )
                  Plaintiffs,         )
7                                     )      Case No.:
          vs.                         )      5:18-CV-04826
8                                     )
    CITY OF SAN JOSE, SAN JOSE POLICE )
9   DEPARTMENT, MICHAEL PINA, AND     )
    DOE POLICE OFFICERS 2 through 5,  )
10                                    )
                  Defendants.         )
11  _____ )

12

13

14

15

16

17                  DEPOSITION OF

18          OFFICER KRISTOFFER FERGUSON

19             SAN JOSE, CALIFORNIA

20               MARCH 4, 2021

21

22  ATKINSON-BAKER, a Veritext Company
    (800) 288-3376
23  www.depo.com

24  REPORTED BY:   THERESA KIELTY, CSR NO. 5037

25  FILE NO.:      AE088F2

Atkinson-Baker, a Veritext Company
www.depo.com

1    incident?

2         A.    No, not that I recall.

3         Q.    There was another incident that I have recorded in

4    reference to a September 12th, 2017 incident that involved an

5    armed robbery at an Arco station.  Were you involved in any

6    way in that investigation?

7         A.    I'm not sure.  Do you have the address?

8         Q.    It was RATTF, Regional Auto Theft Task Force, was

9    surveilling Andrew Anchondo, who is allegedly driving a

10   stolen white Mercedes, and the story goes they drove up to

11   the Arco, someone got out, went in there, bought some water,

12   suspected to be Dominguez, went back into the car, Anchondo

13   came in with a gun and robbed the premises.

14        A.    Yes.

15        Q.    Were you involved with that somehow?

16        A.    Yes.

17        Q.    Okay.  So tell me your first recollection of either

18   being called out for that, taking over the RATTF process or

19   whatever.  What's your first memory?

20        A.    We arrived on scene, I believe, as the robbery had

21   occurred.

22        Q.    Okay.  So the robbery had been completed or was in

23   progress?

24        A.    When I got there, the robbery had just been put out

25   over the radio that it had been completed.

1      Q.   Fine.  And it's awhile ago so you're not going to

2  be criticized for that.  But your task was to follow the

3  Mercedes and keep an eye on the Mercedes?

4      A.   Correct.

5      Q.   So to speak.  But you didn't -- did you see any

6  tapes, videotapes, or talk to any witnesses about who the

7  suspects were who entered the Arco or who were in the

8  Mercedes or anything like that?

9      MS. CLOUSE:  Objection, compound and vague as to time.

10      THE WITNESS:  Okay.

11  BY MR. CROWLEY:

12      Q.   Any time.

13      A.   Me personally, no.

14      Q.   Okay.  So go through what you remember regarding

15  the surveillance of the white Mercedes.

16      MS. CLOUSE:  Objection, calls for a narrative.  You can

17  go ahead and answer.

18      THE WITNESS:  Yeah.  I remember conducting surveillance

19  on it throughout the day.  It was the afternoon, and I

20  remember we surveilled them to the area of San Jose City

21  College, somewhere near there.  There was a vehicle swap,

22  they left one vehicle and got into a different one, I don't

23  recall what that was, and then I believe we continued

24  surveillance throughout that afternoon into the evening,

25  where another vehicle swap was conducted, and from my

1    recollection, I believe that vehicle was a dark colored Kia,

2    or something similar.  And we eventually lost that vehicle

3    late that night.  I don't recall a specific time, but that

4    was the -- I believe the last we worked it that night.

5    BY MR. CROWLEY:

6        Q.   Okay.  So you witnessed a vehicle swap at or around

7    San Jose City College and so the vehicle swap occurred, the

8    white Mercedes was abandoned?

9        A.   Correct.

10       Q.   And the suspects got into another car?

11       A.   Yes.

12       Q.   Could you identify the suspects at that point?

13       A.   Me personally or could anybody identify them?

14       Q.   Combination of you or what you heard over the radio

15   or whatever.

16       A.   I believe they were -- I don't recall who was ID'd

17   at that particular time.  I believe there was an ID, we had

18   an ID on at least one of the occupants, but I cannot tell you

19   who it was --

20       Q.   Okay.

21       A.   -- at that time.

22       Q.   You didn't -- from your prior experience, you

23   didn't identify any of them yourself?

24       A.   No, not myself.

25       Q.   Okay.  But did you see four or three?

1  first time you started issuing commands to the suspect?

2      A.   As I was -- as I got out of my vehicle.

3      Q.   All right.  And what were you -- what did you say

4  to the suspect?

5      A.   Something along the lines of "Hands up.  Put your

6  fucking hands up."

7      Q.   Okay.  And then you got -- where did you go once

8  you were getting out of the vehicle, where did you go?

9      A.   I stayed in the frame of my door.

10     Q.   Okay.

11     A.   My door jamb.

12     Q.   So this is for cover or protection, so to speak?

13     A.   Somewhat, yes.

14     Q.   Best it could be?

15     A.   Yes.

16     Q.   And so you have the A pillar of the vehicle, which

17 holds the windshield, and you have the door and the frame of

18 the door when the door is open, so were you between the frame

19 of the door and the A pillar of the vehicle?

20     A.   Yes.

21     Q.   And were you leaning over the gap, so to speak, or

22 were you behind the gap yelling?  Do you understand the

23 difference?

24     A.   Whether I was backed up from the door jamb itself?

25     Q.   Or hanging over the door somehow.

```
 1  compliance, if you can give me an estimate?
 2        MS. CLOUSE:  Objection, vague.
 3        THE WITNESS:  Less than 10 seconds.
 4  BY MR. CROWLEY:
 5        Q.    Okay.  And how did he comply?
 6        A.    He raised his hands or put his hands up to maybe
 7  shoulder level, kind of limp wrists, not like completely
 8  compliant hands up on the floor or the steering wheel where
 9  they can be seen.  It was kind of like just not wanting to go
10  on the program but kind of getting them up there just enough
11  so we could see them in the window.  He had them up and they
12  were, you know, kind of right here but not all the way up.
13        Q.    Okay.  It was a half -- no, I won't say that.
14  Half-hearted compliance.  It wasn't a full compliance where
15  he's showing his hands and holding them up high, right?
16        A.    Exactly.
17        Q.    You said a limp wrist, so his hands were kind of
18  down, and were his hands above his shoulders or --
19        MS. CLOUSE:  Objection, vague.
20  BY MR. CROWLEY:
21        Q.    -- like this?  Where was his wrist?
22        A.    I'd say above shoulder.
23        Q.    The bent wrist was above shoulder?
24        A.    Yeah.  Maybe ear level.
25        Q.    And could you see from your perspective if there
```

Atkinson-Baker, a Veritext Company
www.depo.com

1   was anything in his hands?

2        A.   I could not see anything in his hands.

3        Q.   Okay.  If he had something in his hands, would you

4   be able to see it?

5        A.   I would have been able to see it.

6        Q.   Okay.

7        A.   In his left hand.

8        Q.   And he didn't have gloves on his hands?  Were his

9   hands gloved?

10       A.   No, not that I recall.

11       Q.   So they were bare?

12       A.   Yes.

13       Q.   And did he have short sleeves or long sleeves, if

14   you could tell?

15       A.   I don't recall.

16       Q.   Okay.  So he gets his hands up, bent wrist.  How

17   did you take that compliance at the time you saw him comply

18   in the way he did?

19       A.   That he didn't want to.  Looked like he was

20   defeated, like he was -- he didn't want to give up, like he

21   didn't want to 100 percent commit to our commands.

22       Q.   Did you take it as some form of taunting a police

23   officer in any way?

24       A.   Not necessarily.

25       Q.   And did you, during this engagement, did you ever

```
1    hear him say anything?
2         A.   I did not hear him say anything.
3         Q.   And was there any -- from your perspective, could
4    you see any other individual in the vehicle other than the
5    occupant in the passenger -- in the driver's side?
6         A.   No.
7         Q.   Could you see any weapons in the vehicle from your
8    perspective?
9         A.   No.
10        Q.   Did you have any reason to believe that there was
11   either a suspect or weapons in the trunk?
12        MS. CLOUSE:  Objection, compound.
13        MR. CROWLEY:  Okay.
14   BY MR. CROWLEY:
15        Q.   Do I need to break it down?
16        A.   We were still under the assumption -- we still
17   believed that he was in possession of that revolver.
18        Q.   Okay.  Anything else, you know, automatic weapons,
19   any other kind of weapons, rifle, anything like that?
20        A.   Not that we knew.
21        Q.   And what was your understanding of the make, model,
22   description of the handgun that he allegedly had?
23        A.   To the best of my recollection, it was a revolver.
24        Q.   Was it black or silver or --
25        A.   I don't recall the color.
```

1        A.   Yes.

2        Q.   Because your life, the life of Mr. Pina, the life

3    of Mr. Lopez and even the life of the occupant is in the

4    balance, correct?

5        A.   Yes.

6        Q.   I would say it's going to take you less than two

7    seconds to do it but I could be wrong.  Okay.  So at -- how

8    long did he keep his hands with the wrists bent over, hands

9    down, sort of up visible in compliance with your command?

10   How many seconds, for instance, did he comply?

11       A.   I would say less than 10 seconds.

12       Q.   Okay.  And during this time period, did anything

13   occur to escalate the situation?

14       MS. CLOUSE:  Objection, vague.

15   BY MR. CROWLEY:

16       Q.   In your mind.

17       A.   While he had his hands up?

18       Q.   Yes.

19       A.   Or after?

20       Q.   Well, while he had his hands up, during that 10

21   seconds, approximately 10 seconds.

22       A.   He lowered his hands.  Is that -- there's that.

23       Q.   So at that point, that escalated the situation, in

24   your mind?

25       A.   Yes.

Atkinson-Baker, a Veritext Company
www.depo.com

1    Q.   So let's get before he lowered his hands.  Was

2  there anything done, said, exchanged in any way in your mind

3  that escalated the relationship between the occupant and the

4  officers?

5    A.   Not that I recall.  Nothing specific.

6    Q.   Anything happen to de-escalate the relationship

7  between the occupant and the officers or vice versa?

8    A.   Him putting his hands up.

9    Q.   Him putting his hands down, you say?  I'm sorry, I

10  didn't hear you.

11    A.   Him putting his hands up.

12    Q.   Okay.  So after about 10 seconds, he put his hands

13  down?

14    A.   Less than 10 seconds but -- I would say no more

15  than 10 seconds.

16    Q.   Okay.  Describe for us the movement that he engaged

17  in in putting his hands down, if you recall.

18    A.   There was a -- as I explained before, his hands

19  were somewhat up here near the shoulder area, and he

20  looked -- he kind of looked down towards his lap and his

21  hands kind of go right down to the crotch area, I mean that

22  direction, towards the waistband, towards -- I mean obviously

23  I could not see it.  Once his hands crossed below the lower

24  part of the window on the door, I couldn't see his hands, and

25  they went from here and then just kind of leaning forward

Atkinson-Baker, a Veritext Company
www.depo.com

1    movement towards his lap, towards his lap or seat area, and I

2    couldn't see once they lowered.

3        Q.   Okay.  And at that point, did you consider that act

4    an imminent -- a threat of imminent death or bodily harm?

5        A.   Yes.

6        Q.   Why?

7        A.   Because we believed he still had a weapon.

8        Q.   Okay.  And so at that point, did you fire your

9    weapon?

10       A.   No.

11       Q.   Why not?

12       A.   I had a flash bang in my hand.

13       Q.   Okay.  So did you -- what were you going to do with

14   the flash bang?

15       A.   Deploy the flash bang.

16       Q.   And did you?

17       A.   No.

18       Q.   Why not?

19       A.   I didn't get a chance.

20       Q.   Okay.  Was there a flash bang deployed?

21       A.   There was.

22       Q.   Who did it?

23       A.   Officer Lopez.

24       Q.   So why were you going to deploy a flash bang?

25       A.   Because of the way he was behaving in the vehicle.

Atkinson-Baker, a Veritext Company
www.depo.com

1     Q.   What would -- so you were going to -- so the flash

2  bang, were you going to put it inside the cabin of the

3  vehicle or were you going to throw it outside or under the

4  vehicle?   What was your intention?

5     A.   Outside the vehicle.

6     Q.   And what good would that do?

7     A.   Gain compliance.

8     Q.   How so?

9     A.   It's a loud noise with a flash.   Most people don't

10 like it.   It scares them.   After that, they see "Okay, it's

11 pretty serious" and put their hands up.

12    Q.   So did you hear the weapon of Officer Pina go off?

13    A.   Yes.

14    Q.   Were you surprised?

15    A.   Initially, I thought it was a flash bang.

16    Q.   Okay.   Were you surprised it was not a flash bang

17 but his rifle going off?

18    A.   No.

19    Q.   So during the time commands were being yelled at

20 and the seconds that we're talking about, Officer Lopez's

21 siren was off, correct?

22    A.   At one point, it was on, and yes, at some point, it

23 was turned off.   I don't know exactly when.

24    Q.   Did you hear any exchange between anyone with words

25 such as "Fuck you, shoot me, bitch"?   Did you hear that, do

1   with Mr. Dominguez, communicating back and forth, was also up

2   on his rifle and had a direct line into the vehicle, I

3   dropped my rifle to go to my flash bang and deploy that.

4        Q.   After the shooting, did you have any conversations

5   with Officer Pina?

6        A.   No.

7        Q.   So in your mind, at the time you saw the suspect

8   bend over, drop his hands, was there any other non-deadly

9   force procedure in your mind you could have utilized?

10       A.   No.

11       Q.   But you never saw him display a weapon; is that

12  right?

13       A.   Correct.

14       Q.   And you never heard him verbally threaten to use

15  deadly force in any way; is that right?

16       A.   Me personally heard?

17       Q.   Yes.

18       A.   Mr. Dominguez?

19       Q.   Right.

20       A.   No.

21       Q.   Say "I got a gun and I'm going to shoot you,"

22  anything like that?

23       A.   No.

24       Q.   So far as you know?

25       A.   Correct.

Atkinson-Baker, a Veritext Company
www.depo.com

```
 1                    REPORTER'S CERTIFICATE

 2

 3

 4        I, THERESA KIELTY, CSR No. 5037, Certified Shorthand

 5   Reporter, certify:

 6        That the foregoing proceedings were taken before me at

 7   the time and place therein set forth, at which time the

 8   witness was put under oath by me;

 9        That the testimony of the witness, the questions

10   propounded, and all objections and statements made at the

11   time of the examination were recorded stenographically by me

12   and were thereafter transcribed;

13        That the foregoing is a true and correct transcript of

14   my shorthand notes so taken.

15        I further certify that I am not a relative or employee

16   of any attorney of the parties, nor financially interested in

17   the action.

18        I declare under penalty of perjury under the laws of

19   California that the foregoing is true and correct.

20        Dated this 17th day of March, 2021.

21

22

23        _____
          THERESA KIELTY, CSR No. 5037
24

25   Signature Requested
```

EXHIBIT 9

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

JESSICA DOMINGUEZ,               )
INDIVIDUALLY AND AS GUARDIAN     )
AD LITEM FOR JACOB DOMINGUEZ,    )
JORDAN DOMINGUEZ AND JALIYAH     )
DOMINGUEZ,                       )
                                 )
              Plaintiffs,        )
                                 ) NO. 5:18-CV-04826-
vs.                              )      BLF
                                 )
CITY OF SAN JOSE, SAN JOSE       )
POLICE DEPARTMENT and DOE        )
POLICE OFFICERS 1, 2 and 3 and   )
DOES, inclusive,                 )
                                 )
              Defendants.        )
_____

DEPOSITION OF DAVID BALASH

DATE:                  November 22, 2021

TIME:                  9:30 a.m.

LOCATION:              Remote Zoom Deposition


REPORTED BY:           BETTY A. SALOIS, RPR,
                       Certified Shorthand Reporter
                       License Number 4768
                       Appearing Remotely

_____
                  SALOIS & ASSOCIATES
             Certified Shorthand Reporters
             111 N. Market St., Suite 300
               San Jose, CA 95113-1112
                    (408) 279-DEPO

1

1           If I use if term path will you understand I

2     mean the way that the bullet travels from the time it

3     left the rifle until it came to rest?

4           A.   Yes.  I do.  I just wanted to make sure that

5     you understand if I say one thing I am not -- I don't

6     want you to think I am dodging or whatever.  I wanted to

7     be clear on that issue.

8           Q.   No.  I appreciate that.  Thank you.  Okay.

9           So if I -- I want to see if this summarizes

10    your opinions in the case.  As to the first bullet is it

11    your opinion that the path of the bullet was through the

12    window, shattering at least partially the window, and

13    then into the jaw area of Mr. Dominguez?

14          A.   Yes.

15          Q.   And no further?

16          A.   Well, I don't know what was further.  I am not

17    sure how far it went.  The only thing they recovered

18    from was -- I am sure there were small fragments of core

19    material that were still in Mr. Dominguez.  They didn't

20    recover everything from the victim.  Great amount of

21    that was missing.  But almost the entire bullet jacket

22    that I saw with some core material adhering to it was

23    still there.  So that is where it went in.

24          The reason it didn't go any further was the

25    fact that it was so severely damaged and then damage is

                                                          19

1    abundantly evident on the wound that you look on Mr.

2    Dominguez's jaw.  Had that been a stable bullet it would

3    have made a hole very similar to what is in the B

4    pillar, but it would have also blown out the back of his

5    head.  It would have also caused depending on where it

6    went in, probably would wouldn't have blown his head,

7    but made a rather large gaping hole out the back had it

8    not been severely damaged prior to making that impact.

9         Q.   Then as to the second bullet is it your opinion

10   that it passed -- probably passed through a portion of

11   the remaining window through the sleeve of Mr. Dominguez

12   and then lodged in the B pillar?

13        A.   Well put, yes.  I agree probably passed through

14   some very non-resistible glass that had already been

15   shattered but still was in the bullet's flight path.

16        Q.   Do you have an opinion then about where the

17   sleeve of Mr. Dominguez's sweat shirt was at the time

18   the first bullet was fired?

19        A.   If you take the first bullet being fired as the

20   fatal bullet I can't say where his arm was, but it would

21   have been virtually impossible in my opinion, I am not a

22   pathologist or medical doctor, but for the type of

23   injury that Mr. Dominguez suffered to have made any

24   motions that were intentional on his part from the type

25   of injury that he suffered.  So that arm would have

                                                    20

1    already had to have been up at that point in time in my

2    opinion.

3        Q.   Is that an opinion that you are offering in

4    this case as an expert witness?

5        A.   Not for the first bullet.  For the second, yes.

6        Q.   Okay.  Let me be clear about this.  Are you

7    offering an opinion about, in this case, as an expert

8    witness, about where Mr. Dominguez's arm was at the time

9    the first bullet was fired?

10       A.   I cannot.  No.

11       Q.   At the time the second bullet was fired it

12   sounds like you do have an opinion about where his arm

13   was at that time?

14       A.   Yes.  It had to be above the door frame area of

15   the window to allow the bullet passage through it.  It

16   would have been in line with the B pillar, and you could

17   probably have drawn out a reasonable bullet flight path

18   backwards from the hole in the B pillar back out to

19   where the bullet would have come through several inches

20   above the door frame itself, the lower part of the door

21   frame.

22       Q.   Do you have any other opinions about Mr.

23   Edwards report?

24       A.   Well, I don't -- I certainly don't agree that

25   Mr. Dominguez's arm was up and that the first bullet

21

1                                    CERTIFICATE OF REPORTER

2

3

4               I, BETTY A. SALOIS, do hereby
        certify:  That I am a Certified Shorthand
5       Reporter, CSR #4768, duly authorized to
        administer oaths pursuant to Section
6       2093(b)of the California Code of Civil
        Procedure.  That prior to being examined
7       the witness named in the foregoing
        deposition was by me duly sworn to testify
8       to the truth, the whole truth, and nothing
        but the truth;

9
        That said deposition was taken at the time
10      and place set forth, and the testimony of
        said witness was reported by me, a
11      Certified Shorthand Reporter, and was
        thereafter transcribed under my direction
12      and supervision;

13      That I am a disinterested person, not
        being in any way interested in the outcome
14      of said action, nor connected with, nor
        related to any parties in said action or
15      to their respective counsel in any manner
        whatsoever.

16
        That prior to the completion of the
17      foregoing deposition:

18      A Review was requested and a list of
        changes if any are attached_____

19

20      A Review was not requested_____

21

22

23      IN WITNESS WHEREOF I have hereunto
        subscribed my name this
24      ____13th_____day of __December_____, 2021.

25

                                                    39

*Betty A. Salois*
_____
Betty A. Salois, CSR #4768

40

EXHIBIT 10

# DAVID E. BALASH

FIREARMS EXAMINER * FORENSIC SCIENCE CONSULTANT
41906 Echo Forest Ct. * Canton, Michigan 48188
Phone (734) 981-6788* Fax (734) 981-6459

September 27, 2021

Mr. John Kevin Crowley
Attorney at Law
125 South Market Street
San Jose, California 95113-2288

> RE:   Dominquez v. San Jose Police Department, et al
> Federal Court - Northern District of California
> Case No.: 5:18-cv-04826

The following list of police reports, evidence examinations, photographs, depositions, autopsy
protocol, scene visit and video were reviewed by the undersigned and were used as source
material for the opinions and conclusions reached in this report.

- 5/21/21   Proposed Stipulated Protective Order, Case No. 5:18-cy-04826-BLF
- 6/8/21    188 pages of police reports on this case
- 6/8/21    109 pages of police reports on this case
- 6/11/21   Flash drive containing;
             Depositions of officers Pena and Lopez
             Scene photographs
             Sweatshirt photographs
             Trajectory photographs
             Officer photographs
             3164 Penitencia Creek home video surveillance
             3158 Penitencia Creek home video surveillance
             Car exterior photographs
             Photographs taken at the Medical Examiner's Office – None during the
             Autopsy.
             Autopsy Protocol
- 9/3/21    Dropbox link containing;
             575 Photographs taken on this case.
- 9/3/21    San Jose's production of documents – 7 pages
- 9/7/21    Dropbox link containing;
             Officer Pena's video statement
             Scene photographs
             Body camera footage from two officers at the shooting.
- 9/9/21    Fly to San Jose – examine evidence (sweatshirt of Mr. Dominquez,
             bullet fragments from the autopsy, bullet fragments from the Dominquez
             vehicle and view the scene. Return to Michigan on 9/10/21.
- 9/9/21    Request to examine the involved Kia, however it was not maintained as
             evidence by the San Jose Police Department.

1

- 9/10/21   Defendant's Expert reports and disclosures
- 9/24/21   Report on the Fatal Shooting of Jacob Dominquez on 9/15/2017, the County of Santa Clara, Jeffery F. Rosen District Attorney

QUALIFICATIONS FOR OPINION

The opinions and conclusions reached on the above-mentioned shooting are based on the following:

- My review of all the above listed material and evidence.
- My experience as a Michigan State Police Officer for over 25 years rising to the rank of D/Lt. in charge of the Firearms, Tool-Mark and Bombs and Explosive Unit of the MSP Northville Forensic Science Laboratory
- My experience for over 20 years as a member of the Michigan State Police Forensic Science Laboratory in the Firearms Identification, Tool Mark, Bombs and Explosive Unit.
- The examination of hundreds of firearms for safety and function testing prior to firing as well as determining the causes of reported firearm failures.
- My experience with the Michigan State Police as a Crime Scene Analyst participating in and supervising hundreds of crime scene investigations during my years with the department.
- My experience at photographing and collecting evidence at crime scenes while with the Michigan State Police.
- My experience at photographing, participating in and collecting evidence at autopsies for over 20 years.
- Training sessions on crime scene reconstruction both as a member of the Michigan State Police and as a civilian examiner.
- My experience in investigating shooting crime scenes for over 20 years as a member of the Michigan State Police and then continuing to utilize that experience as a self-employed examiner in assessing shooting crime scenes for the past 28+ years.
- My experience at having examined hundreds of shooting victims at crime scenes, autopsies, hospitals and funeral homes.
- My experience at taking and interpreting X-rays in bomb squad work and training as well as at using and interpreting X-rays at crime scenes, autopsies and hospitals for the past 48+ years.
- I continue to follow new developments in the field of forensic testing through caseload and review of journals in the subject area.
- Training and review of new materials/techniques through the internet.
- See a copy of my C.V. for more specific information

2

INFORMATION

The following is a brief summary of the events leading up to the shooting death of Jacob Dominquez by San Jose Police Officer Michael Pina on September 15, 2017 as understood by the undersigned from reviewing the above listed material.

Mr. Dominquez was wanted on a felony warrant by the San Jose Police Department and was actively being pursued/surveilled for at least the past two days by members of the San Jose Police Department VCT squad. Information was obtained on the whereabouts of Mr. Dominquez and a surveillance team of approximately 12 officers in individual vehicles were assigned. The officers were advised that the suspect may be armed with a silver revolver due to .357 magnum caliber ammunition that was discovered during the serving of a search warrant.

Officers were aware that Mr. Dominquez frequently violated traffic laws by speeding, running stop signs and red lights, weaving in and out of traffic and making sudden "U" turns in an apparent effort to detect if he was being followed by law enforcement. This erratic pattern of driving required the pursuit teams to remain well out of sight so normal tailing was not possible, therefore a fixed wing aircraft was employed to allow the tailing vehicles to remain well back of the subject vehicle. The fixed wing aircraft advised the VCT team that the Dominquez vehicle had settled down and was traveling normally. A short time later the aircraft advised that the Dominquez vehicle, a black KIA Sportage, was stopped at the light on Penitencia Creek Road at the intersection of N. White Road.

At this point Officer Pena was the first car behind the suspect, Officer Ferguson was the second car with Officer Lopez in the third car. Officer Pena then pulled his undercover vehicle directly in front of the suspect's vehicle with Officer Pena's front passenger door either touching or very close to the front of Mr. Dominquez's front bumper roughly making the letter "T" with the two vehicles. Officer Pena immediately exits his vehicle and takes a position near the left front wheel of Officer Ferguson's vehicle with his M-4 rifle pointed at the suspect in the driver's seat of the Kia. Officer Pena reportedly yells "hands up-show me your hands and if you move, I will shoot you" to Mr. Dominquez in the Kia vehicle. At this time Officer Pena reports that Mr. Dominquez does not raise his hands for several seconds and then does raise his hands all while interacting with Officer Pena through a partially opened driver's door window. Then according to Officer Pena, Mr. Dominquez quickly lowers both of his hands toward his right lap area and leans his body forward (interview demonstration) at which time Officer Pena fires two shots at Mr. Dominquez because he believes he is reaching for a firearm. No firearm was located in the vehicle or on Mr. Dominquez.

When Officer Pena places his vehicle in a "T" position to the Dominquez vehicle, Officer Ferguson quickly positioned the right front tire of his vehicle very close to the driver's door of Mr. Dominquez's vehicle and immediately exits his vehicle with his M-4 rifle

3

standing in his open door and then standing on the floor board of his vehicle pointing his rifle over the roof of his vehicle. Officer Ferguson has essentially the same view of Mr. Dominquez as does Officer Pena and they are standing only 4-6 feet apart along the side of his vehicle. Officer Lopez quickly arrives positioning his vehicle immediately to the rear of and actually strikes the rear bumper of the Dominquez vehicle and immediately exits his vehicle with his M-4 rifle at which time two shots are heard on the body camera.

A flash bang is heard being deployed several seconds later and then all the officers retreat to cover positions for approximately 15 to 30 minutes before having a canine released into the Kia to determine the status of Mr. Dominquez.

## COMMENTS AND OBSERVATIONS

The fatal wound to Mr. Dominquez's left lower jaw area was caused by a damaged fired rifle bullet in this examiner's opinion. The damage would have been the result of the bullet impacting the door window glass prior to striking Mr. Dominquez causing the large irregular bullet wound of entry. The fact that there was no exit from a .223 caliber rifle bullet attests to the severe damage done to this bullet prior to striking Mr. Dominquez. The bullet jacket recovered at autopsy was nearly complete, however the majority of the bullet core material (lead) was missing. This is not unusual given the fact that the bullet was badly damaged by the glass in this examiner's opinion. The weight of the bullet jacket and core material recovered at autopsy approximates ½ of an intact bullet in this caliber, with the missing core material possibly accounted for in the injuries to the left neck area of Mr. Dominquez or the remaining core material was not recoverable.

A bullet strike is noted in the interior of the Kia in the "B" pillar on the passenger's side of the vehicle. This hole is essentially a first strike bullet hole of entry and was caused by an undamaged/slightly damaged fired rifle bullet (note the perfectly round entry hole) in this examiner's opinion. Evidence technicians removed one portion of core material with some apparent jacket material from the area of the "B" pillar during the vehicle inspection at the police facility. The material recovered would represent only a portion of a whole fired rifle bullet, however the area in which the bullet struck could easily account for the missing jacket (inside the steel structure of the "B" pillar or much of the bullet could have escaped the vehicle after striking the interior of the passenger rear door) at the scene. The recovered core material was also approximately ½ the weight of a single fired rifle bullet in the .223 caliber class of bullets, however in noting the uniform bullet hole of entry pictured below with the damaged exit hole in the "B" pillar, this could not have been the missing portion of the fatal bullet in this examiner's opinion. This bullet hole was caused by an undamaged intact fired rifle bullet in the .223 class caliber.

4



Photo # 12363200



Photo # 12363185

The report issued by the Santa Clara County District Attorney Jeffery F. Rosen states that the Santa Clara County Criminalists concluded the following:

1. Officer Pena fired two successive shots approximately ½ second apart;
2. The projectile that killed Dominquez was a fragment of a copper (jacketing) recovered from his body. The combined weight of the (jacketing) and the lead core recovered from the doorframe amounted to the approximate weight of a single .223 bullet;
3. Only a single bullet entered the vehicle, meaning that the other shot fired by Officer Pena was a miss;

5

4. There was no way to tell definitively if the miss was the first or second shot, but according to firearms experts, when two shots are fired in rapid succession, a miss is more likely to occur on the second shot due to recoil.
5. The bullet that entered the vehicle struck the driver's window, shattering it;
6. Upon impact with the glass, the bullet broke up with the lead core going through the forearm of Dominquez's hooded sweatshirt and ultimately lodging in the rear passenger door frame;
7. The (jacketing) fragment that broke away upon impact with the glass traveled in a path that penetrated Dominquez's head, neck and spine causing his death;
8. Dominquez was leaning back in his seat immediately after the shooting;
9. There were two holes in the left forearm of the hooded sweatshirt (the hole on the frontside of the left sleeve was approximately 12 inches up from the edge of the cuff and the hole located on the backside of the left sleeve was approximately 11.5 inches up from the edge of the cuff) that were caused by a single bullet passing through (entrance and exit).

After reviewing the above reasons given by the District Attorney, this examiner is troubled by the sheer number of miss-representations contained in those 9 points which will be addressed below:

1. The Santa Clara Criminalists did NOT state that this was from one bullet due to the combined weight of the two fragments. What they did say in their report was that "It is not possible to determine if Items SJ182278-28 and SJ182278-28 are from one or more projectiles.
2. The criminalists did not say that one shot missed.
3. Apparently the District Attorney believes that a fired rifle bullet can break up causing the bullet jacket and core to separate and only the bullet jacket will be severely deformed and that the core, apparently undamaged by the violent interaction with the window glass now travels as an undamaged projectile to strike the "B" pillar leaving a perfectly round .223 caliber hole. It should be noted that if the hole in the "B" pillar were caused only by a .223 caliber **bullet core**, the hole would only be approximately .180 inches in diameter due the missing jacket. Did anyone take this into account? Bullet manufacturers design jacketed bullets to not have the core material and the jacket separate when impacting a target.
4. The recoil of .223 Remington caliber cartridge in a M-4 rifle (or in other semi-auto rifles) is designed to not cause muzzle jump. This is one of the reasons this caliber rifle is so popular, it is powerful and yet easy to fire and has very little recoil. For anyone to suggest that the recoil of a .223 caliber semi-auto rifle as the reason for a missed shot from less than ten feet into a large vehicle from a well-trained officer is ludicrous.
5. The turning of the bullet core approximately at a 45 degree or greater angle and then have it penetrate the sweatshirt and the "B" pillar needs explanation?
6. On page 18 of that report the District Attorney agrees that Mr. Dominquez's hands were probably up when Officer Pena fired his weapon.

6

The undersigned also examiner the black sweatshirt worn by Mr. Dominquez when he was shot. The reports issued by the Santa Clara Crime laboratory documents the thorough examination of the sweatshirt and the undersigned agrees with the conclusions drawn by the crime laboratory that the holes in the left sleeve of the black sweatshirt were consistent with the passage of a high-speed projectile. The below shown photographs depict the holes in the outside lower left sleeve (DSC-3555) and the inside lower left sleeve (DSC-3550) of the sweatshirt. This clearly indicates the passage of a bullet through the lower sleeve of the sweatshirt from the outside to the inside approximately 11-12 inches up from the cuff, however the bullet does not strike Mr. Dominquez.



DSC-3555



DSC-3550

7

Investigators examining the black Kia being driven by Mr. Dominquez conducted trajectory testing on the bullet hole located in the "B" pillar on the passenger side of the vehicle. The examinations consisted of placing a wooden dowel into the bullet strike in the "B" pillar with a colored string attached near the front of the dowel and then drawing that string out through the driver's side window. The below shown photograph shows this testing by the Santa Clara Crime Laboratory personnel.



Photo # 12363278

Laboratory photographs #12363212e+line through 12363278ce depict various trajectories from the single bullet strike in the "B" pillar with most of the string trajectory lines coming out of the driver's side window near the door handle, however in one of the photographs the orange-colored trajectory line appears to this examiner to be coming out further forward towards the windshield area of the vehicle. The reason these trajectory projections are important is that it appears the investigators are trying to correlate the bullet strike in the "B" pillar with a portion of the bullet from the fatal injury to Mr. Dominquez. The undersigned was unable to reproduce the above listed photos in this report due to the formatting in which the photographs were received by the undersigned.

The importance of the above material is that it appears investigators thought that the bullet strike in the "B" pillar was a portion of the fatal bullet strike to Mr. Dominquez and then it appears that a second version of the trajectory test was that the "B" pillar strike was an independent fired bullet. Investigators could have facilitated the examinations had they not used string taped to a wooden dowel (as shown in the above photo) and simply pulled the trajectory string all the way through the hole in the "B" pillar, centered that

string in the middle of the exit hole while centering the string in the center of the entrance hole and then projecting the string outside the driver's door window. This would have given them a much more accurate flight path of the bullet causing the hole in the "B" pillar. Investigators could have/should have utilized a laser to more accurately determine the angle of the bullet in the "B" pillar. Refer to photographs #'s 12363299 and 12363185 included in this report on page 5.

OPINIONS AND CONCLUSIONS

Officer Pena's vehicle is the first to block in the Dominquez vehicle and Officer Pena immediately exits his vehicle and takes a position near the left front wheel /engine area of Officer Ferguson's vehicle which has blocked the driver's door of the Dominquez vehicle. Officer Pena reportedly begins yelling "show your hands" and "don't move or I will shoot you" commands to the driver of the stopped vehicle. Officer Pena states at first Mr. Dominquez does not comply with the hands up order, however after a few seconds he raised his hands. Within seconds Officer Pena states that Mr. Dominquez then quickly lowers his hands to his lap area and leans forward and it is at this time that Officer Pena fires 2 rounds at Mr. Dominquez stating that he (Pena) thought that Dominquez was reaching for firearm. No firearm was recovered from the vehicle or Mr. Dominquez.

The evidence clearly shows that the fatal wound to Mr. Dominquez (only one bullet wound) struck the partially lowered driver's side window prior to striking the victim in the lower left mouth area with no exit wounds associated with this fatal bullet strike, therefore the bullet hole in the "B" pillar had to be the result of a fragment of the fatal bullet core or an independent bullet strike. The independent bullet version accounts for both the holes in the sweatshirt as well as the round bullet entrance hole in the "B" pillar. The fragment of bullet core from the fatal shot version fails to explain either the round .223 caliber size bullet hole in the "B" pillar and does not explain how the holes in the sweatshirt were created. Officer Pena fired two rounds at Mr. Dominquez with only one bullet striking him. For the bullet strike in the "B" pillar to have been a fragment of the fatal bullet strike, the second shot fired by Officer Pena would have had to completely miss the vehicle (a distance of less than 10 feet with a person using a scoped rifle) as there are no other bullet holes in the Kia or any reported bullet strikes in the vicinity of the shooting. Officer Pena missing with the second shot is not a credible possibility in this examiner's opinion.

Having dismissed the possibility of a missed second shot, then the bullet strike in the "B" pillar was a direct bullet strike and the holes in the lower left sleeve of the sweatshirt had to have been caused by the passage of this fired bullet. The outer (entrance) bullet strike in the sweatshirt reportedly had powdered glass imbedded in the fabric (County of Santa Clara Crime Laboratory) which indicate that the second shot impacted glass prior to striking the sweatshirt, however the glass would have already been shattered from the first shot and would not have offered any substantial resistance to a bullet passing as would intact/non-damaged glass in this examiner's opinion.

9

After carefully reviewing the available information and evidence on this case it is the opinion of the undersigned examiner that Mr. Dominquez had to have had his arms/hands up above the level of the driver's door metal body for the bullet to have impacted the left sweatshirt sleeve and then struck the "B" panel, therefore the statement of Officer Pena that both of Mr. Dominquez's hands were down and out of sight when he fired his weapon is not correct. Mr. Dominquez's left arm/hand was above the level of the window opening in his vehicle when the bullet penetrated the sweatshirt. With the two fired rounds only separated by approximately ½ second and the shot to the sweatshirt (likely the second round fired), it is apparent that at least Mr. Dominquez's left hand/arm was up and above the driver's side window ledge when both rounds were fired.

The undersigned reserves the right to change or modify any of the opinions and conclusions expressed in this report if additional information or evidence becomes available.

Respectfully submitted,

David E. Balash

- A copy of my C.V. is attached
- A copy of my testimony document is attached

10

EXHIBIT 11

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Case No. 5:18-cv-04826-BLF

JESSICA DOMINGUEZ INDIVIDUALLY AND JESSICA DOMINGUEZ AS GUARDIAN AD LITEM
FOR JAD (1), JAD (2) AND JAD (3), Plaintiffs,
vs.
CITY OF SAN JOSE, SAN JOSE POLICE DEPARTMENT, MICHAEL PINA, AND DOE POLICE
OFFICERS 2 through 5, Defendants

EXPERT WITNESS REPORT; Dated 20-MAY-2021

1.  I am John R. Black, and I am providing this report at the request of the office of the City Attorney, City of
    San Jose, California, working with Chief Deputy City Attorney Maren J. Clouse as counsel for the
    Defendants. In doing so, I state the following:

2.  I have been asked to review and give expert opinion in the matter of United States District Court,
    Northern District of California; Case No. 5:18-cv-04826-BLF.

3.  I am over the age of eighteen and competent to testify and render an expert opinion in the matter herein.

4.  I am receiving compensation for my examination, review, and testimony *(when required)* related to this
    matter at the rate of three hundred and twenty dollars per hour.

5.  I professionally consult in the areas of police use of force, police policy, police systems dynamics,
    business strategy, socio-cultural dynamics, and the linking of intelligence-sensemaking to operations-
    decision-making for Department of Defense (DoD) projects involving complexity, wicked problem
    challenges, and similar.

6.  I was employed for approximately 23 years *(retired 2017)* as a Washington County Sheriff's Deputy in
    Hillsboro, Oregon. I am police/patrol certified and have held the positions of Patrol Deputy, Patrol
    Corporal, Patrol Sergeant, Training Sergeant, Professional Standards Sergeant, Internal Affairs Sergeant,
    Services Division Lieutenant, Jail Operations Lieutenant, Patrol Operations Lieutenant (East and West
    Precinct), Investigations Lieutenant, and head of Professional Standards -Internal Affairs. I also acted as
    the representative to the Washington County Human Rights Council.

7.  I routinely advised the Washington County Sheriff's Office in matters related to training, police practices, internal affairs investigations, personnel matters, and police use of force. I served as the final subject matter review of the Washington County deputy's use of force. Additionally, I routinely reviewed and advised executive and command levels on use of force related policy matters for the WCSO.

8.  I have held the positions of defensive tactics instructor, firearms instructor, senior defensive tactics instructor, and lead defensive tactics instructor for the Washington County Sheriff's Office (WCSO), Mobile Response Team (MRT) commander, Mental Health Response Team (MHRT) commander, and acted as a senior advisor to the use of force and survival skills program for all training to Washington County deputies. Additionally, I was also the Washington County Interagency Crisis Negotiations Unit (CNU) commander and assisted with the Washington County Interagency Major Crimes Team (MCT) oversight. I also acted as intelligence lead and oversight for the Special Investigations Unit (SIU).

9.  I hold Oregon Department of Public Safety Standards & Training police certifications at basic, intermediate, advanced, supervisory, and management levels. Additionally, I am a graduate of the National Institute of Corrections Executive Leadership Course and the Oregon State Sheriff's Association Command College.

10. I have been employed by the Oregon Department of Public Safety Standards & Training as a defensive tactics, and senior defensive tactics instructor (use of force, arrest & control techniques, high-risk handcuffing, impact weapons, OC spray, and similar subjects) vehicle stops instructor and confrontational simulation instructor.

11. I served as a Sergeant Major in the United States Army, Active and Reserve forces, for over thirty years and routinely advised in matters of Rules of Engagement and proper Use of Force to include proper police use of force in Afghanistan and Bosnia. I am a graduate of the United States Army Sergeant's Major Academy. My military occupation specialties also included psychological operations, civil affairs, communications, operations & intelligence, training certifications, and security operations.

12. I received my doctorate from Capella University in the school of Business, studying how business intelligence (the way people interpret and process information) and their use of visualization to gain insight during the decision process when dealing with complexity and sensemaking. Additionally, I was previously enrolled in doctoral studies at Walden University in the School of Public Policy and Administration with an emphasis on terrorism, mediation, and peace. Specifically, human decision factors, complexity theory/wicked problem theory, and processes related to decisions in critical environments where I completed all course work.

13. I remain current in the field of decision research, police use of force research, systems thinking-approach, and related fields. I most recently presented at the two below listed national/international conferences. *(Complete listing of presentations or publications are included within my curriculum (CV) as an attachment to this opinion).*

    a. 2021 Annual Society for Decision Professionals Conference (SDP-DAAG 2021); Black, J. R. (2021, April 14, 2021). *Evolving Decision-making in Law Enforcement; Looking at all sides of the Coin*. SDP-DAAG 2021, Virtual.

    b. 2021 Annual Society for the Advancement of Management (SAM) Conference; Black, J. R., Taylor, P. L., Lewinski, W., & Wallentine, K. (2021, March 2021). *An Exploration of Sensemaking, Decision-making, and Management in Policing; The Value of Management Research(ers) in Law Enforcement*. SAM 2021 International Business Annual Conference, Virtual.

14. I routinely present and act as a panel member for topics ranging from firearms training, the application of use of force principles and their investigation, police reform, and how one might incorporate systems thinking and sensemaking-decision-making frameworks into policing. In addition, I have acted as presenter for matters related to use of force at county and state levels to include county commissioners and the Oregon State Sheriff's Association.

15. I have trained thousands of police officers, deputies, soldiers in use of force, survival skills, and the potential use of deadly and non-deadly physical force for over twenty-two years in multiple states and countries. I continue my education in this field and remain current via attending and conducting training. My most recent certifications include the Force Science Institute Advanced specialist certification, Right Question Institute training from the Harvard Kennedy school, and ongoing training and use of the Cynefin framework from Cognitive Edge. I have also attended the National Emergency Management Institute as a train-the-trainer for type III incident command.

16. Additionally, I am trained in the cognitive interviewing of witnesses and those involved in officer-involved shootings and events that often elicit high stress or arousal conditions that can affect attention, perception, reaction, decision-making, and memory.

17. I have consulted, been retained, rendered expert consult, deposition, advice, or testimony in over fifty matters since 1999 *(Complete listing is included within my curriculum by today (CV) as an attachment to this opinion)*. I am currently involved in the below active cases or matters;

    a. Use of Force Expert, advising in the matter of the police shooting of C. Walker by Northern Territory Constable Z. Rolfe. (Criminal charge of murder stemming from police use of force). Retained by the defense as of April 2021. The case is ongoing.

b. Use of Force Expert advising in appeal of Chicago Police Department Officer (Luigi Sarli). COPA Board Appeal Process; case # 21 PB 2986. Retained by the defense as of April 2021. The case/appeal is ongoing.

c. Use of Force consulting for Jackson County, OR// JUAN ANTHONY SANCHO, an individual, plaintiff, vs. JACKSON COUNTY, OREGON, UNITED STATES DISTRICT COURT DISTRICT OF OREGON MEDFORD DIVISION. Case # :20-cv-01232-CL. January 2021-Retained for the defense; ongoing.

d. HOWARD McCay, an individual, Plaintiff, V. SEATTLE POLICE OFFICERS JEREMY BOHANNON, JOSHUA BRILLA, WALKER DICKSON, DORIAN KORIEO, AIMEE LACLAIRE, SCOTT LAPIERRE, GERARDO MORENO, BRENDAN SULLIVAN, and ROXANNE ZECH, Defendants. In the UNITED STATES DISTRICT COURT WESTERN DISTRICT OF WASHINGTON AT SEATTLE; Case # 2:20-cv-01212: Retained by the plaintiff. Case settlement reached in favor of the plaintiff (expected May 2021).

e. JESSICA DOMINGUEZ INDIVIDUALLY AND JESSICA DOMINGUEZ AS GUARDIAN AD LITEM FOR JAD (1), JAD (2) AND JAD (3), Plaintiffs, vs. CITY OF SAN JOSE, SAN JOSE POLICE DEPARTMENT, MICHAEL PINA, AND DOE POLICE OFFICERS 2 through 5, Defendants. In the UNITED STATES DISTRICT COURT NORTHERN DISTRICT OF CALIFORNIA. Case # 5:18-cv-04826. Retained by the defense as of February 2021, the case is ongoing.

f. AMANDA WEST, individually and as Personal Representative of the Estate of PATRICK EASTON WEST; PATRICK ERROL WEST; and BERTHA WEST, Plaintiffs, v. THE CITY OF MONTESANO, WASHINGTON; THE CITY OF ABERDEEN, WASHINGTON; THE CITY OF HOQUIAM, WASHINGTON; BRETT VANCE; DALE GREEN, ANDY SNODGRASS; and DAVID PETERSON; Defendants. In the UNITED STATES DISTRICT COURT WESTERN DISTRICT OF WASHINGTON AT TACOMA. Case # 3:21-cv-05077. Retained by the plaintiff as of February 2021, the case is ongoing.

g. St. Helens Police Department (Ofc. Adam Raethke) against Ms. Ashley Andrews. Retained as a consultant for Defense of Ofc. Raethke (Criminal and Civil). October 2020-Present/ongoing.

h. Use of Force by Washington County Deputy Rian Alden against Mr. Albert Molina. Retained as a consultant and expert for Defense of Dep. Alden (Criminal and Civil). October 2020-Present/ongoing.

i. SABBE, Remi v Washington County. Retained by the defense as a strategy consultant, 2018-present.

18. In giving this declaration and opinion, I have reviewed the following evidence and materials on which I base my conclusions and opinion:

   a. Complaint(s) and answer(s); case 5:18-cv-04826-BLF

   b. Related police reports to include reports and operational plans

      a. CRU operational plan dated 9/15/2017

      b. 17-258-0283 Lab Reports

      c. 17-258-0283 Coroner Report

      d. 17-258-0283 Police Report

      e. CAD log for P172580763

      f. CAD log for P172580283

   c. Related training documentation and policy

      a. Training log/file, California Post summary for Michael Pina

      b. Covert response unit (CRU) training logs/training summaries; 2016 & 2017

      c. San Jose Police Department; Policies Rules and Procedures "Duty Manual" dated 2017

   d. Related reviews or investigations

      a. County of Santa Clara "Report on the fatal shooting of Jacob Dominguez September 15, 2017" dated March 8, 2019

   e. Interviews and Transcripts (note: related video-audio files were reviewed to verify transcripts and consider potential impactors to memory or investigative process)

      a. 1728228 - Interview Transcript of Ofr Kristopher Ferguson

      b. 1728229 - Interview Transcript of Ofr Alvaro Lopez

      c. 1728230 -Interview Transcript of Ofr Michael Pina

      d. Notes taken from an interview of M. Pina by myself dated May 14, 2021

   f. Depositions

      a. Deposition of Ms. Jessica Dominguez dated February 19, 2021

      b. Deposition of Sgt. Michael Pina dated March 3, 2021

      c. Deposition of Ofc. Alvaro Lopez dated March 1, 2021

      d. Deposition of Ofc. Kristoffer Ferguson dated March 4, 2021

   g. Related diagrams, photographs, or graphical representations and demonstratives

      a. Graphic 7 & Graphic 8

      b. Consolidated file of investigative photographs denoted as SJ0189-SJ0763

   h. Related audio files (No transcript provided)

      a. SJ1666 - 10.02.2017 Rhiannon Borunda.wma

      b. SJ1667 - 11.17.2017 Leslie Bradley.wma

      c. SJ1668 - 17-258-0283 Carlos Lavato Phone Interview 9.28.17.wma

i. Related video documentation/recordings to include: *(Note: the video does not appear to have been time synced and in some cases differences greater than 10 seconds. Original times are used.)*

   a. Police body-worn camera (BWC) video

   - SJ1751.mp4

   - SJ1753.mp4

   - SJ1759.mp4

   - SJ1760.mp4

   - SJ1761.mp4

   - SJ1762.mp4

   - SJ1763.mp4

   - SJ1764.mp4

   - SJ1765.mp4

   - SJ1766.mp4

   b. SJ1664 - 3158 Penitencia Creek Rd video

   - NVR_Sherlock_ch3_main_20170915190000_20170915190500.avi

   - NVR_Sherlock_ch3_main_20170915190500_20170915191000.avi

   - NVR_Sherlock_ch3_main_20170915191000_20170915191500.avi

   c. SJ1665 - 3164 Penitencia Creek Rd video

   - HCVR_ch6_main_20170915183000_20170915183022.avi

   - HCVR_ch6_main_20170915183034_20170915183259.avi

   - HCVR_ch6_main_20170915183317_20170915183624.avi

   - HCVR_ch6_main_20170915183628_20170915183705.avi

   - HCVR_ch6_main_20170915183714_20170915183734.avi

   - HCVR_ch6_main_20170915183756_20170915183926.avi

   - HCVR_ch6_main_20170915183956_20170915184041.avi

   - HCVR_ch6_main_20170915184048_20170915184051.avi

   - HCVR_ch7_main_20170915183000_20170915183016.avi

- HCVR_ch7_main_20170915183038_20170915183214.avi

- HCVR_ch7_main_20170915183219_20170915183307.avi

- HCVR_ch7_main_20170915183315_20170915183459.avi

- HCVR_ch7_main_20170915183503_20170915183618.avi

- HCVR_ch7_main_20170915183636_20170915183732.avi

- HCVR_ch7_main_20170915183801_20170915183923.avi

- HCVR_ch7_main_20170915183934_20170915183948.avi

- HCVR_ch7_main_20170915183955_20170915184039.avi

j.  Related research, both in general and specific areas, includes human performance factors, memory, attention, perception, sensemaking, decision-making, investigative techniques, and similar. Specific research cited or used within this opinion is annotated by APA citation standards or footnotes. All research cited is either peer-reviewed, awaiting publication, or ongoing research by recognized institutions.

**Preamble:**

1.  The evidence from this case, upon which my opinion is based, is consistent with the information that other experts in police use of force and I rely upon in analyzing police officers' use of physical force. Subsequently, I reserve the right to amend or modify my opinions based on additional evidence, new research, or information that may be provided. In instances where differing accounts of events are present, I have based my analysis on that which is most probable based on the evidence analyzed from the scene and the witnesses' accounts.

2.  A proper review or analysis of police use of force demands that the reviewer guard against injecting hindsight into the review process. The basis of this comes from research and understanding error (Dekker, 2014) and recognizing that since the actor making decisions is incapable of determining the future, it is unfair that a reviewer knowing the future uses that as a measuring stick to judge the actor. This concept is also demanded by US Supreme Court case law. [1]

3.  Additionally, it is recognized that video evidence is limited in that it is a two-dimensional representation of a three-dimensional event. Subsequently, while an essential piece of evidence, it is taken as a single view and perspective of the entire event. While of great value in determining what occurred in an event, a video's limitations make it most helpful in showing overt actions versus those actions that may be less

---

[1] Graham v. Connor (et al), 490 U.S. 386; 109 S. Ct. 1865, 104 L. Ed. 2d 443 (Supreme Court of the United States 1989)

noticeable in a two-dimensional image.

4.   Police officers are trained that the factors and framework from which a decision to use physical force is made are derived from the United States Constitution and its amendments and reflected in US Supreme Court case law and Federal Court decisions.

5.   Police Officers are trained that the use of force must be objectively reasonable based on the totality of the circumstances [2]. Officers are trained that force may be used for self-defense, defense of another, to overcome active resistance while effecting an arrest, to prevent an escape from legal custody, to maintain the safety and security of a facility, such as a jail or a courthouse, or to prevent the escalation of an event or situation into a potentially harmful situation to citizens or others.

6.   Police officers are trained that when using physical force, it will often occur in dynamic, rapidly changing situation(s) and that it may occur in rapidly evolving situations that are often tense and uncertain. [3] As reflected in US Supreme Court case law, analysis of a use of force event must consider the totality of the circumstances and the context surrounding the application of force. [4]

7.   Additionally, each instance of force may be considered in itself a separate act and therefore a different decision. Analysis of use of force decisions at this level can be referred to as decision-point analysis or segmentation. Research recognizes that use of force decision-making is a process consisting of multiple decision points occurring in a dynamic environment (Hine et al., 2018). While the use of decision point analysis may help understand an event, police officers are routinely trained that their use of force will be examined in the context of the event's totality and not by the use of 20/20 hindsight or each decision point separately.

8.   Police officers are trained that use of force events are often dynamic and fluid in nature and that an officers' response allows for the need to increase or decrease their use of force as required. It is expected that a police officer would reasonably escalate the level of force dependent upon their perception of a subject's (suspect, threat, actor, and similar) behaviors, the perceived threat, or the resistance encountered.

---

[2] Graham v. Connor (et al), 490 U.S. 386; 109 S. Ct. 1865, 104 L. Ed. 2d 443 (Supreme Court of the United States 1989)
[3] Graham v. Connor (et al), 490 U.S. 386; 109 S. Ct. 1865, 104 L. Ed. 2d 443 (Supreme Court of the United States 1989).
[4] Graham v. Connor (et al), 490 U.S. 386; 109 S. Ct. 1865, 104 L. Ed. 2d 443 (Supreme Court of the United States 1989)

9. Equally, it is expected that a police officer can de-escalate their use of physical force (again dependent upon a subject's behavior, resistance, and the level of control needed ) when feasible, to resolve a situation safely.

10. The SJPD maintains a covert response unit (CRU) which is considered a specialized team with selection criteria and conducts advanced tactical training in such areas as apprehension techniques of high-risk threats, advanced weapon skills, surveillance, and tactical operational planning. In the years 2016 and 2017, Sgt. Pina attended multiple training iterations (on average monthly) that train the aforementioned subjects.[5,6] Use of force decision-making was integrated into the related CRU scenario training.

## General Understandings from Research:

1. Action vs. Reaction:

    a. Action versus reaction is a well-researched phenomenon and a needed understanding for this analysis. In the simplest terms, it is the question or idea of what really occurs when a person reacts to another person's action. Perception and reaction time when driving is something that most people have experienced and is well studied (Krauss & Olson, 2015). For example, if one was driving and the car in front of them slammed on their brakes, you, the driver, react to avoid a collision. You would first have to recognize that the car ahead of you is braking abruptly. Next, this recognition (or stimulus) would have to translate into a choice (I need to brake now, hard). Finally, this choice has to be translated into the movement of your leg/foot to both find and step on the brake pedal. Most drivers do this simple act (and often are not even conscious of it) every day while driving. What is interesting to note is that this routine and straightforward task takes time, even for the most skilled drivers. This is why we have often been taught to follow multiple car lengths behind the car ahead of us to have time to react. Looking at this from another perspective would be that if you follow too closely, there is no way that you can react and stop in time.

    b. Specific peer-reviewed and ongoing research has been done to explore how quickly a person can point a firearm at another person and pull the trigger. For example, in one study, a novice or untrained person, while seated in the driver position of a car, was able to grab a pistol located and hidden near their thigh, bring it up, and fire their first shot in approximately .25 seconds on average (Lewinski, 2000). To place this in context, the blink of an eye takes approximately .30 seconds, only slightly longer. In another study, where the driver had hidden a firearm below the

---

[5] As described in interview by M. Pina; dated May 14, 2021
[6] Covert response unit (CRU) training logs/training summaries; 2016 & 2017

officer's line of sight, they attempted to locate and shoot the officer. It took the person/driver approximately .57 seconds (Dysterheft Robb et al., 2013) to locate and lethally engage the approaching officer. In the same study, it took the average officer .37 seconds to recognize and react to the action of the driver. This would leave only .20 seconds for the average officer to make a decision and perform that decision successfully. Research has shown that the greatest amount of time (almost ¾ of the time used when reacting (Lewinski et al., 2014)) is used in recognizing and interpreting the stimulus, as compared to executing the motor skill.

c.  In other peer-reviewed research, the comparative response times between police officers and suspects were studied (Blair et al., 2011). Specifically studied was whether a police officer could execute the action of shooting a pistol that they already had pointed at the suspect before the suspect could bring their pistol up (which was down near their side) and shoot the police officer. This study specifically recognized that the officer's act of shooting involved recognizing the suspect's movements, interpreting the movements, selecting an appropriate action, and ultimately squeezing the trigger of the pistol. This research showed that the time for a suspect to shoot an officer compared to an officer's reaction time to respond and engage the suspect by shooting to be almost equal (.38 seconds for a suspect with .39 seconds for the reacting officer (Blair et al., 2011)). Similar research has shown that it takes the average officer .31 seconds to recognize a stimulus (such as movement) and pull the trigger of a pistol (Lewinski et al., 2014).

d.  Interestingly, related studies have been done in areas involving how fast arms and hands move from different positions. These research studies are often found in sports (Kimm & Thiel, 2015) and the medical community. For example, in one particular medical-related study, the subject started from a seated position with their hands resting on their thighs (Degoede et al., 2001). The study examined the different response times it took for the subjects (based on different stimuli) to raise their hands to their shoulder level. In this study, the motor time averaged approximately .28 seconds. Adding in a commonly accepted value of reaction time (200ms) referenced in multiple studies (Lewinski et al., 2015; Lewinski et al., 2014; Welchman et al., 2010), the total time from response to completing the movement can be determined. To move one's hands from the area of one's thighs (while in a seated position) to shoulder level would most likely occur in slightly less than half a second if one was responding to a stimulus reacting. In contrast, if one was the initiator of the movement, they could do the same movement in less than 1/3 of the second.

e.  Additional ongoing, but only preliminary (pilot research), supports a similar understanding when attempting to perform similar actions with a long gun taking, which took police officers .99 seconds on average to aim and fire their first shot when reacting to a simulated threat (Lewinski et al., 2015).

f.  Summarizing some of the concepts related to reaction time, movement, stimulus, initiation as compared to reacting is that when a suspect initiates action, the police officer is actively seeking information, cues, movement indicators, or similar, and they will be at a disadvantage. The reality is that "police officers are required to react to apparent dangers and apparent weapons because normal conditions and lag time do not often allow an officer to ascertain with certainty whether a weapon is present (Ross, 2013, p. 91)." Therefore, police officers are routinely trained that the initiator of an action (often the suspect) will have an advantage. Subsequently, it will be their use of sound tactics and their focus on the most critical information in a potentially lethal encounter that will give them the best chance of survival. Related to the concepts of action/reaction and advantage/disadvantage is the knowledge that once action or the recognition of action occurs, situations can move extremely fast, almost occurring in the blink of an eye.

g.  Therefore, research would indicate that when the suspect/threat is the initiator of the action, the officer will be unable to react quicker than the suspect. Subsequently, officers are trained to use such things as available cover, concealment, and tactics to remove (or at least reduce) the advantage of the initiator if possible. For example, issuing commands that require an action from the suspect makes the officer the initiator with the suspect reacting, potentially giving the officer an advantage. In addition, overwhelming a suspect by sensory stimuli, a show of force, or sensory distraction can also potentially disrupt the suspect's ability or intent to initiate.

h.  However, research also tells us that once an officer is reacting to the movement of a threat or suspect that they will not be faster than the threat/suspect. To stop the threat, they would need to rely on shot placement, accuracy, and use of cover (which can allow them to return fire even if the initiator got off the first shot). As stated by Hontz over twenty years ago is the realization "that an officer could be covering a subject in a ready position, watching the subject's hands, and the subject could draw his weapon and fire a round before the officer could shoot (1999, p. 470)."

2.  Decision Making: Attention, Perception, Choice, & Implementation:

a.  The act of deciding is something we do hundreds of times every day, often without giving it much conscious thought or reflection. Yet, to decide or choose, a series of complex processes are occurring. First, to comprehend what we will be deciding about, we must focus our attention on the issue or situation. Then, from where our attention is focused or attending to, we construct or choose a perception. This perception (or in some cases multiple perceptions) then determines our choice options; the decision. *(Note: even the act of what we attend to is in of itself a decision, whether conscious or occurring below the level of conscious thought.)* Finally, the choice or decision is then acted on or implemented.

b.  A simple example can again be taken from driving a motor vehicle. Imagine the same situation described earlier of the following a car too closely that slams on its brakes. If you happen to be looking elsewhere, perhaps had focused your attention on a cellular text message, or simply had been daydreaming, you would be unable to perceive what was happening quickly. This is in part because you had not been attending to information (brake lights of the car in front of you, or how it was moving) that was significant. Since you did not perceive that the car was rapidly coming to a halt, the choice to also step down on your brakes hard to avoid a collision never entered your mind. Attention and perception are perpetually intertwined as the precursor to decision-making and choices.

c.  Human attention is a scarce and limited resource, and decision-makers are selective (either at a conscious level or below the level of consciousness) to the cues and stimuli that they attend to as a way of conserving this resource (Orquin et al., 2018). Stated another way, it would be expected, especially in high-stress situations, that those involved only focus their attention on the most critical cues linked to survival or successfully navigating a dangerous situation (Lewinski, 2008; Vickers & Lewinski, 2012).

d.  Attention takes time. Research has shown that shifting attentional focus completely from one object to another can take anywhere between .20 and .60 seconds (Lewinski et al., 2014). As shown prior, a lethal threat can aim and fire a weapon from a concealed position in approximately the same time. This means that an officer must maintain a singular attentional focus on specific cues when involved in a high-stress or survival-type situation.

e.  We will often focus our available attention on seeking information that allows us to recognize a significant pattern. Multiple studies suggest that time pressure and high stress will cause people to be more selective in the information they seek and their focus of attention (Oh et al., 2016). In the same study, it was also shown that one becomes more selective, but they will also begin to discount and ignore information that has less relevance and less importance in solving the task at hand.

f.  There are many instances (to include critical stress situations) where the deliberative process is not the primary decision process (de Vries et al., 2010; Kibele, 2006; Vickers, 2007). For example, research indicates that during high pressure, time-constrained, and survival type scenarios, those making decisions (such as police officers) often rely on their cognitive blueprints or schema (similarly referred to sometimes as heuristics or as intuition in the context of naturalistic decision-making).

g. These blueprints or schema are constructed from our prior experiences and training. This intuitive/heuristic type of decision-making will often be the default decision process when encountering high stress or time-compressed situations (Hine et al., 2018; Klein, 2015; Klein et al., 2010).

h. Pattern recognition is a critical component of decision-making (Kibele, 2006). Police officers seek out patterns of information related to a blueprint or meaningful schema often constructed from training and experience. Experts recognize patterns or schema from memory and then use quick mental simulation or modeling to select the first choice they perceive as adequate (Hine et al., 2018; Klein et al., 1997). This concept is often referred to as satisficing and is well documented and researched in the areas of decision-making (Hine et al., 2018; Oh et al., 2016; Simon, 1956; Stüttgen et al., 2012) and heuristics (Bendor et al., 2009; Gigerenzer & Brighton, 2009; Gigerenzer & Gaissmaier, 2011; Hafenbrädl et al., 2016; Simon, 1956).

i. Heuristics can be thought of as mental shortcuts for decision-making. In fact, in the research literature, heuristics are viewed by some as general rules of thumb (Hafenbrädl et al., 2016). They are a simple tool or strategy that can allow the decision-maker to function quickly and efficiently without conscious deliberation. Using the driving example throughout this analysis (following too closely), a general rule of thumb-heuristic often taught is always to leave yourself enough room to stop. The driver does not constantly calculate each stopping distance; instead, through experience, training, and blueprints (schema), they constantly adjust their following distance (at an almost intuitive unconscious level) to have enough room to stop safely.

j. In lethal force encounters, the officer seeks critical information related to movement, weapons, indicators of intent, and similar that, when aggregated, allows them to recognize that they are about to be shot. Once this recognition occurs, the response (arguably similar to a fast and frugal heuristic (Hafenbrädl et al., 2016)) is almost instantaneous.

k. Again, an example of this is driving a vehicle. Building upon the following too closely scenario... You hear your favorite song and, without thinking, look down (for only a moment) to adjust your phone/radio. Your primary vision and attention have briefly shifted focus. Then your peripheral vision detects the change in movement from the car in front of you as it was coming to an immediate stop. You drop the phone (it's no longer important). Then, without thinking, you begin to apply the brake as you intently focus on the information critical to the outcome, the distance between the front of your vehicle and their rear bumper, and the speed by which it is decreasing.

l.  In this example, it is doubtful there was any conscious deliberation about what you needed to do to navigate your way through this; you simply acted using a known pattern that was successful in the past (the heuristic that involved braking, steering, and focusing your attention).

m.  Much in the same way, police officers are trained to notice the most important cues during a potential life-and-death situation, to recognize and seek that information that is most critical to their survival and successfully navigating the situation. For example, a common rule of thumb or heuristic for police officers is to control the hands. This can either be done by seeing that the hands contain no objects that can harm the police officer or physically control the hands using physical control techniques or restraints. At the most basic level, this is because hands (and the things they control) can kill you. A second common rule of thumb/heuristic is that guns, knives, and things that can hurt you are often kept in the waistband and the pockets (when dealing with a person) or in consoles and under the seat (within arms reach yet hidden) when dealing with a person in a vehicle. Subsequently, police officers are trained to keep a suspect's hands away from the waistband, consoles, glove boxes and moving to areas where a weapon could be hidden in a vehicle (such as under the seat).

3.  Investigation Observations:

a.  Initial interviews of the involved officers were taken approximately 15 hours after the beginning of their shift and with no sleep. Research shows that sleep cycles help consolidate memory (Honig & Lewinski, 2008; International Association of Chiefs of Police, 2016; Remsberg, 2014), as does recovery time to purge the residuals of high-stress events such as adrenaline and similar compounds. Thus, if the affected officers were still consolidating memory during the first interview, several possible things may have occurred.

   1)  First, the initial interview would most likely be inconsistent with subsequent interviews since memory consolidation continued to occur after the first interview.

   2)  Second, aspects of the first interview, such as leading questions or interpretations by the investigator, video utilized as a recall mechanism, could have modified the involved officers' memory.

   3)  This potential effect is considered during my analysis.

b.  The video files are not time-synched or anchored. When using video, standard practice is to sync the videos from a common known point in time. One then adjusts for such things as frame rates or storage algorithms. Timestamps on the body-worn camera videos differ significantly (in some cases over 10 seconds), as do the timestamps on the witness security footage. Because of this, I

have chosen to use the clearest video and its subsequent timestamps.[7] The times mentioned are not considered a true representation of the time of day or occurrence within the event.

**Incident described:**

1. The incident that culminated in the use of lethal force by Sgt. Pina is described as follows. This description is an aggregate from the evidence provided and focuses on significant information used to understand and analyze Sgt. Pina's use of force.

2. Lead up to the event [8]:

   a. On September 12, 2017, members of the Regional Auto Theft Task Force (RATTF) conducted surveillance on Andrew Anchondo as he was driving a stolen Mercedes. The team observed the stolen Mercedes pull into the Arco gas station at 2357 Quimby Road in San Jose. Andrew Anchondo was the driver, Patricia Ruiz was the front passenger, and Jacob Dominquez was the rear seat passenger.

   b. Upon arriving at the Arco, Dominguez exited the vehicle, entered the station's convenience store, paid for gas, and bought some water. Dominguez then returned to the Mercedes, after which Anchondo masked himself up with a bandana, entered the store, and robbed three employees at gunpoint (described as a black handgun) of approximately $350 in cash.

   c. Once RATTF learned an armed robbery occurred inside the Arco station, the San Jose Police Department's (SJPD) Covert Response Unit (CRU) took over surveillance and apprehension of the vehicle's occupants due to the nature of the crime and Anchondo being a suspect in a gang-related shooting that occurred the week before. Surveillance was ultimately lost, and the operation was terminated for the day.

   d. On Wednesday, September 13, 2017, the Santa Clara County Probation Department notified SJPD that Anchondo, Ruiz, and Sheila Franco, the girlfriend of Jacob Dominguez, were at 17641 CalleMazatlan, Morgan Hill. Members of CRU set up surveillance at that location at around noon that day. The three people were seen entering a Chevy Malibu, which CRU stopped using the Vehicle Control Tactic, or "VCT," a method used by law enforcement to apprehend a suspect during a vehicle pursuit.

      a. If executed correctly, the suspect vehicle has no room to maneuver forward or backward,

---

[7] SJ1766, BWC footage from Ofc. Ferguson
[8] County of Santa Clara "Report on the fatal shooting of Jacob Dominguez September 15, 2017" dated March 8, 2019

making it impossible to drive off.

e.  CRU took Anchondo and Ruiz into custody and released Franco after being detained. However, the firearm used in the Arco robbery was not recovered.

f.  Late Friday morning on September 15, 2017, CRU Officer Peter Szemeredi conducted a briefing to advise other CRU members of the Operational Plan ("OP Plan") to apprehend Dominguez on an arrest warrant for the Arco station armed robbery. Officer Michael Pina was present.

g.  CRU personnel were advised in the OP Plan of specific safety concerns in that Dominguez is an active SJG [San Jose Grande] gang member and believed to be armed with a revolver. The handgun used in the Arco robbery is currently outstanding. Dominguez is aware he is wanted, and it is believed that he is aware of surveillance tactics and may be familiar with CRU Cars/personnel. [9][10]

h.  Dominguez was eventually located driving the black Kia near Brokaw Road and Junction Avenue, where CRU reinitiated surveillance. During the surveillance, Dominguez engaged in counter-surveillance tactics such as driving on the shoulder, passing vehicles, stopping in the middle of the street and making illegal U-turns. Consequently, CRU decided to follow at a distance and rely on aerial surveillance to let Dominguez "cool down." [11]

i.  Before 7:00 p.m., aerial surveillance announced that Dominguez started driving normally and turned eastbound on Penitencia Creek from northbound Capitol Expressway. Officer Fonseca kept driving straight on Capitol Expressway, and Officer Pina turned eastbound on Penitencia Creek, making him the lead car. Officer Pina was followed closely by Officer Ferguson and Officer Lopez.

3.  Execution of VCT:

a.  Video shows the execution of VCT [12]; no concerns noted.

---

[9] County of Santa Clara "Report on the fatal shooting of Jacob Dominguez September 15, 2017" dated March 8, 2019.
[10] CRU operational plan dated 9/15/2017
[11] 1728230 -Interview Transcript of Ofr Michael Pina & As described in interview by M. Pina; dated May 14, 2021
[12] HCVR_ch6_main_20170915183034_20170915183259.avi

b. Demonstratives [13], diagrams [14], and photos[15] also show positions of vehicles in the execution of the VCT; no concerns noted.

c. Interview(s) [16] indicate that Ofc. Pina confirmed the selection of location from the air unit and ensured that the VCT did not pose a significant risk to the public.

4. Apprehension (VCT to Shooting Decision):

a. General:

1) Sirens are heard in multiple videos. Officers are plainclothes, using ballistic vests with identification showing that they are police officers. This is confirmed via photos.

2) In addition to their standard police equipment and carry, Officers Pina and Ferguson use an AR 15, .223 caliber tactical rifle. The rifle is customarily attached or slung to their vest by a two-point quick release sling. The optics on the rifle are an Aimpoint red dot sight/scope. This configuration is confirmed via photos, video, and interviews.

3) Multiple Officers issued verbal commands and directed Mr. Dominguez to raise his hands or keep his hands up.

4) Ferguson Video (Clearest video and times used for comparison and calculation. Times are not synced.) [17]

- 02:03:01Z      He is "stopped all by himself," an apparent reference to Dominguez.

- 02:03:24Z      police sirens are heard, his car accelerates.

- 02:03:26Z      Out of Vehicle, "let me see your fucking hands."

- 02:03:28-30Z      Pina can be heard saying "keep your fucking hands up" and something similar to moving you're going to get shot. Ferguson can be heard directing the flash bang-up. Verbal commands continue.

---

[13] Graphic 7 & Graphic 8
[14] 17-258-0283 Police Report
[15] Consolidated file of investigative photographs denoted as SJ0189-SJ0763
[16] 1728230 -Interview Transcript of Ofr Michael Pina & As described in interview by M. Pina; dated May 14, 2021
[17] SJ1766, BWC footage from Ofc. Ferguson

- 02:03:39Z        Ferguson out of the vehicle with weapon positioned and issuing verbal commands. Dominguez is assumed to have hands still up (approximately 13 seconds have passed since the first command).

- 02:03:40-43Z        Situation appears to escalate with increased commands telling Dominguez to keep his hands up. At 02:03:42Z, Ferguson appears to duck slightly as Pina fires shots.

    - Two shots are heard in approximately half a second [18].

- 02:03:56Z Flashbang is tossed by vehicle 3 (Lopez)

b.  Pina Video [19]

    - Shows Pina at the front of vehicle 2 (Ferguson); some commands are heard. One can approximate Pina's position, the firing of rounds, and cadence from body movement and based on the position of Ferguson/weapon.

c.  Crime lab reports [20]

    - The County of Santa Clara Crime Laboratory reports state the time between the two shots of Ofc. Pina as .535 seconds. This time is considered accurate and used throughout this report.

    - Concluded within the report is that Ofc. Pina fired two shots from his rifle, of which one struck Mr. Dominguez. Additionally, based on additional forensic evidence and their analysis, it is reasonably certain that it was Ofc. Pina's first shot struck Mr. Dominguez.

    - Additionally observed is that the left sleeve/forearm area of the sweatshirt worn by Mr. Dominguez at the time of the shooting also had a bullet hole in it that would've been caused by Ofc. Pina's first-round or shot.

---

[18] SJ1766, BWC footage from Ofc. Ferguson & 17-258-0283 Lab Reports
[19] SJ1764, BWC footage from Ofc. Pina
[20] 17-258-0283 Lab Reports

b.   Actions and behavior of Mr. Dominguez:

1)   During the VCT, he placed his car into reverse and was subsequently blocked and contained by Ofc. Lopez. [21]

2)   Mr. Dominguez stares at Ofc. Pina during initial seconds of contact when Ofc. Pina is giving him commands from his position near the front of vehicle two. When Ofc. Pina tells him to put his hands up initially; Mr. Dominguez does not comply and continues to stare at Ofc. Pina. When commanded by Ofc. Pina to put his hands up again and something to the effect that he will be shot, he replies, "fuck you, shoot me bitch." [22] However, he does raise his hands to a level where they can be seen near his shoulders. Ofc. Ferguson recalls conversation between Ofc. Pina and Mr. Dominguez, but not exact words or statements.

3)   Mr. Dominguez, from the position where he had raised his hands earlier, is reported to have quickly lowered his hands while leaning his body forward. It is purported that his hands moved down to the area near the bottom of the driver seat, and in doing so, they were no longer visible.[23]

c.   Perceptions, decisions, and actions of Ofc. Pina.

1)   Ofc. Pina identified Mr. Dominguez before executing the VCT. [24]

2)   Ofc. Pina estimates he was about 10 feet from Mr. Dominguez prior to the shooting.[25]

---

[21] 1728228 - Interview Transcript of Ofr Kristopher Ferguson & 1728229 - Interview Transcript of Ofr Alvaro Lopez & 1728230 - Interview Transcript of Ofr Michael Pina & Deposition of Ofc. Alvaro Lopez dated March 1, 2021

[22] 1728230 - Interview Transcript of Ofr Michael Pina & Deposition of Sgt. Michael Pina dated March 3, 2021 & As described in interview by M. Pina; dated May 14, 2021

[23] Interview Transcript of Ofr Kristopher Ferguson & 1728229 - Interview Transcript of Ofr Alvaro Lopez & 1728230 - Interview Transcript of Ofr Michael Pina & Deposition of Ofc. Alvaro Lopez dated March 1, 2021

[24] 1728230 -Interview Transcript of Ofr Michael Pina & As described in interview by M. Pina; dated May 14, 2021

[25] 1728230 - Interview Transcript of Ofr Michael Pina & Deposition of Sgt. Michael Pina dated March 3, 2021 & As described in interview by M. Pina; dated May 14, 2021

3) Scene reconstruction similarly estimates the distance at somewhere between 10 and 12 feet. [26]

4) Ofc. Pina perceived, based on the facial expressions of Mr. Dominguez and the fact that he had initially raised his hand, communicated with them that Mr. Dominguez was able to hear and understand him. [27]

5) Ofc. Pina remembers looking over the top of the Aimpoint site while his rifle was being held in a low ready vision issuing the initial set of commands to Mr. Dominguez. [28]He recalls being only able to see through the driver's window (partially rolled down) the head and upper shoulder area and potentially as far down to the mid-torso and elbows of Mr. Dominguez.

6) Ofc. Pina remembers being wholly focused on the hands of Mr. Dominguez. Ofc. Pina does not clearly remember visual information about Dominguez, the inside of the vehicle, or other external information other than the hands, facial expressions, and body movement of Mr. Dominguez.[29]

- His focus, attention, and memory of visual information would commonly be expected and occur in such an event. The aforementioned research in this analysis supports this conclusion.

7) Ofc. Pina is acutely focused on the suspect's hands and potential movement. He detected the movement of Mr. Dominguez's hands (downward and out of sight) and body (leaning forward and down) and interpreted/perceived the movement as reaching for a potential firearm. Ofc. Pina believed that if Mr. Dominguez's hands were allowed to come back up, either he or Ofc. Ferguson would be shot. [30]

---

[26] Graphic 7 & Graphic 8
[27] Deposition of Sgt. Michael Pina dated March 3, 2021
[28] As described in interview by M. Pina; dated May 14, 2021
[29] 1728230 - Interview Transcript of Ofr Michael Pina & Deposition of Sgt. Michael Pina dated March 3, 2021 & As described in interview by M. Pina; dated May 14, 2021
[30] 1728230 - Interview Transcript of Ofr Michael Pina & Deposition of Sgt. Michael Pina dated March 3, 2021 & As described in interview by M. Pina; dated May 14, 2021

8) Also noted is that prior to moving his hands downward, Mr. Dominguez had placed his hands where they could be seen and held them up. For Ofc. Pina, this downward movement of the hands represented the exact opposite of what was expected. [31] Ofc. Pina believed/perceived that Mr. Dominguez was reaching for a weapon. The body movement of Mr. Dominguez reinforced this perception. The aforementioned research in this analysis supports the perception that the movement or action of Mr. Dominguez (which he interpreted as reaching for a weapon) would be quicker than he could react.

9) When Mr. Dominguez's hands went down, Ofc. Pina began to raise his weapon and gain a sight picture through his Aimpoint site by attempting to place the red dot of the optic on any available target presented by Mr. Dominguez [32].

10) The only part of Mr. Dominguez that could be seen through the optics was the head and neck /upper shoulder area when he took his first shot.[33]

11) Ofc. Pina attempted to adjust his sight picture for a possible second shot. He remembers the body movement of Mr. Dominguez as seen through his Aimpoint scope as continuing to come upright into the seat. [34] Ofc. Pina was still unable to see the hands of Mr. Dominguez when he took his second shot.  The two shots occur in approximately half a second (.535 seconds)[35]. He states that when he took the second shot, based on the continuing movement of Mr. Dominguez and the lack of any contradictory information, he still perceived Mr. Dominguez as a lethal threat.[36]

12) After the second shot, Ofc. Pina recalls that the movement of Mr. Dominguez's body changed in that he stopped coming up and back, shifted slightly to the right, his head turned away from him, and he was no longer staring at them. [37]Ofc. Pina transitioned from looking through his Aimpoint site to a low ready and did not take a third shot. At

---

[31] 1728230 - Interview Transcript of Ofr Michael Pina & As described in interview by M. Pina; dated May 14, 2021
[32] As described in interview by M. Pina; dated May 14, 2021
[33] Deposition of Sgt. Michael Pina dated March 3, 2021 & As described in interview by M. Pina; dated May 14, 2021
[34] As described in interview by M. Pina; dated May 14, 2021
[35] SJ1766, BWC footage from Ofc. Ferguson & 17-258-0283 Lab Reports
[36] Deposition of Sgt. Michael Pina dated March 3, 2021 & As described in interview by M. Pina; dated May 14, 2021
[37] As described in interview by M. Pina; dated May 14, 2021

this point, Ofc. Pina determined he was no longer a lethal threat. Ofc. Pina began to peel back to the rear vehicles.[38]

13) Ofc. Pina recalls that his decision process was neither conscious nor deliberate. He acted immediately, thinking that either he or his fellow officers were about to be shot. He recalls performing as he had been trained, including training about action vs. reaction.

- It is probable that Ofc. Pina had quickly determined the most critical things that he needed to focus on in this high-stress and critical/survival environment. It is also likely that his decision process (influenced by the environment and his attentional focus) was almost automatic and occurring below the level of conscious choice or deliberate thought. This type of decision-making is not uncommon in such situations and supported by the aforementioned research in this analysis.

**Conclusions:**

1. Sgt. Pina and the CRU executed a VCT to apprehend Mr. Dominguez. They believed that Mr. Dominguez was armed with a firearm (pistol), was considered a dangerous felon, had been displaying erratic behavior indicating that he knew he was under surveillance. It was also believed that he would attempt to escape to avoid arrest. Evidence presented and examined during my analysis supports these beliefs and conclusions of the CRU and Sgt. Pina.

2. The VCT is a commonly accepted tactic used by police to apprehend potentially violent suspects in a vehicle that can potentially be mobile. A properly executed VCT creates sensory overload within the suspect while preventing them from escaping either in their vehicle or on foot. In a properly executed VCT, all three officer vehicles would simultaneously move into their final positions (blocking the suspect vehicle). The evidence presented and examined during my analysis shows that the VCT was performed adequately (vehicles two and three did have a slight lag before coming to a complete stop). The VCT accomplished its desired goals safely. Similarly, two days prior, the CRU had also performed a VCT to apprehend related suspects to Mr. Dominguez.

3. Mr. Dominguez eventually first raised his hands in response to Sgt. Pina's initial set of commands. This would indicate that Mr. Dominguez was able to hear and comprehend the commands given by Sgt. Pina. With the hands of Mr. Dominguez being in view, he was to some degree controlled and contained, and no force (other than a heightened sense of presence with firearms being pointed and verbalization by the officers) was used. There is no evidence presented that contradicts this conclusion.

---

[38] As described in interview by M. Pina; dated May 14, 2021

4. Mr. Dominguez was commanded to keep his hands up and that if he were to move, he would be shot. Instead, Mr. Dominguez moved his hands quickly in a downward motion and out of sight. During this motion of Mr. Dominguez's hands, his body is described as bending or leaning forward while continuing to look in the direction of the officers from approximately 11′ away. Sgt. Pina's interpretation of these actions combined with previous behaviors was that Mr. Dominguez was reaching for a firearm with the intent to either shoot him or his fellow officers. Sgt. Pina's interpretation of Mr. Dominguez's actions and behaviors is that of a reasonably trained and experienced police officer.

5. Sgt. Pina decided to shoot (first shot) based on his perceptions of Mr. Dominguez's actions and behaviors, which he had interpreted as a lethal threat to himself or his fellow officers. Based on the research and my analysis, Sgt. Pina did not have sufficient time to ascertain with any degree of certainty if Mr. Dominguez actually had gained control of a firearm. Sgt. Pina's decision to shoot was based on his interpretation/perception of the actions and behaviors of Mr. Dominguez (taken in the totality and context of all things that led up to that moment).

   a. This conclusion is also supported by a body of research that suggests that the strongest predictor and whether a police officer will use force or not is the suspect's behavior (Cojean et al., 2020; Hine et al., 2018). It was only through observation after the fact, a hindsight analysis, that it was determined that no firearm was present or under the control of Mr. Dominguez.

   b. Research also supports the reasoning that the initiator of an action will always have an advantage over the person reacting to the same action. In this case, Sgt. Pina is reacting to the downward movement of Mr. Dominguez's hands, perceiving them to be reaching for a weapon. Regardless of Mr. Dominguez's intent, we can never know why he moved his hands quickly downward from a position where they were easily seen. Sgt. Pina's actions, prior training, schema, attentional focus, and visual focus support the conclusion that he believed that he knew he was reacting to the initiating action of Mr. Dominguez and at a potentially lethal disadvantage.

6. Sgt. Pina's second shot was similarly based on the continuing movement or actions of Mr. Dominguez, which Sgt. Pina interpreted/perceived as a continuing lethal threat. Sgt. Pina's interpretation of Mr. Dominguez's actions and behaviors is that of a reasonably trained and experienced police officer.

7. No evidence examined during my analysis caused me to reject any of the aforementioned conclusions.

   a. Consideration is given to the holes in the left arm of the sweatshirt of Mr. Dominguez. Hypothetically, starting from the point where Mr. Dominguez's body was leaning forward, and his hands were out of view, we can impose the time of approximately .28 seconds as an approximate time for him to bring his hands back into view of Ofc. Pina.

b. However, within the same time, it would be likely that Ofc. Pina had already shifted his view to the Aimpoint optic and was focused acutely on placing the red dot on the available target presented. In short, it would not be expected that he would see nor perceive the arm of Mr. Dominguez since it would most likely be outside of his field of view.

c. Additionally, since Ofc. Pina was reacting; he would be anywhere from ¼ to a ½ a second behind Mr. Dominguez's movements. Therefore it is likely that by the time Ofc. Pina had detected critical cues, interpreted the information, shifted attention, and executed the motor action (that resulted in his first trigger pull); the continuing movement of Mr. Dominguez to an upright position could result in his left arm being within the trajectory of the first bullet. If this occurred, it would have been compounded by the fact that Ofc. Pina's vision, attentional focus, seeking of critical information (for the most part) remained unchanged until after the second shot, where the movement and actions of Mr. Dominguez changed. This then resulted in Ofc. Pina not shooting a third time as he changed his attentional focus, no longer looking through the Aimpoint optic.

8.  My professional review of this case concludes the following: Ofc (now Sgt.) Pina's actions/response was consistent with accepted practices and training of a reasonable officer for the appropriate use of physical force as dictated by the situation and in response to Mr. Dominguez's actions. Additionally, my analysis also indicates that the actions that led to Sgt. Pina's use of lethal force was first predicated by the actions and choices of Mr. Dominguez. A police officer's choice of a reasonable response is based on training, experience and measured against the standard of the reasonable officer. Additionally noted is that police officers are trained to examine the range of possible, feasible, and reasonable alternatives and choose one response from that range.

9. In this case, the force applied stemmed from a reasonable choice and is consistent with the training of a reasonably trained police officer subject to the same performance limitations and factors that research has shown to affect humans involved in similar situations. Cited research is found in Attachment A (References Cited).

The foregoing facts and conclusions are true based on my personal knowledge and experience, and I make this declaration under the penalty of perjury.

This 20th day of May 2021.


Dr. John R. Black