JOHN KEVIN CROWLEY (SBN: 88189)
*ATTORNEY AT LAW*
125 S. Market Street, Suite 1200
San Jose, California 95113-2288
Telephone: (408) 288-8100
Facsimile:   (408) 288-9409
e-mail: jkclaw@pacbell.net

Attorney for Plaintiffs
**JESSICA DOMINGUEZ INDIVIDUALLY
AND JESSICA DOMINGUEZ AS GUARDIAN
AD LITEM FOR JAD (1), JAD (2)
AND JAD (3)**

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| JESSICA DOMINGUEZ INDIVIDUALLY AND JESSICA DOMINGUEZ AS GUARDIAN AD LITEM FOR JAD (1), JAD (2) AND JAD (3),<br><br>Plaintiffs,<br><br>vs.<br><br>CITY OF SAN JOSE, SAN JOSE POLICE DEPARTMENT, MICHAEL PINA, AND DOE POLICE OFFICERS 2 through 5,<br><br>Defendants. | Case No.: 5:18-cv-04826 BLM<br><br>**SUPPLEMENTAL DECLARATION OF JOHN KEVIN CROWLEY IN SUPPORT OF FURTHER BRIEFING ON SUMMARY JUDGMENT MOTIONS**<br><br>DATE:    April 21, 2022<br>TIME:    9:00 a.m.<br>DEPT.:   3, Fifth Floor<br>JUDGE:  Hon. Beth Labson Freeman<br><br>Trial Date: August 22, 2022 |

I, John Kevin Crowley, declare:

1.      I am an attorney at law licensed to practice before all courts in the State of California and I am an attorney for Plaintiffs in the above captioned matter.

2.      Consistent with this court's order regarding further briefing on Summary Judgment Motions, Document 56, Plaintiffs attach the following exhibits.

//

Supp. Declaration of John Kevin Crowley In Support of Plaintiffs' Motion for Summary Judgment

1

1    3.    The deposition of Scott Defoe took place on or about July 16, 2021.   A true

2    and correct copy of the transcript of that deposition is attached hereto and incorporated

3    herein as **EXHIBIT 12**.

4    4.    Excerpts of the deposition of Michael Pina which took place on or about

5    March 3, 2021.   A true and correct copy of the excerpts of the transcript of that

6    deposition is attached hereto and incorporated herein as **EXHIBIT 13**.

7    

8    5.    Excerpts of the deposition of Plaintiff, Jessica Dominguez, taken on or

9    about February 19, 2021. A true and correct copy of excerpts of the transcript of that

10   deposition is attached hereto and incorporated herein as **EXHIBIT 14**.

11   6.    Excerpts of the deposition of Alvaro Lopez, taken on or about March 1,

12   2021.   A true and correct copy of the excerpts of the transcript of that deposition is

13   attached hereto and incorporated herein as **EXHIBIT 15**.

14   

15   I declare under penalty of perjury under the laws of the state of California that the

16   foregoing is true and correct.

17   

18   Dated:   April 1, 2022

19   _____

     John Kevin Crowley

20   

21   

22   

23   

24   

25   

26   

27   

28   

Supp. Declaration of John Kevin Crowley In Support of Plaintiffs' Motion for Summary Judgment

2

EXHIBIT 12

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

```
JESSICA DOMINGUEZ,              )
INDIVIDUALLY AND AS GUARDIAN    )
AD LITEM FOR JACOB DOMINGUEZ,   )
JORDAN DOMINGUEZ AND JALIYAH    )
DOMINGUEZ,                      )
                                )
              Plaintiffs,       )
                                )  NO. 5:18-CV-04826-
vs.                             )       BLF
                                )
CITY OF SAN JOSE, SAN JOSE      )
POLICE DEPARTMENT and DOE       )
POLICE OFFICERS 1, 2 and 3 and  )
DOES, inclusive,                )
                                )
              Defendants.       )
_____  )
```

DEPOSITION OF SCOTT DEFOE


DATE:                July 16, 2021

TIME:                10:00 a.m.

LOCATION:            Remote Zoom Deposition

REPORTED BY:         BETTY A. SALOIS, RPR,
                     Certified Shorthand Reporter
                     License Number 4768
                     Appearing Remotely


_____
SALOIS & ASSOCIATES
Certified Shorthand Reporters
111 N. Market St., Suite 300
San Jose, CA 95113-1112
(408) 279-DEPO

1

1                    A P P E A R A N C E S

2

3      For the Plaintiff:          THE CROWLEY FIRM
       Appearing Remotely          BY:  JOHN KEVIN CROWLEY, ESQ.
4                                  125 S. Market Street
                                   Suite 1200
5                                  San Jose, CA 95113
                                   408.288.8100
6

7
       For the Defendant:          CITY ATTORNEY'S OFFICE
8      Appearing Remotely          BY:  MAREN CLOUSE, ESQ.
                                   200 E. Santa Clara Street
9                                  16th Floor
                                   San Jose, CA 95113
10                                 408.535.1900

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                                              2

1                       INDEX OF EXAMINATION:

2                                                        Page:

3    Examination by Ms. Clouse                              4

4

5

6

7

8

9

10                      INDEX OF EXHIBITS:

11   Defendants              Description              Page:
     Exhibits:
12

13   No exhibits marked

14

15

16

17

18

19

20

21

22

23

24

25

                                                            3

1                          SCOTT DEFOE,

2      being duly sworn by the Court Reporter to tell the

3      truth, the whole truth and nothing but the truth,

4      testified as follows:

5                    EXAMINATION BY MS. CLOUSE:

6          Q.   Good morning, Mr. Defoe.  Can you state your

7      name and spell your last name for the record?

8          A.   Sure, it is Scott Allen DeFoe, D E capital F O

9      E.

10         Q.   Have you been retained by the Plaintiff in the

11     matter of Dominguez versus City of San Jose?

12         A.   Yes, ma'am.

13         Q.   As a result of that retention you wrote a

14     report that is dated May 21st, 2021?

15         A.   That is correct.

16         Q.   I am going to be referring to that report

17     today.  If you would like to look at that report or any

18     other document during the deposition that is fine.  I

19     would just ask that you let me know what you are looking

20     at since we are not sitting in the same place and I

21     can't tell if you are looking at a document on your

22     screen or desk for instance.  Okay?

23         A.   Yes, ma'am.

24         Q.   I would like to ask you first about opinion

25     number one in that report which is your opinion that it

                                                            4

1    was a poor tactical decision for Officer Pena not to

2    move to a position of cover.  Have I summarized that

3    correctly?

4         A.   Yes, ma'am.

5         Q.   It is your understanding that in the incident

6    on September 17th, 2017 that resulted in Mr. Dominguez's

7    death that Officer Pena and other officers executed a

8    vehicle containment technique?

9         A.   Yes, ma'am.

10        Q.   And that -- I will refer to it as a VCT.  That

11   VCT involved three vehicles?

12        A.   Yes, ma'am.

13        Q.   Is that a recognized law enforcement technique

14   as far as you know?

15        A.   Yes.

16        Q.   Under what circumstances is it used?

17        A.   Typically in my experience with the Los Angeles

18   Police Department it is that we would -- our special

19   investigative section would typically use VCT's to stop

20   someone who is wanted for a crime that they possibly

21   perceive that may flee from officers.  It is a tactic

22   that should be practiced with specific unit, with

23   specific officers, detectives on a frequent basis.

24   Because it is a unique technique it is not something

25   that 4 or 3 officers would arbitrarily do.  So it is

5

1   something that in this case through CRU that they would

2   practice, that they would utilize if called upon to

3   conduct surveillance of someone who may be a flight

4   risk, typically wanted on a felony, may flee from

5   officers, potentially or potential or propensity for

6   violence.

7          There is a number of reasons why typically CRU

8   or unit like SIS with LAPD would be called upon to

9   conduct surveillance and ultimately use VCT if

10  necessary.

11     Q.  You are referring to the SIS unit in L.A.P.D.;

12  is that right?

13     A.  Yes, ma'am.  Special Investigation Section when

14  I was working SWAT with L.A.P.D. we would work in

15  conjunction with them.  Typically for recidivists,

16  people gotten out of jail, wanted on typically a felony,

17  may flee from law enforcement.  They would conduct a

18  surveillance of that individual, and, if necessary, if

19  the opportunity permitted, a lot has to do with

20  obviously time, location, things such as that they would

21  execute or utilize a VCT to try to stop that

22  individual's movements.

23     Q.  Okay.  You were not a part of the SIS unit,

24  correct?

25     A.  No, ma'am, but we worked in conjunction with

1    them on coordinated.  In the event the person got away

2    or we were looking at a structure or the person was

3    barricaded inside the vehicle if they stopped and

4    refused to submit to arrest we would treat that vehicle

5    like we would a structure.

6        Q.   So SWAT would be called in by SIS after they

7    had made an attempt to execute the VCT on some occasion?

8        A.    That is correct.  Some occasions we would work

9    in conjunction depending on the nature of the suspects

10   if there were multiple suspects.  There are times that

11   SWAT would work in conjunction with SIS.  It might be a

12   kidnap for ransom, hostage situation.  It depends on the

13   nature of the incident.

14       Q.   Okay.  Have you yourself ever participated in a

15   VCT?

16       A.   As a -- obviously assisting SIS probably about,

17   maybe about ten times or so during my tenure with SWAT.

18       Q.   Okay.  So when you assisted SIS with the VCT

19   were you actually one of the officers who pulled his

20   vehicle up near the suspect' vehicle?

21       A.   No.  I mean we utilized a BearCat or BEAR at

22   times which is a ballistic vehicle in conjunction with

23   that vehicle, but not to the initial deployment or the

24   initial activation of the VCT.

25            No, that is specifically for a unit that

                                                          7

1    trains, typically undercover unit that is training in

2    that environment, plain clothes unit such as CRU in this

3    case or SIS.  There are many agencies or many large size

4    agencies have this capability typically.

5         Q.  Okay.  You never trained on the VCT then?

6         A.  No.  We trained on it, but once again the

7    actual tactic would be performed by the detectives

8    assigned to SIS.  Once again we would use somewhat of a

9    VCT utilizing ballistic vehicles.  If the vehicle is

10   stationary we needed to conduct a blocking unit.  It

11   would be similar to the movement that was done here, but

12   that is typically if a determination of a pursuit and

13   someone flees and now the vehicle is disabled.  We would

14   come up and do a vehicle containment technique to

15   contain that vehicle, but not roving.  If the vehicle is

16   roving in this case, it is actually moving, that would

17   be specifically ear marked for surveillance units such

18   as SIS or in this case CRU.

19        Q.  Okay.  Just to be sure I understand.  You never

20   trained on conducting a VCT of a roving vehicle?

21        A.  That is correct, in the sense of roving.  We

22   would train with SIS on that, but not to perform the

23   actual execution of that containment technique because

24   once again that would be earmarked for detectives

25   because they are in plain vehicles.  They are undercover

8

1    vehicles and not to obviously give any real

2    identification to the subject which they are following

3    at the time.

4         Q.   Okay.  So the blocking technique that you

5    personally trained in was a technique for blocking in a

6    vehicle that was already stationary?

7         A.   Or potentially move again.  Officers are

8    trained -- patrol officers are trained to conduct a form

9    of a VCT, determination of a pursuit if the vehicle is

10   in a parking lot.  It just depends.  But specifically

11   for conducting a surveillance of an individual who is

12   wanted for potential crime, no, that would be for a

13   surveillance unit.  We would work in conjunction

14   frequently with SIS.  Many of those times would be at

15   the overlay which means at the time in which the VCT is

16   executed if there are multiple suspects inside a car we

17   would obviously utilize our special weapons and tactics

18   to assist SIS with that vehicle containment technique.

19        Q.   Okay.  So I want to try to understand what you

20   mean when you say that you worked in conjunction with

21   SIS, in particular the timing of it.  So can you explain

22   to me what you mean that you would work in conjunction

23   with and assist SIS in some cases?

24        A.   Sure.  We would -- obviously there was a lot --

25   we worked on a lot of cartel kidnapping cases in Los

                                                          9

1     Angles and many of those cases involved multiple

2     suspects.  Obviously some of these suspects had shoulder

3     weapons and weaponry that was beyond the capabilities

4     for patrol officers obviously.  So we would work, we

5     would obviously be in a position or behind the actual

6     containment when the actual containment was executed.

7     If possible we would move our vehicles into a position,

8     blocking position, utilize ballistic vehicles such as

9     the BEAR or BearCat and be able to utilize special

10    weapons to cover that vehicle while the extraction

11    occurred.

12         Q.   Okay.  As far as you know did SIS conduct

13    vehicle containments without back up from SWAT as you

14    have described?

15         A.   All the time.  That was the exception.  They

16    typically would utilize -- do them on their own without

17    SWAT.  So that was typically maybe a hostage taking

18    situation, there was something where these suspects were

19    subject to, access to shoulder weapons or weaponry that

20    we would assist SIS.  But typically that is the bread

21    and butter of SIS in the sense that is what they do on a

22    daily basis.  No, that would be on rare events when they

23    would need some over watch and protection from ballistic

24    vehicles such as that.

25         Q.   Okay.  Do you agree that a VCT was an

                                                          10

```
1    appropriate apprehension technique for Mr. Dominguez

2    based on what officers knew at the time?

3         A.   I think it was appropriate.  I think it was

4    effective.

5         Q.   What makes you think that it was appropriate?

6         A.   Based on the fact that he was wanted on a

7    potential robbery.  They had done a successful VCT two

8    days prior with Mr. Anchondo, Ms. Ruiz and a third

9    female, apparently Mr. Dominguez's potential friend.  So

10   I believe it worked.  It worked.  It was effective.

11        Mr. Dominguez was wanted in connection with a

12   ARCO robbery that occurred on September 12th.  There was

13   still a gun that was outstanding at the time of this

14   robbery that was not recovered.  He was a gang member in

15   the area.  He had associated obviously with Mr.

16   Anchondo.  There was an armed robbery that occurred

17   where money was taken from two victims at the ARCO.

18        So I think it was an appropriate tactic to use

19   based on what the officers knew at the time.

20        Q.   You said it was effective in your view.  What

21   makes you say that?

22        A.   I think it was done effectively, I think the

23   way in which obviously Detective Pena, now Sergeant Pena

24   initiated the actual containment technique.  I thought

25   they coordinated -- little bit of a lapse, but once
```

11

1    again that is going to happen in the sense at the time

2    when Detective Ferguson and Detective Officer Lopez, the

3    other two vehicles were put in the position I think

4    Officer Lopez was effective in moving his vehicle off to

5    insure that the vehicle was in fact boxed in.

6         I think the area in which it was done though it

7    is obviously preferable in a parking lot, right, but in

8    this particular case where Penitencia and North White

9    Road, the intersection there being that he was in

10   obviously -- would be the number three lane if you count

11   the left turning lane, but the first vehicle in line

12   which is great so you don't have a cross fire situation

13   with the vehicle in front.  I think that was effective.

14        I think the coordination was effective.  We

15   know there were seven to nine additional CRU members

16   that were responding including a sergeant, Sergeant

17   Jimenez.  I think the coordination in itself was

18   effective.

19        I think the reason for conducting the VCT was

20   appropriate.  I think the timing of the VCT was

21   appropriate as well.

22   Q.   Have you visited the location of the shooting?

23   A.   I have not yet, ma'am.

24   Q.   But if I understand your report correctly you

25   have some criticism of how the VCT was done after it was

                                                        12

1    initially executed?

2         A.   Well, my criticisms are specific to Officer,

3    Detective Pena's actions with where he deployed.

4    Obviously where Officer Lopez deployed, I think there

5    was an opportunity to move back to position of cover for

6    the safety of the officers.  The vehicle is boxed in.

7    So right now we want to create time and distance.  So

8    the move obviously being Detective Ferguson, Pena to the

9    rear of Detective Lopez's vehicle and slow down.  You

10   know you have other assets that are responding.  You

11   have a sergeant that is responding.  The vehicle is

12   contained.

13        If the vehicle breaks away and breaks through

14   containment that is fine.  It happens.  You have over

15   watch with the surveillance, fixed wing plane.  They

16   could transition that to a helicopter if necessary.  So

17   I think the containment technique was appropriate.

18        I think the movement and the positioning

19   specifically of Detective Pena in an open air

20   environment, front quarter panel of Detective Ferguson's

21   car was a poor tactical position for both him and

22   ultimately for Mr. Dominguez.

23        Q.   Okay.  So if I understand you correctly in your

24   view Officer Pena should have gone to the rear of

25   Officer Lopez's vehicle?

                                                         13

1          A.   Sure.   I mean at least worked his way to the

2     rear of Detective Ferguson's vehicle and ultimately

3     moved to position to Detective Lopez's vehicle where he

4     could obviously -- the vehicle was boxed in at that

5     time.   K-9 was enroute.   In the event that he fled they

6     would have capability of K-9 to either conduct

7     systematic search or direct deployment of K-9.

8               Obviously to move back with any other obviously

9     high risk felony vehicle stop officers are trained

10    obviously to move back to position of cover, utilize PA

11    system and order someone outside of the vehicle.   It is

12    never done directly across from the driver's door for

13    number of reasons.   Because if the person is armed if

14    you reasonably believe they are armed you wouldn't put

15    yourself in that poor tactical position.

16         Q.   Okay.   In your view Officer Ferguson -- maybe

17    this will be easier if we number the vehicles.   In my

18    mind Officer Pena's vehicle to the front of the suspect

19    vehicle is vehicle number one.   Does that make sense to

20    you?

21         A.   Sure.   That is fine.

22         Q.   Okay.   Then Officer Ferguson's vehicle parallel

23    to the driver's side of the suspect vehicle is vehicle

24    number two.   Okay?

25         A.   Okay.   That's great.

                                                           14

1          Q.   Officer Lopez's vehicle to the rear is vehicle

2     number three.  Okay?

3          A.   Yes, ma'am.

4          Q.   So is there any other way in your mind to

5     perform the technique other than for a vehicle to be in

6     the number one position as Officer Pena's vehicle was?

7          A.   No.  I think it blocked off obviously egress

8     looking at the photos and looking at the diagrams that

9     were provided in this case.  I think it was effective.

10    It was -- I think it was done correctly.  It allowed him

11    to come out of the driver's door.  He can work his way

12    to the rear quarter panel of the driver's side.

13    Obviously with time, with cover could move to the rear

14    of Detective Ferguson's car and then ultimately with

15    cover could move to the rear of Detective Lopez's

16    vehicle.

17               There is another alternative too.  He could

18    have remained in a position of cover in his vehicle to

19    the right rear quarter panel.  That based on the

20    vehicle's positioning would not have created a cross

21    fire situation based on the photographs that were

22    provided.  But I think it is probably safer to move to

23    the rear of those vehicles.  That is typically how it is

24    trained to conduct a VCT.

25         Q.   Okay.  But as you stated it takes some time

                                                          15

1   before the driver of the number one vehicle to move away

2   from his vehicle first to the number two vehicle and

3   then to the number three vehicle, correct?

4       A.   Sure.  If he is going to move I mean once again

5   looking at a photograph in front of me which is

6   consistent with my report.  I think there is an

7   opportunity to stay where he is at.  It doesn't put him

8   in a cross fire situation, but once again the best

9   tactic would be to move to the rear.  That would be done

10  by officers communicating that you are covering my

11  movement if I was now moving and you are going to cover

12  my movement I am letting you know that you are covering

13  my movement and I am going from point A to B.  In the

14  event that a legal threat by Mr. Dominguez presented

15  himself then the officers would respond accordingly to

16  that threat.

17      Q.   So as officers are moving -- in your mind there

18  are sort of two officers moving.  Officer in vehicle one

19  is moving toward the rear of vehicle three and then the

20  officer in vehicle two is also moving toward the rear of

21  vehicle three; is that correct?

22      A.   I think the best -- you want one officer to

23  move at a time.  That is typically the best movement

24  because you are going to want those other officers to

25  cover the other officers movement.  You could have

16

1    obviously Detective Ferguson go to the rear of his

2    vehicle.  He still would be able to keep an eyesight on

3    Mr. Dominguez's actions.  Then with that communicate to

4    Detective Pena the time at which he could move.

5         Detective Pena could then move to the rear of

6    Detective Ferguson's vehicle, and at that point it would

7    be a coordinated move, one office, detective could move

8    to the rear of Detective Lopez's car while the other

9    detective covered that movement in the event once again

10   that Mr. Dominguez presented a weapon, was a lethal

11   threat he could respond to that lethal threat.

12        Q.  So as that movement is occurring if the suspect

13   presents a lethal threat then officers respond to that?

14        A.  Yes, ma'am.

15        Q.  Your opinion about the way that officers should

16   move during a VCT, what is that based on?

17        A.  It is just covered movement.  It is based on

18   most officers learn that cover and concealment based on

19   their basic POST academy training.  CRU units are

20   typically highly trained.  They are tacti -- quasi

21   tactical units because you are dealing with a tactical

22   intervention, tactical intervention technique such as

23   the VCT.

24        So yes, that is just basic principles of cover

25   and movement is that you want to move when someone is

17

1    covering that movement.  That would be lethal and less

2    lethal coverage.  In event once again the person

3    presents a non-lethal threat you wouldn't shoot them.

4    But if they present a lethal threat -- if reasonable --

5    you could use lethal force.

6         But that is just basic POST training and

7    typical training that officers receive in service

8    throughout their career on high risk vehicle pull overs.

9    May be a stolen vehicle, may it be a, through the POST

10   learning domain may be a vehicle containment technique,

11   pursuit intervention technique like a pit maneuver, all

12   of those are trained through obviously POST learning

13   domains.  Nineteen, 22, 23 are typically the learning

14   domains that are trained.

15        Q.   Is there a difference between a VCT and a high

16   risk vehicle pull over?

17        A.   Sure.  I mean obviously they are both high

18   risk.  They both fall into high risk category.  But

19   yeah, your typical high risk vehicle pull over typical

20   like you would see on T.V. or that officers perform on

21   daily basis, so stolen car, lights and siren, typically,

22   it is typically a determination of a pursuit, so minimum

23   of two officers and a supervisor if not more.  Two to 3

24   car lengths behind, offset, vehicle comes to a stop then

25   once again you slow down, contact officer giving

18

1    instructions to the driver to shut the car off, drop the

2    keys out the window.

3         The formulated tactical plan may be used with

4    lethal and less lethal force depending on the subject's

5    level of resistance.  Then have that subject exit the

6    driver's side of -- if there is one subject you are

7    going to want that person to put their hands up over

8    their head, show their waist band, come down to their

9    knees, and then depending on the number of subjects in

10   the vehicle you do the same thing.  You are going to

11   want to obviously cover the suspects or subjects and

12   then clear the vehicle.  That is typical.  Typically

13   that is how it is done in VCT as well.  You have to get

14   them out of the car.  No sense of walking up to the car

15   if you believe they are armed.  You want to order them

16   out of the car from a position of cover, safer for the

17   officers, and then put him in a prone position away from

18   the officers, cover him, clear the car, and then effect

19   a handcuffing technique.

20        Q.  Okay.  So the commands are similar in a VCT

21   than a high risk pull over, but the positioning of the

22   officers vehicles is different; do I have that right?

23        A.  Yes.  VCT is an offensive aggressive movement.

24   You are doing that to obviously -- there is the element

25   of surprise, right.  You want to get that person where

                                                        19

1   there is an element of surprise that you are surprising

2   that person.  That is the purpose of the VCT.

3          Unlike a pursuit or someone who is failing to

4   yield, something like that, they know they are wanted,

5   right.  In this case Mr. Dominguez made known he was

6   wanted.  I think it is evident he did because he

7   purchased a plane ticket.  I think Mr. Dominguez not --

8   at the time apparently did not know that he was being

9   surveilled even though he was doing some counter

10  surveillance preceding this according to my review of

11  the record.  They performed it well enough they were

12  able to effectively conduct the VCT without him fleeing.

13  So they did a good job on the part of implementing the

14  VCT.

15     Q.  Did you make any assumptions in forming your

16  opinion about Mr. Dominguez's conduct after his vehicle

17  -- or after the vehicle containment technique was

18  executed up until the time of the shooting?

19     A.  I don't understand the question did I make any

20  assumptions?

21     Q.  So, I am sure you have seen the testimony from

22  the officers that Mr. Dominguez initially put his hands

23  up and then dropped his hands and leaned forward.  Did

24  you assume the truth of those statements as you formed

25  your opinions?

20

1          A.   I don't make credibility determinations, ma'am.

2     People's perceptions are going to be different depending

3     on what their view point is.  So what I do know is that

4     and what was testified to in this case, what we know

5     from our experience is people put their hands up and

6     down all the time.  Sometimes people are submitting to

7     arrest.

8               I think it was also telling in this case was

9     the evidence, right, obviously there was some bullet

10    holes that went through the sweat shirt area of -- sweat

11    shirt of Mr. Dominguez he was wearing at the time.  So I

12    did not do a reconstruction of the shooting.  There is

13    someone obviously that the Plaintiff has as well as I

14    read your -- the report that you produced in this case,

15    defense experts produced in this case.  I agree that it

16    seems apparent once again that when the hands are up and

17    the initial shot is to the head of Mr. Dominguez that

18    the hands are up based on the evidence of the bullet

19    holes in the sweat shirt.  So I don't make credibility

20    determinations of what Detective Pena saw at the time

21    when he fired his weapon.  I am just saying what the

22    evidence revealed.

23         Q.   So let me ask you the follow up on that.  Then

24    I will try to get back to the question I was asking.  Is

25    it your assumption that Mr. Dominguez's hands were up as

                                                          21

1    in above his shoulders and visible above the level of

2    the -- through the car window at the time of the

3    shooting?

4        A.    Apparently, ma'am, just based on the evidence

5    of the bullet holes in the hooded sweat shirt.

6        Q.    Is it your understanding that the position of

7    the bullet holes gives information from which

8    conclusions can be drawn about the position of Mr.

9    Dominguez's hands?

10       A.    Sure.  I mean I think there could be different

11   versions of what those conclusions are, but I think the

12   evidence is that his hands would have had to have been

13   up for those bullet holes to have been in that sweat

14   shirt.  If they were down below obviously the frame of

15   the door there would be no way that those holes would

16   have been in the area that they were in based on not

17   just the evidence I read but specifically based on your

18   defense experts reconstruction of the actual shooting

19   incident.

20       Q.    So your assumption is based on your review of

21   the report of Rocky Edwards?

22       A.    Yes, and once again just common sense of

23   looking where the holes are in the sweat shirt that the,

24   it appears that the hands are up at the time at which

25   the round is fired because he didn't put his hands up

                                                            22

1    after being shot in the head I would assume with the

2    lethal shot.  His hands would have been up in the air at

3    the time the shot to the head occurred.

4         Q.  So you didn't make any assumptions about what

5    Officer Pena perceived at the time in terms of where Mr.

6    Dominguez's hands were?

7         A.  No, ma'am.  I can't objectively give an opinion

8    of what his perceptions were at the time.

9         Q.  I am asking a little bit different question.  I

10   am asking if you make any assumptions in forming your

11   opinions about what Officer Pena perceived at the time?

12        A.  No, ma'am, I did not.

13        Q.  Okay.  So, belatedly did you make any

14   assumptions about whether Mr. Dominguez did or did not

15   drop his hands down and lean forward before Officer Pena

16   fired?

17        A.  Once again I don't make credibility

18   determinations.  If that is Officer Pena's version of

19   the facts it just seems inconsistent with what the

20   evidence is, ma'am.

21        Q.  What I am asking you is if you made any

22   assumption one way or another in forming your opinions

23   in this case about whether Mr. Dominguez did or did not

24   drop his hands down and lean forward before Officer Pena

25   fired?

                                                    23

1          A.   I don't know, ma'am.

2          Q.   You don't know if you made that assumption?

3          A.   I don't know if --

4          MR. CROWLEY:  Counsel, I object.  Your question

5     has been asked and answered two different times.  Now we

6     are getting into the third time.  I think it is clear

7     his answer is on the record.  I don't know why you are

8     continuing to harass him with the same kind of question.

9          MS. CLOUSE:  I think Mr. DeFoe can handle

10    repeated question.  I don't think I have got an answer

11    to it, yet.

12          If I am not asking it in a way that is

13    understandable for you, Mr. DeFoe, let me know and I

14    will try to ask a different question.

15          THE WITNESS:  Ma'am, based on my review of the

16    evidence in this case and based on the conclusion,

17    specifically on page 24 of your defense experts report,

18    the hands would have been in an upward area as

19    commanded.  He was told to raise his hands.

20          At the time of the shooting, the time of the

21    lethal shot based on your defense experts report is that

22    his hands would have been in an upward position above

23    his shoulders or in an area that was at least above the

24    door frame of the Kia vehicle for that obviously

25    evidence to be on that sweat shirt the way it was with

                                                          24

1    both of those holes.  So, once again I am not making

2    credibility determinations on what Mr. -- Detective

3    Pena's observations were.  Based on my review of the

4    facts in this matter his hands were in an upper

5    position.  Based on the evidence of the sweatshirt and

6    based on the report I read from your defense expert once

7    again reinforces my opinion at the time I submitted my

8    Rule 26 report in this case.

9         Q.   I got that piece.  I was attempting to ask

10   about something earlier in time in the sequence of

11   events as the officers have testified about it.  I am

12   sorry if my question was less than clear.

13        Are you familiar with the deposition testimony

14   of the officers that when Mr. Dominguez -- at the

15   initiation of the VCT Mr. Dominguez initially had his

16   hands up above his shoulders where officers could see

17   them and then dropped his hands down and leaned forward.

18   Are you familiar with that deposition testimony?

19        A.   From Detective Pena, yes.

20        Q.   As you formed your opinions in this case did

21   you assume that that testimony was accurate or did you

22   assume -- in other words, did you assume that Mr.

23   Dominguez in fact made that movement or did you assume

24   that he did not make that movement?

25        A.   It didn't matter to me anyway if he made the

                                                            25

1    movement, put his hands down or kept them down it did

2    not matter to me anyway because no one ever saw anything

3    in Mr. Pena's (sic) hands.  Officer Ferguson stated he

4    could see Mr. Dominguez's mid arm and shoulder up.

5    According to fairing he stated that if there was

6    something in Mr. Dominguez's hands he would have been

7    able to see it.

8         So no, I looked at the officers testimony and

9    what they were looking at.  Ferguson also stated he was

10   100 percent focused as to what was going on in the car.

11   So obviously Pena stated when he had his hands up, when

12   Dominguez had his hands up he could see there was

13   nothing in his hands, no weapons.  So once again we know

14   there was no weapon in the car.  We know when his hands

15   came back up when he was shot based on the evidence of

16   the sweatshirt there was nothing in his hands.  I don't

17   know how to answer your question other than what the

18   officers testified to in this case.  And it corroborates

19   the consistency of your defense experts report as well

20   as my looking at the evidence in this case that was

21   presented to me during discovery.

22   Q.   Okay.  What I am trying to do is understand the

23   facts that are important to you in forming your

24   opinions.  So I think we are getting there.

25        Am I right in understanding that it is not

26

1    important to you whether Mr. Dominguez dropped his hands

2    and leaned forward because no one saw anything in his

3    hands when he had them up?

4        A.   Partially.   But we also know that and even

5    Detective Pena stated he encountered people who

6    initially had their hands up and then down and then back

7    up.   That is not uncommon.   That is why cover is so

8    important.   That is why being in a good position is

9    important.   Because if people are non-compliant there is

10   passive non-compliance not offering any form of physical

11   resistance.   People are non-compliant.   That in itself,

12   that, that non-compliance would not justify using lethal

13   force.   There is no basis for passive non-compliance.

14         Once again to answer your question I look at

15   all the information that is provided to me to formulate

16   objective opinions.   As I stated earlier I am very

17   complimentary with the way the VCT was done.   But after

18   the VCT was performed the tactics as well as the use of

19   force I believe were unreasonable.

20       Q.   Did you conclude that because no one saw

21   anything in Mr. Dominguez's hands before the shooting

22   when he had his hands up that that meant that there

23   wasn't a weapon in the car?

24       A.   No.   There very well could have been a weapon

25   in the car.   But once again officers are trained from

                                                              27

1    the time we all enter the police academy is that what

2    can kill you is the hands.  We want to make sure that we

3    are monitoring the hands.  And with that that is why

4    cover is so important because it gives you time and

5    distance.

6            So once again no, until that car is searched

7    and Mr. Dominguez is searched that being his person I

8    think that you have to obviously use proper tactics

9    until you know otherwise.  I think that is reasonable

10   because there is a reason why they did a VCT.  There is

11   a reason why he was allegedly involved in this robbery

12   that transpired couple days prior.  I think the decision

13   to use the VCT based on the information the officers

14   knew was reasonable.  That is why proper tactics are so

15   important because you want to order them out of the car,

16   make sure that obviously he doesn't have a weapon on him

17   or weapon close to him, place him in handcuffs and take

18   him into custody.

19       Q.  Do you agree that at some point during a VCT

20   the officers are necessarily going to be in close

21   proximity to the suspect?

22       A.  Sure.  I mean they are based on the tactic in

23   itself, yes.  It is a unique tactic that puts you in

24   close proximity.  Once again officers are trained once

25   it is performed to put yourself in a position of cover

28

1   because you don't want officers getting shot or hurt.

2   We want to make sure they are in a good position of

3   cover.

4           The vehicle is in good position of cover if you

5   are not leaning across the hood of it at the front

6   driver's side quarter panel that provides you no cover.

7   So no, officers are trained that obviously because it is

8   a close tactic in the sense where there is close

9   proximity to the subject's vehicle based on the nature

10  of the intervention technique, yes, they are going to be

11  in harm's way until they can put themselves in behind a

12  position of cover.

13      Q.   What is your understanding about the commands

14  that officers issued after the VCT was initiated?

15      A.   Tell him to show his hands.  Let me see your

16  hands as they were giving him commands to put your hands

17  up, let me see your hands.

18      Q.   In your view did officers issue conflicting

19  commands?

20      A.   No.  I didn't hear any conflicting commands.

21  No, there was -- not that I opined on.  There was

22  nothing that a reasonable person would understand what

23  the officers wanted him to do at the time.

24      Q.   As I understand your opinions you believe that

25  officers should have done more to de-escalate the

                                                        29

1    situation out there?

2        A.   Sure.   Obviously from time and distance, right,

3    you put yourself in position of cover allows you once

4    again to de-escalate, defuse the best way you can.   Use

5    words to influence behavior.   You do that from a

6    position of cover.   He knows that you are not leaving.

7    It is not like he is going to leave.   You are not going

8    to let him leave.   He is not free to leave.   He is being

9    detained.   Most likely he knows he is going to be

10   arrested.

11          So at that point, yes, you want to use words

12   that influence behavior.   You want to formulate a good

13   tactical plan.   If he doesn't come out of the vehicle,

14   consider what your less lethal options are.   You can

15   slow things down at this point.   It is not always that a

16   VCT is done in a manner that truly blocks that person

17   in.   It was done in this case appropriately.   Once

18   again it afforded the officers involved time and

19   distance.   It allows them to decompress as well.   This

20   is a tactic that once again there is obviously

21   physiological and psychological responses to a tactical

22   event even for officers who train all the time.   It

23   allows the officers to decompress, use time and

24   distance, understand what they want him to do at that

25   time, reduce that persons anxiety, Mr. Dominguez's

30

1    anxiety, their own anxiety and then tell him what you

2    want him to do.

3          If he does not comply and there is a different

4    level of resistance you will respond to that level of

5    resistance based on his actions.

6    Q.   Do you agree that de-escalation requires some

7    for lack of better word cooperation on the part of the

8    suspect?

9    A.   Sure.  Officers also know for number of reasons

10   people may not be initially compliant.  They are

11   passively non-compliant.  So you understand that.  That

12   is common in police work.  Everything from the traffic

13   stop, none VCT typically for the allegation of speeding

14   sometimes people are non-compliant.  Officers deal with

15   that every day.  They know how to de-escalate and

16   defuse.  Use good verbal strategies, active listening

17   skills.

18         There are times that people don't comply, and

19   then obviously that is up to the officers to use the

20   proper verbal strategies to hopefully have that person

21   concede to their commands and submit to arrest if it is

22   an arrest situation.

23   Q.   Would you agree that a suspect's behavior can

24   escalate a situation?

25   A.   Sure.  Any officers will respond based on the

                                                          31

1    subject's actions at the time based on that subject's

2    actions.  Officers are trained obviously through their

3    respective departments through POST learning domain 20

4    what that subject's level of resistance is and what

5    would be a commensurate appropriate use of force based

6    on that level of resistance.

7         Q.  Okay.  Moving on to your opinion number two I

8    understand based on this opinion that Officer Pena

9    failed to formulate a tactical plan from a position of

10   cover; is that a fair paraphrase?

11        A.  Yes.

12        Q.  You would agree that the -- Officer Pena and

13   the other officers had a plan for the VCT, right?

14        A.  Yeah.  In fact the plan worked effectively,

15   yes, ma'am.

16        Q.  And that they formed that plan in response to

17   information they had about Mr. Dominguez?

18        A.  Yes, coupled with the fact they have obviously

19   done this before through training.  So they understood

20   what their roles and responsibilities were in effecting

21   the VCT.  Based on the results of the VCT I think there

22   is no doubt that they used proper training in the use of

23   the VCT and they exercised the VCT appropriately.

24        Q.  It is your understanding that there was a

25   briefing with regard to Mr. Dominguez in which Officer

                                                          32

1    Pena participated?

2         A.   Yes, ma'am.

3         Q.   So what is your understanding of the plan for

4    the VCT that existed before the VCT was initiated?

5         A.   Basically Detective Peter -- I am going to

6    spell his last name -- S Z E N E R E D I, there was a

7    briefing based on the fact of Mr. Dominguez's alleged

8    robbery that transpired on the 12th of September, 2017.

9    There was also discussion that on the 13th Mr. Anchondo,

10   Ms. Ruiz and Ms. Franco were taken into custody at the

11   time.  There was a firearm not recovered.  That

12   obviously Jacob Dominguez who goes by the nickname of

13   Chongo who is a San Jose Grande gang member was wanted

14   for the alleged involvement in the robbery that

15   transpired on the 12th of September.  He was driving a

16   black Kia Sportage, 2016.  He was conducting counter

17   surveillance at the time.

18        So my understanding there was a briefing that

19   was done.  Detective Szeneredi was the, sorry about

20   that, Betty, was the actual case agent, and then

21   obviously the officers attended the briefing and they

22   were going to conduct a roving surveillance of him.  As

23   we know allegedly during the actual arrest on the 13th

24   that transpired at 17641 Calle C A L L E, street is M A

25   Z A T L A N in Morgan Hill that apparently Mr. Dominguez

                                                        33

1    drove by at the time during that, during the detainment

2    of those individuals I previously mentioned.  So he knew

3    he was wanted most likely and he was conducting counter

4    surveillance.  The intent was to conduct a VCT.  They

5    obviously located him.  They requested obviously by

6    RATTF, Regional Auto Theft Task Force.  I think that is

7    about it.

8         Q.  What is your understanding of the plan for the

9    VCT?  I am asking because as I understand it you don't

10   criticize the VCT itself, but you think that they should

11   have at some point when they were executing that

12   technique or after they executed it they should have

13   taken cover and then made further plans; is that right?

14        A.  Yes.  VCT's are interchangeable.  It depends on

15   your position.  You may not be where you want to go back

16   to calling the number one vehicle.  Depending where you

17   are in that actual containment you have to know the

18   roles and responsibilities of all the vehicle.  If you

19   are number one vehicle if you are going to be a blocking

20   vehicle on the driver's side or rear blocking vehicle.

21   Typically the rear blocking vehicle will initiate the

22   VCT.  They do it at a stop light where there is a bump.

23   They will press up.  That person will look behind to see

24   the bump in the rear view mirror.  Typically the vehicle

25   will initiate the number one vehicle pull in front of

34

1     that other vehicle.  That is a typical tactic.

2             Then depending on the terrain, depending on

3     where that person is it make take four vehicles to

4     conduct a VCT to box that person in or may take in this

5     case three vehicles.

6             So my understanding is that there is no set

7     tactic for VCT because the positions are

8     interchangeable.  Depending on where you are in that

9     surveillance will determine what your role is in that

10    specific vehicle containment technique.

11        Q.   In your mind would it have been reasonable for

12    Officer Pena to plan that after stopping his vehicle in

13    the number one position he would point his rifle at the

14    suspect?

15        A.   Sure.  This is a potential lethal force

16    situation.  I have no criticism at all of pointing --

17    typically you want to point it in the low ready position

18    at the 45-degree angle.  Pointing up and coming up on

19    target is typically your mark when immediate defensive

20    life situation when you are going to use deadly force.

21    The reason for that is it limits, obstructs your vision

22    having that rifle or weapon sitting in front of your

23    face.  Either in a weaver shooting platform or an

24    Isosceles shooting platform may restrict your ability to

25    see.  Typically officers are trained especially with a

                                                            35

1    shoulder weapon like in this case to stay at the low

2    ready and then obviously be guided by the subject's

3    actions, provide verbal commands.

4        There is no doubt based on the totality of the

5    circumstances the deployment of shoulder weapons in this

6    case was reasonable or pistol or any type of use of

7    potential lethal force at the ready in the event that

8    Mr. Dominguez was in fact armed and he took an offensive

9    aggressive action toward the officers with that weapon

10   system if he had one.

11       Q.   What further plan were the officers -- should

12   the officers have formulated from behind a position of

13   cover in your mind?

14       A.   Once again once it is contained like it was in

15   this case is to move back to position of cover.  You can

16   wait for additional -- remember you have 7 to 9 people,

17   potentially ten officers involved in this surveillance.

18   You know people are combing.  You can slow things down.

19       Once again if he tries to break out of it, he

20   breaks out of it then obviously then you go into a more

21   of a pursuit mode which would probably incorporate the

22   utilization of black and white vehicles at that point

23   because of the dangers associated with pursuing an

24   unmarked car even with police packages like lights and

25   sirens on them.

                                                          36

1          And then at that point once again whoever the

2     point of contact may be, it may be Detective Pena, it

3     may be Ferguson, it may be Detective Lopez.  Sergeant

4     Jimenez at the time could have been pulling up at that

5     time and then again give that person commands.

6          Once your team is set you don't want to give

7     commands to someone until you are set behind cover.

8     Then let that person know what you want them to do, shut

9     the vehicle off, drop the keys out the window.

10         In this case you have him come out of the

11    passenger side because of the way in which the vehicle

12    was pinned or you may have him come out the driver's

13    side depending, but I think it is preferable to have him

14    come out the passenger side and then obviously put him

15    in a prone position on the street, order him into a

16    prone position on the street.

17         There might be a concern obviously because of

18    the residential area you may want him to come out the

19    driver's side and put him on the ground adjacent to the

20    driver's door.  That is somewhat precludes him from

21    running into the neighborhood if you are concerned about

22    him fleeing into a residential area.

23         There is a number of ways to do it.  I don't

24    think there is any right or wrong.  It is just the time

25    and distance, create time and distance, make sure you

                                                          37

1    have the proper assets, make sure you have less lethal

2    force capabilities, long range impact devices such as

3    bean bag shotgun, 40 millimeter.  In the event that his

4    actions are now aggressive you have to utilize less

5    lethal force option.  That would be the best force

6    because you don't have to walk up on a car like you

7    would with a taser, pepper spray, impact weapon.  So

8    long range impact device would be appropriate less

9    lethal force option for a situation such as this.

10          Then lastly you have the K-9 that is

11   responding.  K-9 is a great ruse to use.  I know from

12   working K-9 for five years with LAPD is that is a great

13   ruse to let that person know you are going to send the

14   dog in the car even though you wouldn't do that in this

15   case until that person is out of the car because you

16   would not want that person to stab, shoot or harm the

17   dog.  Then you would still have to walk up on the car

18   anyway.

19          I think the use of the K-9 in this case was

20   appropriate, but after the shooting to ascertain if Mr.

21   Dominguez was -- there was any signs of life.  I think

22   the use of the K-9 was an appropriate tool in this case

23   after the fact.

24   Q.  You said it was an appropriate tool or

25   inappropriate?

                                                        38

1          A.   It was an appropriate tool.  After that I don't

2     believe the shooting is reasonable so I don't believe

3     there should have been the use of the K-9 for that

4     reason.  To utilize a K-9 once someone is shot to

5     ascertain if they are in fact alive, K-9's are used in

6     that way because you are going to hear the person yell

7     or scream in the event they are being bit which lets the

8     officers know the person is not fully incapacitated at

9     that time.

10         Q.   So in your opinion should the officers not have

11    given any commands to Mr. Dominguez until they were all

12    in positions of cover behind vehicle number three?

13         A.   It depends.  Once again if he takes an

14    offensive action, produces a hand gun you can't wait for

15    that if there is that situation.  But no, that is the

16    optimal situation is to move to position of cover.

17    Obviously start giving a person -- you want to be

18    concerned.  I don't know what you are going to say.  You

19    don't know what I am going to say.  The objective is we

20    want him to come out of the car.  But I am going to

21    designate Officer Lopez, or whoever or I may take that

22    upon myself.  I am going to be contact.  I am giving the

23    commands so we don't have any conflicting commands which

24    happens many times, two opposing command and the person

25    doesn't know what to do and then they do something to

                                                          39

1    the contrary.  Now there is an officer involved

2    shooting.

3            So single point of contact.  The other people

4    will cover that being with lethal and less lethal cover.

5    Then obviously as other officers come deploy them as you

6    need to as they did after the fact.

7            What happened after the fact in this case,

8    after the shooting is what should have transpired before

9    the shooting is blocking off traffic, bringing up

10   resources, getting the K-9 ready to go, utilize the K-9

11   as a ruse.  All that happened after the shooting was

12   appropriate but that then should have been done prior to

13   the shooting.

14       Q.  So I think this takes us to your opinion three

15   which is as I understand it is essentially that officers

16   shouldn't have treated Mr. Dominguez as a barricaded

17   suspect; is that right?

18       A.  Possibly.  If he does not submit to arrest the

19   fact that okay, you need to come out of the car.

20   Utilize PA system or voice to get him to come out of the

21   car.  The driver's side window is partially open so we

22   know that he can hear you.  He knows he is obviously in

23   fear of the police at that point.  I don't think there

24   is any issue that he knows he is wanted.  That you are

25   the police even though you have tac vests on and

                                                          40

1    baseball caps and beards.  I don't think there is an

2    identification issue here.  He knows who he is dealing

3    with.  I think a reasonable person would know that it is

4    the police.

5           And at that point yes, if he does not respond

6    and he would not come out of the car the fact that there

7    may be a nexus to a firearm based on the robbery that

8    transpired on the 12th with the firearm still

9    outstanding, he has affiliation with a gang, all those

10   things are things that officers should look and say

11   okay, there is an officer safety issue here.  Treat the

12   car as a structure like you would if it was a house and

13   someone refused to submit to arrest.  San Jose is a very

14   robust highly trained SWAT team that deals with training

15   on situations like this for them to come out to a

16   situation where it is a barricade inside a vehicle

17   presumed to be armed refusing to submit to arrest it

18   would fall within their policy and it would be

19   appropriate based on the totality of the circumstances.

20       Q.  At what point does someone become a barricaded

21   suspect?

22       A.  Once again possibly armed in this case we will

23   assume he is possibly armed based on what the officers

24   reasonably know at the time.  They have asked him to

25   come out of the car.  They have given him reasonable

                                                          41

1    opportunity to comply.  He does not comply.  Maybe he

2    says I am not coming out.  At that point -- I don't want

3    to do anything else at that point, start breaking out

4    windows with less lethal force options because once

5    again I can tell you what with hundred percent of

6    assurance based on working L.A.P.D. SWAT as a supervisor

7    probably the first thing they are going to do is

8    interchange some of those vehicles with ballistic

9    vehicles that will provide the officers ballistic

10   protection.  Then eventually try to negotiate with him

11   with utilization of a negotiation component that being

12   trained negotiators as in a residence.  If that fails

13   after the time they decide that obviously negotiations

14   are no longer possible or they are possible at all they

15   can interject a throw phone to obviously to try to

16   establish communication.  If none of that works most

17   likely they are going to interject a chemical agent or

18   irritant into the vehicle.

19          By shooting out all the windows with 40

20   millimeters preceding SWAT's arrival it kind of negates

21   your opportunity to do that with chemical agent because

22   now all the glass is broken out which would ventilate

23   the entire car in the event you want to utilize a

24   chemical agent later on down the road.

25          So once again believed to be armed, involved in

                                                        42

1    a criminal act, potential threat, position of advantage

2    that being in the car and obviously refusing to submit

3    to arrest.

4        Q.   So if -- let's say in the case of a regular

5    high risk vehicle pull over officers order a suspect out

6    of the car and he doesn't immediately comply.  Is the

7    suspect considered barricaded at that point or does it

8    have to be -- at which point having made the demand once

9    -- well, let me ask a better question.

10            How many -- how much of an opportunity is

11   someone to be given to comply before officers should

12   conclude that he is barricaded and then wait for the

13   SWAT team to arrive?

14       A.   Well, once again to answer your question a

15   traffic stop without any other information, never met

16   with the person before, don't know that person has

17   propensity for violence, don't know if that person is

18   presumed to be armed, you know, no other information

19   other than traffic violation will not come out of his

20   car that is probably not going to be a barricaded

21   subject incident because you don't know that the person

22   is presumed to be armed.  So SWAT would probably not

23   respond to a situation like that.

24            Once again if you ran the vehicle and now the

25   registered owner of the vehicle has a felony warrant or

43

1    maybe they have prior weapons convictions or you have

2    interacted with that driver in the past, known him or

3    her to be, have a propensity for violence, carrying

4    weapons, that would change even though there may not be

5    a weapon involved in that particular incident, it would

6    be based on facts known at the time.

7           But you want to continue to use verbal

8    strategies.  Words influence behavior.  You have a bunch

9    of tenured officers in this case to get to CRU.  You are

10   typically tenured.  You have guys that can work with

11   little or no supervision.  They understand verbal

12   strategies and how to influence behavior.  So you may --

13   it may take 15, 20 minutes.  And while SWAT is

14   responding as I know from countless times of getting

15   putted out of bed and you are halfway there and then

16   they say subject submitted to arrest, came out of the

17   car or residence, whatever it may be.

18          You want to continue on with asking him or her

19   to come out of the car.  Then if he or she comes out,

20   great.  If they don't obviously SWAT will get there and

21   assume tactical command once they get there and they are

22   briefed and they have proper resources and assets.

23   Q.  Is there any standard in which you are aware

24   for how much of an opportunity should be given to a

25   possibly armed suspect in a position of advantage before

                                                        44

1    it is determined that he or she is barricaded?

2         A.   There is no time.  It just depends on the

3    subject's actions.  If they tell you clear and

4    convincingly I am not coming out that is not a good

5    sign.  But you are talking to him or her, and once again

6    -- once again that is where -- a lot of guys have crisis

7    intervention training that are tenured guys or maybe

8    Sergeant Jimenez or Lopez, former members of the

9    negotiation component of San Jose, and now they

10   understand what they need to do.  A lot of times we know

11   the initial person that starts dialogue is not the right

12   person.  That person is kind of abrasive and maybe not

13   the best person to have that person comply.  So we may

14   change someone and let them know hey, by the way, Jacob,

15   you are just wanted on a crime.  We know a little bit

16   about you.  You have three kids.  This is not that big

17   of a deal.  Try to minimize it.  You can to try to once

18   again to reduce his anxiety.  Obviously see if you can

19   get him in agreement with what you are trying to do.

20          So yeah, you want to use whatever means you can

21   to appropriately have him come out of the car.  And then

22   if he doesn't come out the determination will be made by

23   a supervisor, Jimenez would make that determination,

24   okay, Mr. Dominguez is not coming out of the car.  We

25   have tried.  Nothing is working.  Let's go ahead and get

                                                        45

1    SWAT rolling and at least get the call in to them

2    because as we know the guys are working out and not

3    sitting in the neighborhood most likely.  So they are

4    doing whatever they do.  By the time they get there

5    might be 30 minutes, 45 minutes by the time they get the

6    ballistic vehicles.  So it is going to be a delay.

7         So you want to get them en route as quick as

8    possible once you make that determination that he is not

9    submitting to arrest.

10        So to answer your question, it is just going to

11   be depending on the circumstances.  There is no set time

12   him.  It is are you making any headway with him.  Does

13   he seem like he is going to come out.  Hopefully like

14   they do 99 percent of the time people come out of the

15   car.  If you give them the opportunity to come out they

16   will come out of the car.

17        Q.  You think that Mr. Dominguez was given the

18   opportunity to come out of the car?

19        A.  Do I think he was given the opportunity?

20        Q.  Yes.

21        A.  Absolutely not.

22        Q.  You think he would have had that opportunity to

23   comply with officers commands?

24        A.  I am not saying he didn't comply with officers

25   commands.  As I mentioned earlier his arms appeared to

46

1    be in an upward position, at least his left arm was when

2    he was shot.  So he very well may have been complying

3    with officers commands to bring his hands up as he was

4    instructed to do preceding the officer involved

5    shooting.

6        Q.  So you think he was given the opportunity to

7    comply with officers commands?

8        A.  No.  I don't think -- it is a reasonable

9    opportunity.  Obviously, no, he was shot, Counsel.  He

10    was shot with his hand, at least left hand up in the

11    air.  Once again if he was keeping his hand down at his

12    waist band or whatever that is why cover is so

13    important.  ==You just can't arbitrarily shoot him because==

14    ==he is non-compliant.==  People are non-compliant all the

15    time.  There is nothing in his hands.  No one sees

16    anything in his hands, doesn't make any verbal threats

17    other than allegedly shoot me, Bitch, something to that,

18    which is, once again raises your standard of care if you

19    think someone is trying to ask you to shoot them.  Are

20    they trying to elicit some kind of suicide by cop

21    response.  That would cause me again to be concerned

22    this person might cause me to do something to take an

23    offensive action and be mindful of that.

24        Q.  Let me just make a couple notes and I would

25    like to follow up on some of what you just said.

                                                              47

1          So if it is the case that officers commanded

2     Mr. Dominguez to put his hands up and then he did

3     initially put his hands up for some period of time is it

4     your opinion that is not a reasonable opportunity to

5     comply with officers commands?

6          A.   Well, he is complying if his hands are up.

7          Q.   He had a reasonable opportunity to comply and

8     did comply, right?

9          A.   Yes.

10         Q.   Okay.  Then you said that if a suspect says

11    something like fuck you, Bitch, shoot me, that should

12    raise the standard of care for an officer?

13         A.   Sure.  If someone is making overt comment that

14    fuck you, Bitch, shoot me, I am going to be thinking

15    this person once again not knowing what I don't know is

16    this person mentally ill, experiencing mental crisis,

17    under the influence of narcotics, intoxicated, are they

18    -- are they trying to elicit some type of suicide by cop

19    scenario?  So yes, once again that is going to be

20    concerning to me.  Most people don't say that.  So if he

21    does say that then I am going to be concerned with him

22    saying that.  Obviously once again that is why cover is

23    so important in slowing things down, de-escalation at

24    that point.  Letting him know no one is here to shoot

25    you.  We just need you to comply with what we are asking

                                                         48

1    you to do.  Once again using words to influence

2    behavior.

3         Q.  That would be concerning, you would be thinking

4    that this suspect might do something that would cause

5    the officer to take offensive action?

6         A.  Potentially, yeah.  Once again if someone says

7    that, right, is it someone that is looking to kind of

8    have you do something and take an offensive action to

9    potentially shoot them.  That is non-compliance.

10   Officers hear that all the time.  Stand over here.

11   People -- officers get cussed at all the time.  People

12   are non-compliant.  They are not offering any form of

13   physical resistance.  They are just non-compliant.

14   Sometimes they use words that aren't kind like in this

15   case, but officers know that.  Once again that shouldn't

16   be a big deal other than the fact that it should let you

17   know that okay, maybe this person is going to try to do

18   something that is going to elicit some kind of response

19   by me so my standard of care should be greater based on

20   that comment.

21        Q.  So in this case if officers were all behind

22   positions of cover and Mr. Dominguez had reached under

23   his seat and pulled out a gun and started shooting what

24   would they have been in a position to do in response to

25   that?

                                                          49

1      A.   Well for one if they are behind, if you just

2  look at the map, the photos, whatever it may be in this

3  case, once again even a right hand dominant person, even

4  a left hand dominant person is going to have to come out

5  of their window and then point backwards once again with

6  that firearm.  You are going to see that because you are

7  trained to watch the hands.  If he does that obviously

8  the officers are going to use lethal force to stop that

9  behavior.

10      But that is why cover is so important because

11  by not being in a position of cover like Officer Pena in

12  this case then you are dealing with action reaction

13  related issues.  So I want to be in a position of cover

14  A, because I want to be safe.  I want to be able to

15  utilize other options other than using lethal force such

16  as less lethal force options such as long range impact

17  device.  I understand that people are going to be

18  non-compliant.  He may have his hands where I can't see

19  them.  That happens specifically.  Many cars have tinted

20  windows.  You can't see the hands anyways.  So you are

21  going to want that person to put their hands outside the

22  windows because you can't see in the car.  So that is

23  why being to the rear of that vehicle is critically

24  important.  In the event he takes an offensive action

25  and comes out shooting or points a weapon out shooting

50

1    then the officers are going to have to respond to that

2    lethal threat with lethal force to stop that lethal

3    behavior.

4        Q.  In your view that is an area they would have to

5    wait until they saw him pointing a gun out the window at

6    them before they could use lethal force?

7        A.  If you are in a position of cover behind, yes.

8    If he waves a gun up in the air or there is nothing in

9    front of him, no citizens, has it in his hands and takes

10   offensive action no one needs to wait until a weapon is

11   pointed at him.  If he takes a weapon and comes out and

12   the officers reasonably believe he is going to fire that

13   weapon for sure they can use force at that time.  I am

14   never going to purport until they wait until a gun is

15   pointed at them.  The action reaction to that would not

16   be beneficial for the officers to do that.

17       Q.  So moving to your opinion number four which

18   again let me know if this is an accurate paraphrase, it

19   is your opinion that an officer would give a verbal

20   warning before using lethal force; is that right?

21       A.  Yes, and reasonable opportunity to comply.

22       Q.  Is it your understanding that Officer Pena did

23   not warn Mr. Dominguez that he was going to use deadly

24   force before doing so?

25       A.  I don't believe he did.

                                                      51

1        Q.   Is it your opinion that Mr. Dominguez did not

2   threaten officers in this incident?

3        A.   I did not hear any threats or anyone say that

4   he ever threatened any of the officers in this case.

5        Q.   So you -- are you referring to verbal threats?

6        A.   Yeah.  According to Ferguson he never stated I

7   have a gun and I am going to shoot you.  There was

8   nothing that anyone heard that he said that he was going

9   to according to Pena, Dominguez did not verbally

10  threaten him.  That is on page 102 of his deposition.

11  There was no verbal threats directed at the officers

12  based on what I have reviewed in this case.

13       Q.   Are verbal threats the only threats that you

14  considered?

15       A.   Well, there was no pre-fight indicators,

16  Counsel.  He was in a car.  It isn't like he was in a

17  bladed stance or clinched fist or tight jaw or made any

18  overtures that he was going to do something offensively.

19  He didn't have an object in his hand.  He didn't try to

20  ram his way out of the containment technique.  My

21  understanding he may have backed up a little bit, but

22  Officer Lopez used proper technique and went ahead and

23  buttressed the front end of his car against the rear of

24  Mr. Dominguez car.  So he didn't try to force his way

25  out.  There was no one standing in front of the car.

                                                        52

1    There was no one standing behind the car where that

2    would be an issue of potentially in harm's way in that

3    respect.

4         Q.   Then moving on to your opinions 5 and 6 what is

5    the difference between those opinions?

6         A.   Just more of the POST or Graham V Connor

7    version five where it talks about obviously the grand

8    factors in which specific learning domain 20 specific to

9    obviously San Jose Police Department's use of force

10   policy.

11        Number six is opinion specific to the testimony

12   associated.  They are -- it could have been combined

13   into one opinion to answer your question.  I put it into

14   two opinions.  But they are both the same.  I believe

15   that the shooting of Mr. Dominguez on September 15,

16   2017, was inappropriate and unreasonable.

17        Q.   I certainly understood that that is your

18   conclusion.  Okay.  So you made that conclusion in part

19   based on your assessment that a reasonable officer would

20   not have perceived Mr. Dominguez as a lethal threat,

21   right?

22        A.   Yes, based on the totality of the circumstances

23   at the time at which the force was used.

24        Q.   I would like to see if I can get a list from

25   you of those circumstances that support your conclusion

                                                          53

1    if you don't mind?

2        A.   They are outlined.  I can read them to you.

3    They start on page 23 of my report through page 24.

4    Obviously there was no reasonable necessity at the time.

5    So that remains basically that the delay and

6    apprehension would not create a substantial and

7    reasonable risk to others and possibly resulting in a

8    serious physical injury or death.  So that is one part

9    of it obviously.

10        Then obviously at the time in which the force

11   was used there is no imminent danger at the time.  It

12   wasn't imminent.  There was no immediate defense of life

13   at the time, at the time the force was used.  No one saw

14   Mr. Dominguez with an object in his hand.  No one saw

15   Mr. Dominguez with a weapon ever.

16        The fact that a gun is outstanding that's not

17   uncommon in cases.  Suspects get rid of guns all the

18   time.  Once again I am not minimizing that they should

19   not have assumed or considered that Mr. Dominguez was

20   armed.  I am not purporting that.  But there was nothing

21   in his hands at the time.  He did not display any type

22   of weapon.

23        As I mentioned earlier Ferguson could see his

24   arm, shoulder up.  He was concentrating.  They did not

25   hear him say anything.  There was no threats.  Did not

54

```
 1   try to use the vehicle as a weapon.  Never stated he had

 2   a gun or he is going to shoot anyone.

 3            Pena was the most important here because he is

 4   the one that used force.  He could see there was nothing

 5   in his hands, no weapon when he had his hands up.  He

 6   said when he fired he could not see what Mr. Jacob

 7   Dominguez's hands were doing.  It is not like he said

 8   him acquiring an object, cell phone, something that a

 9   reasonable officer might believe would be an object of

10   concern even though officers are trained that guns look

11   like guns and not cell phones unless there is a lighting

12   issue.

13            Then specifically as I mentioned on page 24 is

14   that Pena has dealt with people who have been

15   non-compliant in the past.  Put their hands up, put them

16   down.  I don't believe he has shot anyone preceding this

17   incident if I am correct.

18       Q.  If an officer reasonably believes that a

19   suspect is about to arm himself with a firearm does the

20   officer have to wait until the suspect actually has the

21   firearm in hand before he can take defensive action?

22       A.  It depends.  It depends on location.  It

23   depends on what type of firearm.  It depends on the

24   person's proximity.  It depends if that person was

25   involved in a prior shooting incident or they are wanted
```

                                                        55

1    for murder.  They have used a gun in the past or fired

2    at officers.  It just depends on a number of factors.

3            In this specific case they had no nexus other

4    than they presume even though during the robbery that

5    transpired on the 12th of September, 2017, no one ever

6    saw Dominguez with a firearm that day.  Anchondo

7    allegedly had the hand gun.  We know that Dominguez went

8    in and bought water and paid for gas inside of the

9    market prior to the robbery occurring.  So no one ever

10   saw him with a firearm at any point during a pursuit or

11   during -- at any time at all.

12           So in this case, yes, you would have to wait.

13   In this case you would have to wait.  That is why cover

14   is so important.  Once again you can't -- you have to

15   reasonably believe, it has got to be reasonable based on

16   the totality of the circumstances.  And based on my

17   review of the records in this case it was unreasonable

18   because based on everything that transpired and

19   especially the evidence is what it is, Counsel, is that

20   the -- there is two bullets holes in the left arm which

21   is clearly an indicator that his arm was up when the

22   shot transpired.  He was shot in the head so.

23           There is a number of factors that came into

24   this case that I reviewed that made me firmly believe

25   that it was inappropriate at the time the rounds were

                                                          56

1    fired.  I don't believe Mr. Jacob Dominguez was a lethal

2    threat based on the totality of the circumstances.

3         Q.   That is in the part because you don't think

4    there was a sufficient nexus between Mr. Dominguez and

5    possession of a firearm if I understood you correctly?

6         A.   No.  It is not just that.  As I mentioned

7    earlier I think the use of the VCT, the surveillance,

8    the briefing was appropriate.  I think the tactical

9    concerns other than obviously Pena's actions were

10   appropriate and reasonable.  I think the request by

11   RATTF to utilize CRU in this case was appropriate based

12   on what they knew at the time.

13        So yes, I think that taking the necessary

14   precautions so officers don't get injured I think is

15   appropriate and the community is safe.  But at the same

16   time it is what the individuals actions are doing at the

17   time that the force is used.

18        So he wasn't wanted for murder.  It wasn't a

19   Garner issue where he committed a violent atrocious

20   felony where you could shoot him for flee.  If he drove

21   away or ran away from the car you couldn't shoot him.

22   There is not enough there, right?  Just based on his

23   fleeing, the fact that he is wanted in an arm robbery

24   from several days prior is not enough to shoot him from

25   running.  So yes, Counsel, based on the totality of the

                                                              57

1   circumstances it was not enough I believe to justify the

2   use of lethal force in this case.

3       Q.   Do you believe it was unreasonable for an

4   officer to believe that Mr. Dominguez was about to arm

5   himself based on the testimony that he had his hands up

6   and then dropped them and leaned forward?

7       A.   No.  I don't believe.  Once again that is

8   important.  I think what is most important is

9   specifically on page 106 and 107 of Pena's deposition

10  when he stated he has encountered people who initially

11  had their hands up and put them down and then back up.

12  That happens.  People are non-compliant.  People are

13  non-compliant and could be frustrated, realized he is

14  going to go to jail now.  People are non-compliant.  The

15  fact that there was no object seen.

16          These guys are trained as they were.  These are

17  trained detectives that work a highly tactical unit is

18  that they were focused on hands.  And Ferguson was

19  hundred percent focused on what was going on in the car.

20  Ferguson never fired his weapon.  We know that Lopez

21  didn't fire his weapon.  I know there was a call or

22  request to bring up a noise flash diversion device.

23  That never came until 12 or 13 seconds after the

24  shooting.  So there was no at that time reasonable

25  necessity based on imminent danger.

1          Q.   So if an officer is watching a suspect's hands,

2     doesn't see anything in them and then a suspect drops

3     his hands to where an officer can no longer see them and

4     where a firearm might be located is it not reasonable to

5     believe that a suspect might be about to arm himself?

6          A.   Not in the facts in this case.  Once again that

7     is why cover is so important.  People are going to do

8     what they do with their hands.  He could have been

9     texting someone with his hands down.  Letting his wife,

10    his kids, whoever, mom, whoever let them know hey,

11    listen, I am about to go to jail.  You don't know what

12    he is doing in there with his hands down.  ==So the fact==

13    ==that his hands are out of your view and underneath the==

14    ==actual frame of the door in itself does not mean he is==

15    ==arming himself with a weapon.==

16              Once again he didn't have a weapon.  We know

17    that.  Once again -- and the officers are trained to be

18    focused as they were.  If you look at the proximity too,

19    the poor tactical position by Pena directly across in

20    that area there he is 10 to 12 feet away based on my

21    review of the records.  There is no indication he is

22    coming up with any type of object at all when he fires.

23    There is nothing in the record that Detective Pena now

24    Sergeant Pena stated he was coming up with I believe was

25    an object in his hand.  There was immediate defense of

                                                            59

1    life.  Never articulated that.  We know his left arm was

2    up at the time of the shooting.  So no, there was never

3    enough in this case for the use of lethal force based on

4    my review of the records.

5        Q.  Do you agree that there is always a lag time

6    associated with an officers reaction to a suspect's

7    movements?

8        A.  There can be a lag time reaction and distance.

9    I believe in some cases I believe there is.  I have been

10   involved in several officer involved shootings myself.

11   I can tell you that there is at times depending.  In

12   this case once again he is in a on target position

13   across the hood of a car with the shoulder weapon with

14   an eight point sighting system on it.  Much different on

15   reaction time than if I am in a holstered position which

16   typically that was when this reaction lag time distance

17   was originally studied back in my former department

18   going back to the late '70's was based on a holstered

19   position and the time it took for an officer to identify

20   a threat, reasonable time to process that threat, lag

21   time associated with the threat, and then use of legal

22   force or force associated with that person's actions.

23        Here you have a trained detective with a

24   shoulder weapon that fires a 75 range bullet at

25   2700 feet per second.  The reaction time is going to be

                                                            60

1    quite minimal compared to what it would be if he was in

2    a holstered position on patrol as a peace officer.

3         Q.   Do you agree that an officer will always be

4    behind a suspect who draws a weapon in terms of reaction

5    time?

6         A.   That depends.  Once again it depends.  Someone

7    in a sniper position, no.  That person is already up on

8    target.  The second they see a weapon produced in an

9    offensive action the sniper in that position would be

10   able to react quicker.  Same as this case, ma'am.  You

11   have a close -- you have a point of impact situation

12   here with that rifle from that distance.  So once again

13   it depends.  Not always, but at times, yes.  I agree

14   that at times that officers are put in a situation where

15   they may be reacting to a subject's actions.  That is

16   why cover and distance is so important in the event

17   someone does produce a firearm you have an opportunity

18   to react to that threat.

19        Q.   So you referred to some studies that you were

20   familiar with during your time in L.A.P.D. about

21   reaction time from holstered position firing; is that

22   right?

23        A.   Yeah.  Initially it was looked at as a related

24   to edge weapons on the John Tueller, T U E L L E R rule.

25   That was initial studies on the 21-foot rule.  Dr.

61

1    Biliwinski (phonetic) has done some studies over the

2    years.  Some have been accepted in the courtroom.  Some

3    have not in the sense of reaction lag time and distance.

4    I believe reaction lag time and distance in some cases

5    is something officers need to consider.  In all cases

6    they should consider by the way of using cover because

7    if someone does produce a weapon you are in a position

8    of cover to be able to respond to that threat.  So that

9    is why cover is so important.  But sure, I think

10   officers need to be cognizant of that.  Someone's

11   reaction lag time may be different.  You might be much

12   better with your pistol and rifle than I am.  So your

13   reaction time is going to be less than mine.  Mine may

14   be greater than obviously Mr. Crowley's because he is

15   sitting on his phone right now not paying attention.

16   That may be a longer time he may react to a lethal

17   threat, but yeah, so, it just depends on the person and

18   the circumstances, Counsel.

19        MR. CROWLEY:  In my defense I am making notes.

20        THE WITNESS:  That is okay, Counsel.  I was

21   just interjecting some humor into Ms. Clouse's

22   examination.

23        MR. CROWLEY:  Thank you.

24        MS. CLOUSE:  I thought I was doing pretty well

25   for humor as far as these things go already.  I will try

                                                        62

1       to step that up.

2            Q.   Are you familiar with any other literature

3       about reaction time other than Biliwinski, the case you

4       referenced, and the Tueller study?

5            A.   No.   There has been a lot of studies over the

6       years I have looked at obviously.   It is not junk

7       science.   Some cases it has been expanded in certain

8       ways to maybe try to justify certain shooting

9       situations.   But I think it is something officers need

10      to be cognizant of.   That is why tactics is important.

11      That is why cover is important.   That is why vehicle

12      placement is important.

13              So sure, I think that you want -- officers

14      should understand that they may have to react to a

15      potential threat.   That is why training, positioning,

16      obviously understanding the environment, totality of the

17      circumstances is so critical for officer safety.   So I

18      don't believe that -- that has when -- that was trained

19      throughout my law enforcement career, and obviously it

20      comes up in virtually every one of the 250 or so police

21      shootings I have been retained on in the last seven

22      years or so.   So I think it is real.   Officers should

23      understand that.   That is why I believe cover and time

24      and distance is so important.

25           Q.   When you say it is real you mean lag time is

                                                              63

1    real?

2          A.   It can be.  It is something that officers need

3    to consider.  They need to understand that there may be

4    reaction time based on a threat.  That is why time,

5    distance, cover is really important in the event that

6    the threat presents itself that the officer is not in an

7    open air environment that does not provide him or her

8    any cover.

9          So, yes, it just depends.  Officers -- that is

10   why tactics are so important.  That is why using cover

11   is so important in the event that someone produces a

12   bottle, a gun, a rock, a knife, a firearm, that they are

13   in a position to be able to respond to that threat with

14   time and distance and through the proper use of force

15   option, be able to react to it appropriately.

16         So sure, I think it is real, and I think that

17   is why officers are trained to make sure that they use

18   proper tactics to minimize the lag time and minimize

19   their response time to any threat.

20         Q.   Have you yourself fired AR15 rifle?

21         A.   Oh, significant training, ma'am.  AR15, M4, M16

22   are all interchangeable.  Obviously I worked in SWAT

23   L.A.P.D.  Our primary duty weapon is a shoulder weapon,

24   M4.  Obviously I have six years in the United States

25   Army.  So I have had training at that time with the M16.

64

1    M16 and AR15, they are interchangeable weapons.  M4 all

2    fire 223 weapon.  Actually the Colt M4 defense system is

3    what I was, that is what I carry working SWAT.

4    Obviously working K-9 I had a rifle as well, a Colt M4.

5    Similar.  223, 30 round magazine capacity.

6    223 ammunition which is typically 75 grain ammunition.

7    Extensive training working full time with L.A.P.D.

8         Q.   When you used those weapons did you also use a

9    sighting system?

10        A.   Sure.  You typically learn on iron sights like

11   I did in the Army.  That is the best way to learn.  We

12   used 8 point sighting systems.  ACOG sighting systems.

13   There are different sighting systems.  L.A.P.D. allows

14   you, at least SWAT to pick your respective sighting

15   system.  Some people like different types of sights.

16   Some older guys, former Marines, they use basic iron

17   sights.  They are stuck on the iron sight.  They think

18   that is better for them.  Those people that work the

19   sniper component are using some type of optic due to

20   distance.

21        Sure, use multitude -- we would test and

22   evaluate different sighting systems through different

23   vendors working full-time with SWAT.  So sure.  I am

24   familiar with the sighting system on this particular

25   rifle and I have obviously trained with it.

1      Q.   On your opinion number seven I understand that

2   is an opinion that Officer Pena violated his training?

3      A.   Yes.

4      Q.   When he used lethal force against Mr.

5   Dominguez?

6      A.   Yes.  I don't believe looking at San Jose's use

7   of force policy I don't believe it was reasonable.  I

8   think they should have determined through the review

9   process that the shooting was unreasonable based on the

10  totality of the circumstances.  The other training

11  obviously deals with learning domains 22, 23 on tactical

12  considerations.

13     Q.   Do you agree that the learning domains do not

14  specify what an officer should do in every circumstance?

15     A.   They are just standards, best practices,

16  guidelines.  They are not like a policy.  It is just --

17  consider this from subject matter experts that

18  formulated this either based on unfortunately bad things

19  that transpire and things that work well.  They augment

20  those as time goes on to formulate the better version of

21  that tactic or movement or whatever it may be.

22     Q.   Okay.  So your opinion number seven they, in

23  those bullet points, are those the reasons you believe

24  why Officer Pena violated his training?

25     A.   Yes.  Ultimately -- and the training as well as

                                                          66

1    the obviously the ultimate decision to use force.

2         Q.   Okay.   I wanted to ask you about some of those

3    bullet points.   You state this was not an immediate

4    defense of life situation.   I want to be sure I

5    understand all the reasons why you made that conclusion?

6         A.   Obviously there was no imminent danger at the

7    time at which the force was used.   There was no

8    reasonable necessity at the time.   There was no --

9    unreasonable substantial risk at the time.

10        Obviously I don't believe he comported with

11   obviously the policy of San Jose as relates to

12   subjectively use of lethal force.   I believe obviously

13   if it is the ultimate -- it was not immediate defense of

14   life situation.   We know that his hand was up, at least

15   the left hand.   He was told to put his hands up.   The

16   time the shot killed him his hand was up.   The fact that

17   they did not see his hands purportedly for a period of

18   time according to Sergeant Pena's testimony which I am

19   not making credibility determinations.   He himself said

20   there is plenty of times people don't comply.   He could

21   have been texting on his phone.   He could have been

22   doing other things on the phone at the time.

23        I don't believe at the time the force was used,

24   the time he fired the two rounds from his rifle, it was

25   not immediate defense of life.   I don't believe at that

                                                          67

1    point Mr. Dominguez's actions rose to the level of

2    lethal force at the time in which he used lethal force.

3         Q.   Are those the same reasons why you conclude

4    that these were not the direst of circumstances?

5         A.   Yes.  There was -- he was wanted on an armed

6    211.  I am not minimizing that, armed robbery.  But it

7    wasn't the direst of circumstances.  This was not a

8    situation where you had someone that committed a violent

9    felony and he was fleeing.  This was not Richard

10   Ramirez, night stalker, that if you didn't shoot and

11   kill him he was going to rape and kill someone else.

12   This was not -- the fleeing felon rule did not apply

13   here.  So getting out and running or fleeing you could

14   not shoot him.

15        The vehicle at the time was not being used as a

16   weapon.  The vehicle was static.  The window was down.

17   He was complying at the time even if he did not comply

18   based on Sergeant Pena's version of the events and put

19   his arms down we know that he may well if there is

20   reasonable opportunity to comply would have put his

21   hands back up which I believe he did at the time he was

22   shot based on the evidence.  So it was not the direst of

23   circumstances at the time in which force was used.

24        Q.   All right.  Then you also conclude that there

25   were other reasonable measures available.  Other

68

1    reasonable measures available to do what?

2       A.   Sure.   To go to the back of the car, get in a

3    position of cover.  Get on a PA or use an outdoor voice

4    to tell him shut the car off.  Drop the keys out the

5    window.  Let him know that you are not leaving.

6    Obviously put together a tactical plan as I mentioned if

7    he does not submit to arrest then obviously you could

8    utilize a very capable and competent SWAT team such as

9    San Jose's to come and assist you.  You could use K-9 to

10   use direct deployment.  There were so many different

11   options available.  Seven to 9 officers responding to

12   the scene.  As we know there was sample uniformed patrol

13   officers that could have shown up to assist in the event

14   that he fled to initiate a actual vehicle pursuit.  They

15   had a fixed wing airplane up.  They had a lot of

16   resources.  Once again from a department that is highly

17   trained and highly competent there was other things that

18   they could have done at the time rather than what

19   Sergeant Pena decided to do and use lethal force.

20      Q.   Those in your mind were other things that could

21   have been done to respond to Mr. Dominguez dropping his

22   hands and leaning forward?

23      A.   Sure.  I mean -- yes.  Leaning forward or not,

24   putting his hands up, you still have to come up with a

25   plan to have him come out of the car.  You are going to

                                                         69

1    do that from a position of cover.  You are not going to

2    want to walk up on that car.  You are going to treat it

3    like you would a high risk felony vehicle pull over.

4    Order him out of the car, have him come out,  put him in

5    a prone position and take him into custody.  You are not

6    going to want to walk up on the car.  You can't really

7    have it two ways.  If you reasonably believe he is armed

8    based on the robbery that transpired on the 12th and

9    there is somehow that weapon is outstanding, he may have

10   that weapon, he is a gang member, so there is all those

11   concerns that you have, you wouldn't walk up on the car.

12   You wouldn't stand in front of the car.  You shouldn't

13   stand across from the drivers window if you are

14   concerned about reaction lag time and distance you

15   wouldn't put yourself in that position because knowing

16   you are not going to be able to appropriately react.  So

17   you would put yourself back in a position of cover and

18   slow things down and use words to influence behavior.

19          If we are going to go much longer could I take

20   a two-minute break?  I need to use the boys room.

21       Q.   Yeah, I think I have about another 20 minutes

22   probably.  Let's take a short break.

23       A.   Okay.  Thank you.

24          (Short recess.)

25       Q.   (By MS. CLOUSE)  All right.  Your opinion

                                                          70

1    number eight I am not quite sure how to characterize

2    this one, but I wanted to ask you about a couple of the

3    things that you say in the opinion.

4            You state that Officer Pena's tactical conduct

5    and decisions preceding the use of deadly force in this

6    matter was inappropriate based on the totality of the

7    circumstances.  The tactical conduct that you have in

8    mind with that statement, is that what we have already

9    discussed?

10       A.  Yes.  We have already discussed it, his

11   positioning, where he positioned himself and all the

12   other potential tactical options that were available to

13   him the day of the incident.

14       Q.  What decisions do you have in mind in that

15   statement?

16       A.  Exactly where he ended up.  The idea of him

17   stopping at the front rear quarter panel of Detective

18   Ferguson's vehicle and leaning over that hood, that

19   provides him no form of cover at all.  Once again harken

20   back to reaction lag time and distance.  From ten feet

21   away just poor tactical position to hut himself in.

22   Your options are limited at that point on what you can

23   do in the event that Mr. Dominguez was armed and took an

24   offensive action.  He was in a really poor place at

25   that, poor position at that time.

71

1              Officers are meant to assume cover.  There is a
2    reason why you have a shoulder weapon with a sighting
3    system because at a distance -- not to say he should go
4    back 100 yards or not purporting that at all, but at
5    least back to the back of initially to Detective Lopez's
6    vehicle and then hopefully work himself back to Sergeant
7    Jimenez's vehicle once they slowed things down a little
8    bit to use -- to try to put obviously metal between him
9    and Mr. Dominguez's vehicle in the event Mr. Dominguez
10   is armed and he takes an offensive action with Detective
11   Pena or Sergeant Pena, excuse me, to not get injured.
12        Q.   Then you also state in opinion number eight
13   that Officer Pena displayed a gross lack of situational
14   awareness and fundamental tactical errors.  We have
15   talked about the tactical errors already, correct?
16        A.   Yes, ma'am.
17        Q.   Okay.  What do you have in mind when you say
18   that he displayed gross lack of situational awareness?
19        A.   He should have known right away -- officers
20   know at times, there are times officers and myself
21   included you put yourself in a bad tactical position.
22   You move from that bad tactical position to better
23   tactical position at that point because you are not
24   looking to react to a lethal threat where you could be
25   injured.  You want to be able to be in a position where

                                                            72

1    in the event that a lethal threat or any threat presents

2    itself that you are in the best position to counter that

3    threat with a force option.  It may be less lethal.  It

4    may be utilizing cover.  It may be the use of lethal

5    force.  Putting yourself in that -- knowing that you are

6    in an open environment directly across from that window

7    10 to 12 feet away based on the evidence in this case

8    leaning across the hood of a car it is fortunate that he

9    didn't get injured in the event that Mr. Dominguez was

10   armed and took an offensive action.

11             So the situational awareness is officers know

12   that.  You don't stand behind vehicles that might be

13   moving.  You don't stand in the middle of a crosswalk in

14   traffic, right.  You don't put yourself in a bad

15   position and have to respond to that bad position based

16   on the position that you elected to put yourself in.  He

17   elected to move to that position.  It wasn't like he

18   ended up there.  He ended up in that position based on

19   his own volition.  He moved from that vehicle to the

20   front driver side quarter panel.  That was a decision he

21   made.

22             That is why I talk about situational awareness.

23   He moved to that position knowing that was a poor

24   tactical position to be in.  He should have known better

25   based on his background, training and experience,

73

1   particularly the unit that he is assigned.  People are

2   typically hand picked for those type of units based on

3   their employment history.

4       Q.  What is your understanding about why Officer

5   Pena was in that position behind the right front quarter

6   panel -- by the front quarter panel of vehicle number

7   two?

8       A.  I don't know.  I don't know why he was -- I

9   don't know if that ever -- I think he believed -- I

10  don't know.  I don't know if I read that, the reasoning

11  for that it.  Regardless of his reasoning it wouldn't

12  justify the behavior because you had other officers out

13  there.  The vehicle was pinned in.  The vehicle was not

14  mobile at the time.  Even if it was you would not want

15  to be in that position anyway if the vehicle was mobile

16  if he decided to work his way out of that, or work his

17  way out.  You wouldn't want to be in that position

18  anyway.  I don't know his reason.

19      Q.  Is it your opinion that Officer Pena should

20  have known at the time that he was -- at the time that

21  he fired at -- let me start over.

22          Is it your opinion that Officer Pena should

23  have known when he fired his weapon where the other

24  officers in the event were?

25      A.  Of course he should have known.  You know that

74

1    based on their vehicles.  You don't do your training

2    where you are going to assume cover.  They know that

3    obviously you don't have anyone to the passenger side of

4    Mr. Dominguez's vehicle in the sense of an officer.

5    They did not use a passenger side containment.  So you

6    know that you don't have a cross fire in the situation

7    where he is at.  You know everyone else is to the rear.

8    You know that Ferguson is going to be in close proximity

9    to where you are, but at least at the door frame of his

10   vehicle and then should be moving to the rear of his

11   vehicle.

12           So no, you should have a situational awareness

13   as to where others are at the time.  Not to say you are

14   going to be tracking them because you are looking at the

15   potential threat.  But that is where the training comes

16   in.  Obviously this is a trained tactic.  It wasn't like

17   three officers met on that day and decided to do a

18   vehicle containment technique.  This is the bread and

19   butter of one of the things they do.

20           So understanding others positioning is really

21   important because as I mentioned earlier you may be the

22   rear vehicle tomorrow and today you are the driver's

23   side vehicle and tomorrow you are doing the front

24   vehicle containment.  So they are all interchangeable

25   based on where your position is at the time in which the

                                                          75

1    technique is initiated.

2         Q.  So Officer Pena should have known in your mind

3    where other people were supposed to be?

4         A.  Yes.  He should have known -- typically once

5    again they have been through training and through real

6    life situations.  They know -- most -- officers should

7    be trained or are trained that you use that vehicle for

8    cover.  You have an engine block.  You want to use that

9    vehicle for cover.  You want to put yourself in a

10   position where you can obviously be behind the position

11   of cover.  Cover is defined as something that would stop

12   a bullet, right.  Where we know that officer or

13   detective or Sergeant Pena was it was not in a covered

14   location.  He was in an open air environment that

15   provided him no cover at all.

16        Q.  In the context of a VCT where can officers

17   position themselves so that they have cover but can also

18   respond to a lethal threat?

19        A.  Once again the most you are going to be is one

20   to two car lengths away.  That is the distance.  So that

21   is why the shoulder weapons, even from, with a pistol,

22   effective range of a pistol as long as you are 25 yards

23   typically officers train with a pistol at about 20 to

24   25 yards effectively.  But not saying you are going to

25   be 75 feet behind the vehicle.  Two through three car

                                                      76

1    lengths, 20 feet maximum behind that vehicle in a

2    position of cover, behind Lopez's vehicle all the way so

3    if you look behind Lopez's vehicle obviously you are a

4    car length behind but it puts you in a tactical

5    situation where now that suspect has to come out of the

6    car.  If he is right hand dominant and he is in the

7    driver's seat, turn his body all the way.  By that time

8    you are going to obviously be trained because you are

9    looking at hands, you are looking at his actions, to be

10   able to respond to that lethal threat if you behind.

11          Now if you are across from that person, that

12   person comes out with a firearm, it puts you at a much

13   obviously worse of a tactical position.  That is why you

14   don't go to those positions.  You want to put that

15   driver or that subject, that potentially armed person at

16   as much disadvantage as possible.  That is using cover

17   from behind that vehicle so that person even if they do

18   take an offensive action and try to fire you are still

19   behind a car.  You are not in an open air environment

20   where you can be shot.

21      Q.  Is it right that in order to respond to a

22   lethal threat, in other words, in order for an officer

23   in a VCT to use his shoulder weapon to fire on a

24   suspect, in a suspect vehicle, that the officer would

25   have to expose himself at least somewhat?

77

1        A.   It depends.   Officers should be trained or are

2   trained obviously to either go with right shoulder

3   dominant, right hand dominant or transition to your non-

4   dominant hand.   If you cannot see someone based on the

5   positioning of a right-hand dominant person you could

6   easily transition.   You should be able to with the

7   training transition to a non-dominant hand.   You -- if

8   you are right hand dominant you put the butt of that M4,

9   AR15 into your left shoulder and then use the back of

10   that vehicle for cover while you are monitoring.

11        So sure, there may be some exposure but it is

12   minimal.   It is not your entire body across the hood of

13   a car in an open air environment directly across from

14   where the subject is.   That is not an effective safe

15   tactic for the officers.

16        Q.   In your report did you list all the documents

17   and evidence that you reviewed up to this point?

18        A.   What is not listed is the three reports, one

19   from Dr. John black, one from Rocky Edwards and Heather

20   Heidle or Heider, I believe it is, and then I can't --

21   and then Dr. Daniel Sudeikis (phonetic).   I can't

22   remember, once again who did the toxicology on or opined

23   on the toxicologist of Mr. Dominguez post shooting.

24        Q.   Did you find any of the information you

25   reviewed unreliable other than those expert reports?

1          A.   No.   I mean I don't think the information is

2     unreliable.   I formulated my opinions based on the

3     material that was presented to me.   My understanding

4     there was a couple depositions obviously I think the

5     deposition of Mr. Black or Dr. Black, I received this

6     morning.   I didn't even open up the E-mail from Mr.

7     Crowley's office, couple recent depositions taken.   None

8     factored into my opinions here.   I think I had ample

9     material, obviously video and recordings and the

10    investigation to make my, to formulate my opinions thus

11    far of what I have reviewed.

12         Q.   Were there -- is there any information or any

13    documents that you would have liked to have seen that

14    you didn't?

15         A.   No.   I mean we know that Pena's body worn

16    camera was not activated.   That would have been

17    important.   It was not activated.   Ferguson's body worn

18    camera was sufficient based on the event.   No, there was

19    nothing that I needed that I didn't have to formulate my

20    opinions.

21         Q.   Have you worked with Mr. Crowley before this

22    case?

23         A.   Before this case, no, I have worked with one

24    other case since he retained me on one other case since

25    this case on a San Jose State University matter

                                                          79

1   involving unlawful detention and arrest of a traffic

2   violator.

3       Q.   Not a use of force case?

4       A.   No, just a DUI arrest, unlawful detention

5   arrest, 4th Amendment issues regarding an arrest.

6       Q.   You have any opinions that are not identified

7   in your May 21st, 2021 report?

8       A.   Nothing that we haven't discussed today thus

9   far.  I don't know if I will be asked to write a

10  rebuttal report.  I have not -- on Dr. Black's report.

11  Obviously I won't be formulating any medical opinions.

12  I won't be doing any reconstruction in this case.  I

13  won't be rebutting Mr. Edwards and Heather Heider's

14  report.  So I don't know if Mr. Crowley wants me to

15  write a rebuttal report if that is even within the

16  discovery deadline to do that.  I have not been asked

17  thus far.

18      Q.   What rate are you charging Mr. Crowley for your

19  services?

20      A.   For workup is $375 an hour, that is document

21  review, discussions, preparation of Rule 26 report, any

22  re-creation, that kind of stuff.

23      Q.   How about for testimony?

24      A.   Depositions and trials are $475 an hour.

25      Q.   How much have you billed so far?

80

1      A.   I have billed $12,375 which I have received a

2   $4,000 retainer and then my bill for 33 hours, that was

3   through the submission of my Rule 26 report was an

4   additional 8375 so total of $12,375.  I have occurred

5   about 6 or 7 hours to review the three additional

6   reports and then obviously for my preparation for my

7   deposition with you here today.

8           MS. CLOUSE:  I don't have any further questions

9   for you, Mr. DeFoe.  We will get you a check for two

10  hours worth of time at 475 per hour.

11          THE WITNESS:  Thank you, ma'am.

12          MR. CROWLEY:  Madam Court Reporter, I would

13  like a copy of the deposition.

14          THE REPORTER:  Thank you, John.

15                          (The deposition of Scott DeFoe
    was adjourned at 11:54 p.m.)
16
                            -oOo-
17
    I certify under penalty of perjury under the laws of the
18  State of California that the foregoing is true and
    correct.
19
                            Date_____
20
                            _____
21                              Scott DeFoe

22

23

24

25

                                                              81

1                    REPORTER'S CERTIFICATION

2

3

4            I, BETTY A. SALOIS, a Certified Shorthand

5     Reporter in and for the State of California do hereby

6     certify that the witness in the foregoing deposition was

7     by me duly sworn to tell the truth, the whole truth, and

8     nothing but the truth in the within-entitled cause; that

9     the foregoing is a full, true and correct transcript of

10    the proceedings had at the taking of said Deposition.

11

12                          Date:_____, 2021

13                          _____

14                          BETTY A. SALOIS, NO. 4768

15

16

17

18

19

20

21

22

23

24

25

                                                          82

```
1                          SALOIS & ASSOCIATES
                      111 N. Market Street, Ste. 300
2                         San Jose, CA 95113
                            (408) 279-3376
3                   Basalois@salois-associates.com

4


5    Date: August 12, 2021

6    To:   Scott DeFoe
           C-O THE CROWLEY FIRM
7          JOHN KEVIN CROWLEY, ESQ.
           125 S. Market Street, Ste. 1200
8          San Jose, CA 95113

9    Re:   Dominguez v City of San Jose

10   Dear Mr. DeFoe,

11   Please be advised that pursuant to the California Code
     of Civil Procedure Section 2025.52, the transcript of
12   your deposition that was taken in the above captioned
     matter has been prepared and is now ready for your
13   review, corrections, if necessary, and signature.

14   If you are represented by an attorney, we suggest that
     you contact your counsel before arranging with us for
15   the review of your deposition.  You also have the option
     of reading your attorney's copy of the transcript.  If
16   you choose to do this, please notify us by letter of any
     changes you wish to make to your deposition.
17
     Please contact us at (408) 279-3376 if you wish to make
18   an appointment.

19   The transcript will be available for review for thirty
     days from the date of this letter, after which time it
20   will be sealed and sent to the attorney who noticed the
     deposition for safekeeping.
21
     Very truly yours,
22


23
     Betty A. Salois
24

25   File No:   21-8103
```

83

# EXHIBIT 13

1                UNITED STATES DISTRICT COURT

2             NORTHERN DISTRICT OF CALIFORNIA

3


4    JESSICA DOMINGUEZ INDIVIDUALLY      )
     AND JESSICA DOMINGUEZ AS            )
5    GUARDIAN AD LITEM FOR JAD (1),      )     **CERTIFIED COPY**
     JAD (2) AND JAD (3),                )
6                                        )
                        Plaintiffs,      )
7                                        )     Case No.:
              vs.                        )     5:18-CV-04826
8                                        )
     CITY OF SAN JOSE, SAN JOSE POLICE   )
9    DEPARTMENT, MICHAEL PINA, AND       )
     DOE POLICE OFFICERS 2 through 5,    )
10                                       )
                        Defendants.      )
11   _____)

12

13

14

15

16

17                     DEPOSITION OF

18               SERGEANT MICHAEL PINA

19                 SAN JOSE, CALIFORNIA

20                    MARCH 3, 2021

21

22   ATKINSON-BAKER, a Veritext Company
     (800) 288-3376
23   www.depo.com

24   REPORTED BY:  THERESA KIELTY, CSR NO. 5037

25   FILE NO.:     AE08206

Atkinson Baker, a Veritext Company
www.depo.com

1              UNITED STATES DISTRICT COURT

2            NORTHERN DISTRICT OF CALIFORNIA

3

4   JESSICA DOMINGUEZ INDIVIDUALLY      )
    AND JESSICA DOMINGUEZ AS            )
5   GUARDIAN AD LITEM FOR JAD (1),      )
    JAD (2) AND JAD (3),                )
6                                       )
                    Plaintiffs,         )
7                                       )    Case No.:
            vs.                         )    5:18-CV-04826
8                                       )
    CITY OF SAN JOSE, SAN JOSE POLICE   )
9   DEPARTMENT, MICHAEL PINA, AND       )
    DOE POLICE OFFICERS 2 through 5,    )
10                                      )
                    Defendants.         )
11  _____     )

12

13

14

15

16          Deposition of SERGEANT MICHAEL PINA, taken on

17  behalf of Plaintiffs, at 200 East Santa Clara Street, San

18  Jose, California, 95113, commencing at 11:10 a.m., Wednesday,

19  March 3, 2021, before Theresa Kielty, CSR No. 5037.

20

21

22

23

24

25

```
 1               A P P E A R A N C E S:

 2     FOR PLAINTIFFS:

 3     LAW OFFICES OF JOHN KEVIN CROWLEY
       BY:   JOHN KEVIN CROWLEY, Esq.
 4     125 S. Market Street
       Suite 1200
 5     San Jose, California    95113
       (408) 288-8100
 6     jkclaw@pacbell.net

 7     FOR DEFENDANTS:

 8     OFFICE OF THE CITY ATTORNEY
       BY:   MAREN CLOUSE, Esq.
 9     200 E. Santa Clara Street
       16th Floor
10     San Jose, California    95113
       (408) 535-1948
11     maren.clouse@sanjoseca.gov

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1   high.
 2        Q.   Yeah.  So you're focused on a hundred percent of
 3   what's going on in that cabin of the suspect's vehicle.
 4        A.   Yes.
 5        Q.   And even though as you're moving, are you sensing
 6   where Ferguson's car is but you're still focused on the
 7   suspect?
 8        A.   Yes.
 9        Q.   You didn't take your eyes off him once?
10        A.   Me?
11        Q.   Right.
12        A.   I don't know if I took my eyes off him once.  I
13   can't say for sure.
14        Q.   Okay.  So you positioned yourself.  Did you lay on
15   the front of Ferguson's driver's side portion of his vehicle?
16        A.   Lay on it?
17        Q.   Well --
18        A.   I'm just trying to understand.
19        Q.   Did you squat down?  Tell us how you positioned
20   yourself.
21        A.   I stood next to it, next to the -- I want to say
22   like the front tire wheel and was giving him additional
23   commands.
24        Q.   Were you in a standing position or squatting
25   position?
```

Atkinson Baker, a Veritext Company
www.depo.com

1       A.    I want to say standing.

2       Q.    So would you say from your view, standing, you had

3  like a 10-degree, 20-degree view down into the driver's seat

4  cabin?

5       A.    I'm not good at degrees.

6       Q.    Okay.

7       A.    I had a better view as he's in a higher vehicle

8  standing in that position to see.

9       Q.    So what I'm trying to get to, so you're standing,

10 and about how far away from you where you were standing was

11 the suspect?

12      A.    Just to the other side of the car, maybe another

13 foot or two away.

14      Q.    So like the width of a car and another foot or two?

15      A.    Yeah, couple feet.

16      Q.    And from where you're standing, could you see down

17 into the driver's -- the cabin portion of the driver's seat?

18      A.    What is the cabin?

19      Q.    Well, I'll rephrase it.  Could you see down into

20 the driver?

21      A.    I could see the driver.

22      Q.    Could you see down further than the shoulder?

23      A.    Yeah.

24      Q.    So tell me how far you could see in your standing

25 position.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | | |
|---|---|---|
| JESSICA DOMINGUEZ, | ) | |
| INDIVIDUALLY AND AS GUARDIAN | ) | |
| AD LITEM FOR JACOB DOMINGUEZ, | ) | |
| JORDAN DOMINGUEZ AND J, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | NO. 5:18-CV-04826- |
| | ) | BLF |
| CITY OF SAN JOSE, SAN JOSE | ) | |
| POLICE DEPARTMENT and DOE | ) | |
| POLICE OFFICERS 1, 2 and 3 and | ) | |
| DOES, inclusive, | ) | |
| | ) | |
| Defendants. | ) | |

_____

DEPOSITION OF JESSICA DOMINGUEZ

DATE:                    February 19, 2021

TIME:                    9:30 a.m.

LOCATION:                Remote Zoom Deposition
                         San Jose, California


REPORTED BY:             BETTY A. SALOIS, RPR,
                         Certified Shorthand Reporter
                         License Number 4768
                         Appearing Remotely

_____

SALOIS & ASSOCIATES
Certified Shorthand Reporters
111 N. Market St., Suite 300
San Jose, CA 95113-1112
(408) 279-DEPO

1

EXHIBIT 14

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| JESSICA DOMINGUEZ,<br>INDIVIDUALLY AND AS GUARDIAN<br>AD LITEM FOR JACOB DOMINGUEZ,<br>JORDAN DOMINGUEZ AND J,<br><br>        Plaintiffs,<br><br>vs.<br><br>CITY OF SAN JOSE, SAN JOSE<br>POLICE DEPARTMENT and DOE<br>POLICE OFFICERS 1, 2 and 3 and<br>DOES, inclusive,<br><br>        Defendants. | NO. 5:18-CV-04826-<br>    BLF |

==DEPOSITION OF JESSICA DOMINGUEZ==

DATE:                     ==February 19, 2021==

TIME:                     9:30 a.m.

LOCATION:                 Remote Zoom Deposition
                          San Jose, California


REPORTED BY:              BETTY A. SALOIS, RPR,
                          Certified Shorthand Reporter
                          License Number 4768
                          Appearing Remotely

------------------------------------------------------------

SALOIS & ASSOCIATES
Certified Shorthand Reporters
111 N. Market St., Suite 300
San Jose, CA 95113-1112
(408) 279-DEPO

1

1                    A P P E A R A N C E S

2

3      For the Plaintiff:        THE CROWLEY FIRM
       Appearing Remotely        BY:  JOHN KEVIN CROWELY, ESQ.
4                                125 S. Market Street
                                 Suite 1200
5                                San Jose, CA 95113
                                 408.288.8100
6

7

8      For the Defendant:        CITY ATTORNEY'S OFFICE
       Appearing Remotely        BY:  MAREN CLOUSE, ESQ.
                                      ARDELL JOHNSON, ESQ.
9                                200 E. Santa Clara Street
                                 16th Floor
10                               San Jose, CA 95113
                                 408.535.1900
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                                              2

1                    INDEX OF EXAMINATION:

2                                                          Page:

3       Examination by Ms. Clouse                            4

4

5

6

7

8                     INDEX OF EXHIBITS:

9       Defendants              Description              Page:
        Exhibits:
10

11      A               WIS Letter of July 12, 2019      21

12      B               2014 - 2016 W 2 copies           25

13      C               W2 Wage and Tax Statement 2009   27

14      D               Homes of a Loving Father letter  49

15      E               135 pages of texts               61

16      F               Audio of Dispatch                63

17

18

19

20

21

22

23

24

25

                                                              3

1    right-hand corner?

2        A.   I can't see the small print, but I can see the

3    WIS at the top.

4                (WHEREUPON, Defendant's Exhibit A was

5                 marked for identification.)

6        Q.   Do you recognize this document, Mrs. Dominguez?

7        A.   Yes.

8        Q.   Is it a document that you gave to your lawyer

9    for purposes of this case?

10       A.   Yes.

11       Q.   If you look the document states that

12   Mr. Dominguez was employed with Window Installation

13   Specialists as a window installer from March 2014 to

14   June 2016.  Do you see that?

15       A.   Yes.

16       Q.   Do you remember Mr. Dominguez being employed by

17   Window Installation Specialists?

18       A.   Yes.

19       Q.   Is it consistent with your memory that he was

20   employed there from about March 2014 to June 2016?

21       A.   Yes.

22       Q.   How did you get this letter from Window

23   Installation Specialists?

24       A.   From human resources, from the company.

25       Q.   Did you request this letter from them?

21

```
1        A.   Yes.

2        Q.   Why did you do that?

3        A.   Because I needed to submit proof that he was

4   employed there.

5        Q.   Why did you need to submit proof?

6        A.   Cause I believe you guys asked for it.

7        Q.   Okay.  So it was for purposes of this

8   litigation that you got this letter?

9        A.   Yes.

10       Q.   Okay.  Thank you.  Why did Mr. Dominguez'

11  employment with Window Installation Specialists end in

12  June of 2016?

13       A.   Because they were laying off employees, job was

14  ending.

15       Q.   What else can you tell us about the work that

16  Mr. Dominguez did for this company other than he was a

17  window installer?

18       A.   He loved working there.  He started as a

19  glazier, and then his boss made him a foreman.  And so

20  he had like his own -- he was the leader of his own

21  installation.  There was like 5 or 6 different people I

22  believe in his, under him once he became the foreman.

23       Q.   Sorry?

24       A.   No.  Go ahead.

25       Q.   Were you finished with your answer?
```

                                                           22

```
1    Diamond or from the other company?
2         A.   No.  I tried to get -- tried to get those
3    documents.  I think I got the ones from the Black
4    Diamond, but the one before that I tried to reach out to
5    the person that he used to work with and I couldn't
6    contact them.
7         Q.   Other than the vocational training that you
8    testified about earlier did Mr. Dominguez have any
9    training in construction?
10        A.   I don't think so.
11        Q.   After June 2016 when Mr. Dominguez was laid off
12   was he looking for work?
13        A.   Yes.
14        Q.   What kind of work was he looking for?
15        A.   Anything.  He was trying just to find
16   employment, taking care of my kids.  I was in school at
17   the time.
18        Q.   At the time you were attending De Anza?
19        A.   2016, yes, I think so.
20        Q.   How long did you attend De Anza to get your AA
21   in nursing?
22        A.   I started 2015 and I finished in 2019.
23        Q.   Were you going to school part time?
24        A.   Yeah.  In the beginning, yes.  Once I was in
25   the nursing program it was full time.
```

29

1          Q.   Were you working while you were attending

2     school?

3          A.   Sometimes, yes, not the entire time.

4          Q.   When you did work where did you work?

5          A.   At Denny's.

6          Q.   Anywhere else?

7          A.   During that time, no, not that year.

8          Q.   About how many hours a week did you work at

9     Denny's?

10         A.   It was just part time, maybe 16 or 20 or so

11    approximately.

12         Q.   What job were you doing at Denny's?

13         A.   Server.

14         Q.   Were you attending school at De Anza during the

15    day?

16         A.   Yes.

17         Q.   Were you working during the day as well?

18         A.   Yeah.

19         Q.   Did you work nights sometimes?

20         A.   Sometimes.

21         Q.   What did you do for child care while you were

22    in school and working?

23         A.   They would go to day care during the day.  Then

24    if I had to at night they would be home with their dad.

25         Q.   Did they attend day care with a family member?

                                                            30

1    referring to?

2         A.   Myself and Jacob's family and my family.

3         Q.   How much did you raise in those fund raisers?

4         A.   I think somewhere around 8,000 maybe

5    approximately.

6         Q.   What did you do for fund raising?

7         A.   We had car washes.  We had items for sale such

8    as candles and T-shirts, and my son made brownies and

9    sold them at one of the fund raisers at the park,

10   anything that we could do.

11        Q.   Other than the fund raisers how did you pay for

12   the funeral expenses?

13        A.   From whatever I had saved I think.  I can't

14   remember exactly where we came up with the money.  I was

15   really just shocked at the time.  I can't remember

16   exactly.

17        Q.   You testified earlier that Mr. Dominguez lived

18   at a men's home beginning in May of 2017.  Is that

19   right?

20        A.   Yes.

21        Q.   Was that called Homes of a Loving Father?

22        A.   Yes.

23        Q.   I would like to show you a document.  Bear with

24   me for a moment, please.  Can you see the document?

25        A.   Yes.

                                                           48

1      A.   Yeah.

2      Q.   What was the program as far as you understand

3  it?

4      A.   It is a Christian men's home for sober living

5  environment.

6      Q.   I am going to shop sharing the document.  Did

7  Mr. Dominguez choose to go into this program?

8      A.   Yes.

9      Q.   Why as far as you know?

10     A.   Because he wanted to not drink alcohol.

11     Q.   Is that something that he talked about with you

12  wanting to go into this program because he didn't want

13  to drink alcohol?

14     A.   Yes.

15     Q.   Did Mr. Dominguez feel that he had a problem

16  with alcohol?

17     A.   Yes.

18     Q.   Is that something that he expressed to you?

19     A.   Yes.

20     Q.   When did he first express that to you?

21     A.   First time ever probably, I don't know, couple

22  of years before that.

23     Q.   When did he first -- did he at some point tell

24  you that he thought he should go into a sober living

25  program?

                                                        50

1        A.   At that time, yes.  2017, yes, is when he said

2   that he wanted to go to the program.  Before that, no.

3        Q.   How long before May of 2017 did he say he

4   wanted to go into a program?

5        A.   He didn't.

6        Q.   How did it first come up between the two of you

7   that you talked about him going into a sober living

8   program?

9        A.   Cause he didn't want to drink alcohol anymore.

10   Felt like he needed help.  That he couldn't do it on his

11   own.

12        Q.   When was that compared to May of 2017?

13        A.   That was in May when he said that he wanted to

14   go to the program.

15        Q.   Why did he choose the Homes of a Loving Father

16   program?

17        A.   I am sorry, why did he choose that one?

18        Q.   Yes.

19        A.   Cause it is Christian based.

20        Q.   Do you know how he heard about it?

21        A.   I think his cousin was in there prior to that

22   if I remember correctly.

23        Q.   In May of 2017 did you think that Mr. Dominguez

24   had a problem with alcohol?

25        A.   Yes.

                                                           51

1      A.   Yes.

2      Q.   Why?

3      A.   So he can have the tools that he needed to not

4  drink.

5      Q.   Did his drinking cause problems for him?

6      A.   Not necessarily.

7      Q.   What do you mean not necessarily?

8      A.   Like not significant problems, no.

9      Q.   Did it cause minor problems for him?

10      A.   Probably.

11      Q.   What kind of problems?

12      A.   Where he would want to leave.

13      Q.   Would want to leave the house or would want to

14  leave you?

15      A.   No, just leave the house for the day.

16      Q.   Sorry.  I am not quite sure what you mean by

17  that.  When he got drunk he would want to leave the

18  house?

19      A.   Uh-huh.

20      Q.   And go where?

21      A.   I don't know.

22      Q.   Did he sometimes leave the house because he was

23  drunk?

24      A.   Yeah.  Sometimes.

25      Q.   You don't know where he went?

                                                          53

1      Q.   Do you know whether he was with anyone else
2  when he was leaving the house for a day or so when he
3  was drunk?
4      A.   No.
5      Q.   Did he ever tell you what he did during those
6  times?
7      A.   No.
8      Q.   So is it right that Mr. Dominguez lived at
9  Homes of a Loving Father for a three-month period or so
10  in 2017?
11      A.   Yes.
12      Q.   Was he living in San Jose?
13      A.   Yes.
14      Q.   Did he ever come home during that period?
15      A.   Yes.
16      Q.   How often?
17      A.   I don't remember exactly, but he would get
18  passes to come home to visit us.
19      Q.   Did he ever stay the night at home during that
20  period?
21      A.   Yes.
22      Q.   More than one night in a row?
23      A.   No.  He wasn't allowed to more than one time,
24  more than one night anyway.
25      Q.   Were you allowed to visit him at the home?

                                                        55

```
 1        A.   Yes.
 2        Q.   Did you do that?
 3        A.   Yes.
 4        Q.   How many times do you think?
 5        A.   Quite often.  I can't remember an exact number,
 6   but very often.
 7        Q.   More than once a week?
 8        A.   Oh, yeah.
 9        Q.   Were your children allowed to visit him there?
10        A.   Yes.
11        Q.   Did they?
12        A.   Yes.
13        Q.   As frequently as you did?
14        A.   Yes.
15        Q.   Then Mr. Dominguez left that program in August
16   of 2017; is that right?
17        A.   Yes.
18        Q.   After he left the program did he go back to
19   living with your family?
20        A.   No.
21        Q.   Where did he live?
22        A.   I don't know.
23        Q.   Why didn't he go back to living with your
24   family?
25        A.   I don't know.  He wanted to.  We talked on the
```

                                                            56

1      phone.  He wanted to come home, but he never made it.  I

2      don't know.

3            Q.   Did you want him to come home?

4            A.   Yes.

5            Q.   Why did he leave the Homes of a Loving Father

6      program in August of 2017?

7            A.   I am sorry.  I didn't hear you.

8            Q.   I am sorry.  Why did he leave the Homes of a

9      Loving Father program in August of 2017?

10           A.   So I didn't know at the time.  I didn't know

11     this until even after his passing.  I thought that he

12     left willingly on his own, but I believe the person in

13     charge of the home made him leave because I think the

14     night before he left or something like that, like he

15     left when he wasn't supposed to, I think.  So then when

16     he went back they made him leave.  I think that is what

17     happened.  I am not even sure.

18           Q.   You don't know where he went when he left?

19           A.   No.

20           Q.   Did he ever spend the night at home after he

21     left the Homes of a Loving Father program?

22           A.   No.

23           Q.   But you were speaking to him on the phone

24     during that period between when he left the home and

25     when he died?

                                                              57

EXHIBIT 15

Atkinson-Baker, a Veritext Company
www.depo.com

1              UNITED STATES DISTRICT COURT

2            NORTHERN DISTRICT OF CALIFORNIA

3

4    JESSICA DOMINGUEZ, INDIVIDUALLY   )
     AND JESSICA DOMINGUEZ AS          )
5    GUARDIAN AD LITEM FOR JAD (1),    )
     JAD (2) AND JAD (3),              )
6                                      )
                    Plaintiffs,        )
7                                      )     Case No.:
            vs.                        )     5:18-CV-O4826
8                                      )
     CITY OF SAN JOSE, SAN JOSE POLICE )
9    DEPARTMENT, MICHAEL PINA, AND     )
     DOE POLICE OFFICERS 2 through 5,  )
10                                     )
                    Defendants.        )
11   _____)

12

13

14

15                 DEPOSITION OF

16            OFFICER ALVARO LOPEZ

17            SAN JOSE, CALIFORNIA

18               MARCH 1, 2021

19

20

21

22   ATKINSON-BAKER, a Veritext Company
     (800) 288-3376
23   www.depo.com

24   REPORTED BY:   THERESA KIELTY, CSR NO. 5037

25   FILE NO.:     AE088F4

Atkinson-Baker, a Veritext Company
www.depo.com

```
 1                  UNITED STATES DISTRICT COURT

 2                NORTHERN DISTRICT OF CALIFORNIA

 3

 4   JESSICA DOMINGUEZ INDIVIDUALLY    )
     AND JESSICA DOMINGUEZ AS          )
 5   GUARDIAN AD LITEM FOR JAD (1),    )
     JAD (2) AND JAD (3),              )
 6                                     )
                       Plaintiffs,     )
 7                                     )    Case No.:
              vs.                      )    5:18-CV-O4826
 8                                     )
     CITY OF SAN JOSE, SAN JOSE POLICE )
 9   DEPARTMENT, MICHAEL PINA, AND     )
     DOE POLICE OFFICERS 2 through 5,  )
10                                     )
                       Defendants.     )
11   _____)

12

13

14

15

16              Deposition of OFFICER ALVARO LOPEZ, taken on

17   behalf of Plaintiffs, at 200 East Santa Clara Street, San

18   Jose, California, 95113, commencing at 11:35 a.m., Monday,

19   March 1, 2021, before Theresa Kielty, CSR No. 5037.

20

21

22

23

24

25
```

Atkinson-Baker, a Veritext Company
www.depo.com

```
 1                A P P E A R A N C E S:

 2    FOR PLAINTIFFS:

 3    LAW OFFICES OF JOHN KEVIN CROWLEY
      BY:   JOHN KEVIN CROWLEY, Esq.
 4    125 S. Market Street
      Suite 1200
 5    San Jose, California    95113
      (408) 288-8100
 6    jkclaw@pacbell.net

 7    FOR DEFENDANTS:

 8    OFFICE OF THE CITY ATTORNEY
      BY:   MAREN CLOUSE, Esq.
 9    200 E. Santa Clara Street
      16th Floor
10    San Jose, California    95113
      (408) 535-1948
11    maren.clouse@sanjoseca.gov

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Atkinson-Baker, a Veritext Company
www.depo.com

1   entrance into the residence.

2       Q.   Okay.  So you detained Anchondo, Ruiz and Franco in

3   the residence?

4       A.   Outside.  We called them out.

5       Q.   Okay.  See, I didn't know that.

6       A.   We surround the residence and call everyone out of

7   the residence.

8       Q.   Like with a bullhorn, "Everyone come out with your

9   hands up," stuff like that?

10      A.   Yes.

11      Q.   Then you searched the residence?

12      A.   Correct.

13      Q.   What did you find, if anything, in terms of

14  weapons?

15      A.   There were a couple of replica -- I believe there

16  was one replica assault rifle and then at least -- I think at

17  least one more handgun that was also a replica.

18      Q.   What kind of a handgun was it?

19      A.   I don't remember.

20      Q.   Was it silver?

21      A.   I don't remember the color.

22      Q.   Any other handguns?

23      A.   There might have been.  I don't remember right now.

24      Q.   And did you interview any of those -- the arrestees

25  or suspects yourself?

Atkinson-Baker, a Veritext Company
www.depo.com

1       A.   Try to get compliance from there.  Continue to give

2   him commands.

3       Q.   So you heard a noise.  Did you think it was the

4   flash bang going off?

5       MS. CLOUSE:  Objection, vague.

6   BY MR. CROWLEY:

7       Q.   Do you want me to go back?

8       A.   Yeah.  What do you mean?

9       Q.   So we have the commands from the officers, the

10  compliance, then the non-compliance, both hands going down

11  and he bends over, and then the next thing that happens is

12  what?

13      A.   I reached down, I hear the bang, I heard someone

14  yell for a bang and I don't hear a bang being deployed so I

15  decided that I'm the one that's going to deploy the bang.  I

16  deploy the bang, and at that time, I felt like the bang was

17  deployed before the shooting.  Looking back, I know that it

18  was the shooting happened then the bang was deployed.

19      Q.   Okay.  So who yelled for the flash bang?

20      A.   It was either Pina or Ferguson.  I don't remember.

21      Q.   Okay.  And who was going to do the flash bang?  Who

22  had the flash bangs in their possession or vehicle?

23      A.   We all do.

24      Q.   So someone yelled for a flash bang, no one threw

25  one out there and you went to get one, and you -- did you

1    A.   Yes.

2    Q.   And so did you have time to stop the engagement of

3  the flash bang and unsafety your weapon and shoot him?

4    A.   I think that would have taken longer.

5    Q.   Well, the flash bang was irrelevant at the time he

6  was bending over in your mind, right?

7    MS. CLOUSE:   Objection, misstates his testimony and it's

8  argumentative.

9    THE WITNESS:   No, because I felt like Pina and Ferguson

10  had a better view of his actions versus me being behind and

11  not having a direct view of his face and his demeanor and

12  everything else that would help you determine whether it's a

13  shoot or no shoot situation.

14 BY MR. CROWLEY:

15   Q.   But you agree at the time he put his hands down and

16 leaned forward that was a precept to a lethal event, he was

17 going to pull out a gun and shoot people, right?

18   A.   Yes.

19   Q.   So the flash bang was not an appropriate defensive

20 device, right?

21   A.   No, I believe it was.

22   Q.   So you think a flash bang would have prevented him

23 from taking a weapon out and shooting people?

24   A.   I think it would have helped gain his compliance

25 and maybe put his hands right back up instead of coming down.