**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

| | |
|---|---|
| JESSICA DOMINGUEZ, et al., <br><br>  Plaintiffs, <br><br> v. <br><br> CITY OF SAN JOSE, et al., <br><br>  Defendants. | Case No. 18-cv-04826-BLF <br><br> **ORDER DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT; GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** <br><br> [Re: ECF Nos. 52, 55] |

In the aftermath of an alleged armed robbery involving Plaintiff Jacob Dominguez, officers obtained a warrant for his arrest and sought his apprehension upon locating Dominguez on September 15, 2017. While he was driving near Penitencia Creek Park in San Jose, California, three police vehicles pulled up and blocked Dominguez's vehicle's movement. Officers emerged from the vehicles, took out firearms, and ordered Dominguez to raise his hands. The confrontation, which lasted less than one minute, ended with Officer Michael Pina shooting and killing Dominguez as Dominguez sat in the driver's seat of his vehicle. This suit, brought against Pina, the City of San Jose, and the San Jose Police Department by Dominguez's wife (individually and as guardian ad litem for Dominguez and their three children), alleges that Pina used excessive force in violation of Dominguez's constitutional and statutory rights when Pina shot and killed him.

Now before the Court are competing motions for summary judgment brought by both Plaintiffs and Defendants. *See* ECF Nos. 52 ("PMSJ"), 55 ("DMSJ"), 62 ("PReply"), 64 ("DReply"). The Court held a hearing on the motions on April 21, 2022. Because the Court finds that there are genuine disputes of material fact regarding the circumstances of the shooting, the

Court DENIES Plaintiffs' motion for summary judgment and GRANTS IN PART AND DENIES IN PART Defendants' motion for summary judgment.

## I. BACKGROUND

### A. September 12–15, 2017 – Armed Robbery and Surveillance

In early September 2017, the Covert Response Unit of the San Jose Police Department began assisting the Regional Auto Theft Task Force in surveilling a stolen Mercedes driven by Andrew Anchondo. ECF No. 55-1 ("Clouse Decl.") Ex. 6 ("Pina Dep.") 27:4–22. On September 12, 2017, officers followed Anchondo to an ARCO gas station, and they were present when it was robbed. *Id.* 29:6–7. An individual later identified as Jacob Dominguez—husband of Plaintiff Jessica Dominguez and father of the three Plaintiff children—had gotten out of the stolen vehicle and purchased water at the gas station before Anchondo entered with a gun and robbed it. Clouse Decl. Ex. 8 ("Ferguson Dep.") 20:8–14. The two returned to the stolen vehicle and fled. Pina Dep. 30:19–31:3.

Officers followed the Mercedes to an area near San Jose City College, where Anchondo, Dominguez, and a woman later identified as Patricia Ruiz got out of the Mercedes and into a different stolen vehicle. *Id.* 33:16–34:1; Clouse Decl. Ex. 7 ("Lopez Dep.") 19:20–20:4, 38:11–14. Officers followed that vehicle to a house, where the three occupants were picked up in a third vehicle—what appeared to be a dark-colored Kia or similar boxy car—driven by someone who officers were told was Dominguez's girlfriend. Pina Dep. 34:5–35:20; Lopez Dep. 38:11–39:12. That vehicle was driven to a parking lot, where Anchondo, Dominguez, and Ruiz got into a fourth vehicle. Lopez Dep. 39:5–14; Ferguson Dep. 23:14–24:4. Officers attempted to surveil that vehicle but lost it later that night. Ferguson Dep. 24:1–4.

On September 13, 2017, Anchondo and Ruiz were arrested at a house in Morgan Hill. Pina Dep. 37:25–38:1; Lopez Dep. 49:11–18. While the arrests were occurring, officers saw Dominguez drive by in the Kia vehicle from the night before. Lopez Dep. 52:22–53:4. Officers attempted to follow the Kia but were unsuccessful. *Id.* On a search of the house, officers recovered ammunition for a .357 gun, but did not locate the gun itself. Pina Dep. 40:2–17. Officers then obtained a warrant for Dominguez's arrest on armed robbery charges. *See* ECF No.

1  55-5 ("Neumer Decl.") Ex. 5 (warrant dated September 14, 2017).

**B.     September 15, 2017 – Briefing, Vehicle Containment, and Shooting**

On September 15, 2017, Officers Pina, Lopez, Ferguson, and others met at a briefing to discuss attempts to apprehend Dominguez. Pina Dep. 20:9–25. Officers were informed that Dominguez had a history of arrests and convictions for armed robbery with a gun; carjacking; resisting arrest; possession of a firearm and illegal weapons; a gang enhancement; and being under the influence of a controlled substance. *Id.* 54:1–15. Officers were also told that Pina was an active gang member; officers know from experience that active gang members are likely to be armed in anticipation of confronting other gang members or police. Lopez Dep. 36:14–20. Officers also feared that Dominguez's purported girlfriend, who was present when Anchondo and Ruiz were arrested, may have tipped off Dominguez that police were looking for him. Pina Dep. 54:25–55:10. Finally, a source had told the police that Dominguez was armed with a revolver. *Id.* 55:16–56:6; Ferguson Dep. 74:2–23.

Officers then set out to attempt to find Dominguez. Officers located and began to surveil his girlfriend. Pina Dep. 57:13–23. Dominguez met up with her in his vehicle. *Id.* Officers followed him, but he began to drive erratically and officers believed Dominguez knew he was being surveilled. Lopez Dep. 59:15–60:14. An aircraft involved in the surveillance continued to relay Dominguez's location, and officers planned to apprehend him at the first opportunity. *Id.* 51:6–14; Pina Dep. 59:10–17.

Dominguez stopped at the intersection of Penitencia Creek and North White Road in San Jose. Pina Dep. 60:21–25. Officers attempted a Vehicle Containment Technique ("VCT"), a tactic in which multiple vehicles surround a suspect vehicle from different sides to box in the suspect vehicle and prevent its escape. *Id.* 59:18–62:22. Officers Pina, Lopez, and Ferguson each drove their unmarked vehicles on three separate sides of Dominguez's vehicle—Officer Pina to the front, Officer Ferguson to the driver's side door, and Officer Lopez to the rear. *Id.*; *see also* Neumer Decl. Ex. 3 at 00:25–39 (surveillance footage from nearby home showing three vehicle executing VCT). Officer Lopez sounded his siren and activated red and blue police lights. Lopez Dep. 67:10–21.

  Officer Pina exited the vehicle with a rifle and ran to Officer Ferguson's car, placing himself just across the hood of Officer Ferguson's car from where Dominguez was in the drivers' seat. Pina Dep. 67:11–24; Neumer Decl. Ex. 3 at 00:39–45; *id.* Ex. 1 ("Pina BWC")[1] at 2:03:15. Dominguez attempted to reverse out of the VCT but was not successful. Pina Dep. 65:24–66:4. Officers Pina and Ferguson both yelled at Dominguez to put his hands up. Neumer Decl. Ex. 2 ("Ferguson BWC") at 2:03:25–29. Officer Pina specifically said, "I'll shoot you, put your fucking hands up!" *Id.* at 2:03:27–28. Dominguez did not comply and Officer Pina could not see his hands. Pina Dep. 72:15–73:25. Instead, Officer Pina says Dominguez gave him a "'screw you' type look." *Id.*

  Dominguez then put his hands up to about shoulder level. Pina Dep. 79:9–80:26. Dominguez's wrists were "limp"—in Officer Ferguson's view, suggesting that Dominguez was "kind of like just not wanting to go on the program but kind of getting them up there just enough so we could see them in the window." Ferguson Dep. 72:5–12. Officer Pina then said, "Move and you get shot!" Ferguson BWC at 2:03:30. Dominguez then said either, "Fuck you, shoot me, bitch!" or "Fuck you, bitch, shoot me!" Pina Dep. 91:12–92:13. Officer Ferguson said, "Keep your hands up!" Ferguson BWC at 2:03:38.

  According to the officers, after keeping his hands up for a few seconds, Dominguez quickly dropped his hands out of sight and leaned down and forward toward the seat or floor. Pina Dep. 89:6–9, 95:2–22; Ferguson Dep. 78:7–11; Lopez Dep. 75:7–8. Officer Pina was aiming his rifle and "finding [his] sight" when Dominguez allegedly leaned forward. Pina Dep. 95:23–96:7, 97:3–10. Officer Ferguson says that once Dominguez dropped his hands below the sill of the window on the driver's door, he couldn't see his hands. Ferguson Dep. 67:7–20, 79:16–80:2. Officer Lopez, from his vantage point to the rear of the Kia, says he saw Dominguez bring his hands down and thought him to be "reaching for something." Lopez Dep. 63:21–24, 69:21–25, 75:9–76:14. Officers Pina and Ferguson again and repeatedly told Dominguez to put his hands up. Ferguson BWC at 2:03:38–42. As Dominguez was reaching down, all three officers believed he

---

[1] Citations to any bodyworn camera footage will cite to the timestamp in the top right corner.

4

was reaching for a gun.  Pina Dep. 95:23–96:7, 98:23–99:5; Lopez Dep. 86:5–8, 92:2–15; Ferguson Dep. 80:3–7.

As Dominguez was "coming up," Officer Pina fired two shots, killing Dominguez.  Pina Dep. 97:3–10; Ferguson BWC 2:03:42–43.  No firearm was found in Dominguez's vehicle.  No bodyworn camera footage captures any view of Dominguez throughout the entire incident because of obstructions from the officers' clothing or the positioning of officers during the incident.

### C.   Aftermath – Forensic Reports and Expert Opinions

A crime lab report states that one bullet struck Dominguez in the jaw and lodged in his neck.  Clouse Decl. Ex. 10 ("Balash Rpt.") at 6.  A second bullet was found on the interior passenger side of the vehicle.  *Id.* at 4.  The report also states that a bullet hole was found on the left forearm of the sleeve of the sweatshirt Dominguez was wearing.  *Id.* at 6.

Plaintiffs' proffered ballistic expert is David Balash.  *See generally* Balash Rpt.  According to Mr. Balash, Officer Pina's first shot struck and shattered the car window, deforming the bullet which then struck Dominguez in the jaw and lodged in his neck.  Clouse Decl. Ex. 9 ("Balash Dep.") 19:10–14.  The second bullet passed through Dominguez's sweatshirt sleeve before striking and lodging in the passenger side of the vehicle.  *Id.* 20:9–14.  Mr. Balash opines that because of the location of the bullet hole on Dominguez's sweater and the location of the bullet on the passenger side of the vehicle, Dominguez's arm must have been above the car door's window frame when the second bullet passed through the shirt.  *Id.* at 21:11–21.

Defendants' expert Dr. John Black is an expert in police training and decision-making.  *See* Clouse Decl. Ex. 11 ("Black Rpt.").  Dr. Black opines that officers are trained that initiators of an action have an advantage, and that suspects are often the initiators.  *Id.* at 11.  His opinion is allegedly supported by research showing that "when the suspect [or] threat is the initiator of the action, the officer will be unable to react quicker than the suspect."  *Id.*  Officers thus take from 0.31 to 0.39 seconds to react to the movement of a suspect.  *Id.* at 9–10.  In Dr. Black's opinion, Officer Pina thus "did not have sufficient time to ascertain with any degree of certainty if [] Dominguez actually had gained control of a firearm" because "he would be anywhere from ¼ to ½ a second behind [] Dominguez's movements."  *Id.* at 23–24.

### D. Procedural History

Plaintiff Jessica Dominguez—in her individual capacity and as guardian ad litem for Dominguez and their three children—filed this lawsuit on August 9, 2018. ECF No. 1. The operative complaint is the Second Amended Complaint filed on April 12, 2019, *see* ECF No. 37 ("SAC"), to which Defendants filed answers on April 15, 2019, *see* ECF Nos. 38, 39. Plaintiffs bring three claims against Defendants City of San Jose, San Jose Police Department, and Michael Pina: (1) a claim under 42 U.S.C. § 1983 for use of excessive force; (2) a claim under the California Bane Act, Cal. Civ. Code § 52.1; and (3) a claim under the California Ralph Act, Cal. Civ. Code § 51.7. Compl. ¶¶ 16–40.[2]

Nearly three years after the Second Amended Complaint was filed, Plaintiffs moved for summary judgment. *See* PMSJ. Defendants filed a cross-motion for summary judgment. *See* DMSJ. Both parties filed a simultaneous combined opposition and reply briefs. *See* PReply, DReply.

## II. LEGAL STANDARD

"A party is entitled to summary judgment if the 'movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1049 (9th Cir. 2014) (quoting Fed. R. Civ. P. 56(a)). A fact is "material" if it "might affect the outcome of the suit under the governing law," and a dispute as to a material fact is "genuine" if there is sufficient evidence for a reasonable trier of fact to decide in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The party moving for summary judgment bears the initial burden of informing the Court of the basis for the motion and identifying portions of the pleadings, depositions, answers to interrogatories, admissions, or affidavits that demonstrate the absence of a triable issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To meet its burden, "the moving party must either produce evidence negating an essential element of the nonmoving party's claim or

---

[2] The final two paragraphs of the Second Amended Complaint prior to the Prayer for Relief are misnumbered as paragraphs "47" and "39" when they should be paragraphs "39" and "40," respectively.

6

defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000). In judging evidence at the summary judgment stage, the Court "does not assess credibility or weigh the evidence, but simply determines whether there is a genuine factual issue for trial." *House v. Bell*, 547 U.S. 518, 559-60 (2006). Where the moving party will have the burden of proof on an issue at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party. *Celotex*, 477 U.S. at 325; *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007).

If the moving party meets its initial burden, the burden shifts to the nonmoving party to produce evidence supporting its claims or defenses. *Nissan Fire*, 210 F.3d at 1103. If the nonmoving party does not produce evidence to show a genuine issue of material fact, the moving party is entitled to summary judgment. *Celotex*, 477 U.S. at 323. "The court must view the evidence in the light most favorable to the nonmovant and draw all reasonable inferences in the nonmovant's favor." *City of Pomona*, 750 F.3d at 1049. "[T]he 'mere existence of a scintilla of evidence in support of the [nonmovant's] position'" is insufficient to defeat a motion for summary judgment. *First Pac. Networks, Inc. v. Atl. Mut. Ins. Co.*, 891 F. Supp. 510, 513–14 (N.D. Cal. 1995) (quoting *Liberty Lobby*, 477 U.S. at 252). "'Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.'" *First Pac. Networks*, 891 F. Supp. at 514 (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

## III. DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Both Plaintiffs and Defendants move for summary judgment. *See* PMSJ, DMSJ. The Court will analyze Defendants' motion first.

### A. Claim 1 – 42 U.S.C. § 1983

Defendants move for summary judgment on Plaintiffs' first claim for excessive force under 42 U.S.C. § 1983. *See* DMSJ at 10–20. This claim is brought against both Officer Pina and the two entity defendants. *See* SAC ¶¶ 16–25. Because different legal standards govern § 1983 claims for those entities, the Court will address them separately.

### i. Officer Pina

Defendants argue that Officer Pina did not violate the Constitution when he shot Dominguez twice because he was reacting to an "imminent deadly threat," and his conduct did not violate clearly established law, and thus is entitled to qualified immunity. DMSJ at 10–17. Under *Graham v. Connor*, 490 U.S. 386, 395 (1989), Defendants say that Officer Pina reasonably perceived an imminent deadly threat when he encountered Dominguez, who was believed to have a weapon, was known to have participated in armed robberies, had a history of crimes involving firearms, and was actively trying to evade police. *Id.* at 10–11, 16–17. Officer Pina, Defendants say, was not required to view a weapon before reacting to Dominguez's movement downwards. *Id.* at 12–16. Because no constitutional violation occurred, Officer Pina is entitled to qualified immunity, Defendants contend. *Id.* at 17–20. Plaintiffs respond that no qualified immunity is warranted because case law has established that using lethal force against Dominguez in these circumstances was excessive and unreasonable. *See* PReply at 13–23. Plaintiffs cite cases they contend clearly establish that the use of force was excessive. *Id.*

"The doctrine of qualified immunity protects government officials from liability for civil damages 'unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct.'" *Wood v. Moss*, 572 U.S. 744, 745 (2014) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011)). In *Saucier v. Katz*, 533 U.S. 194 (2001), the Supreme Court set forth a two-part approach for analyzing qualified immunity. The initial constitutional inquiry requires the court to determine this threshold question: "Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" *Saucier*, 533 U.S. at 201. If the Court determines that a constitutional violation could be made out based on the parties' submissions, the second step is to determine whether the right was clearly established. *Id.* "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* at 202. The Supreme Court has clarified that the sequence of analysis set forth in *Saucier* is not mandatory and that a court may exercise its sound discretion in

8

determining which of the two prongs of the qualified immunity analysis to address first. *Pearson v. Callahan*, 555 U.S. 223, 241–42 (2009).

The Supreme Court recently reiterated the longstanding principle that "the clearly established right must be defined with specificity." *City of Escondido v. Emmons*, 139 S. Ct. 500, 503 (2019). Defining the right at too high a level of generality "avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced." *District of Columbia v. Wesby*, 138 S. Ct. 577, 590 (2018) (quoting *Plumhoff v. Rickard*, 572 U.S. 765 (2014)). "[A] defendant cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." *Plumhoff*, 134 S. Ct. at 2023. There can, however, be "the rare 'obvious case,' where the unlawfulness of the officer's conduct is sufficiently clear even though existing precedent does not address similar circumstances." *Vazquez v. City of Kern*, 949 F.3d 1153, 1164 (9th Cir. 2020) (quoting *Wesby*, 138 S. Ct. at 590).

The Court finds that granting qualified immunity to Officer Pina turns on accepting Defendants' version of disputed facts, so qualified immunity is not appropriate at present. *See Estate of Aguirre v. Cnty. of Riverside*, 29 F.4th 624, 630 (9th Cir. 2022) ("[c]ritical disputes of fact render[ed] summary judgment premature" in police violence case where police claimed qualified immunity); *Espinosa v. City & Cnty. of San Francisco*, 598 F.3d 528, 532 (9th Cir. 2010) (affirming denial of summary judgment on qualified immunity grounds because there were genuine issues of fact regarding whether the officers violated plaintiff's Fourth Amendment rights, which were also material to a proper determination of the reasonableness of the officers' belief in the legality of their actions).

The central and material factual dispute in this case is the course of action that Dominguez took after his arms were raised in response to officers' commands. Defendants contend that Dominguez reached down toward his seat so that his hands were obscured from view of the officers, who believed him to be reaching for a weapon they suspected he possessed. *See* Pina Dep. 89:6–9, 95:2–22; Ferguson Dep. 78:7–11; Lopez Dep. 75:7–8. Plaintiffs, however, assert

that based on forensic evidence, Dominguez was shot when his hands were raised above the sill of the driver's window. Their proffered expert Mr. Balash opines that because the second bullet passed through Domingez's shirt sleeve and lodged in the passenger side door, the bullet must have passed through his shirt sleeve when he had his arms up. *See* Balash Dep. 21:11–21. And although unknown to Officer Pina at the time, Dominguez did not in fact have a weapon in the car, which could cast some doubt on the officers' testimony about Dominguez's actions. Dominguez, of course, is unable himself to offer his own version of events through testimony because he was killed during the altercation.

The Ninth Circuit confronted a similar situation in *Cruz v. City of Anaheim*, 765 F.3d 1076 (9th Cir. 2014), in which the court partially reversed and remanded a district court's grant of summary judgment to police officers. In *Cruz*, acting on a tip from a confidential informant that Cruz was selling methamphetamine and carrying a gun in his waistband, several Anaheim police officers converged on Cruz's vehicle's location. *Id.* at 1077–78. Officers surrounded Cruz in their vehicles, and Cruz's attempt to escape failed when he backed his car into one of the patrol vehicles. *Id.* at 1078. Cruz opened his door, and police shouted at him to get on the ground. *Id.* According to four officers, "[Cruz] ignored their commands and instead reached for the waistband of his pants. Fearing that he was reaching for a gun, all five officers opened fire." *Id.* After firing, officers found Cruz dead and tangled in his seatbelt. *Id.* Officers found no weapon on Cruz's body but did locate a handgun near the passenger seat. *Id.* The district court granted summary judgment to the officers, finding that Cruz's decedents "hadn't presented anything to contest the offices' version of events." *Id.*

The Ninth Circuit reversed in relevant part. The court first noted that "i[t] would be unquestionably reasonable for police to shoot a suspect in Cruz's position if he reaches for a gun in his waistband, or even if he reaches there for some other reason." *Cruz*, 765 F.3d at 1078 ("Given Cruz's dangerous and erratic behavior up to that point, the police would doubtless be justified in responding to such a threatening gesture by opening fire."). "Conversely, [however,] if the suspect *doesn't* reach for his waistband or make some similar threatening gesture, it would clearly be unreasonable for the officers to shoot him after he stopped his vehicle and opened the

10

door." *Id.* at 1078–79. Thus, to decide the case, "a jury would have to answer just [the] simple question" of whether "police [saw] Cruz reach for his waistband." *Id.* at 1079. The Ninth Circuit faulted the district court for relying solely on the testimony of the officers in saying that no reasonable jury could find that Cruz didn't reach for his waistband. "Because the person most likely to rebut the officers' version of events—the one killed—can't testify, '[t]he judge must carefully examine all the evidence in the record . . . to determine whether the officer's story is internally consistent and consistent with other known facts.'" *Id.* (quoting *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994)). This includes "circumstantial evidence that, if believed, would tend to discredit the police officers' story." *Id.* The Ninth Circuit noted the existence of such circumstantial evidence. Cruz did not have a gun on his person—"so why would he have reached for his waistband?" *Id.* Cruz also saw that he was completely surrounded by police, so it "would have been foolish" to try to "fast-draw his weapon in an attempt to shoot his way out." *Id.* A jury could doubt that Cruz made that "foolish" decision. *Id.* It could also be "skeptical" that all four officers saw Cruz reach for his waistband because that would require "four pairs of eyes [to have] a line of sight to Cruz's hand as he stood between the open car door and the SUV." *Id.* The jury could also question officers' credibility given identical testimony given by one of the officers in a previous similar shooting case, or find curious that Cruz was found still constrained by his seat belt after his death despite the officers' testimony that he had opened the door and began to emerge from the vehicle. *Id.* at 1080. Given these "curious and material factual discrepancies," the district court erred in granting summary judgment to the officers. *Id.*

The Court finds that there are striking similarities between this case and *Cruz*. Because Dominguez is deceased and can't testify, the Court is left only with the officers' story, and so it must determine if the officers' testimony is "internally consistent and consistent with other known facts," including circumstantial evidence that might "discredit the police officers' story." *Cruz*, 765 F.3d at 1079. There is circumstantial evidence here that, if believed, would tend to discredit officers' testimony. First, Dominguez did not have a gun on his person or in his vehicle. This raises the same question as in *Cruz*: why would Dominguez have reached down in a motion associated for reaching for a weapon when he in fact did not have one? Second, as in *Cruz*, the

11

three officers have entirely consistent testimony that they saw Dominguez reach down, despite each of them being in different positions and admitting at other junctures that their line of sight was not entirely clear. Third, and again as in *Cruz*, Dominguez saw that he was surrounded by police officers and failed in his attempt to flee when his vehicle hit one of the police vehicles. Reaching down to seek a (nonexistent) gun and shoot his way out in those circumstances would have been "foolish." *Id.* at 1079. Finally, there is forensic evidence that (in one expert's opinion) suggests that Dominguez's hands were raised when Officer Pina fired the second shot. All of this circumstantial evidence could lead a jury to discredit officers' testimony and find that Officer Pina shot Dominguez when his hands were raised. *Contra* GReply at 11–12 (arguing that "[n]o such [circumstantial] evidence exists here," unlike in *Cruz*).

To be clear, the Court is neither rejecting the officers' version of events nor accepting Dominguez's. *Accord Cruz*, 765 F.3d at 1080 ("We make no determination about the officers' credibility, because that's not our decision to make."). Nor is it finding that one version of events is more credible than the other. The Court merely holds that there is sufficient circumstantial evidence that, if accepted, could lead a reasonable jury to question officers' version of events. If a jury did so and found that Dominguez had his hands raised when he was shot, "it would clearly be unreasonable for officers to shoot him" and Officer Pina would not be entitled to qualified immunity. *Id.* at 1078.

Officer Pina is not entitled to qualified immunity on this claim at this stage of the case. His motion for summary judgment on claim one is thus DENIED.

      **ii. City of San Jose and San Jose Police Department**

Claim one is also asserted against the City of San Jose and San Jose Police Department. *See* SAC ¶¶ 16–25. Defendants argue that the City and the Department are entitled to summary judgment on this claim because Plaintiffs have identified no policy, custom, or practice that was the "moving force" behind the violation or a pattern of similar incidents. DMSJ at 20 (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978)). Plaintiffs respond that the *Monell* claim is based on (1) "the brutal and deadly manner" in which Defendants seized and used unreasonable force against Dominguez; (2) "the failures of the [D]efendant[s'] decision making"; (3) the

1    promotion of Officer Pina to Sergeant Pina following the incident; and (4) a report issued by the
2    District Attorney after the incident. PReply at 23–26.

3    "The Supreme Court in *Monell* held that municipalities may only be held liable under
4    section 1983 for constitutional violations resulting from official…policy or custom." *Benavidez v.*
5    *Cty. of San Diego*, 993 F.3d 1134, 1153 (9th Cir. 2021) (citing *Monell*, 436 U.S. at 694).
6    "[P]olicies can include written policies, unwritten customs and practices, failure to train municipal
7    employees on avoiding certain obvious constitutional violations, … and, in rare instances, single
8    constitutional violations [that] are so inconsistent with constitutional rights that even such a single
9    instance indicates at least deliberate indifference of the municipality[.]" *Id.* at 1153 (internal
10   citations omitted). "A municipality may [also] be held liable for a constitutional violation if a
11   final policymaker ratifies a subordinate's actions." *Lytle v. Carl*, 382 F.3d 978, 987 (9th Cir.
12   2004). "In order to establish liability for governmental entities under *Monell*, a plaintiff must
13   prove '(1) that [the plaintiff] possessed a constitutional right of which [s]he was deprived; (2) that
14   the municipality had a policy; (3) that this policy amounts to deliberate indifference to the
15   plaintiff's constitutional right; and, (4) that the policy is the moving force behind the constitutional
16   violation.'" *Dougherty v. City of Covina*, 654 F.3d 892, 900 (9th Cir. 2011) (alterations in
17   original) (quoting *Plumeau v. Sch. Dist. No. 40 Cty. of Yamhill*, 130 F.3d 432, 438 (9th Cir.
18   1997)). The Court evaluates each species of *Monell* liability in turn.

19   <u>Policy, Custom, or Practice</u>. A municipality may be held liable on the basis of an
20   unconstitutional policy if a plaintiff can "prove the existence of a widespread practice that,
21   although not authorized by written law or express municipal policy, is 'so permanent and well
22   settled as to constitute a "custom or usage" with the force of law.'" *City of St. Louis v. Praprotnik*,
23   485 U.S. 112, 127 (1988) (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 167–168 (1970)).
24   "Liability for improper custom may not be predicated on isolated or sporadic incidents"—rather,
25   "[t]he custom must be so persistent and widespread that it constitutes a permanent and well settled
26   city policy." *Trevino v. Gates,* 99 F.3d 911, 918 (9th Cir. 1996) (internal citations omitted).

27   Plaintiffs here identify no other incidents similar to this one that would support liability for
28   a policy, custom, or practice. Plaintiffs' first two assertions—the "brutal and deadly manner" of

the officers' actions and the "failures of [their] decision making—both relate only to this event. The other two—the promotion of Officer Pina to Sergeant Pina and the District Attorneys' report on the incident—post-date this incident and do not amount to policies, customs, or practices. *Trevino*, 99 F.3d at 918. Because Plaintiffs identify no other distinct incidents, they have not identified a policy, custom, or practice upon which *Monell* liability could be founded.

Failure to Train. "Failure to train an employee who has caused a constitutional violation can be the basis for § 1983 liability where the failure to train amounts to deliberate indifference to the rights of persons with whom the employee comes into contact." *Long v. City of Los Angeles*, 442 F.3d 1178, 1186 (9th Cir. 2006) (citing *City of Canton v. Harris*, 489 U.S. 378, 388 (1989)). This standard is met when "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *Canton*, 489 U.S. at 390. "Only where a failure to train reflects a 'deliberate' or 'conscious' choice by a municipality—a 'policy' as defined by our prior cases—can a city be liable for such a failure under § 1983." *Id.* at 389. And only under such circumstances does the failure to train constitute "a policy for which the city is responsible, and for which the city may be held liable if it actually causes injury." *Id.* at 390. "A pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train." *Connick v. Thompson*, 563 U.S. 51, 62 (2011) (internal citations omitted).

Here again, Plaintiffs have failed to point to "[a] pattern of similar constitutional violations by untrained employees" such that the City or Department could be found liable for a failure to train. In the absence of any such evidence, failure to train cannot be grounds for *Monell* liability. *Connick*, 563 U.S. at 62.

Ratification. "A municipality may be held liable for a constitutional violation if a final policymaker ratifies a subordinate's actions." *Lytle v. Carl*, 382 F.3d 978, 987 (9th Cir. 2004). "To show ratification, a plaintiff must show that the authorized policymakers approve a subordinate's decision and the basis for it." *Id.* (internal quotation marks and citation omitted). The policymaker must have knowledge of the constitutional violation and actually approve of it –

14

a failure to overrule a subordinate's actions, without more, is insufficient to support a § 1983 claim. *Id.* In other words, ratification requires an authorized policymaker to make a "conscious, affirmative choice" to endorse subordinate's actions. *Gillette v. Delmore*, 979 F.2d 1342, 1346-47 (9th Cir. 1992). A policymaker's after-the-fact approval of a subordinate's conduct that caused the alleged constitutional violations may be used as evidence that a municipality had a pre-existing policy that caused the alleged constitutional violations. *Silva v. San Pablo Police Dep't*, 805 F. App'x 482, 485 (9th Cir. 2020). To show that ratification was a "moving force" behind the constitutional deprivation, a plaintiff must demonstrate both causation in fact and proximate causation. *Arnold v. Int'l Bus. Machs. Corp.*, 637 F.2d 1350, 1355 (9th Cir. 1981); *Dougherty v. City of Covina*, 654 F.3d 892, 900-901 (9th Cir. 2011).

Plaintiffs point to two post-incident events as grounds for a ratification theory: the promotion of Officer Pina to Sergeant Pina and a report by the District Attorney's office about the incident. Neither can support a ratification theory. A post-incident promotion is insufficient alone as a grounds for *Monell* liability. *See Dizon v. City of S. San Francisco*, 2018 WL 5023354, at *5 (N.D. Cal. Oct. 16, 2018) (citing cases); *see also Moua v. McAbee*, 2007 WL 3492157, at *13 (E.D. Cal. Nov. 14, 2007) (granting summary judgment for defendant on *Monell* claim where plaintiff failed to submit evidence that "any command level policymaker promoted [the officer] or that any supervisor had knowledge of the alleged conduct, let alone that such person made a 'conscious affirmative choice to ratify the conduct in question'"). Here, Plaintiffs point to the mere fact of Officer Pina's promotion, but offer no other evidence that any policymaker made a "conscious affirmative choice" to ratify Officer Pina's conduct in this case by promoting him. The District Attorney's report suffers from the same defect. Moreover, the District Attorney is a separately elected official with no control over the City of San Jose or its officers. Accordingly, no evidence supports a ratification theory of *Monell* liability.

Because the Court has found that Defendants have shown that there is no genuine dispute of material fact supporting the City or Department's liability under *Monell*, Defendants' motion for summary judgment on claim one as to the City and Department is GRANTED.

### B. Claim 2 – Bane Act

Defendants next move for summary judgment on the Bane Act claim. *See* DMSJ at 21–22. They argue that Officer Pina did not violate the Bane Act because, even if there is a genuine dispute of material fact regarding whether Officer Pina committed a constitutional violation, there is no evidence that Officer Pina had a specific intent to "not only use force, but intent to use unreasonable force." *See id.* (citing *Reese v. Cty. of Sacramento*, 888 F.3d 1030, 1043 (9th Cir. 2018) (quoting *Cornell v. City & Cnty. of San Francisco*, 17 Cal. App. 5th 766, 800 (2017)). Plaintiffs respond that use of unreasonable force under the Fourth Amendment is a *per se* violation of the Bane Act. PReply at 26–27.

The Court finds that Defendants are not entitled to summary judgment on this claim. "[C]ourts have considered recklessness sufficient to meet *Cornell*'s specific intent requirement." *Ochoa v. City of San Jose*, 2021 WL 7627630, at *16 (N.D. Cal. Nov. 17, 2021); *accord Reese*, 888 F.3d at 1045 ("[I]t is not necessary for defendants to have been thinking in constitutional or legal terms at the time of the incidents, because a reckless disregard for a person's constitutional rights is evidence of a specific intent to deprive that person of those rights."). While Plaintiffs are incorrect that a Fourth Amendment violation is *per se* a violation of the Bane Act, *see Ochoa*, 2021 WL 7627630, at *16 (citing *Sandoval v. Cnty. of Sonoma*, 912 F.3d 509, 520 (9th Cir. 2018)), the Court finds that there is a genuine dispute of material fact regarding the recklessness of Officer Pina's conduct given the circumstantial evidence in this case that a reasonable jury could find undermines the officers' version of events. That circumstantial evidence is sufficient to allow the Bane Act claim against Defendants to go forward.

Defendants' motion for summary judgment on claim two is DENIED.

### C. Claim 3 – Ralph Act

Finally, Defendants move for summary judgment on Plaintiffs' third claim for violation of the Ralph Act. *See* DMSJ at 22–23. Defendants say that there is no evidence that Officer Pina was motivated to shoot Dominguez because of his race or other protected characteristic. *Id.* Plaintiffs counter that Dominguez is "readily identified as a Hispanic male" and that Defendants' "actions are so outrageous and inconsistent to the situation they encountered such that [P]laintiffs

16

1   allege that it must have been motivated by racial animus." PReply at 26–27.

2         The Ralph Act provides that "[a]ll persons within [California] have the right to be free
3   from any violence, or intimidation by threat of violence, committed against their persons or
4   property" because of race. Cal. Civ. Code § 51.7. A plaintiff must show that a defendant
5   "threatened or committed violent acts against [him]" and "was motivated by his perception of the
6   plaintiff's race." *Knapps v. City of Oakland*, 647 F. Supp. 2d 1129, 1167 (N.D. Cal. 2009). To
7   survive summary judgment, the evidence of racial bias must be "specific and substantial." *Lindsey
8   v. SLT Los Angeles, LLC*, 447 F.3d 1138, 1152 (9th Cir. 2006). A "plaintiff's subjective belief . . .
9   that a defendant's conduct is motivated by discriminatory intent is not sufficient to defeat
10  summary judgment." *Hutton v. City of Berkeley Police Dep't*, 2014 WL 4674295, at *10 (N.D.
11  Cal. Sep. 9, 2014).

12        The Court agrees with Defendants that they are entitled to summary judgment on this
13  claim. Plaintiffs have pointed to no evidence, much less "specific and substantial" evidence, that
14  Officer Pina acted as a result of racial animus. Plaintiffs' grounds for their Ralph Act claim come
15  down to their own "subjective belief" that Officer Pina acted out of racial animus because of what
16  they see as "outrageous and inconsistent" actions by Officer Pina. This is not sufficient to sustain
17  a Ralph Act claim. *Hutton*, 2014 WL 4674295, at *10.

18        Defendants' motion for summary judgment on the Ralph Act claim is GRANTED.

### IV. PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

20        Plaintiffs also move for summary judgment on all three of their claims. *See* PMSJ. The
21  Court's analysis in the context of Defendants' motion resolves Plaintiffs' motion for summary
22  judgment.

23        On claim one as to Officer Pina, the Court has found that there are disputes of material fact
24  regarding Dominguez's actions after officers executed the VCT. *See supra* Section III.A.i.
25  Plaintiffs have offered circumstantial evidence that could lead a jury to discredit officers'
26  testimony, but viewed in a light most favorable to Defendants, the jury could also reject the
27  circumstantial evidence and agree with the officers' story. Summary judgment for Plaintiffs on
28  claim one as to Officer Pina is thus DENIED.

17

On claim one as to the City of San Jose and San Jose Police Department and claim three, the Court has granted Defendants' motion for summary judgment. *See supra* Section III.A.ii, III.C. Plaintiffs' motion for summary judgment on those claims is thus DENIED.

On claim two, the Court has denied Defendants' motion for summary judgment in light of the disputed issues of material fact discussed in the context of claim one. Those same disputed facts are material to Plaintiffs' motion. *See supra* Section III.B. Summary judgment for Plaintiffs on this claim is thus DENIED.

## V. ORDER

For the foregoing reasons, IT IS HEREBY ORDERED that:

- Plaintiffs' motion for summary judgment is DENIED; and
- Defendants' motion for summary judgment is GRANTED as to (1) Plaintiffs' first claim for violation of 42 U.S.C. § 1983 as to Defendants City of San Jose and San Jose Police Department (*Monell* claims); and (2) Plaintiffs' third claim for violation of Cal. Civ. Code § 51.7 as to all Defendants. Defendants' motion for summary judgment is DENIED in all other respects.

The existing case schedule (ECF No. 24) remains in effect.

Dated: May 16, 2022

BETH LABSON FREEMAN
United States District Judge

18